IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JASON SCOTT,<br><br>Plaintiff,<br><br>v.<br><br>UPS SUPPLY CHAIN SOLUTIONS,<br><br>Defendant. | ) | C.A. NO. 10-cv-929-RGA |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Jennifer C. Jauffret, Esq. (#3689)
Jauffret@rlf.com
Lori A. Brewington, Esq. (#4522)
Brewington@rlf.com
RICHARDS, LAYTON & FINGER
One Rodney Square, P.O. Box 551
920 N. King Street
Wilmington, Delaware 19899
(302) 651-7700

Emmett F. McGee, Jr., Esq. (admitted *pro hac vice*)
Ariana Wright Arnold, Esq. (admitted *pro hac vice*)
JACKSON LEWIS LLP
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209

*Counsel for Defendant,*
*UPS Supply Chain Solutions, Inc.*

# TABLE OF CONTENTS

**PAGE**


TABLE OF AUTHORITIES .......... ii

I. INTRODUCTION .......... 1

II. STATEMENT OF FACTS .......... 1

A. SCS Operations In Newark Delaware .......... 1

B. Scott's Employment by Kelly Services .......... 2

C. Scott's Temporary Assignment At SCS .......... 2

D. Scott's Attendance Problems .......... 4

E. The Move; September 11, 2009 .......... 4

F. SCS Discovers the Inconsistency Between Scott's Arrival Time and Time Entry .......... 6

G. Scott's Temporary Assignment At SCS Ends .......... 8

III. LEGAL STANDARD .......... 9

IV. LEGAL ARGUMENT .......... 10

A. Scott Was Not an Employee of SCS .......... 10

B. SCS Is Entitled To Summary Judgment Because He Cannot Establish that His Assignment at UPS Was Terminated Because of His Sexual Orientation. .......... 13

1. UPS/ SCS Decision-Makers Were not Aware of Scott's Sexual Orientation. .......... 14

2. Scott's Assignment Ended for Legitimate Non-Discriminatory Reasons Unrelated to his Sexual Orientation; The Sincere Belief that Scott Had Falsified His Time Records .......... 15

3. Scott Cannot Establish Pretext .......... 16

V. CONCLUSION .......... 19

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abramson v. William Paterson Coll. of N.J.*,
260 F.3d 265 (3d Cir. 2001)....................16

*Alexander v. Rush N. Shore Med. Ctr.*,
101 F.3d 487 (7th Cir. 1996) ....................11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................9, 10

*B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*,
825 F. Supp. 65 (D. Del. 1993)....................9

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................9, 10

*Elrod v. Sears, Roebuck & Co.*,
939 F.2d 1466 (11th Cir. 1991) ....................16

*Featherson v. Montgomery Cnty. Sch.*,
739 F. Supp. 1021 (D. Md. 1990)....................15

*Fogleman v. Mercy Hospital, Inc.*,
283 F.3d 561 (3d Cir. 2002)....................9

*Fuentes v. Perskie*,
32 F.3d 759 (3d Cir. 1994)....................13, 14, 17

*Geraci v. Moody-Tottrup Int, Inc.*,
82 F.3d 578 (3d Cir. 1996)....................14

*Giles v. Norman Noble, Inc.*,
88 Fed. Appx. 890 (6th Cir. 2004)....................19

*Green v. National Steel Corp., Midwest Div.*
197 F.3d 894 (7th Cir. 1999) ....................16

*Hedberg v. Indiana Bell Tele. Co.*,
47 F.3d 928 (7th Cir. 1995) ....................15

*Holmes v. J.P. Morgan Chase Nat'l Corporate Servs., Inc.*,
2010 U.S. Dist. LEXIS 4124 (E.D. Mich. Jan. 20, 2010).................... 18-19

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*,
90 F.3d 737 (3d Cir. 1996)....................................................................................9

*J.A. Moore Constr. Co. v. Sussex Assocs. Ltd.*,
688 F. Supp. 982 (D. Del. 1988)............................................................................9

*Jackson v. Kenney*,
762 F. Supp. 863 (W.D. Mo. 1991).......................................................................15

*Matsushita Electrical Indust. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..............................................................................................10

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973).................................................................... 13, 14, 16-17

*Miller v. Delaware Dep't of Prob. & Parole*,
158 F. Supp. 2d 406 (D. Del. 2001), *aff'd*, 41 Fed. Appx. 581 (3d Cir. 2001)........................13

*Mitchell v. Wachovia Corp.*,
556 F. Supp. 2d 336 (D. Del. 2008)..........................................................13, 16

*Ringer v. Fallis*,
848 F. Supp. 519 (D. Del. 1994)...........................................................................10

*Robinson v. Adams*,
847 F.2d 1315 (9th Cir. 1987), *cert. denied*, 490 U.S. 1105 (1989).......................................15

*Sarullo v. United States Postal Serv.*,
352 F.3d 789 (3d Cir. 2003).................................................................................13

*Shah v. Bank of Am.*,
346 Fed. Appx. 831 (3d Cir. 2009).......................................................................11

*Shah v. Bank of Am.*,
598 F. Supp. 2d 596 (D. Del. 2009), *aff'd.*, 346 Fed. Appx. 831 (3d Cir. 2009).........11, 12, 13

*Willett v. Illinois*,
1999 U.S. Dist. LEXIS 18026 (N.D. Ill. Nov. 10, 1999) .......................................19

**STATUTES & RULES**

Fed. R. Civ. P. 56(a) ..............................................................................................9

Fed. R. Civ. P. 56(e) ..............................................................................................9

Defendant, UPS Supply Chain Solutions, Inc. (hereinafter also referred to as "SCS" or "Defendant"), by its undersigned counsel, submits this Memorandum in Support of its Motion for Summary Judgment, and states as follows:

## I. INTRODUCTION

Plaintiff Jason Scott has filed a Complaint against Defendant SCS claiming entitlement to relief under Delaware's anti-discrimination laws based on his claim that his temporary assignment with SCS was terminated as a result of alleged discrimination on the basis of his sexual orientation. However, Scott is simply not entitled to the relief he seeks. First, he was an employee of Kelly Services, and not of SCS, and was merely assigned to SCS on a temporary basis. Second, those at SCS involved in the decision to end his assignment were unaware of his sexual orientation. Finally, Scott's temporary assignment with SCS ended for reasons unrelated to his sexual orientation; SCS legitimately believed he had falsified his time record in violation of SCS's integrity policy. For all of these reasons, Defendant SCS is entitled to summary judgment as a matter of law.

## II. STATEMENT OF FACTS

### A. SCS Operations In Newark Delaware

SCS provides transportation and freight services, logistics and distribution services. SCS helps manage its clients' entire supply chain – from point of order entry to cash receipt, handling everything from customer service to warehousing and distribution to accounts receivable.[1] The Newark, Delaware office where Scott performed a temporary work assignment through Kelly Services is responsible for performing accounts receivable and collection services for SCS clients in the pharmaceutical and healthcare industries. (Exh. 3; Exh. 25, Scott depo. 71-72).

[1] http://www.ups-scs.com/logistics/

**B. Scott's Employment by Kelly Services**

Plaintiff Jason Scott graduated from high school in 2000, but has no formal education beyond high school. (Exh. 25, Scott depo. 47). Scott has worked in a variety of data entry, billing and collections positions. (Exh. 25, Scott depo. 55-60; Exh. 5, Scott Kelly Services Employee File). A number of Scott's work assignments were through Kelly Services, working temporary assignments as a Kelly Services employee, at the work sites of businesses that contracted with Kelly Services. (Exh. 25, Scott depo. 62, 64). Scott signed an employment agreement with Kelly Services, and it was made clear to him that he was employed by Kelly Services and not by the businesses where Kelly Services may assign him to work. (Scott depo. 65-66; Exh. 5, Kelly Employee File). In connection with his employment with Kelly Services, Scott specifically acknowledged and agreed that he would not be an employee of any of Kelly Service's customers where he was assigned to work; Scott signed an Agreement with Kelly Services stating: "As a Kelly employee, I understand that I am not an employee of the customers to whom Kelly assigns me, regardless of any customer statement, conduct, or belief." (Scott depo. 65-66; Exh. 5, Kelly Employee File, p. 7).

**C. Scott's Temporary Assignment At SCS**

In November 2008, Kelly Services contacted Scott about a temporary work assignment at the SCS office in Newark, Delaware. (Exh. 25, Scott depo. 66). Scott accepted the assignment from Kelly Services and started work at SCS in November 2008. (Scott depo. 70). After accepting the assignment, Scott signed an acknowledgment reaffirming his status as a Kelly Services employee, and indicating that he understood and agreed that he would not be an employee of UPS. (Exh. 5, Kelly Employee File, pp. 11-12).

While on that assignment, Scott performed collections work; contacting customers regarding outstanding balances due to one of SCS's pharmaceutical industry clients. (Scott

depo. 71-73). SCS's agreement with Kelly Services made clear that the workers whom Kelly Services assigned to work as SCS's locations were not SCS employees for any purpose. *See* Agreement at Exh. 1.

Scott received a Kelly Services employee handbook, and was paid by Kelly Services during his assignment at SCS. (Exh. 25, Scott depo. 65-69; Exh. 5, Kelly Employee File). Scott reported to a supervisor at Kelly Services, Paola Carazo. (Scott depo. 84; Exh. 24, Carazo depo. 5-6). If Scott wanted to take vacation, he would first contact his supervisor at Kelly Services to arrange to request time off, and it would have to first go through Kelly Services. (Scott depo. 84). Similarly, if he was going to be absent or late for his work assignment at SCS, Scott contacted his supervisor at Kelly Services to let her know that he was going to be late for work. (Scott depo. 84-85, 111-112). All of Scott's conversations about his work performance and attendance were with his supervisor at Kelly Services. (Scott depo. 85). Since he was not a SCS employee, Scott did not have a badge that gave him access to the SCS building; instead, each day when he arrived, Scott had to ring a door bell and wait for the receptionist to unlock the door and let him into the building. (Scott depo. 107 ).

During his assignment at SCS, Sherri O'Connell was one of several the Accounts Receivable Supervisors for SCS at the Newark Delaware location. (Exh. 4, Org. Chart). Prior to August 2009, Scott did not work with or for Sherri O'Connell. (Exh. 25, Scott depo. 93). Beginning in August 2009, Sherri O'Connell became responsible for the "Bracco team" of collections workers that included Scott. (Scott depo. 75; Exh. 9, O'Connell Aff. ¶ 3). Sherri O'Connell reported to Heidi Maslin, who was the Financial Services Unit Manager at SCS. (Scott depo. 75). Heidi Maslin in turn reported to Kim Kohler, the Senior Manager for the Order to Cash Department at SCS. (Exh. 4, Org. Chart).

**D. Scott's Attendance Problems**

Each member of the collections team was required to be at his or her workstation, ready to work at their assigned start time. (Exh. 17, O'Connell depo. 9-10; Exh. 9, O'Connell Aff. ¶ 6-7). Upon arrival, Scott was required to log in to his computer and record his start time on the SCS system, and also log into a Kelly Services web site to record his start time there as well. (Scott depo. 79-81). This time entry task could be accomplished from *any workstation*. (Exh. 21, Pinkett depo. 15; Exh. 11, Kohler Aff. ¶ 6).

Scott admits that during 2009, he was absent or late for work on a number of occasions, and that he had been warned about his attendance. (Exh. 25, Scott depo. 110-114). These were recorded by both Kelly Services and SCS. (Attendance Records, Exhs. 5, 6). Scott's supervisor at Kelly Services warned him that his attendance was unacceptable and that it needed to improve. (Scott depo. 113-114).

Despite prior warnings, Scott attendance problems continued in August and September 2009. Scott failed to report to work at SCS on August 3 and 4, 2009. (Scott depo. 112; Attendance Records, Exhs. 5, 6). Scott was absent again on September 4, 2009. (Scott depo. 112-113; Exh. 6). During what ended up being his last week of work at SCS, Scott was late twice earlier in the week. He was late on Tuesday, September 8 and on Wednesday, September 9, 2009. (Exh. 6, Attendance records; Exh. 25, Scott depo. 114-116).

**E. The Move; September 11, 2009**

On Friday, September 11, 2009, Scott's group was scheduled to move from the first to second floor within the Biddle Street Building. (Exh. 9, O'Connell Aff. ¶ 5; Exh. 10, Maslin Aff. ¶ 7). In September 2009, Scott's assigned start time at SCS was 8:30 a.m. (Scott depo. 75).

Sometime between 8:30 and 8:45 a.m. on the morning of the move the employee who was to move into Scott's cubicle on the first floor approached Sherri O'Connell and asked if she

could move Scott's belongings. (Exh. 17, O'Connell depo. 12; Exh. 9, O'Connell Aff. ¶10). O'Connell looked for Scott on the first floor, but could not locate him. (Exh. 9, O'Connell Aff. ¶12). She then went to Heidi Maslin to ask if Kelly Services had reported that Scott would be late, and to ask whether Maslin had seen Scott that morning. (Exh. 18, Maslin depo. 11-13; Exh. 10, Maslin Aff. ¶¶ 10-11). Maslin checked her email messages and found no indication that Scott was scheduled for late arrival. *Id.* By 8:45 a.m., Scott still had not arrived at his cubicle on the first floor, so Sherri O'Connell authorized the employee who was moving into Scott's cubicle to begin moving his belongings. (Exh. 17, O'Connell depo. 16).

O'Connell stayed near Scott's work station to monitor the moving of his possessions. (Exh. 9). Scott did not report to his work area on the first floor of the building until sometime after 8:45 a.m. on September 11, 2009. (Exhs. 9, 16). When he arrived at his workstation, Sherri O'Connell told him that she had authorized another employee to move some of his belongings since he was not there. (Exh. 9). Janet Evangelista was nearby and remembers O'Connell making the comment. (Exh. 16). It was raining that morning, and Scott was still wearing his raincoat when he arrived in the first floor work area. (Scott depo. 118-119, 140; O'Connell Aff. ¶ 16).

Scott now claims that he actually arrived at the building by 8:30 a.m. morning but went directly to his new cubicle on the second floor before coming down stairs to the first floor area to help with the move. (Exh. 25, Scott depo. 118-122, 138, 143-144). Despite the fact that he did not have a keycard or access pass, Scott claims that he was able to get into the second floor area where his new cubicle was located by slipping through the access door as someone else was leaving. (Scott depo. 129-130). Even assuming, *arguendo*, that Scott actually arrived at the building by 8:30 a.m., it is undisputed that he was not at his workstation on the first floor at his

scheduled start time of 8:30 a.m., that he never mentioned to either Sherri O'Connell or Heidi Maslin that he had arrived at 8:30, and that Sherri O'Connell and Heidi Maslin honestly believed that Scott arrived at work late. (Exh. 17, O'Connell depo. 18, 25; Exh. 9, O'Connell Aff. ¶ 22; Exh. 18, Maslin depo. 22).

After seeing Sherri O'Connell downstairs at approximately 8:50 a.m. and then starting to help with the move, Scott then went upstairs to his new cubicle on the second floor. (Exh. 25, Scott depo. 146-147). Scott eventually logged in to his computer at 9:45 a.m. (Scott depo. 149-150, 169; Exh. 7, Time Records). When Scott went into the time record systems he "backdated" the records to reflect that he actually started work that day at 8:30 a.m. (Scott depo. 149-150, 169). On both his UPS and Kelly time entry records Scott entered his start time that day as 8:30 a.m. (Exh. 7, fax to Carazo re Time Cards).

At the end of the day on September 11, 2009, Scott approached Sherri O'Connell and asked if going forward he could change his regular start time from 8:30 a.m. to 8:00 a.m., and she agreed. (Exh. 25, Scott depo. 164). Scott also discussed a possible change of his start time with Heidi Maslin, and although Heidi Maslin again warned Scott about his repeated tardiness, she also agreed to change Scott's start time going forward. (Scott depo. 163-164). At the time they approved Scott's request for a schedule change, they did not know that he had falsified his September 11 time record. (Exh. 9, O'Connell Aff. ¶ 22; Exh. 17, O'Connell depo. 21).

**F. SCS Discovers the Inconsistency Between Scott's Arrival Time and Time Entry**

As part of her duties as team supervisor, Sherri O'Connell was responsible for reviewing and approving the time entry of Kelly Services employees in the SCS and Kelly time systems. (Exh. 9, O'Connell Aff. ¶ 20). On Monday, September 14, 2009, Sherri O'Connell was reviewing her group's time entry logs for the previous Friday when she noticed that Scott had falsely recorded the start of his work day on September 11, 2009 as 8:30 a.m. (Exh. 9,

O'Connell Aff. ¶ 21; Exh. 17, O'Connell depo. 23-26). O'Connell knew this was false because she had looked for him that morning, and O'Connell had specifically spoken to and authorized another employee to begin moving Scott's belongings since he wasn't at his workstation by 8:45 a.m. (O'Connell Aff. ¶ 22; O'Connell depo. 29).

Sherri O'Connell informed her manager, Heidi Maslin, that Scott had recorded his start time for September 11, 2009 as 8:30 a.m. in the time entry system. (O'Connell Aff. ¶ 23; O'Connell depo. 23, 28; Exh. 18, Maslin depo. 23-24). Heidi Maslin also recognized that Scott had not arrived at his work station until after 8:45 a.m. that morning, and believed that by recording his start time as 8:30 a.m. Scott had committed a serious act of dishonesty in violation of the SCS integrity policy. (Exh. 10, Maslin Aff. ¶ 15; Exh. 18, Maslin depo. 24-25). Sherri O'Connell and Heidi Maslin then brought the matter to the attention of Ms. Maslin's manager, Kim Kohler. (Exh. 10, Maslin Aff. ¶ 16; Exh. 9, O'Connell Aff. ¶ 24; Exh. 11, Kohler Aff. ¶ 7). Kim Kohler reviewed Scott's time logs for September 11, 2009 and questioned Ms. O'Connell and Ms. Maslin about when Scott had reported to his workstation on September 11, 2009. (Exh. 10, Maslin Aff. ¶ 16; Exh. 9, O'Connell Aff. ¶ 24; Exh. 11, Kohler Aff. ¶ 7). Kim Kohler similarly concluded that Scott had falsified his time card, that the matter should be reported to Scott's employer, Kelly Services, and that his assignment with SCS should end. (Exh. 11, Kohler Aff. ¶¶ 7-8).

Sherri O'Connell, Heidi Maslin and Kim Kohler did not know that Scott was homosexual. (Maslin Aff. ¶ 25; O'Connell Aff. ¶ 32; Kohler Aff. ¶ 13). Prior to this incident, Kohler, Maslin and O'Connell had a favorable impression of Scott's performance, and believed he would have been eligible to apply for a permanent position at SCS if he improved his

attendance and if workload permitted the creation of new permanent positions on the Bracco team. (Exh. 18, Maslin depo. 25; Exh. 19, Kohler depo. 22-23).

**G. Scott's Temporary Assignment At SCS Ends**

SCS's Vendor Services Agreement with Kelly Services identified a list of prohibited conduct that could result in Kelly Services terminating an employee's assignment. One of the identified types of misconduct is "[f]alsification or misrepresentation on any company document, including but not limited to . . . time records." (Exh. 1, Agreement at Exhibit B-Vendor Code of Conduct).

On Monday, September 14, 2009, Sherri O'Connell notified Kelly Services' Staffing Supervisor Paola Carazo by phone that Scott had falsified his September 11, 2009 time entries and faxed copies of the entries to Kelly Services. (Exh. 7, Fax from O'Connell to Kelly Services; Exh. 9, O'Connell Aff. ¶ 25; Exh. 24, Carazo depo. 10-12).

When his work assignment at SCS ended, it was Kelly Services that notified Scott that his assignment ended. (Scott depo. 173-174). Later that same day, September 14, 2009, Scott received a call from his supervisor at Kelly Services, Paola Carazo. (Exh. 25, Scott depo. 173). The Kelly Services supervisor informed Scott that he should log out and leave the building and that his work assignment at SCS was over. (Scott depo. 173). Carazo told Scott that his work assignment at SCS was ending because of a problem with his time entry for September 11, 2009. (Scott depo. 171, 173-174). Scott did not protest the end of his assignment at SCS during the call with his Kelly supervisor and did not claim his assignment was ended based on his sexual orientation; he simply packed his belongings and left the SCS building, without speaking to anyone at SCS. (Scott depo. 173, 178). No one at SCS told Scott that his work assignment ended, and he never discussed the end of the assignment with any managers at SCS. (Scott depo. 178).

Following the ending of his work assignment at SCS, Scott continued to be employed by Kelly Services, and Kelly Services offered him other work assignments. (Exh. 25, Scott depo. 179-183; Exh. 24, Carazo depo. 13-14; Exh. 5, Kelly Services Employment File).

## III. LEGAL STANDARD

Summary judgment should be granted when there is no genuine issue as to a material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 566 n.3 (3d Cir. 2002).

While the burden is on the moving party to justify summary judgment, a district court should grant summary judgment where the pleadings and evidence before the court "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a); *see, e.g*., *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996); *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 825 F. Supp. 65, 67 (D. Del. 1993); *J.A. Moore Constr. Co. v. Sussex Assocs. Ltd.*, 688 F. Supp. 982, 987 (D. Del. 1988).

By its very terms, this standard requires the party opposing a properly supported motion for summary judgment to set forth specific, material facts showing that there is a genuine issue for trial—that is, evidence such that a reasonable fact finder could return a verdict for the non-moving party. *See Anderson*, 477 U.S. at 247-48; *B.F. Goodrich*, 825 F. Supp. at 68; *J.A. Moore*, 688 F. Supp. at 987. Thus, no genuine issue of material fact exists unless there is enough evidence favoring the non-moving party for a fact finder to reasonably find for that party. *See Anderson*, 477 U.S. at 248-49.

Accordingly, considering the facts in the light most favorable to the non-moving party, this Court must determine "whether the evidence presents a sufficient disagreement to require

submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law." *Ringer v. Fallis*, 848 F. Supp. 519, 524 (D. Del. 1994) (*quoting Anderson*, 477 U.S. at 251-52), *aff'd*, 77 F.3d 463 (3d Cir. 1996) (TABLE).

Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp.*, 477 U.S. at 327. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Electrical Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-8 (1986). "If the evidence [submitted by a party opposing summary judgment] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. The "mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to survive a motion for summary judgment. *Id*. at 252.

Here, there is no sufficiently probative evidence to support Scott's claim and he therefore cannot avoid summary judgment.

## IV. LEGAL ARGUMENT

Even if he had been an employee of UPS SCS (which he was not), Mr. Scott's discrimination claim fails as a matter of law and Defendant is entitled to summary judgment. Mr. Scott's allegation that UPS SCS discriminated against him on the basis of his sexual orientation is wholly unsupported by admissible evidence and is nothing more than an attempt to draw attention away from his own dishonest act.

### A. Scott Was Not an Employee of SCS

To establish a claim under the Delaware Discrimination in Employment Act, a temporary employee must first establish that he in fact was an employee of the defendant, and not simply of

the temporary staffing agency. *Shah v. Bank of Am.*, 346 Fed. Appx. 831, 833-34 (3d Cir. 2009), *citing Menkowitz v. Pottstown Mem'l Med. Ctr*., 154 F.3d 113, 127-28 n.5 (3d Cir. 1998) (stating that, as under Title VII, independent contractors are not employees within the meaning of the ADEA) (Scirica, J., concurring in part, dissenting in part); *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996) (a plaintiff must prove the existence of an employment relationship in order to maintain a Title VII action against the defendant; independent contractors are not protected by Title VII).

In order to determine whether a person is an employee for purposes of anti-discrimination laws, the Third Circuit has indicated that the common law of agency and the common elements of a master-servant relationship apply. *Shah*, 346 Fed. Appx. at 833-34.[2] In *Shah*, the plaintiff was employed by a temporary staffing agency and had previously been assigned to work on special projects for defendant Bank of America ("BOA"). After an assignment, a permanent employee of BOA complained about plaintiff. BOA later contacted the agency to obtain temporary assistance for a special project. The agency then contacted plaintiff and advised him of his assignment to BOA and his rate of pay and instructed him to report his hours for pay to the agency using an automated system. *Shah v. Bank of Am.*, 598 F. Supp. 2d 596, 600-01 (D. Del. 2009), aff'd., 346 Fed. Appx. 831 (3d Cir. 2009).

When plaintiff arrived at BOA, another employee remembered the previous dispute and reported it to a supervisor. The supervisor then contacted the temporary agency and advised it that, effective immediately, plaintiff's services were no longer needed. The termination of

[2] Factors to be considered include the hiring party's right to control the, the skill required, the source of any tools, the location and duration of the work, the right to assign additional projects, the method of payment, whether the work is part of the regular business of the hiring party, the provision of employee benefits and the tax treatment of the hired party. *Id., citing Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-24, 112 S. Ct. 1344 (1992).

plaintiff's assignment with BOA did not affect his ability to obtain further assignments from the temporary agency and he was maintained by the agency as eligible to work. Plaintiff applied for and received unemployment benefits, listing the temporary agency as his employer. *Shah*, 598 F. Supp. 2d at 600-01. Plaintiff filed suit against BOA alleging violations of Title VII and the Delaware Discrimination in Employment Act ("DDEA"), 19 *Del. C.* § 710, *et seq*.

The District Court concluded that the plaintiff had not established that defendant BOA was his employer and summary judgment for BOA was appropriate where: (1) defendant was not the employer of plaintiff; (2) plaintiff's length of employment with BOA was brief and plaintiff had an on-going relationship with the staffing agency; (3) it was the staffing agency who assigned plaintiff's rate of pay, to whom plaintiff reported hours worked, and who paid plaintiff; (3) although BOA decided it no longer needed plaintiff's services, it was the staffing agency who advised plaintiff that his services were no longer needed; and (4) the record reflected that, following the termination of the temporary assignment, plaintiff sought unemployment benefits and listed the staffing agency as his employer, not defendant. *Shah* 598 F. Supp. 2d at 602-03.

The same factors require the conclusion that SCS *was not* Scott's employer here. While Scott's assignment was ongoing, it is clear that he was an employee of Kelly Services on a temporary assignment at UPS SCS. At no time was he ever an employee of UPS SCS. The SCS Agreement with Kelly Services during the relevant period specifically provided that Kelly Services was an independent contractor with "sole responsibility to counsel, discipline, review, evaluate, set the pay rates of, and terminate" its employees assigned to SCS and that no employee of Kelly Services assigned to perform work at SCS shall be deemed to be an employee, co-employee or joint employee of UPS SCS. (Exh. 1, Agreement, ¶ 8(d)).

Scott requested time off, reported his time, received feedback on his performance and received his compensation from Kelly Services. (Exhs. 5, 6). Like the plaintiff in *Shah*, Scott remained eligible for assignments with Kelly after the SCS assignment ended, and he applied for and received unemployment benefits from the State of Delaware. (Exhs. 5, 32). Consequently, because SCS was not Mr. Scott's employer, he cannot maintain an employment discrimination claim against SCS based on their decision to end his temporary assignment.

**B. SCS Is Entitled To Summary Judgment Because He Cannot Establish that His Assignment at UPS Was Terminated Because of His Sexual Orientation.**

A plaintiff seeking to establish discrimination under the Delaware Discrimination in Employment Act ("DDEA"), may prove discrimination through the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) applicable to proving federal claims of employment discrimination. *Shah* 598 F. Supp. 2d at 603; *Mitchell v. Wachovia Corp.*, 556 F. Supp. 2d 336, 347 (D. Del. 2008).

Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of discrimination. In order to establish a *prima facie* claim of discrimination, an employee must present evidence demonstrating: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that at the time of the adverse employment action he was meeting his employer's legitimate expectations; and (4) the action occurred under circumstances giving rise to an inference of unlawful discrimination. *See Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *Miller v. Delaware Dep't of Prob. & Parole*, 158 F. Supp. 2d 406, 410-11 (D. Del. 2001), aff'd, 41 Fed. Appx. 581 (3d Cir. 2001); *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant, who must "articulate some legitimate, nondiscriminatory reason" for its

treatment of the plaintiff. *McDonnell Douglas,* 411 U.S. at 802; *see also Fuentes,* 32 F.3d at 763. If the defendant produces a sufficient reason for its actions, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the employer's rationale is pretextual. *See McDonnell Douglas,* 411 U.S. at 804; *see also Fuentes,* 32 F.3d at 763.

It bears emphasis though that "throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes,* 32 F.3d at 763. Therefore, once the defendant has articulated a nondiscriminatory reason for its actions, the plaintiff must point to some evidence that the defendant's proffered reasons are merely a pretext for discrimination. *See Fuentes*, 32 F.3d at 763-64.

**1. UPS/ SCS Decision-Makers Were not Aware of Scott's Sexual Orientation.**

Scott cannot establish the essential elements of a *prima facie* case with respect to the end of his assignment at SCS as his employer was unaware of his status as a member of a protected class and the circumstances therefore do not give rise to an inference of unlawful discrimination. Sherri O'Connell did not know that Scott was gay, and Scott has no facts to suggest otherwise. (Exh. 9, O'Connell Aff.,¶ 32; Exh. 17, O'Connell Depo. at 33). Scott admits that he never told Sherri O'Connell or anyone else at SCS that he was gay. (Exh. 25, Scott depo. 102). Scott speculated that Sherri O'Connell may have guessed that he was gay, because he claims that she frowned when she saw him with a Mohawk haircut and also when he wore a pink polo shirt one day. (Scott depo. 102-107). However, he admits that Sherri O'Connell never did or said anything else to suggest that she knew Scott was gay. (Scott depo. 107).

Scott cannot prove discrimination on these facts. It is impossible to establish discriminatory animus based on sexual orientation when those who made the decision did not know his sexual orientation. *See Geraci v. Moody-Tottrup Int, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) ("We cannot presume that an employer most likely practiced unlawful discrimination

when it does not know that the plaintiff even belongs to the protected class."); *Jackson v. Kenney*, 762 F. Supp. 863, 866 (W.D. Mo. 1991) ("[C]ommon sense dictates that a plaintiff must also establish as part of her *prima facie* showing not simply that she is a member of a racial minority but, in addition, that the defendant knew her race."); *Featherson v. Montgomery Cnty. Sch.*, 739 F. Supp. 1021, 1025-26 (D. Md. 1990) ("As a matter of logic and of fact, a person cannot make an adverse, retaliatory decision based upon information of which s/he is unaware."); *Robinson v. Adams*, 847 F.2d 1315, 1316 (9th Cir. 1987), *cert. denied*, 490 U.S. 1105 (1989) ("An employer cannot intentionally discriminate against a job applicant based on race unless the employer knows the applicant's race."); *Hedberg v. Indiana Bell Tele. Co.*, 47 F.3d 928, 932 (7th Cir. 1995) (an employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of a disability - this is supported both by simple logic and by the conclusions of other courts). Accordingly, because Ms. O'Connell, Ms. Maslin and Ms. Kohler did know Mr. Scott's sexual orientation, he cannot establish the first element of a *prima facie* case.

**2. Scott's Assignment Ended for Legitimate Non-Discriminatory Reasons Unrelated to his Sexual Orientation; The Sincere Belief that Scott Had Falsified His Time Records.**

Even if the Court were to conclude that Scott had established a *prima facie* case of discrimination, Defendant would be entitled to judgment as a matter of law as SCS had legitimate reasons for ending his assignment. SCS asked Kelly Services to end Mr. Scott's assignment based on the conclusion that he had deliberately falsified his time entries. Integrity is a core value at UPS SCS, and the Company has a zero tolerance policy for dishonesty.

Scott was not at his work station at his scheduled start time on September 11, 2009. (Exhs. 9, 10). O'Connell and Maslin believed, based on their own observations on the date in question, that Scott had falsified his timecard. (Exhs. 9, 10). O'Connell and Maslin have

terminated heterosexual UPS SCS and temporary employees for similar integrity violations. (Exhs. 9, 10, 11, 29-31).[3]

In asking Kelly Services to end Mr. Scott's assignment, SCS acted under the honest belief (which it still holds) that he falsified his time card and represented that he had worked time that he never actually worked. *See Green v. National Steel Corp., Midwest Div.* 197 F.3d 894, 899 (7th Cir. 1999) (stating "regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions"); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (if employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not "because of race" and the employer has not violated the anti-discrimination statutes).

Thus, the question is not whether Scott was or was not late on the day in question. Rather, the only relevant factor is whether SCS believed that he was late and had falsified his time, and terminated his assignment on that basis. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 283 (3d Cir. 2001) (it is not enough for a plaintiff to show that the employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus).

**3. Scott Cannot Establish Pretext**

Since SCS has clearly put forth a legitimate reason for ending Scott's assignment, the burden then shifts to Scott to show that reason is a pretext for discrimination. *See McDonnell*

[3] Employer was entitled to summary judgment with respect to an employee's gender and racial discrimination claims under Title VII and the Delaware State Discrimination Act, 19 *Del. C.* § 710 *et seq.*, because, while the employee was subject to an adverse employment action the employer invoked the same policy as to similarly situated employees who were not part of the protected class. *Mitchell v. Wachovia Corp.*, 556 F. Supp. 2d 336 (D. Del. 2008).

*Douglas,* 411 U.S. at 804; *see also Fuentes,* 32 F.3d at 763. The facts and testimony fail to establish pretext here.

Scott admits that during his entire work assignment at SCS, no one ever commented about his sexual orientation or harassed him in any way. (Exh. 25, Scott depo. 212, 215). Scott does not contend that he was ever discriminated against in any way based on his sexual orientation *before September 14, 2009,* when his assignment at SCS ended. (Scott depo. 211-212). Scott has also acknowledged that two of the SCS managers involved in ending his assignment, Heidi Maslin and Kim Kohler, harbored *no bias* based on his sexual orientation and did not discriminate against him in any way. (Scott depo. 89-90, 92-93).

Rather, Scott attributes discriminatory animus only to Sherri O'Connell. Scott supports this claim only with hearsay and rumors. First he claims that Kirk Slaughter, Janet Evangelista and Myron Giddens heard rumors after his assignment ended, that he was terminated based on his sexual orientation. *Id.* Slaughter denies ever discussing or passing on such a rumor. Giddens and Evanglista refer only to "water cooler" talk and rumors. (Exh. 28, Giddens depo. 46-48; Exh. 22, Evangelisa depo. 26-28, 38-39). Slaughter and Evangelista have since provided sworn testimony that they do not recall where they heard this rumor and never held the belief that Scott was treated differently based on his sexual orientation. (Exhs. 14-16).

Scott also relies on the claim by former Kelly employee Toni Shepperson (who was herself terminated for integrity issues) that she overheard a conversation that allegedly took place on September 11, 2009.[4] Shepperson claims that on the morning of the move, she heard Sherri O'Connell mention Jason's name and rolled into the aisle between the cubicles to try to hear

[4] Shepperson also filed a charge with the Delaware Department of Labor against SCS after her assignment ended and sought Scott's assistance with her claims. *See* Exh. 27, Shepperson depo. 35, 40-42.

what was being said.[5] (Exh. 27, Shepperson depo. at 74, 78-83, 120-22). Shepperson allegedly heard O'Connell speaking to Terri Hinderer and heard O'Connell say that Scott was late and had lied about his arrival time and used the word "faggot." *Id.* However, Shepperson was not part of the conversation, and merely claims that she overheard the comment from across the room. (Exh. 27, Shepperson depo. at 74, 78-83, 120-22). In fact she admits that because of the distance and cubicle walls she was unable to hear what if anything was said by Terri Hinderer during the conversation. *Id.*[6] Those that supposedly did take part in the conversation, O'Connell and Hinderer, have provided sworn testimony affirming that such a conversation never took place. (Exh. 9, O'Connell Aff. ¶ 18; Exh. 12, Hinderer Aff. ¶¶ 6-8).[7] In fact Terri Hinderer is adamant that she would definitely recall hearing anyone using such a term, and does not believe that O'Connell would ever use derogatory language or treat someone differently based on their sexual orientation. (Hinderer Aff. ¶¶ 7-11).

Scott has thus offered only post hoc rumors and the claim of a terminated employee about an *overheard* a conversation, to substantiate his claim of discriminatory animus. (Scott depo. 191-204).[8] Office gossip and rumors of discrimination are simply insufficient to establish discriminatory animus. *See Holmes v. J.P. Morgan Chase Nat'l Corporate Servs., Inc.*, 2010

[5] In fact, O'Connell's testimony, as well as that of Maslin and Kohler make clear that O'Connell was not even aware of the discrepancy between Scott's arrival time and his time card at the time Shepperson claims the conversation took place; O'Connell did not discover the discrepancy until the following Monday, September 14, 2009. (Exhs. 9, 10, 11).

[6] Both Hinderer and Maslin have testified that Hinderers and Shepperson's cubicles were quite a distance apart. (Exh. 18, Maslin depo. 45; Exh. 12, Hinderer Aff. 5).

[7] No other SCS employee or manager has ever heard O'Connell make any derogatory remarks about someone sexual orientation, including another SCS employee is openly gay and has been well treated by O'Connell, and O'Connell has several close friends and family members who are gay. (Exhs. 10, 11, 12, 13, 14, 15, 16, 18-23).

[8] Q: And other than that what they told you, do you have any facts, evidence or anything else at all to support the claim that your sexual orientation had anything to do with the decision to end your assignment at Supply Chain Solutions? . . . A: I just -- no. (Exh. 25, Scott depo. 204).

U.S. Dist. LEXIS 4124, at *16-17 (E.D. Mich. Jan. 20, 2010) (rumors that supervisor wanted to terminate older employees or that plaintiff's potential replacement was discussed during her medical leave did not constitute admissible evidence demonstrating that employer's decision to terminate her was motivated by age discrimination; rumors were mere inadmissible second-hand speculation by peers); *Willett v. Illinois*, 1999 U.S. Dist. LEXIS 18026, at *22 (N.D. Ill. Nov. 10, 1999) (summary judgment for employer was proper where plaintiff's claim that he heard through the "rumor mill" that he was terminated for improper reasons fails to establish that stated reason for firing him was pretext); *Giles v. Norman Noble, Inc*., 88 Fed. Appx. 890, 895 (6th Cir. 2004) (plaintiff failed to demonstrate pretext because his only proof consisted of conclusive allegations, hearsay, and subjective beliefs regarding racial bias within management; rumors, conclusory allegations and subjective beliefs are wholly insufficient evidence to establish a claim of discrimination as a matter of law).

There is nothing to support Mr. Scott's allegation of discrimination other than his own self-perception and unsupported rumor and hearsay. The *admissible evidence* clearly indicates that the circumstances surrounding the ending of Mr. Scott's assignment *do not* give rise to an inference of unlawful discrimination.

## V. CONCLUSION

Plaintiff cannot pursue his claims against SCS as he was not an SCS employee; he was employed by Kelly Services. In addition, Plaintiff has offered only his own subjective belief, hearsay and rumor in support of his claim that the decision to end his assignment at SCS was motivated by discrimination. As such, his claims fail as a matter of law and SCS is entitled to summary judgment.

*/s/ Lori A. Brewington*
Jennifer C. Jauffret (#3689)
Jauffret@rlf.com
Lori A. Brewington (#4522)
Brewington@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
(302) 651-7700

*Attorneys for Defendant*
*UPS Supply Chain Solutions, Inc.*

OF COUNSEL:

Emmett F. McGee, Jr.
Ariana Wright Arnold
Jackson | Lewis LLP
2800 Quarry Lake Drive, Suite 200
Baltimore, MD 21209
(410) 415-2000

Dated: March 1, 2012

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of March, 2012, true and correct copies of Defendant's Memorandum in Support of its Motion for Summary Judgment was filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Robert T. Vance, Jr.
100 South Broad Street, Suite 1530
Philadelphia, PA 19110
(215) 557-9550
fx(215) 557-9552
Email:Rvance@vancelf.com

Andrew Lukashunas
The Lyons Law Firm
1526 Gilpin Avenue
P.O. Box 579
Wilmington, DE 19899
(302) 777-5698
Fx(302) 777-5051
Email: alukashunas@lyonslaw.com

*/s/ Lori A. Brewington*
Lori A. Brewington

*Counsel for Defendant,*
*UPS Supply Chain Solutions, Inc.*