# Exhibit 24

# In The Matter Of:

*Scott v.*
*UPS Supply Chain Solutions*

---

*Paola Carazo*
*January 30, 2012*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE 19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone: 302-655-0477, fax: 302-655-0497*

WILCOX & FETZER LTD.

Original File 013012pc.tb.txt

Min-U-Script® with Word Index

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

JASON SCOTT, ) Civil Action No.
v. ) 1:10-CV-00929-RGA
UPS SUPPLY CHAIN SOLUTIONS )

Deposition of PAOLA CARAZO, taken pursuant to notice, at Executive Banquet & Conference Center, 205 Executive Drive, Newark, Delaware, 19702, beginning at 3:42 p.m., on Monday, January 30, 2012, before Terry Barbano Burke, RMR-CRR and Notary Public.

APPEARANCES:

ROBERT T. VANCE, JR., ESQUIRE
LAW OFFICES OF ROBERT T. VANCE
100 South Broad Street, Suite 1530
Philadelphia, Pennsylvania 19110
For the Plaintiff

ARIANA WRIGHT ARNOLD, ESQUIRE
JACKSON LEWIS LLP
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
For the Defendant

ALSO PRESENT:
JASON SCOTT

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com



PAOLA CARAZO,
the deponent herein, having first been
duly sworn on oath, was examined and
testified as follows:
**BY MR. VANCE:**
Q. Good afternoon, Miss Carazo. Robert
Vance. I represent Jason Scott.
Have you ever had your deposition
taken before?
A. No.
Q. I'm going to be asking you some questions
related to his lawsuit, so I just want to give
you a few instructions.
First, please make sure you give a
verbal answer to my questions because we're
making a record of the proceeding.
Secondly, if I ask you a question and
you do not understand it, just tell me that you
don't understand the question and I'll rephrase
the question, because when I ask you a question
and you answer it, I'm going to presume that you
understood the question and that your answer is
responsive to the question that I posed.
Thirdly, you might anticipate a



question I ask you, and if that's the case, just
kind of wait until I finish, because it's
difficult for the reporter to take down more than
one person talking at the same time.
Do you understand those instructions?
A. Yes.
Q. Do you understand that you're testifying
under oath and subject to the penalties of
perjury?
A. Yes.
Q. In the last day or two, have you taken
any kind of drug or medication that might
interfere with your ability to understand my
questions or to answer them?
A. No.
Q. What's your date of birth?
A. April 29th, 1978.
Q. What is your current home address?
A. It's Five Dunsmore Road.
Q. Can you spell that?
A. D-U-N-S-M-O-R-E.
Q. Where is that located?
A. It's Newark.
Q. What's the zip code?



A. 19713.
Q. 19713.
Can you tell me about your
educational background?
A. High school, completed.
Q. Where did you go to high school?
A. Gurnee, Illinois, Warren Township High
School.
Q. Can you spell that?
A. G-U-R-N-E-E.
Q. Illinois?
A. Uh-huh.
Q. You're currently employed by who?
A. Kelly Services.
Q. What is your position?
A. I'm a Kelly representative. It's called
MSP. It's master service provider.
Q. How long have you worked for Kelly?
A. For Kelly I've worked three years.
Q. Can you explain to me what is your role
with respect to employees that Kelly places at
UPS?
A. At the time -- we don't currently have
that position any more. I don't have that as a

**customer any more. I'm currently in another role.**
Q. Okay.
A. **At the time I would interview candidates that would qualify to work at UPS for their customer service and credit positions that they had. We did a background check and then some supervisor would like an additional interview with the candidate. Some didn't. Once I identified those candidates, they would be placed in the positions that were currently open at the time.**
Q. So was UPS relying on you to do the interview process and the screening for the people?
A. **Yes.**
Q. Did UPS do its own interviewing or background check, do you know?
A. **No.**
Q. When you placed someone at UPS, what was your responsibility, your continuing responsibility with respect to that person, what did you do?
A. **Well, we would supervise the person. I**



**have my contact information. If there were any situations or any counseling session that needs to be made, then I would reach out to the person. Or the person, if they had any questions in regards to the account, they'll contact me.**
Q. In terms of the day-to-day work of the Kelly people that you place at UPS, did you give them their assignments or did they get their assignments from UPS?
A. **They would get the assignment from UPS.**
Q. And as far as the work policies, was it your understanding that the people that you placed at UPS were obliged to follow UPS's policies that related to their job duties?
A. **Yes.**
Q. Did Kelly have its own human resources department?
A. **If who? I'm sorry.**
Q. Did Kelly have its own human resources department at the time?
A. **No.**
Q. So did you have any understanding whether the employees that you placed at UPS were able to have resource to the UPS human resource systems?



A. **That I don't know.**
Q. Did you have direct contact with the UPS supervisors?
A. **Yes.**
Q. How frequently was your contact with them once you placed somebody there?
A. **It would depend. Maybe every two weeks we'll have some type of conversation.**
Q. What was the purpose of the conversation?
A. **Just to kind of get feedback on employees.**
Q. On their performance and things?
A. **On their performance.**
Q. Specifically with respect to Mr. Scott, when he was going to be out from work or knew that he had to be out from work, was he required to clear that with you first and then you would make the communication with UPS?
A. **It would be communicated to UPS and then have a follow-up phone call to myself.**
Q. So you would approve his absences to some extent?
A. **It would be mainly the UPS supervisor, and then I would get the final approval.**



Q. And in terms of Mr. Scott and the other Kelly placements' salaries, you would get a time card from UPS about how many hours they would work, is that how it would work on a weekly basis?
A. **No. The Kelly Services employees will import their time on a web-based time card keeping, and then it would go to final approval for the supervisor.**
Q. For the supervisor at UPS?
A. **Correct.**
Q. Did you have to approve the time card once it was approved by UPS?
A. **No, once it is approved by UPS, it will go directly into payroll.**
Q. And then they will get paid whatever they are entitled to get paid?
A. **Correct.**
Q. If a Kelly placement had an issue with a UPS supervisor, were they supposed to contact you about that issue or go directly to the UPS people?
A. **They will contact me.**
Q. And then you would interface with UPS?

**A. Correct.**
Q. Was it your understanding that UPS could end the placement of a Kelly person at any time they felt they wanted to end it?
**A. How do you mean?**
Q. That was a bad question. When a person like Mr. Scott was placed at UPS, they were not placed for a definite term; is that right?
**A. Right, they were for temporary positions.**
Q. For as long as UPS wanted them to work there, is that your understanding?
**A. Yes.**
Q. There was no definitive time period like three months, six months, 12 months?
**A. There was not.**
Q. So was it your understanding that at any time UPS could have decided with respect to Mr. Scott or any of the Kelly placements that they did not need to show up to work any more, that their assignment was over, for whatever reason?
**A. Yes.**
Q. You would not investigate whether that reason was a good reason, a bad reason or



anything like that?
**A. It would depend.**
Q. What would it depend on?
**A. If the reason was there. Sometimes I would need more specifics.**
Q. Let me make a better question. I assume that, let's say, if one day UPS decided every black Kelly employee is no longer employed regardless of whether they are good or bad, you would look into that?
**A. Yes.**
Q. But if UPS said to you, well, we're ending this person's assignment because we have a policy that says you can't take out a company car without prior permission and this person took out a company car and here's the proof, you would just take the proof and go on about your business?
**A. Right.**
Q. Now, with respect to Mr. Scott, do you recall being advised by UPS that his assignment was over?
**A. Yes.**
Q. And do you recall whether you were given



a reason for why his assignment was over?
**A. If I recall a reason?**
Q. Yes.
**A. Yes.**
Q. Let me show you. We marked this at Miss O'Connell's deposition just a minute ago. It's a fax to you. Can you recall receiving that? It's O'Connell 1.
**A. I don't remember.**
Q. Do you recall the reason why Mr. Scott was terminated?
**A. Because the reason was for, he was 15 minutes late and he did not -- it showed on his pay card that he came in at 8:30 and the supervisor said that he actually walked in the door at 8:45.**
Q. That's what you were told?
**A. Yes.**
Q. Did you say anything in response to that, did you have any response to that statement?
**A. I don't remember.**
Q. Did anyone from UPS ask you to ask Mr. Scott why he had stated on his time card that he came in at 8:30 if according to them he came



in at 8:45?
**A. Yes.**
Q. They asked you?
**A. If they asked me?**
Q. Yes. Did anybody from UPS say, Miss Carazo, would you please ask Mr. Scott why he put on his card he came in at 8:30 when, from what we know, he came in at 8:45?
**A. I don't remember.**
Q. Would you get requests like that when it came time to end employee placements?
**A. Depending on the supervisor.**
Q. Do you have any specific recollection of anyone at UPS ever asking you to ask one of the Kelly placements why they did a particular thing?
**A. No.**
Q. Would it be correct to say you were just informed that Mr. Scott's employment was being terminated, you were not consulted about it, would that be correct?
**A. Yes.**
Q. Did you object to Mr. Scott being terminated?
**A. I don't remember if I objected or not.**

Q. After Mr. Scott was terminated, did he contact you at all, do you have a recollection of him contacting you?
**A. For other assignments, yes.**
Q. Did you put him on other assignments?
**A. No, we didn't place him on other assignments because either they were not available or it was something he wasn't looking for.**
Q. That's the only reason? It isn't because of his performance or anything like that?
**A. No.**
Q. So he was available and you would have placed him had there been somewhere to put him?
**A. Correct.**
Q. Do you recall writing a letter of recommendation for Mr. Scott?
**A. Yes.**
Q. And did he request that of you?
**A. Yes.**
Q. And do you have any problem giving it?
**A. No.**
**MR. VANCE:** Here it is. Can you mark that as Carazo 1.



(Carazo 1 was marked for identification.)
**BY MR. VANCE:**
Q. Miss Carazo, I'm handing you a document that has been marked Carazo 1. It's a letter from you dated December 9, 2009, as Bates No. UPS 00380.
**A. (Pause.)**
Q. Is that a copy of your letter?
**A. Yes.**
Q. Is that accurate, the letter, what's stated in that?
**A. Yes.**
Q. Mr. Scott, was he ultimately placed in another assignment through Kelly?
**A. I don't believe after UPS. I think that was his last assignment with Kelly.**
Q. But again, that was because there was nothing available?
**A. Correct. Either available or something that it was offered and he did not take.**
Q. Were you contacted by anyone from UPS about Mr. Scott's termination after you wrote that letter?



**A. No.**
Q. So other than this contact for this deposition, this is --
**A. The first time.**
Q. The first time?
**A. Yes.**
**MR. VANCE:** Can you give me a minute with Mr. Scott?
**MS. ARNOLD:** Sure.
(Recess.)
**MR. VANCE:** I don't have any other questions for you.
**MS. ARNOLD:** I just have a couple really quick.
**BY MS. ARNOLD:**
Q. So Mr. Scott was employed by Kelly; correct?
**A. Yes.**
Q. And Kelly paid his wages?
**A. Yes.**
Q. Did Mr. Scott either at the time his assignment was ended or any time after that tell you that he felt he had been mistreated because of his sexual orientation?



**A. No.**
**MS. ARNOLD:** That's all I have.
**MR. VANCE:** Thank you.
**MS. ARNOLD:** You have the opportunity after a written transcript has been created to review it and check for typographical errors. You can't change the answers you have given or responses to questions you were asked, but check it for mistakes. Would you like the opportunity to do it?
**THE WITNESS:** No, I'm good.
**MS. ARNOLD:** I'll ask her attorney, their general counsel at Kelly may feel differently.
(Witness excused.)
\- - -
(The deposition concluded at 4:03 p.m.)

Page 17

INDEX

DEPONENT: PAGE

Examination by Mr. Lance 2
Examination by Ms. Arnold 15

EXHIBITS

CARAZO DEPOSITION EXHIBITS MARKED

Carazo 1 Memo dated December 9, 2009, from Ms. Carazo, "To whom it may concern," UPS 00380 (Retained by Mr. Lance) 14

DIRECTIONS NOT TO ANSWER PAGE LINE

NONE

REQUESTS MADE FOR DOCUMENTS PAGE LINE

NONE

CERTIFICATE OF REPORTER PAGE 18

Page 18

State of Delaware )
)
New Castle County )

CERTIFICATE OF REPORTER

I, Terry B. Burke, RMR-CRR and Notary Public, do hereby certify that there came before me on Monday, January 30, 2012, the deponent herein, PAOLA CARAZO, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that reading and signing of the deposition were waived by the deponent and counsel.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

Terry B. Burke

Terry Barbano Burke, RMR-CRR

# Exhibit 25

IN THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

JASON SCOTT ) NO. 10-929-JCJ
)
- vs - )
)
UPS SUPPLY CHAIN )
SOLUTIONS )

Videotaped deposition of JASON SCOTT, held at One Rodney Square, 920 North King Street, Wilmington, Delaware, on Thursday, May 5, 2011, at 9:45 a.m., before Dolores M. Horne, Professional Reporter and Notary Public, in and for the Commonwealth of Pennsylvania.

ESQUIRE DEPOSITION SERVICES
1600 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
215-988-9191



APPEARANCES:

THE LAW OFFICES OF RONALD G. POLIQUIN
BY: RONALD G. POLIQUIN, ESQUIRE
48 The Green, Second Floor
Dover, Delaware 19901
(800) 811-5182
ron@ronpoliquin.com
Attorneys for the Plaintiff

JACKSON LEWIS, LLP
BY: EMMETT F. MCGEE, JR., ESQUIRE
2800 Quarry Lake Drive
Suite 200
Baltimore, Maryland 21209
(410) 415-2003
emmett.mcgee@jacksonlewis.com
Attorneys for the Defendant

ALSO PRESENT:
SHERRI O'CONNELL



INDEX


| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| JASON SCOTT | | |
| | By: Mr. McGee | 6 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Scott 1 | Time Record | 115 |
| Scott 2 | Time Record | 149 |




DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer
Page Line Page Line Page Line

Request for Production of Documents
Page Line Page Line Page Line

Stipulations
Page Line Page Line Page Line

Question Marked
Page Line Page Line Page Line

THE VIDEO TECHNICIAN: We're now on the record. The following is a videotaped deposition. My name is Anthony DiMattia. I'm a videotape operator representing Esquire Deposition Solutions, in Philadelphia, Pennsylvania. This deposition is being taken on Thursday, May 5, 2011 scheduled for 9:30 a.m. at the law offices of Richard, Layton & Finger, 920 North King Street, Third Floor, Wilmington, Delaware. The caption for today's case is as follows: Jason Scott versus UPS Supply Chain Solutions, filed in the United States District Court for the District of Delaware, Civil Action No. 10-929-JCJ. Appearances today are the witness, Jason Scott. The deposition is being taken on behalf of the defendant. At this time counsel will identify themselves on the record.

MR. MCGEE: Yes. I'm Emmett McGee from the firm of Jackson Lewis representing the defendant, UPS Supply Chain Solutions.

MR. POLIQUIN: Ron Poliquin, of the law firm of Ronald G. Poliquin,



representing Jason Scott, the plaintiff in this case.

MR. MCGEE: And also present at the deposition today is Sherri O'Connell from UPS Supply Chain Solutions.

THE VIDEO TECHNICIAN: The court reporter is Dolores Horne. The time is 9:45. Ms. Horne will now swear in the witness.

JASON SCOTT, after having been first duly sworn, was examined and testified as follows:

THE VIDEO TECHNICIAN: Mr. McGee.

* * *

EXAMINATION

* * *

BY MR. MCGEE:

Q. Good -- good morning, Mr. Scott. I introduced myself before but let me introduce myself again. My name is Emmett McGee. I'm the attorney for UPS Supply Chain Solutions. We're here today for your deposition in connection with the lawsuit that you have filed or that has been filed on your behalf against



UPS Supply Chain Solutions. You've been sworn in. You're under oath. Your obligation is to tell the truth, just the same as it would be in open court, despite the fact that this may appear to you to be a little bit less formal setting.

I'm going to be asking you questions. You do need to give an audible, verbal response as opposed to simply a nod of the head. If at any point you don't understand a question or you'd like me to repeat the question, please let me know and I'll try to accommodate you. Okay?

A. Yes, yes.

Q. And if you don't tell me and speak up and tell me that you don't understand, can we safely assume that you do understand the question and are answering truthfully and completely?

A. Repeat that, please?

Q. Unless you speak up and tell me that you don't understand the question, we will assume that you do understand it. Okay?

A. I understand, yes.



Q. And that you are answering truthfully and completely; is that fair?

A. I understand, yes.

Q. If at any point you want to break for any reason, again, let me know and we'll accommodate you in that regard as well. What have you done to prepare for this deposition?

A. As far as preparation, nothing, just went through everything I've been going through.

Q. And what do you mean went through that?

A. Meaning that a lot of stress, I've been stressing.

Q. What did you do to prepare for the deposition?

A. Spoke to my attorney.

Q. Other than speaking with your attorney, have you spoken with anybody else about the case or about the deposition?

A. No, only my partner. That was it.

Q. And who is your partner?

A. Terrence Arthur.

Q. How do you spell the last name?

A. A R U T H U R -- A R T H U R.
Q. For how long has he been your partner?
A. We met the summer of 2009.
Q. What month?
A. Maybe June or July.
Q. How did you meet?
A. Through a mutual friend.
Q. Who is that?
A. Family friend, Delaina -- Delaina Scott, Delaina, D E, Delaina Scott.
Q. And where did you meet?
A. In Philadelphia, Pennsylvania.
Q. Where in Philadelphia?
A. We were about -- it was so long ago -- at her house, actually.
Q. Whose house?
A. Delaina's house.
Q. And when did your relationship with Terrence Arthur begin?
A. It began since we talked verbally over the telephone for a couple of months. It began maybe around August 2009.
Q. And what was the beginning of the -- when you say the relationship began at that



time, what happened at that time?
A. We started dating, going out, movies.
Q. Where did Mr. Arthur live at the time?
A. He lived in Philadelphia.
Q. Where were you living?
A. Dover.
Q. Where does Mr. Arthur currently live?
A. Philadelphia.
Q. Where do you live?
A. Dover.
Q. When did your relationship first become of a sexual nature?
MR. POLIQUIN: I'm going to object. You can answer the question.
BY MR. MCGEE:
Q. You -- you can answer the question.
A. What does that have to do with anything -- I'm confused. I don't understand what the question about our relationship --
Q. Well, you've identified him as somebody that you have a relationship with and you discussed the case with and also this is a



case involving sexual orientation. So that's why I'm asking these questions.
A. I understand.
Q. When did relationship first become of a sexual nature?
A. Months after our relationship. So after I was going -- actually, there wasn't really no sex involved. I was so depressed, so distraught from what I went through at work at UPS.
Q. My question is when did it first become sexual in nature?
A. Not until February of 2010, February 2010.
Q. That is the first sexual act that you ever engaged in with Mr. Arthur, February of 2010?
A. Yes.
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. Between August of 2009 and February of 2010, how often did you see Mr. Arthur?
A. Weekend basis, on a weekend basis.
Q. And how and where would you see him



during that period of time?
A. He would come to Dover. I would come to Philadelphia.
Q. And when you visited each other, would you spend the night together?
A. No. On a daily basis, like hi and bye, meet at the Christiana Mall, have dinner, have lunch together.
Q. Did you ever -- did you ever spend the night together at any point in time between August of 2009 and February of 2010?
A. A couple of times, yes, I would say.
Q. When did you first spend the night together?
A. Approximately two months after the fact.
Q. After what fact?
A. That we met.
Q. And how often had you seen Mr. Arthur between when you first met him and September 11, 2009?
A. How often --
Q. Yes.
A. -- I did -- Mr. Arthur between --

Q. When you first met him and when your work assignment at UPS Supply Chain Solutions ended?
A. A weekly basis, weekend, yes.
Q. During -- strike that. Since August of 2009 have you dated anyone else other that Mr. Arthur?
A. No. I'm a faithful individual.
Q. Pardon?
A. I said no. I'm a faithful individual.
Q. Has he dated anyone else, to your knowledge?
A. I would hope not, no.
Q. I asked you what you had done to prepare for the deposition and you said that you had spoken to your attorney and you had also spoken to Mr. Arthur. What did you discuss with Mr. Arthur?
A. Just basically telling him I'm getting ready for my deposition. It starts at 9:30 on this particular day. He said just -- you'll be okay. You'll be fine. You're going through a lawsuit, so. But as far as any deep, deep,



deep details, he said you'll be okay, you're fine.
Q. Where does Mr. Arthur work?
A. ELT.
Q. Pardon?
A. He works for a company called ELT.
Q. What kind of company is that?
A. It's like a -- his -- his position within the company is a computer technician.
Q. Where is it located?
A. The headquarters is in San Francisco. He works out of Philadelphia, works from home.
Q. What is his address?
A. 939 Sanger, S A N G E R, Street, Philadelphia, 19124.
Q. Does he live with anyone else?
A. No.
Q. In preparation for the deposition, have you reviewed any documents or writings?
A. For myself -- for my -- me, myself and I, yes.
Q. What have you done?
A. I prepared to come today, basically.
Q. And have you -- did you review any



documents or writings to prepare for the deposition?
A. Just what I basically had myself.
Q. And what is that? What do you have yourself?
A. I mean, it's in my mind so that's what -- what I prepared for.
Q. I'm asking you whether you reviewed any documents or writings in preparation for your deposition?
A. Just my notes that I've taken on my -- my journal, what I've been -- what I've been through for the last year and one-half.
Q. When did you start, first start making a journal or writing in a journal?
A. Right after I was terminated.
Q. Had you ever maintained any type of diary or journal before that?
A. I didn't have a reason to.
Q. Did you?
A. No, no, I didn't have a reason.
Q. Why did you start writing a journal?
A. Because I felt as though not -- this was not correct. I was -- felt as though I was



being discriminated against. So I wanted to make sure I was doing the right thing. So I took note of what I did.
Q. Did anybody suggest that you --
A. No.
Q. -- take notes --
A. No.
Q. -- or maintain a journal?
A. No.
Q. And just for the benefit of the court reporter, if you will try to wait until I finish my question --
A. Sure.
Q. -- before answering. And similarly I will try to wait until you've finished your answer before I ask the next question, and that's just for the court reporter so we're not talking over each other.
A. Okay.
Q. Why did you start maintaining or writing in a journal?
A. Because I felt as though I needed to take notes because I felt as though my mind, it was -- it was too much on my mind and it was --

and time so I needed to write down what I was going through.
Q. And describe for me that journal? Is it a book, a notebook?
A. Written documentation or typed documentation.
Q. Did you type it on a computer?
A. My personal, yes.
Q. What kind of computer do you have?
A. I have HP Pavilion, HP Pavilion.
Q. Is it a laptop --
A. No, desktop.
Q. Desktop?
A. Uh-huh.
Q. And to the extent that you have these typed part of your journal, is that all contained in a single document or file?
A. Yes, it is.
Q. What -- what is the name of that document?
A. Word, Microsoft Word.
Q. Do you -- have you labeled that particular document or journal with some name?



A. It's just labeled statement, statement and the dates.
Q. And are -- is part of your journal handwritten as well?
A. Yes.
Q. And where are those handwritings contained?
A. My primary care doctor. My primary care doctor.
Q. Who is that?
A. Dr. Henry Isiocha.
Q. Is it contained in a booklet or a pamphlet or a notebook or is it just straight pieces of paper?
A. I don't know how he has them, but I know what I provided to him.
Q. What did you provide to him?
A. Papers.
Q. Just pieces of paper?
A. On -- on white -- white printed paper, paper like you're writing on here that you can make a copy, yes.
Q. And why did you provide those to your doctor?



A. So he would see what I was going through, and he referred me to a psychiatrist.
Q. Have you ever thrown away or destroyed any part of the journal or notes that you have made?
A. No.
Q. Have you retained copies of everything?
A. Yes.
Q. So you gave copies to your doctor, at least of your handwritten statements, but you also have the originals?
A. Yes.
Q. Did you give your doctor any of your typed parts of your journal or your typed statement?
A. I can't remember.
Q. Have you shared any parts of your journal with anyone other than your doctor?
A. The psychiatrist.
Q. Who is that?
A. At Mind and Body Consortium in Dover, Delaware.



Q. Now, you, I believe that you said that you started writing or maintaining a journal right after September 11, 2009?
A. Yes.
Q. And how often have you written and/or recorded in any type of statement as part of that journal?
A. Whenever I feel down and think back to what I went through.
Q. And how often has that been?
A. Honestly, a daily -- weekly basis, uh-huh, weekly, weekly, monthly.
Q. How about during the, you know, first six months after September 11, 2009, how frequently during that period of time were you writing things down or making any entries in your journal?
A. More so, it would be every two weeks to the month.
Q. When was the last time you made any entry in your journal or made any type of written notes or statement?
A. Approximately two weeks ago, two, three weeks ago.

Q. What did you write about at that point?
A. How I feel while I'm going through this.
Q. Have you ever made any notes about or journal entries or any type of written record at all of other things that are going on in your life?
A. No.
Q. Have you ever made any notes about any relationships that you've been engaged in?
A. They're included. I mean, that part of the relationship is included. That was in -- my relationship has gone because of -- because of this. It was included in my notes.
Q. What has happened to your relationship?
A. It's on eggshells. It's like shaky.
Q. When did it first start becoming shaky?
A. Approximately -- approximately -- this is May. I'm going to say right after June of last year, June, July last year.
Q. So June or July of 2010?



A. Uh-huh.
Q. You need to give a verbal response?
A. Yes, sorry, yes.
Q. And what happened at that point?
A. I started feeling as though he wasn't interested any more because I still didn't have a job. I was still out of work, and I wasn't able to maintain like my bills and everything.
Q. And how did that affect your relationship?
A. Because I was always able to bring financially to the date, where I always -- I always wanted to do something as far as go out and do certain things, go out to dinner, go out to the movies. I just felt as though I couldn't do anything any more.
Q. But how did that affect your relationship with your partner?
A. Because he was always used to that. He's used to me wanting to be -- to go get -- always go out and do certain things with him.
Q. And did he indicate to you that he resented that fact?



A. He asked me why don't I want to do this, why don't I want to do that. I don't want to. I don't want to do -- I didn't want to do anything.
Q. Did you continue to maintain, though, a good, strong personal --
A. I tried.
Q. -- relationship?
A. I still try to.
Q. And what's the state of your relationship today?
A. We're working on it, put it that way, yes.
Q. Well, tell me what your -- what the state of your relationship is?
A. We're just basically friends now -- now.
Q. When did your relationship change to friends from something more serious and committed?
A. Three months ago, two to three months -- two to three months ago, uh-huh.
Q. Do you currently have a sexual relationship with Mr. Arthur?



A. No.
Q. When was the last time that you had any type of sexual contact with him?
MR. POLIQUIN: I'm going to object to this line of questioning. You can still answer the question.
THE WITNESS: What does that have to do with anything?
BY MR. MCGEE:
Q. I believe it's relevant. You have to answer the question.
MR. POLIQUIN: It's -- you still have to answer the question, Mr. Scott.
THE WITNESS: What is your question again, when was the last time?
BY MR. MCGEE:
Q. Yes. When was the last time you had any sexual contact with Terrence Arthur?
A. March 30th I think -- March 30th.
Q. What year?
A. This year.
Q. Have you had any sexual contact with anyone --
A. No.

Q. -- since that date?
A. No.
Q. Do you have -- do you communicate with Mr. Arthur via e-mail?
A. For work purposes.
Q. What work purposes?
A. He may send me like something like shoes that I like, he might like to -- I like shoes. He may send me shoes or he may send me anything showing like what he brought me or recipes. I like to cook. So that's basically it.
Q. Well, how is that work related?
A. I said or work related issue. Work related, as far as work related -- I may send -- I did send him an e-mail. I sent him an e-mail the other day from my job e-mail, which was a forward e-mail.
Q. What is your work e-mail?
A. J Scott at Nemours dot org.
Q. What is your personal e-mail?
A. JAI Scott at G mail dot com.
Q. What is Mr. Arthur's personal e-mail?
A. T -- TJ -- TJ -- I can't remember -- I



can't remember it. It's saved in my favorites. It's saved in my contacts.
Q. What is his work e-mail?
A. It's in my favorites as well, work -- his work contact.
Q. Have you shared with Mr. Arthur the things that you went through or are going through in relationship to this -- this lawsuit or the work that you provided at UPS Supply Chain Solutions?
A. He knows I've been depressed. I haven't been able to do anything. He's noticed the difference.
Q. And when I -- if I -- I may shorten up UPS Supply Chain Solutions to refer to it as SCS or Supply Chain Solutions --
A. Okay.
Q. -- you'll understand that; won't you?
A. Yes, I will.
Q. How frequently do you have e-mail communications with Mr. Arthur?
A. It's basically mainly phone conversation more than e-mail.



Q. But you do have some e-mail communications with him?
A. Yes.
Q. Have you had any e-mail communications with any current or former worker at Supply Chain Solutions?
A. E-mail.
Q. Have you had any e-mail communications with anyone other than your attorney about any issues relating to this case or any of the emotional distress that you claim that you've experienced?
A. Say that again? Have I had any e-mail --
Q. Yes.
A. -- communication with anyone?
Q. Yes.
A. My witnesses sent me e-mails.
Q. Who are they?
A. Toni Shepperson, Myron Giddens, M Y R O N, Giddens, Vonda Bynum, V O N D A B Y N U M, Janet Evangelista and Nikki Pinkett, P I N K E T T. That's it.
Q. Have you sent e-mails or responses to



those individuals?
A. Thank you. That's it.
Q. Have you provided copies of all of those e-mail communications?
A. Yes.
Q. Who did you give them to?
A. My -- well, EEOC, they have a copy.
Q. Have you given your attorney copies of those e-mails?
A. Yes.
Q. Did you give him copies of everything --
A. Well --
Q. -- all e-mails?
A. I did.
Q. Do you have a Face Book page?
A. Yes.
Q. What is on your Face Book page?
A. My family, me.
Q. Who are your friends?
A. They're on there, right, yes, friends on there but nothing extravagant.
Q. How many friends?
A. Total, wow, like 200, maybe 300.

Q. How frequently do you post on your Face Book page?
A. I just posted -- what's today, Thursday. I posted something on Tuesday, Monday or Tuesday I did.
Q. What was that?
A. I stated on there what I was cooking for dinner that day, and I also stated on there -- let me think -- a song, a video, a song and what else did I put on there. I looked at other people's comments. I replied to other people's comments.
Q. Have you had any other -- any postings or communications via Face Book about your relationship with Mr. Arthur or anybody else?
A. No. Just -- just me saying I'm spending time with someone special and that's it.
Q. Have you posted or communicated with anyone via Face Book relating to any of the kind of emotional things that you claim that you're experiencing or have experienced?
A. On Face Book?
Q. Yes.



A. No. They can't know my business -- no. I very rarely, rarely, rarely post on Face Book.
Q. What is your Face Book password?
A. Password?
Q. Yes.
MR. POLIQUIN: I'm going to object.
THE WITNESS: Password for Face Book?
BY MR. MCGEE:
Q. Yes.
A. What's that have to do with anything?
Q. Well, I believe it's relevant.
A. I mean, why would it be relevant?
Q. It might have something to do with some of the things that you're alleging in this case, Mr. Scott.
MR. POLIQUIN: I'm going to object to the extent that I don't know if he's required to give his Face Book password in a deposition. We don't have a confidentiality agreement in place. If there was such perhaps but unless it's -- I think that's beyond the



scope of what you can ask regarding --
MR. MCGEE: Will you agree to provide us with access to the Face Book page?
MR. POLIQUIN: I think -- well, I would agree to provide discovery as to if there's a request in this case regarding -- that -- that are -- that are on his Face Book page. I think that -- that it's clearly relevant if there's communication.
MR. MCGEE: Have you viewed the Face Book page to determine whether there is anything encompassed within the scope of our request?
MR. POLIQUIN: Well, I'm not going to --
MR. MCGEE: Let me just ask that you do that if you haven't done it already.
MR. POLIQUIN: I'll -- I'll go over it with Mr. Scott. And if you have a request, you can certainly put that and --
MR. MCGEE: Well, the requests have already been submitted. I would have assumed that that would have been done already.



If it hasn't, I ask that you do it, please.
BY MR. MCGEE:
Q. Mr. Scott, do you communicate via Twitter?
A. No, I don't.
Q. Any -- any social media other than Face Book?
A. No.
Q. What is your telephone number?
A. 30 -- 302-423-6338.
Q. Is that a cell phone or a land line?
A. Cell phone.
Q. Do you have a land line?
A. I don't use it. 302-678-3477.
Q. How long have you had that cell phone number?
A. Years.
Q. Who is your cell phone provider?
A. AT&T.
Q. What is Mr. Arthur's phone number?
A. 718-679-8881.
Q. Is that a cell phone?
A. Uh-huh.
Q. You need to give an audible response.

A. Yes.
Q. Thank you. The cell phone number that you gave us, was that the cell phone number that you had as of September 11, 2009?
A. Yes.
Q. What is your mother's name?
A. Doris, D O R I S, Scott, S C O T T.
Q. Her address?
A. The same as mine, 435 Balsam, B A L S A M, Drive, Dover 19901.
Q. Do you live in that home with your mother?
A. Yes.
Q. Does anybody else live there?
A. My brother.
Q. What is his name?
A. Samuel Scott, Jr.
Q. How old is he?
A. Thirty-three, five year difference, 33.
Q. What is your date of birth?
A. 5-18-82.
Q. Where does your brother work?
A. He works for Proctor and Gamble.



Q. Where?
A. Dover, Delaware.
Q. What is his job?
A. Warehouse production.
Q. Do you have any other siblings?
A. No.
Q. Is your father living?
A. Yes.
Q. What is his name?
A. Samuel Scott, Sr.
Q. Where does he live?
A. Barklay, B A R K L A Y, Maryland.
Q. Does he work?
A. Yes.
Q. Where?
A. Kraft Foods, Dover.
Q. What is his job?
A. Supervisor.
Q. What's his phone number; do you know?
A. Work -- work number or home phone?
Q. Home?
A. 410-253 -- I use him in my favorites. 41 -- sorry. 410-253-4529.



Q. What is your brother's phone number?
A. 302-359-2803.
Q. What is your mother's phone number?
A. 302-678-3477.
Q. I'm sorry. Can you state that again, please?
A. 302-678-3477.
Q. What is -- what is your relationship with your father?
A. We're good.
MR. POLIQUIN: Objection.
THE WITNESS: Yes.
BY MR. MCGEE:
Q. Has your father ever had any issue with your sexual orientation?
MR. POLIQUIN: Objection.
THE WITNESS: What does that have to do with anything?
BY MR. MCGEE:
Q. I believe it's relevant, Mr. Scott.
A. No, he has not.
Q. How about your brother?
A. He may have made comments, but he's gotten over it after years as we became older, became more mature.



Q. Are your parents divorced?
A. Yes.
Q. When did they get divorced?
A. I was 14, 15.
Q. Have you ever been involved in any lawsuits other than this -- this case against SCS?
A. Not lawsuit, just an accident case.
Q. Have you ever filed for bankruptcy?
A. No.
Q. What was the accident case?
A. Car -- auto accident.
Q. When did the accident occur?
A. April 2008.
Q. What happened?
A. An oncoming vehicle struck me on the driver's side of -- of my cousin's vehicle.
Q. Were you driving?
A. Yes, yes.
Q. Were you injured?
A. Yes.
Q. In what way?
A. Left shoulder, back injuries.

Q. Did you file some type of claim in connection with that?
A. Yes.
Q. And did you recover money?
A. Yes.
Q. How much?
MR. POLIQUIN: I'm going to object.
THE WITNESS: What does that have to do with anything?
BY MR. MCGEE:
Q. Pardon?
A. What does it have to do with anything?
Q. I believe it's relevant. I wouldn't be asking you otherwise, Mr. Scott.
MR. POLIQUIN: Objection.
THE WITNESS: It was -- I'm adding up my attorney's fees. Total was $9000.
BY MR. MCGEE:
Q. Who was your attorney?
A. Schwartz and Schwartz in Dover, Delaware.
Q. Was there actually a lawsuit filed; do you know?



A. I don't believe so. I don't believe so.
Q. Have you ever -- have you been involved in any -- in any more recent automobile accidents?
A. Yes.
Q. When was that?
A. October 28, 2010.
Q. What happened then?
A. Me and Terrence was on our way to Ron's office.
Q. Coming from where?
A. TJ Max.
Q. Where?
A. Dover, Delaware.
Q. Why were you going to Mr. Poliquin's office?
A. To discuss my case.
Q. Was it a pre-scheduled appointment?
A. Yes.
Q. Why was Mr. Arthur there with you?
A. He was driving me to the appointment. He was going with me to the appointment.
Q. Whose car?



A. My car.
Q. Why was he driving?
A. No. I said he was going with me to the appointment.
Q. Why was he going with you to the appointment?
A. He was my partner.
Q. What happened?
A. We didn't get to go because I had the accident.
Q. What -- describe for me the accident, please?
A. I was driving down Route 13. The sun was glaring into my eyes and I ran in the back of a vehicle.
Q. Was the vehicle stopped?
A. It was approaching the stop -- they were stopped but I didn't see the light because of the sun glare. So I ran into the back of them.
Q. Who was in the other vehicle?
A. A lady.
Q. What was her name?
A. I don't remember her name.



Q. Was she injured?
A. Yes.
Q. Were you injured?
A. No.
Q. What was the nature of the injury of the driver or passenger of the other car?
A. Well, she stated as we were leaving that her back was hurting. And then the next day my insurance company called me and advised me she came into her office and wanted to go to the emergency. They didn't give me any of the specifics of her injury. It was her back. She -- she claimed her back -- her back was injured.
Q. Has she filed a lawsuit in connection with that accident?
A. I don't -- I don't know.
Q. Has she filed some type of claim for compensation?
A. That I'm sure -- I'm sure she has. I'm not really fully aware.
Q. Well, was your vehicle damaged?
A. It was totaled.
Q. Have you had a car since then?

A. I just purchased a car. I was out -- I was out a car for -- from that day up through March of this year.
Q. Is that when you purchased your car?
A. Yes, in March.
Q. Was it a new car?
A. Used.
Q. What was it, what kind of car?
A. Chrysler Sebring.
Q. Convertible?
A. Yes.
Q. What model, what year?
A. 2004.
Q. Where did you buy it?
A. Hertrick.
Q. Pardon?
A. Hertrick.
Q. Is that in Dover?
A. Yes, yes.
Q. How much?
A. Seven -- I had to finance. It was 799 -- the exact price was 799 -- I can't remember the exact digits, but I had to finance it.
Q. Finance through whom?



A. Wells Fargo.
Q. Was the car that you totaled in the October of 2010 accident, was that fully paid for?
A. No. I still owed on it.
Q. What kind of car was that?
A. 2001 Dodge Stratus Coupe.
Q. Did your insurance cover the -- you know, some value for that?
A. Yes.
Q. Was that sufficient to pay off what you owed on the car?
A. Yes.
Q. Do you believe that you have been discriminated against in any way at any other job or work other than at SCS?
A. No.
Q. Have you ever claimed that you were discriminated against in any other way by anyone else?
A. No.
Q. When did you first consult with an attorney regarding any issue that you had in connection with your work at or for SCS?



A. Right after I spoke with the labor board, EEOC, which was between, I would say September '09 through October of '09. I can't remember the exact date, though.
Q. Did you speak with any attorney before going to the EEOC?
A. No.
Q. And what prompted you to contact a lawyer after speaking with the EEOC?
A. No. I'm sorry. I take that back. I take that back because I did speak to -- I did. I did. I spoke to the attorney first. I had a document somewhere -- the EEOC -- I called the E -- EEOC on or about when they first sent -- I went to the EEOC the week after I went to file for unemployment. So like around -- between the time frame of 9-11 and the time frame of -- between the middle and end of September when I contacted the EEOC. And then I also spoke to Ron's office and called another attorney's office. But I didn't get any feedback from them so I went with Ron.
Q. How were you referred to Mr. Poliquin or Mr. Poliquin's office?



MR. POLIQUIN: I'm going to object to the question.
THE WITNESS: Schwartz and Schwartz.
BY MR. MCGEE:
Q. So, the law firm that had represented you in connection with the auto accident referred you to Mr. Poliquin for your employment matter?
A. Yes. I asked them did they have any employment -- I asked them that I needed an employment agency or employment attorney in Dover, Delaware.
Q. Have you spoken to any attorney about any of the issues involved in this lawsuit other than Mr. Poliquin?
A. No.
Q. How long have you lived at your current address?
A. At first -- when my mom and dad first got divorced I was 14 or 15. I went to school in Dover. So I was -- I'm approximately 28 now. I was 14, 15 years old, so ten years plus.

Q. Have you lived anyplace else during that period of time?
A. At 1417 Hopkins Avenue.
Q. Is that Dover?
A. Uh-huh.
Q. You need to give an audible response?
A. Yes, yes.
Q. During what period of time did you live there?
A. 2000 -- after the death of my friend. So I stayed there, which was approximately within the time frame of 2009 through 2010 right after my employment with UPS. But I couldn't maintain my bills at the 435 so I was able to rent at the 1417 Hopkins Avenue.
Q. Well, the -- the 435 was your mother's home; wasn't it?
A. Yes.
Q. What do you mean you couldn't --
A. I couldn't maintain the bills as far as the household expenses. It was cheaper for me to stay at the 1417 Hopkins with a friend of the family's aunt.



Q. With who?
A. A friend of the family's aunt, Denise Wright.
Q. Did she own that house?
A. Yes.
Q. And who is Denise Wright?
A. She's a friend of our family.
Q. Did she charge you any rent or any -- any cost at all to live there?
A. I helped her out with taking care of her grandchildren because when she lost -- once her daughter passed away, she needed help with her grandchildren, three children.
Q. Why did -- when did you end up moving back in with your mother?
A. I moved back in with my mother -- it was back and forth. So I can't say I was basically living there. I was back and forth from household to household throughout that time frame.
Q. Well, when did you resume living with your mother on a full-time basis?
A. Approximately February 2010, February 2010.



Q. Why did you move back in with your mother at that point?
A. Because she needed financial help.
Q. And you mentioned the death of a friend. Who was that?
A. Jamie Cameron.
Q. Who is Jamie Cameron?
A. I went to school with her. She was a close -- a best friend, a close friend, which is Denise Wright's daughter.
Q. How did she die?
A. Natural causes.
Q. Meaning what?
A. Just what I stated, natural causes. She died in her sleep.
Q. Did you graduate from high school?
A. Yes.
Q. What high school?
A. Dover High.
Q. What year?
A. 2000.
Q. Have you had any education since high school?
A. No.



Q. No college or community college or anything?
A. No.
Q. Do you currently have any medications prescribed for you?
A. They have me on -- I was on Wellbutrin. I was -- I'm on Celexa now, Celexa, 20 milligrams, Ambien for the depression.
Q. When was the last time you took any of that medication?
A. I took my Celexa this morning.
Q. What dosage?
A. What is the dosage on that. Twenty -- I'm going to say 20 milligrams.
Q. How frequently do you take that?
A. Every day.
Q. How about the Ambien?
A. When I can't sleep at nights.
Q. How often is that?
A. Two -- two, three times a week.
Q. Are you on any other medication?
A. No.
Q. Do you believe that that medication

that you're taking has in any way impaired your ability to testify completely and truthfully today?
A. Yes. I think -- I think I'm fine.
Q. You're fine?
A. Yes.
Q. You're not impaired; are you?
A. No, I'm fine, no. It just calms me down. I'm fine.
Q. Are you currently employed?
A. Yes.
Q. Where?
A. Nemours Children's Hospital, Al Dupont.
Q. Where is that located?
A. Wilmington.
Q. When did you start there?
A. February 14, 2011.
Q. What is your job?
A. Insurance verification.
Q. What does that involve?
A. Well, incoming phone calls from parents calling to schedule their appointment for their children.



Q. Who do you report to?
A. Tanya Marrero, M A R R E R O.
Q. What is your compensation?
A. $15.25 an hour.
Q. How many hours a week do you work?
A. Forty.
Q. How many days a week?
A. Five.
Q. What days?
A. Monday through Friday.
Q. Do you receive health insurance as part of that job?
A. Yes.
Q. What -- what other benefits?
A. Blue Cross, Blue Shield, medical.
Q. Any retirement plan?
A. Yes.
Q. 401K?
A. 401K, I'm not -- I'm not enrolled in that as of yet.
Q. You're eligible to, though?
A. I am eligible, uh-huh, yes.
Q. Have you had any issues or problems with -- at that job?



A. No.
Q. How has your attendance been?
A. I've been missing time due to what -- I'm here today and going to my doctor's appointment at primary care, Dr. Isiocha and Mind and Body Consortium.
Q. Have you missed any time from work at that job other than when you've had doctors' appointments?
A. No.
Q. Have you received any type of counseling about your job performance or attendance?
A. My job performance is fine, yes.
Q. Has anybody indicated to you that it's unsatisfactory in any respect?
A. No.
Q. Has anybody harassed you at that job?
A. No.
Q. Has anybody discriminated against you on any -- on any basis?
A. No.
Q. Or in any way?
A. No.



Q. Have you had any conflicts with any coworkers at that job?
A. No.
Q. Have you worked anywhere else since September 11, 2009?
A. No.
Q. Even on a temporary basis?
A. No.
Q. How did you get the job at Nemours?
A. Searched on the internet, Nemours dot org.
Q. What is your sexual orientation?
A. I'm gay.
Q. And when did you first come to the realization that you were gay?
MR. POLIQUIN: Object.
THE WITNESS: 2005, 2005.
BY MR. MCGEE:
Q. How did you come -- how did you come to that realization?
A. I was attracted to gentlemen, to men.
Q. When was your first homosexual relationship?

A. I wouldn't call it a relationship. I would just say that I would speak to men, like hi, bye. But a relationship, relationship it would be 2007.
Q. Who was that first relationship with?
A. Sean Horne.
Q. Last name? I'm sorry.
A. H O R N E.
Q. Who is he or how did you know him?
A. I knew him. I -- I did know him, yes.
Q. How?
A. He was my friend. He was just a friend, just a friend.
Q. How did you meet him?
A. I met him in Philadelphia at a night club, at a club.
Q. How long did that relationship last?
A. We was just a friend. It was nothing sexual. It was just friends, phone conversations, just friends.
Q. So what was your first homosexual relationship and of a sexual nature?



MR. POLIQUIN: Objection.
THE WITNESS: Terrence Arthur.
BY MR. MCGEE:
Q. So, Mr. Arthur was your first relationship?
A. Yes, he was.
Q. And you say that began in the summer of 2009?
A. Yes.
Q. Have you had a relationship with anyone other than Mr. Arthur?
A. A female but that was when I was -- like I said, before that time but no.
Q. That was before 2005?
A. Yes.
Q. But have you had a homosexual relationship with anybody other than Mr. Arthur?
A. No, sir.
Q. Have you dated anyone else other than Mr. Arthur?
A. Movies, yes, just movies and friends, that's it.
Q. Did you date anyone else during the



time period that you worked at the Supply Chain Solutions location?
A. No, only just Terrence Arthur.
Q. Were there other individuals, homosexual individuals who worked at the Supply Chain Solutions location?
A. Not that I'm aware of.
Q. Where did you work prior to starting a work assignment at Supply Chain Solutions?
A. Hospital Billing Collection Services in New Castle.
Q. Hospital Billing --
A. Yes. It's Hospital Billing Collection Services.
Q. Is it hospital building or Hospital Billing?
A. Billing, B I L L I N G.
Q. Where was that located?
A. In New Castle, Delaware.
Q. What was your job there?
A. Insurance verification.
Q. During what period of time did you work there?
A. I worked there twice, actually. My



last time working there was -- I started -- I started on June 2008 -- no. I started there -- I only worked there for five or six, seven months, put it that way, for the second time that I went back.
Q. What -- what years?
A. 2000 -- it was UPS for 2009 -- no. 2000 -- 2008, 2008, 2007, 2008.
Q. Were you an employee of Hospital Billing Collection Services?
A. Yes, I was.
Q. So this was not a work assignment you got through Kelly Services?
A. No. It's permanent -- a permanent assignment.
Q. Why did that employment end the first time?
A. I needed to be closer to home and get more experience. So I went to Aetna in Dover, Delaware.
Q. How about the second time, why did it end?
A. I went to UPS for a temp -- temp to perm position. It was closer to home.

Q. Who was your supervisor at Hospital Billing Collection Services?
A. I had two. She's no longer there. Her name was Kim Bantum, B A N T U M. I had another supervisor named Liz -- what was her last name -- Poe, P O E.
Q. Did you have any issues or conflicts with anybody at that job?
A. No.
Q. Did you feel that anybody harassed you or discriminated against you in any way?
A. No.
Q. What year did you get out of high school?
A. 2000.
Q. So -- so where else did you work prior to getting the work assignment at Supply Chain Solutions?
A. Hospital Billing, Aetna, Household and JP Morgan Chase.
Q. Why don't you take it through -- me through it chronologically?
A. Okay. First was -- first was --
MR. POLIQUIN: Mr. Scott, just



answer the question that he asks.
THE WITNESS: He asked the time frame. Okay. I'm putting the time frame together. One second.
MR. POLIQUIN: I mean, you're not here to speculate or guess.
THE WITNESS: Right. Okay. JP Morgan Chase and then Household and then EDS with Kelly Services, Aetna and then Hospital Billing and then UPS Supply Chain.
BY MR. MCGEE:
Q. What was your job at JP Morgan Chase?
A. Collection representative.
Q. What period of time did you work there?
A. 2001.
Q. What location?
A. White Clay Center.
Q. Pardon?
A. White Clay Center.
Q. Where is that?
A. Newark, Delaware.
Q. Were you employed by JP Morgan Chase?



A. No. That was temporary through -- then it was -- it was a temp to perm position.
Q. So did you become a regular JP Morgan Chase employee?
A. Yes.
Q. Why did your employment end?
A. They downsized.
Q. You were laid off?
A. Uh-huh, yes.
Q. Was your job performance or attendance ever criticized?
A. No, top performer.
Q. What was your job at Aetna?
A. Customer service.
Q. Where?
A. Dover, Delaware.
Q. During what period of time?
A. 2000 and -- I can't remember the exact dates.
Q. So why did it end?
A. Right before I went to EDS.
Q. Why did it end?
A. Aetna downsized, too. They sent



workers to work from home. So that office -- office closed.
Q. Did you have any issues or problems at that job?
A. No.
Q. Did you believe you were discriminated against or harassed in any way by anyone?
A. No, top performer.
Q. You mentioned Household. When did you work for Household?
A. Household, I worked there 2000 into '01, 2002.
Q. Is that HBSC?
A. Yes.
Q. What was your job there?
A. Collections representative.
Q. Why did your employment end?
A. That was temporary.
Q. Through an agency?
A. Yes.
Q. What agency?
A. Ranstadt.
Q. When you say temporary, what do you mean by that?

A. Temporary assignment.
Q. Were you actually employed by Household?
A. It was a temp to perm, yes -- yes, sir.
Q. So you were a Household employee?
A. After I was a permanent, yes. They offered --
Q. So you started as a temp and then you were actually hired by --
A. Yes.
Q. -- Household?
A. Yes, yes.
Q. Just, if you will --
A. Yes.
Q. -- let me finish the question just for the benefit of the court reporter?
A. Okay.
Q. And why did your employment at Household end?
A. I went to the other location, the other job location, which was -- what did I tell you after that?
Q. You tell me, EDS?



A. It may have been. I can't remember.
Q. Well, why -- if you were a Household employee, why did you leave Household?
A. I wanted to be closer to home, to Dover. Household was in New Castle.
Q. When you worked at EDS was that as a Kelly Services employee?
A. Yes.
Q. What location of EDS?
A. On Chapman Road in Newark, Delaware.
Q. What was your -- what was your job there?
A. Client service representative.
Q. What did that involve?
A. Answering calls for Delaware prescription assistance program.
Q. Who was your supervisor?
A. I forget her name. I forgot her name.
Q. Did you have any issues or problems at that job?
A. Excuse me. No.
Q. Why did it end?
A. Temporary assignment.
Q. When you were first given that



assignment, did you -- did it have a specific end date?
A. No, just temporary.
Q. So why did it end?
A. They no longer needed the temporaries. They no longer needed the temp.
Q. Have you ever worked at Client Logic?
A. That was back in -- right after high school as well. I was in high school still, yes.
Q. What was your job there?
A. Mail room clerk.
Q. Why -- did you -- were you employed by Client Logic?
A. Yes, it was Client Logic, yes.
Q. What location?
A. Dover, Delaware.
Q. Why did that job end?
A. That was just -- I was not making enough money. I wasn't making enough.
Q. Did you go to another job directly from there?
A. I can't remember. What year was that?



I can't remember.
Q. When did you first become employed by Kelly Services?
A. Kelly Services, I can't remember the exact date. I can't remember the exact date.
Q. What year?
A. I had an assignment with them in Dover, Delaware back in -- it was a Playtex assignment doing production and data entry.
Q. When?
A. I can't remember the exact date.
Q. What year?
A. That may have been right after Client Logic.
Q. What other work assignments have you had through Kelly Services?
A. That's it.
Q. Just Playtex?
A. Playtex, EDS, Supply Chain, yes.
Q. Was the assignment at Aetna through Kelly Services?
A. No, permanent.
Q. You were actually an Aetna employee?
A. Yes.

Q. Did you have any type of -- of employment agreement with Kelly Services?
A. Yes.
Q. Where is that employment agreement?
A. With Kelly Services still.
Q. You never had a copy of it?
A. It's in my file at Kelly Services, yes.
Q. What -- what does the employment agreement say?
A. Basically states your time, your attendance, your performance, temp to perm position, dress code. That's it.
Q. Do you have any documents at all relating to your employment at Kelly Services?
A. I have the policy with the dress code. I still have that.
Q. Do you have any type of employee handbook?
A. That was included. That's included in that.
Q. So, you do have the employee handbook?
A. Yes.



Q. And Kelly Services explained to you that you're not actually employed by the company where you're working unless and until they decide to hire you as an employee?
A. Yes.
Q. Were you ever hired as an employee by Supply Chain Solutions?
A. No.
Q. So, while you were working at Supply Chain Solutions, you were employed by Kelly Services?
A. Temporary, yes.
Q. How did you first find out about a job assignment at Supply Chain Solutions?
A. I contacted Kelly Services.
Q. You did?
A. Yes.
Q. What prompted you to contact it, Kelly Services?
A. Because I needed something closer to home because Hospital Billing was too far away. So I called and spoke to Paola, which was a staffing representative and advised her I needed something closer to Dover. And she



advised me it was a temp to perm position that was going to be available with Supply Chain.
Q. Who was that individual?
A. Paola, P A O L A, last name, C A R A Z O.
Q. So she explained to you that you would start that work assignment as a Kelly Services employee, not a Supply Chain Solutions employee but there was a possibility that you -- down the road you could be hired by Supply Chain Solutions?
A. Yes.
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. What else did Paola tell you about the work assignment at Supply Chain Solutions?
A. The dress code, the performance I would have to do, the requirements.
Q. What did she tell you about that?
A. She said that I had the experience. There would be a collections positions. So I had -- I had the experience, so it would be a collections position, the hours, Monday through Friday and the pay rate.



Q. Did you speak with anybody about that job assignment other than Paola?
A. I interviewed at Supply Chain.
Q. With whom?
A. Nikki Pinkett.
Q. Anyone else?
A. No, no.
Q. What did that interview involve?
A. The same information, temp to perm position, Monday through Friday, what I would be responsible for doing on a daily basis. I had the experience. And then pay -- not the pay rate. They don't discuss pay rate there. The pay rate would be discussed at the temp agency.
Q. So you never talked about pay or compensation with anybody at Supply Chain Solutions?
A. No. Only --
Q. That was strictly through Kelly Services?
A. Yes, sir.
Q. And I take it you were paid by Kelly Services --

A. Yes.
Q. -- not Supply Chain Solutions?
A. Yes.
Q. As a Kelly Services employee, did you receive any employee benefits other than your -- your wages?
MR. POLIQUIN: Objection.
THE WITNESS: No.
BY MR. MCGEE:
Q. You never received any type of employee benefits as a -- when you were working at Supply Chain Solutions; did you?
A. No.
Q. Excuse me. Did you?
A. No.
Q. When did you first start the work assignment at SCS?
A. It was on November 2008.
Q. When you started that work assignment, did you -- did anyone give you any indication about how long it would last?
A. They just stated temp to permanent position.
Q. Who told you that?



A. The agency.
Q. Kelly?
A. Kelly Services, yes. And the name is Gigi, Gigi Trainer also advised me of that information.
Q. Is that somebody at Kelly Services?
A. Yes. Her name is G I G I, Gigi Trainer -- Trainer.
Q. Did anyone ever discuss with you how long you would have -- would have to work as an employee of Kelly Services before you were eligible to be considered for hire by Supply Chain Solutions?
A. No. They just said it was a temp to perm position.
Q. What did you understand that to mean?
A. Three months is basically is when -- three months.
Q. At what location of SCS did you work?
A. 200 Biddle.
Q. In newark?
A. Yes.
Q. Now, I thought that you told me that



you -- when you contacted Kelly Services about a new -- getting a new work assignment that you wanted to be closer to home?
A. Yes.
Q. Is -- where -- where were you working at that time?
A. That was in New Castle, which is further up.
Q. So you think Newark, Delaware is -- is closer to your home than New Castle?
A. Yes, with traffic, yes, sir.
Q. What type of work did you perform at the SCS location in -- on Biddle Street?
A. Collections representative.
Q. What does that involve?
A. Contact clients regarding outstanding balances on Bracco Diagnostic supplies.
Q. What kind of business is SCS?
A. Supply Chain Solutions.
Q. And what is it? What do they do?
A. Supply diagnostics to hospitals, doctors' offices, x-rays, chemicals, supply -- supply chain.
Q. Supply chain for pharmaceuticals?



A. Yes, yes.
Q. So -- so who -- who are Supply Chain Solutions or SCS's customers?
A. Some of them were -- there were so many. Some of them were --
Q. Well, they're pharmaceutical companies?
A. Yes.
Q. Okay. And -- and so what Supply Chain Solutions does is it just kind of does the fulfillment and delivery of -- of pharmaceuticals for their pharmaceutical clients?
A. For Bracco Diagnostics, yes.
Q. And Bracco Diagnostics is one of the clients?
A. Bracco diagnostics is who I basically worked for within that facility, Supply Chain Solutions.
Q. So -- so you would be as a -- working at Supply Chain Solutions, you would be doing effectively kind of collections work for Supply Chain Solutions, Bracco Diagnostics?
A. Yes.

Q. And -- and that would involve, what, telephone calls?
A. Uh-huh, yes, telephone calls, e-mails, yes.
Q. Did -- did your work assignment remain essentially the same through the entire period of time that you worked at the Biddle Street location?
A. Yes.
Q. So, you were basically engaging in collection services via telephone and e-mail on behalf of Supply Chain Solution client, Bracco Diagnostic?
A. Yes.
Q. Were there other Kelly Services employees who were working at the Biddle Street location doing effectively the same thing?
A. Yes.
Q. Who were they?
A. Toni Shepperson, Vonda Bynum, Janet Evangelista. She was hired the same day I was hired.
Q. By Kelly Services?
A. Yes. Who else -- I can't remember the



others' names but there were maybe others as well.
Q. And all of those individuals were Kelly Services employees and not Supply Chain Solutions' employees?
A. Yes.
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. Were they all basically doing the same work that you were doing?
A. Yes.
Q. Was there any -- a name given to kind of the work group that you worked with?
A. No.
Q. Was it called the collections group or the order to cash group or anything like that?
A. Collections team, collections team.
Q. Was there a supervisor for that group?
A. Nikki Pinkett.
Q. And was she the supervisor for that group the entire time that you worked at the Biddle Street location?
A. No, not the entire time.



Q. Who else supervised -- was the supervisor in that group?
A. Sherri.
Q. When did Sherri O'Connell become the supervisor of that group?
A. Approximately the end of July, August.
Q. 2009?
A. Yes.
Q. So initially Nikki Pinkett was the supervisor of the group and then --
A. From when I started --
Q. Sherri took over?
A. Yes.
Q. Who did Sherri O'Connell report to?
A. Kim Kohler, Heidi Maslin.
Q. Did you have a regular work schedule when you worked at the Biddle Street location?
A. Yes.
Q. What was your schedule?
A. 8:30 to 5:00, Monday through Friday.
Q. What was your normal routine upon arriving at work? Kind of walk me through a typical day.
A. I get to work, go in, happy go lucky



person, hi, good morning, happy Friday, happy Monday, how are you, clock in, sit down, eat breakfast, warm my oatmeal up or speak to everyone.
Q. So you clock in before you went to get breakfast?
A. Yes.
Q. So -- so you -- how would you clock in?
A. On the -- on the computer, at my own PC.
Q. And then would you go get breakfast?
A. Yes.
Q. Where would you go get breakfast?
A. Right in the -- right in the little lunch -- right to warm my breakfast up, right in the little concession area in the break -- in the break room or bring it with me at times.
Q. And would you eat breakfast in the break room?
A. No. At my desk.
Q. So, you get your breakfast, bring it back to your desk?

A. Yes.
Q. And -- and would you eat your breakfast while working or would you just eat your breakfast before starting work?
A. Eat breakfast throughout the morning while working.
Q. And -- and describe for me kind of, you know, the typical, you know, work assignment that you would be involved in? Would you be looking at a computer screen?
A. Looking at a computer screen.
Q. And what would show up on the computer screen?
A. Spread sheets for different clients to call -- to call throughout that day, contact the client throughout the day.
Q. And would you record something on the computer when you called somebody?
A. Yes, we'd take notes.
Q. And that would all be recorded in the -- in the computer?
A. Yes.
Q. So, if you called somebody, you'd enter in the -- the computer I called so and so



at this time and here's what they had to say?
A. Yes.
Q. Did you typically take a lunch break?
A. Yes.
Q. Did you go the same time every day or --
A. It was different.
Q. Did you have flexibility in terms of what time you broke for lunch?
A. Yes.
Q. Typically what did you do during your lunch break?
A. Go to McDonald's, KFC, go out. Sometimes I stayed at my desk.
Q. Would you clock out in any way when you started your lunch break?
A. Yes.
Q. How did you do that, get on your computer?
A. Same.
Q. And how would your -- your day typically end? What did you do at the end of the day?



A. Clock out and go home, shut the computer down and restart it.
Q. Now, let's -- let's -- let's talk about the, you know, clocking in. Tell -- tell me how that process worked?
A. I believe it was called Cronos, but if it's not, I don't know the terminology that they have. But I would go in, type in my user name and password.
Q. And -- and this is on your personal -- your own computer in your work area?
A. Yes.
Q. And -- and what was your work area?
A. Cubicles.
Q. Did you have your own cubicle?
A. Yes.
Q. So, you had a computer in your cubicle?
A. A PC in a cubicle, yes.
Q. Go ahead. Take me through the process of clocking in?
A. So come up, pull up the computer, put in the user name and password, pull up the punch in system, clock in. And it -- it can



stay up all day or stay down all day. It didn't really matter. Then lunch time came, same thing. End of the day came, same thing.
Q. And did you also have -- have to log into some type of Kelly Services --
A. Yes.
Q. -- system?
A. Yes, we did.
Q. So, you clocked in through a Kelly Services web site as well?
A. Yes.
Q. And basically did the same thing?
A. Yes, sir.
Q. And when you logged on to the computer, did you actually have to enter a time or did it automatically enter the time for you when you logged on?
A. I always restarted my computer for the next morning. It would come right up. So I would unlock it, password sensitive -- I mean, put my password and user name and then clock into the system. They had a specific system to clock in on.
Q. And did you have to enter a specific

time or did the time automatically get entered for you --
A. You had -- you had to enter your time.
Q. And what time would you enter?
A. The time I would get there.
Q. So when -- when you walk through the first door -- through the front door, was it the time when you actually started logging on your computer --
A. When I sat down and started working, yes.
Q. So, it would have been the time right before you logged onto the computer?
A. Uh-huh, to start my workday, yes.
Q. Was there ever any -- any time when the computer was down or unavailable --
A. Yes.
Q. -- for you to log on?
A. Yes.
Q. When?
A. September 11.
Q. Was that the first and only time that the computer system was unavailable for you to log in?



A. As I can recall, yes, that was a major issue. It was relocating.
Q. Did you ever fill out any type of employment application for Supply Chain Solutions?
A. On several occasions.
Q. Though you were never hired as a Supply Chain Solutions employee?
A. We were advised -- no. We were advised nothing was available at the time.
Q. You were paid by Kelly Services, I think you said?
A. Yes.
Q. And did you get a check from Kelly Services or did Kelly deposit your pay directly into a bank account?
A. A check.
Q. And did you pick up the check at Kelly Services?
A. They would mail it -- no. I can't remember. They mailed us a pay stub. They mailed -- yes, they mailed us a pay stub --
Q. Well, did you --
A. Hold on. Let me think. How did we



get paid. It was check. We didn't have to go to the office, no.
MR. POLIQUIN: Mr. Scott, please don't speculate.
THE WITNESS: No, I can't -- I can't remember.
BY MR. MCGEE:
Q. So -- so you don't recall if Kelly gave you a physical check or whether they directly deposited it in a bank account?
A. No, I can't remember.
Q. Did you have a bank account?
A. Yes, I did.
Q. But you know that you did get at least a pay stub from Kelly Services?
A. Direct deposit I had, TD Bank, yes.
Q. But you got a paper pay stub for --
A. Yes.
Q. -- from Kelly confirming that they had deposited --
A. Yes.
Q. -- your pay in your account? Again, just try to let me finish the question. So let me -- you -- Kelly Services deposited your pay



directly into your bank account, correct?
A. Yes.
Q. But then Kelly Services gave you a paper pay stub confirming that direct deposit?
A. Yes.
Q. Did you ever take any vacations during the period of time that you worked at the Biddle Street location?
A. I was off with supervisor approval for Memorial Day of 2009.
Q. When you wanted to have -- take time off, how did you go about getting that time off?
A. Kelly Services had to approve it.
Q. Who at Kelly Services had to approve it?
A. Paola.
Q. Paola Caroza?
A. Yes.
Q. And -- and how about if you were going to be late or miss a day; would you also have to call in to Paola or somebody else at Kelly Services to let them know you were going to be late or were going to be absent?

A. Yes.
Q. During the time -- during the period of time that you worked at the Biddle Street location, did you receive any type of performance evaluation or performance appraisal from Kelly Services?
A. No.
Q. Did anybody at Kelly Services talk to you about how your job performance was?
A. Yes.
Q. Who was that?
A. Paola.
Q. Was that in a face-to-face meeting or was it a telephone call?
A. Both.
Q. What was the Kelly Services location where she worked?
A. New Castle, Delaware.
Q. And when you had a face-to-face conversation with Paola at Kelly Services about your performance, what did she say to you?
A. You're doing fine. You're doing well. Keep up the good work. They like you there at UPS.



Q. And -- and did you have the same types of conversations with Paola over the phone?
A. Yes.
Q. And -- and you -- you claim that you were a good worker while working at the Biddle Street location, correct?
A. Yes.
Q. Did Sherri O'Connel ever indicate to you that she believed or -- that you were a good worker?
A. We never discussed that.
Q. Did Sherri ever give you any type of feedback on your job performance?
A. I can't remember.
Q. Do you believe that Sherri O'Connell thought that your work performance was good?
A. She never stated it to me.
Q. Okay. But do you believe that she thought that your job performance was good, regardless of whether she stated to you or not?
MR. POLIQUIN: Objection.
THE WITNESS: She should have. But I believe she should -- I believe she should have.



BY MR. MCGEE:
Q. Was Sherri O'Connell ever complimentary of you?
A. We didn't really talk.
Q. Is -- is it true that Sherri O'Connell was complimentary of you and said that you were very detailed oriented -- oriented and had outstanding customer skills?
A. She never told me that.
Q. Did she tell anybody that?
A. She may have, but I wasn't aware of that.
Q. Did anyone ever tell you that you were on track to being hired by Supply Chain Solutions as a Supply Chain Solutions employee?
A. I spoke to Heidi Maslin about it.
Q. When?
A. Throughout my time of employment there.
Q. What did Heidi Maslin tell you?
A. Apply for the position. That's when I applied.



Q. When you applied for employment at Supply Chain Solutions, they told you nothing was available?
A. Nothing was available at that point in time.
Q. When was the last time that you spoke to Heidi Maslin about the possibility of being hired by Supply Chain Solutions as an employee?
A. Prior to being terminated. I can't remember the exact date.
Q. How -- how close in time to September 11, 2009 was it?
A. I would say maybe a month to two months, maybe.
Q. What did she tell you at that time?
A. Nothing was available. That's it.
Q. Did anybody tell you that you were on track to being hired by Supply Chain Solutions as a Supply Chain Solutions employee?
A. I spoke to Nikki Pinkett about it when she was my supervisor.
Q. What did Nikki Pinkett tell you?
A. They were working on getting the temps hired.

Q. Did that ever happen?
A. No.
Q. Do you know if Sherri was in favor of hiring you as a Supply Chain Solutions' employee?
A. I don't know.
Q. Did you ever speak with anybody other than Heidi Maslin and Nikki Pinkett about the possibility of being hired by Supply Chain Solutions as a Supply Chain Solutions' employee?
A. Paola.
Q. And what was your discussion with -- with Paola?
A. I thought this was temp to perm. I've been temping for a while now.
Q. And this is Paola Caroza?
A. Yes.
Q. What did she tell you?
A. They're trying to get the temporaries -- they're trying to get the temporary employees permanent positions.
Q. How -- how much contact did you have with Heidi Maslin?



A. Every day.
Q. How would you describe your relationship with her?
A. Fine, great.
Q. Did Heidi Maslin ever do or say anything to indicate to you that she didn't like you?
A. No.
Q. Did Heidi Maslin ever discriminate against you in any way based on your sexual orientation?
A. No.
Q. Did Heidi Maslin ever discriminate against you based on your, you know, feminine behavior or your failure to kind of conform to any stereotype about what a man should act like?
A. No.
Q. Did Heidi Maslin know that you were gay, homosexual?
A. I'm sure she did, yes.
Q. How do you know whether she knew that?
A. My actions, the way I dressed, my hairstyles.



Q. Did you ever tell her that you were homosexual or gay?
A. I didn't tell her, no.
Q. Did she ever say or do anything to indicate that she knew that you were gay?
A. No.
Q. Did Heidi Maslin ever do or say anything to suggest that she would discriminate against somebody based on their sexual -- sexual orientation if they were gay?
A. No. I need a break.
Q. Sure. Do you want to take a break?
THE VIDEO TECHNICIAN: We're going off the record. We're at the end of disk No. 1. The time is 11:25.
(Whereupon a break was taken.)
THE VIDEO TECHNICIAN: We're back on the record. We're at the beginning of disk No. 2. The time is 11:41. Please continue.
BY MR. MCGEE:
Q. Ms. Scott, who was Kim Kohler?
A. She was a manager at Supply Chain.
Q. Did you have contact with her?



A. Not really, no.
Q. Ever?
A. Just hi and bye, keep going.
Q. Did she ever do or say anything to indicate that she did not like you?
A. No.
Q. Did she know that you were gay or homosexual?
A. She may have. I don't know.
Q. Pardon?
A. She may have. I don't know.
Q. Did Kim Kohler ever discriminate against you in any way based upon your sexual orientation?
A. No.
Q. Did she discriminate against you in any way based on your feminine behavior or failure to conform to any stereotype about what a man should act like?
MR. POLIQUIN: Objection to this line of questioning.
THE WITNESS: I never knew of her -- no.
BY MR. MCGEE:

Q. Did Kim Kohler ever say or do anything to indicate that she was biased or prejudiced against people who were gay or homosexual?
A. I never really had contact with her, so, no, just spoke to her.
Q. Well, did she ever say or do anything to indicate that she would discriminate against anybody on the basis of their sexual orientation?
A. No.
Q. Did you know who Sherri O'Connell was before she took over for Nikki Pinkett?
A. I just seen her around the office.
Q. Did you have any contact with her before she took over for Nikki Pinkett?
A. No. I just would see her.
Q. How would you describe your relationship with Sherri O'Connell?
A. Hi, bye, that's it.
Q. Just casual?
A. Uh-huh.
Q. Pardon?
A. Yes, sorry, yes.
Q. After Sherri O'Connell took over for



Nikki Pinkett, did you have any contact with Sherri O'Connell?
A. We had our meetings, our Wednesday morning meetings or our daily meetings with the team.
Q. And was that basically your only contact with her?
A. As I can recall.
Q. Were those meetings group meetings?
A. Yes.
Q. How many people were in those meetings?
A. The Bracco -- the Bracco team, approximately nine, ten, 11.
Q. Did Sherri O'Connell ever do or say anything to indicate that she did not like you?
A. We had a talent show the summer of -- that summer, and she was a part of our group. They were being Supremes, and I was one of the judges. And I -- when I went to judge the group, I asked the group why was she dressed the way she was dressed. And that's when I noticed another -- a difference within the way she would treat me. Because she didn't have on



a wig like the rest of the team had on a wig or the rest of the singers had on a wig. So I noticed a difference then.
Q. Was that before or after she took over for Nikki Pinkett?
A. She was supervisor then, I believe. I want to say she was supervisor then.
Q. Who did you ask that question to?
A. Ask what question to?
Q. Why wasn't she wearing a wig?
A. I asked the group, the three -- the ladies within the group. But then I -- if I can recall, she was -- stated back she just didn't have a wig on.
Q. And you said you noticed some change after that?
A. Yes.
Q. So, prior to that what was her demeanor and treatment of you?
A. It was just still casual.
Q. Excuse me. So prior to that occasion Sherri O'Connell had never done or said anything to indicate that she didn't like you; had she?



A. Just spoke, hi and bye, spoke casual.
Q. But prior to you asking that question at the talent show, had she ever done or said anything to indicate that she didn't like you, she was biased against you in any way?
A. I would sense --
MR. POLIQUIN: Objection.
THE WITNESS: I would sense she didn't want to be bothered with me.
BY MR. MCGEE:
Q. Prior to you asking that question?
A. Prior, yes. I -- I would get a sense of it, I would.
Q. What gave that you sense?
A. I would see her speak to other individuals on the team, have this -- go over to their desk, talk to them, unlike me, no.
Q. Well, did she ever do or say anything else to indicate that she didn't want to be bothered with you or didn't like you?
A. No. That would be about it.
Q. And how about after you asked that question at the talent show, did -- did things change at all?

97

A. Yes. That's when I really, really took -- took heed to it.
Q. Well, what changed?
A. The looks.
Q. What else other than the looks?
A. She didn't speak as much.
Q. Had she spoke with you a good bit before?
A. Just the casual good morning but not as much after that situation.
Q. Anything else change?
A. Not that I can recall.
Q. The -- the talent show, did Sherri O'Connell indicate to you in any way that she was offended by the question that you asked about why she didn't wear a wig?
A. She just stated she just didn't have one on. She just didn't have one.
Q. Why do you believe that you asking that question caused her to change her -- in her treatment or interaction with you?
A. Because I had to judge the whole group. And I specifically said to her and the -- and the group, why isn't Sherri wearing

98

a wig. You're supposed to be the Supremes. Everyone else looks nice. You're doing the -- you're doing the Supremes song. She was, well, I didn't have one on. It's okay.
Q. So do you think she was offended or angry with you for asking that question?
A. I think she may have felt like I was picking her out or pointing her out but I wasn't.
Q. And you think that's what caused her treatment of you to change?
A. Possibly because she knew if it was me -- possibly, yes, possibly.
Q. So what about her looks changed?
A. I would say like a negative look, like a facial expression.
Q. You have to explain to me what you're talking about?
A. Smiling, it wouldn't be -- it wouldn't be a smile, like a morning smile, no, like a greeting smile, like a greeting smile in the morning.
Q. What would it be?
A. Just a regular, keep on looking

99

like -- like this compared to a smile, like a greeting smile.
Q. And how did the frequency with which she spoke to you change, if at all?
A. On 9-11 she spoke that morning, which I was just surprised.
Q. I'm just asking -- I thought you said that she didn't speak with you as much after you asked the question at the talent show --
A. Yes, yes --
Q. -- is that true?
A. Yes.
Q. How did that change?
A. The day after I noticed -- the day --excuse me. The day after until -- until 9-11.
Q. So -- so tell me about what -- you know what it was before and how it changed after you asked her the question at the talent show?
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: I just stated that. I stated that it was casual speaking.

100

The talent show, from after the talent show it was like it wasn't the same -- it wasn't the same Sherri. I noticed a difference.
BY MR. MCGEE:
Q. Okay. So tell me what the difference was?
A. I just stated that. There was a smile previously. After the talent show it was just a regular, just a look.
Q. And how about did the way she talked to you or the frequency with which she talked to you change in any way after you asked the question at the talent show?
A. Yes.
Q. How?
A. It wouldn't be as I would expect as far as a supervisorly speaking to an employee.
Q. Well, tell me how it changed?
A. The speakingness, I just stated that.
Q. What differences were there in that?
A. Good morning, Jason, how are you doing. Sherri, how are you. And then I noticed a difference, like I said the facial

expressions.
Q. We talked about the facial expressions. I want to talk about the talk now. Did the talking, the way she spoke with you or the frequency with which she spoke with you change after you asked the question at the talent show?
A. With me, yes.
Q. Tell me what the change was?
A. It wasn't --
MR. POLIQUIN: Objection.
THE WITNESS: -- the same.
BY MR. MCGEE:
Q. What was the difference?
A. She didn't speak.
Q. She never spoke to you again?
A. She just -- her facial expressions.
Q. Again, we've talked about the facial expressions. That's one thing. Now I want to know if there's any change in the way or frequency with which she actually spoke to you?
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: That's my answer.



BY MR. MCGEE:
Q. Anything more?
A. No.
Q. Any other differences?
A. Not that I can remember any differences, no.
Q. Did you ever tell anybody at Supply Chain Solutions that you were gay or homosexual?
A. Myron Giddens knew. I worked with him previously.
Q. Where?
A. JP Morgan Chase.
Q. Did you tell him at Supply Chain Solutions that you were gay or homosexual?
A. They could tell.
Q. We'll -- we'll get to that. My question is, did you tell anybody at Supply Chain Solutions that you were gay or homosexual?
A. No.
Q. Did Sherri O'Connell ever do or say anything to indicate that she knew that you were gay or homosexual?



A. Just her actions towards me I felt as though she knew.
Q. Do you know whether she knew?
A. She knew.
Q. How do you know whether she knew?
A. She could tell, like I said, by my hairstyles, how I dressed.
Q. Did Sherri O'Connell ever do or say anything to indicate that she knew that you were gay?
A. She -- when I had the mohawk, I noticed a frown, like she wasn't really interested or what have you.
Q. Did Sherri O'Connell ever do or say anything else to indicate that she knew that you were gay?
MR. POLIQUIN: Objection as to -- to a time frame.
BY MR. MCGEE:
Q. At any point did Sherri O'Connell ever do or say anything to indicate that she knew that you were gay?
A. The way I would dress.
Q. I'm asking you what Sherri O'Connell



said or did, not what you said or did.
A. The time -- I'm telling you, yes, as far as the way I would dress, the -- the facial expressions I would recognize.
Q. What facial expressions?
A. That she would make towards what I had on, my clothing I would have on.
Q. When did she make a facial expression relating to what you were wearing?
A. I can't remember the time, the time frame but the summer -- the summer of 2009.
Q. What were you wearing?
A. Shorts, pink.
Q. Pink what?
A. Pink polo shirt.
Q. When did you wear shorts and a pink polo shirt?
A. I don't know the exact date.
Q. Are you just making this up?
A. No.
MR. POLIQUIN: Objection.
THE WITNESS: I don't know the exact date.
BY MR. MCGEE:

Q. Do you have a specific recollection of wearing shorts and a pink polo shirt one day?
A. Yes, I do. I have an outfit, it's a polo outfit.
Q. And did Sherri O'Connell see you in that outfit?
A. She had to. Everyone seen me in the outfit.
Q. Did do you recall Sherri O'Connell, seeing you or reviewing you wearing shorts and a pink polo shirt?
A. Yes, she had to.
Q. And did she do or say anything about that?
A. Just the facial expression.
Q. What facial expression?
A. Like a -- just I would notice a facial expression like -- just a facial expression.
Q. What kind of facial expression?
A. Like she didn't like it basically.
Q. And describe for me what the facial expression was?
A. Turn your nose up.
Q. Was anyone else there when she gave



you that facial expression?
A. Just walking -- just walking through the office.
Q. Where -- where did you see her when she made that facial expression?
A. Downstairs.
Q. Where downstairs?
A. When I was coming through the door.
Q. What door?
A. The main door to come in to start work that day.
Q. What time was it?
A. Like lunch time, lunch time.
Q. Do you have a specific recollection of that?
A. Yes, I do, lunch time.
Q. Was anybody else around?
A. Other employees. We were just -- it was just a regular business day, just a regular business day.
Q. Well, who was around when you saw Sherri O'Connell make this facial expression?
A. The secretary that answers the door when you ring the doorbell. You had to ring



the doorbell to get in. I was a temporary employee. I didn't have a badge to get in to the door.
Q. Did the UPS employees have badges to get in the door?
A. Yes, they did.
Q. So, how would you get in the door?
A. Ring the doorbell and the secretary would answer it.
Q. Did anybody else see Sherri O'Connell make any facial expression about what you were wearing that day?
A. I'm sure others seen it but I wasn't paying them any attention.
Q. Did Sherri O'Connell ever do or say anything else to indicate that she knew you were gay?
A. Not that I can recall.
Q. Pardon?
A. Not that I can recall.
Q. Do you believe -- did you ever have a hairstyle that you believe indicated or suggested that you were gay?
A. Yes.



Q. What was that?
A. A mohawk.
Q. When did you have that?
A. When I went on my trip, when I went on my trip Memorial Day weekend, which was May, the end of May.
Q. You got a mohawk then?
A. Yes.
Q. For how long did you have a mohawk?
A. Approximately two weeks.
Q. And what about a mohawk hairstyle indicates that someone is gay?
A. It was a quick weave.
Q. Pardon?
A. It was -- it was a quick -- it was a weave.
Q. What does that mean?
A. It was extensions. It wasn't my hair.
Q. And what about that suggests a person with a mohawk hairstyle with weaves is gay?
A. Because it was a female hairstyle on me.
Q. What do you mean it was a female

hairstyle?
A. It was -- it was a weave, a weave that African Americans wear in their hair.
Q. You're saying a mohawk is a female hairstyle?
A. The way I had it, yes, it was. Because I was -- I had -- originally had braids. But for me to go from braids to this mohawk hairstyle, that's why.
Q. A mohawk, you mean it was shaved close on the sides and then kind of longer on the top?
A. Yes.
Q. Kind of like Mr. T?
A. Yes.
Q. Did you ever have any other hairstyle that you believe indicated or suggested that you were gay?
A. Just my braids but that's just regular, regular braids.
Q. Other than wearing shorts and a pink shirt one day, did you ever dress in a manner that you believe suggested that you were gay?
A. My jeans, skinny jeans.



Q. Anything else?
A. No. That's it.
Q. During 2009 you were absent some days at Supply Chain Solutions work assignment; weren't you?
A. Yes.
Q. For what reasons?
A. The car accident.
Q. When was the car accident?
A. The car accident was April, in April.
Q. Of what year?
A. 2009 -- no. 2008 -- hold on -- I'm sorry. April, April sir.
Q. What year?
A. 2009.
Q. Before you told me the car accident was in April of 2008.
A. Eight, 2008.
Q. So, did the car accident that occurred in April of 2008 cause you to miss work in 2009?
A. Sorry. It was 2008. It was 2008.
Q. My question is, why were you absent in



2009?
A. Doing the physical therapy.
Q. In 2009 you had to work -- had to miss work to go to physical therapy as a result of the car accident that you were in in April of 2008?
A. Yes.
Q. How often were you absent from work in 2009?
A. A couple of times out of the month with doctors' excuse to provide -- provided to them.
Q. And would you give the doctors' excuses to your supervisor at Kelly Services?
A. Yes.
Q. Now, I've seen in Kelly Services' records indicating that you were absent for medical reasons on a number of occasions in 2009. Was that always because of the physical therapy from the car accident?
A. Yes, it was.
Q. Now, I also have seen that in August of 2009 you called out sick on some occasions?



A. Car accident.
Q. That was also because of the auto -- auto accident?
A. Yes, it was.
Q. And -- and what about the auto accident caused you to call out sick on -- in August of 2009?
A. The pain from my back pain, yes.
Q. And when you called out sick, what was the procedure?
A. Call Kelly Services to notify them and they would notify UPS.
Q. And -- and do you admit that you called out sick on August 3rd and August 4, 2009?
A. That sounds familiar, yes.
Q. And then you were 30 minutes late on August 26, 2009; do you recall that?
A. That sounds -- that sounds correct when I called the agency.
Q. The agency being Kelly Services?
A. Yes.
Q. And then you were absent again on September 4, 2009?

113

A. With a work excuse submitted, I'm sure, yes.
Q. And why were you absent that day?
A. I can't recall. I'm sure it was documented.
Q. And when you missed work for, quote, unquote, medical reasons in 2009, you said that was because of physical therapy from the car accident?
A. That's where I was going, yes.
Q. And where did you go for that physical therapy?
A. Pro Therapy in Dover, Delaware.
Q. Where in Dover?
A. It was across from Kraft Foods.
Q. And -- and did you see a particular person there?
A. I seen several individuals.
Q. Did you have to check in in some way?
A. Yes.
Q. And Paola Caroza at Kelly had spoken to you about your attendance in 2009; hadn't she?

114

A. Yes.
Q. She -- she told you you were missing too much time?
A. Yes, and try to change appointment times, yes.
Q. And -- and in August of 2009 you had a performance evaluation from Kelly Services where again you were told that your attendance and punctuality needed to improve?
A. Correct.
Q. I want to talk about the week ending September 11, 2009. I want to get to September 11th, but I want to talk about the days of that week prior to the Friday. And I think Friday -- was September 11th a Friday?
A. It was a Friday, yes.
Q. So on Monday of that week you arrived at work late, correct?
A. How late?
Q. 8:45.
A. Who -- did I call in to Kelly Services?
Q. I'm asking you. Is it -- is it accurate to say that you arrived at work at

115

8:45 on -- excuse me -- on -- on Tuesday of that week?
A. I can't remember.
Q. Well, you -- you logged in your time when you arrived at work, correct?
A. Yes, that's the normal procedure.
Q. And what was your scheduled start time?
A. Scheduled from 8:30 to 5:00.
Q. So if you clocked in and recorded 8:45 as a start time, you would be -- that would be late, correct?
A. Say that again, please?
Q. If you recorded that you didn't start until 8:45, that would be late; wouldn't it?
A. Correct.
(Document marked Exhibit Scott 1 for identification.)
BY MR. MCGEE:
Q. Mr. Scott, I'm going to show you what's been marked as Scott Deposition Exhibit No. 1 and ask you to take a look at that, please. And -- and are those your Kelly Services' time sheets for the week ending

116

September 11, 2009?
A. Yes.
Q. And so what time did you arrive at work on Tuesday, September 8th?
A. I can't remember.
Q. What does this -- this time record indicate?
A. It says 8:45.
Q. Do you have any reason to believe that that wasn't accurate?
A. I would think it would be honest.
Q. And you're the one that entered this time, correct?
A. Right.
Q. So why -- why were you 15 minutes late on Tuesday, September 8th?
A. Traffic. And I believe I called.
Q. Called who, Kelly?
A. Kelly Services.
Q. Are you sure you did or you believe you did?
A. I believe that I would have -- I would have called Kelly Services.
Q. So you were -- you were late on

Tuesday, September 8th. What time did you arrive on Wednesday, September 9th?
A. 8:40.
Q. And that was late as well, correct?
A. Correct.
Q. Why were you late that day?
A. Same, traffic.
Q. Where were you driving from that day to get to work?
A. Dover.
Q. And what route did you take?
A. That day I can't remember, 13 -- it was either/or 13 or Route 1.
Q. And was there a car accident or something that caused there to be traffic on that day?
A. Rain, accident, it could have been either one of the two.
Q. What time did you normally leave home to get to work by 8:30?
A. I would need to leave home no later than 7:15, 7:15.
Q. And what time did you leave home to go to work on Tuesday, September 8th?



A. 7:15.
Q. And what time did you leave home to get to work on Wednesday, September 9th?
A. Approximately the same time, 7:15.
Q. Were you absent from work on Monday, September 7th?
A. I must have been. There's -- there's no time entered. So I must -- I must have been.
Q. Why were you absent that day?
A. I can't recall. It should be documented.
Q. Had you spent -- had you spent the weekend in Philadelphia with your partner?
A. Not that weekend I hadn't been, no.
Q. Let's -- I want you to take me through the events of Friday, September 11, 2009. How did you get to work that day?
A. My car.
Q. Is that how you typically got to work?
A. Yes.
Q. Did anybody else drive with you?
A. No.
Q. Where were you coming from that day?



A. Dover.
Q. Where in Dover?
A. My house.
Q. What -- what time did you leave your house that day?
A. 7:00, 7:15. It was raining. It was raining that day so I left -- I gave myself more allotted time because it was raining that day.
Q. Was anybody at -- at home when you left that day?
A. I can't recall if there -- I can't recall.
Q. Do you have a specific recollection of when you left home that morning?
A. It was raining, so I would leave -- give myself a lot of time, so 7:00, 7:15.
Q. Did you see anybody in your house that morning after you got up, between the time you got up and the time you left the home?
A. I can't remember. I cannot remember.
Q. Did you talk to anybody on the telephone that morning before you got to



work?
A. I can't remember.
Q. What route did you take to work that morning?
A. Route 1.
Q. Why did you take Route 1?
A. I always switch back and forth to take Route 1. That would be always.
Q. Why did you take Route 1 on that particular --
A. It was raining.
Q. -- morning?
A. It was raining.
Q. And what about the fact that it was raining caused you to take Route 1 as opposed to an alternative route?
A. Because of the traffic on 13.
Q. How did you know there was traffic on Route 13?
A. From past experience.
Q. Past experience being what, when it rained --
A. When it rained --
Q. -- Route 13 has more traffic?

A. Yes.
Q. And -- and what time did you arrive at the Biddle Street building that morning?
A. Between 8:20, 8:30.
Q. Between 8:20 and 8:30?
A. Yes.
Q. How do you know what time it was when you entered the building?
A. My clock in my car and my watch.
Q. And do you recall specifically looking at your watch when you entered the building to see what time it was?
A. Yes. And I went upstairs, also.
Q. Did you have to sign in when you entered the building?
A. I was unable to.
Q. I mean -- I mean, when you first entered the building?
A. I was unable to.
Q. Why -- why was that?
A. My computer wasn't hooked up.
Q. I'm talking about when you walked through the front door?
A. You never sign in at the front door.



Q. That was my question.
A. No, we never sign in the front door.
Q. But you had to ring a doorbell and somebody at the front desk would let you in?
A. No. I went upstairs.
Q. Pardon?
A. I went upstairs.
Q. Well, how did you get in the building?
A. It's an automatic -- when you go in on your own -- there's two different doors, the building door and a UPS Supply door. You have to ring that door to get into where the office was, my previous seating was. I went in the door on my own, went upstairs to my new desk.
Q. All right. So you didn't -- when you entered the building you didn't go to your old work station initially?
A. No.
Q. Why not?
A. Because my new seating arrangement was upstairs.
Q. Didn't you have to move your computer and belongs up to your new work location?
A. It was already there.



Q. But weren't you supposed to do the moving?
A. No.
Q. Aren't you supposed to do the packing?
A. It was already pre-packed the day before.
Q. It was pre-packed the day before?
A. Yes, when -- that -- that Thursday.
Q. Who packed your belongings and computer on Thursday?
A. I did.
Q. Tell me what you did Thursday to prepare for the move?
A. Got my files together, unplugged my computer and left it at the desk. And I took my paper work, pens, paper, upstairs.
Q. Thursday you did that?
A. I -- Thursday, yes, Thursday.
Q. So Thursday you took your belongings and put them in your new, what was going to be your new work location?
A. Yes.
Q. And you did all that Thursday?
A. Thursday evening right before I left.



I left the computer there.
Q. Pardon?
A. I left the computer there.
Q. Did you leave anything in your old cubicle other than your computer?
A. I can't remember.
Q. But you're certain that you took certain -- some of your personal belongings up to your new -- what was going to be your new work location and you did that on Thursday before leaving work?
A. Yes.
Q. And -- and tell me what you took up to your new work location on Thursday?
A. Pens, files, like paper work -- excuse me -- paper work.
Q. Why did you do that Thursday?
A. A lot of coworkers was doing that, moving the day before.
Q. Who -- who else moved on Thursday?
A. The rest of the Bracco team.
Q. Specifically who?
A. I believe Janet did, Toni did.
Q. Janet Evangelista and Toni Shepperson?

125

A. There was others involved, I'm sure, from other departments as well that was coming downstairs and upstairs, they did as well that afternoon.
Q. But who else on your team moved stuff on Thursday?
A. The Bracco team.
Q. Who else?
A. The Bracco team.
Q. Who on the Bracco team other than yourself --
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. -- On Thursday?
A. The Bracco team.
Q. Give me names of the people who you claim moved on Thursday?
A. I gave you the names. Toni Shepperson and Janet Evangelista.
Q. Anyone else?
A. It should have been the Bracco team. We was instructed to do so.
Q. Who instructed you to move on Thursday?

126

A. Our supervisors.
Q. Who was that?
A. Heidi and Sherri.
Q. And did they give that instruction directly to you?
A. The Bracco team.
Q. But you -- you heard it directly from their mouths?
A. Yes, I heard them.
Q. And what instructions did Heidi and Sherri give you?
A. Specifically we're going to pre -- we're going to pre-pack our -- your belongings. They'll be ready in the morning.
Q. And did they tell you to actually take things up to your new work location on Thursday?
A. Yes. That's why we was -- that's why we did it, the Bracco team did it.
Q. Did you leave some of your personal belongings in your old cubicle Thursday night?
A. Yes.
Q. Okay. But -- but you had packed them all up?

127

A. I left some things packed and some things unpacked.
Q. What did you leave unpacked Thursday when --
A. I can't remember.
Q. All right. So, again, let's get back to Friday, September 11, 2009. Tell me what you did and where you went after you walked through the front door of the building?
A. Went upstairs, come to realize that my belongings were there. I went back downstairs --
Q. That your belongings were there or were not there?
A. They were there. So I went back downstairs.
Q. Okay. Let's take it one point, one at a time. So when did you -- did you have a cubicle set up for yourself in the new location?
A. It was set up, yes.
Q. And did you have your own dedicated cubicle up there?
A. It was set up, yes.

128

Q. Did it have a name plate or anything like that on it?
A. No.
Q. When you say it was set up, how -- how was it set up?
A. It was just my computer was there unplugged, not able to start work. My telephone wasn't hooked, unable to clock in or do anything.
Q. So when you arrived at your, what was going to be your new cubicle that morning, your computer was already in your -- your new cubicle?
A. Yes.
Q. How did your computer get to your new cubicle?
A. The supervisors, my supervisors.
Q. Who?
A. Sherri or Heidi took it.
Q. And did they take it Thursday night or Friday morning?
A. Possibly it could have been Thursday night or Friday morning.
Q. Do you know?

A. I don't know.
Q. At the time that you arrived at your new cubicle on Friday morning, what else was in your cubicle other than your computer and the things that you had brought up Thursday night?
A. A chair. That's it that I remember.
Q. Were the other things that you had packed up Thursday night and left in your old cubicle, had they been moved to your new cubicle at the time that you first arrived there on Friday morning?
A. Yes.
Q. And who moved those things up?
A. I don't know. I just -- remember I told you I took certain things up when I -- when I left there.
Q. When you first went to your cubicle on -- on Friday morning, did you -- did you see anybody?
A. Myron Giddens.
Q. You did?
A. Myron.
Q. And where was your new cubicle located in relationship to where your old cubicle



was?
A. Upstairs.
Q. And to get to that work area upstairs, you didn't need to -- any special pass or access?
A. If I remember correctly, the door was propped opened because they was bringing other computers back and forth from upstairs to downstairs. But I can't really remember.
MR. POLIQUIN: Can we go off the record for a moment?
MR. MCGEE: Sure.
THE VIDEO TECHNICIAN: Off the record at 12:27.
(Discussion off the record.)
THE VIDEO TECHNICIAN: We're back on the record at 12:28.
BY MR. MCGEE:
Q. Mr. Scott, on Friday morning, September 11, 2009 when you first went up to your new work area upstairs, did you see anybody in that area other than Myron Giddens?
A. No.
Q. Where did you see Myron Giddens?



A. Upstairs.
Q. Where upstairs?
A. Near my new cubicle.
Q. Where specifically?
A. In the new location I was going to be sitting at.
Q. Where specifically in relationship to where your cubicle was?
A. Maybe right down the aisle way from -- from where my new one was going to be seated at.
Q. Do you have a specific recollection of where you were --
MR. POLIQUIN: Objection; asked and answered.
BY MR. MCGEE:
Q. -- or are you just guessing?
A. I'm telling you where I was and where he was.
Q. So -- so tell me where he was?
A. Upstairs near my new seating area.
Q. And where in relationship to your new seating area did you see Mr. Giddens?
A. Down --



MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: I just said that.
BY MR. MCGEE:
Q. Where?
A. By my cubicle.
Q. Where in relationship to where your cubicle was?
A. In the same vicinity of my cubicle.
Q. How many feet away from your cubicle, approximately?
A. Like from that doorway to where you're sitting at.
Q. So how -- how far away is that approximately?
A. Seating distance because he came to me and spoke to me, so.
Q. So you saw Mr. Giddens and Mr. Giddens approached you?
A. Yes.
Q. Where were you standing when Mr. Giddens approached you?
A. At my new seating area.
Q. Inside the cubicle?

A. Going back downstairs, yes.
Q. Are --
A. Going back to go downstairs.
Q. Where were you when Mr. Giddens approached you?
A. At my new desk.
Q. Sitting at your desk?
A. No. Going to go back downstairs.
Q. Okay. So where were you?
A. I just said it, at my new cubicle.
Q. Well, you told me two different things, one you said you were at your new cubicle and then you also said you were going back downstairs. So --
MR. POLIQUIN: Objection.
THE WITNESS: At my computer going back downstairs.
BY MR. MCGEE:
Q. Okay. So did you -- did he approach you while you were standing inside your cubicle?
A. At my cubicle making my way to go back downstairs.
Q. So, when you say at your cubicle, was



it inside your cubicle or outside your cubicle?
A. At the cubicle. It's the difference as outside -- a cubicle, so I'm standing there going back downstairs.
Q. Were you inside the cubicle or outside the cubicle?
A. I was at the cubicle.
Q. When you say at the cubicle, you're going to have to explain that to me. What -- what do you mean at the cubicle?
A. Standing there going back downstairs.
Q. Is the cubicle an enclosed area?
A. No. It's just a box.
Q. Okay. Was it inside the box or outside the box?
A. At the cubicle, on the corner of the cubicle.
Q. Were you standing inside the box or outside the box?
A. I can't remember. I know he approached me and came to me.
Q. And was Mr. Giddens when he approached



you standing inside the box or outside the box?
A. He was walking, approaching me.
Q. And when he spoke to you, was he standing inside the box or outside the box?
A. He was approaching me and I was going to -- downstairs.
Q. Were you -- were you -- so, tell me, were you inside the box of the cubicle or outside the box of the cubicle?
A. I just said at my desk.
Q. Oh, you were at your desk?
A. At the cubicle -- cubicle desk, at the cubicle. He was approaching me.
Q. Were you sitting down or standing up?
A. Standing up.
Q. Okay. How far away from the entrance to your cubicle were you when you spoke to Mr. Giddens?
A. Right on the corner of the cubicle.
Q. So a matter of -- a matter of a couple feet --
A. A matter of --



Q. That's not going to work on the video camera. Just tell me in terms of feet?
A. Right here.
Q. Okay. So right next to you. Okay. And what did Mr. Giddens say to you when he approached you at your cubicle?
A. Good morning. How do you like your new seating arrangement.
Q. And what did you say?
A. It's just a seat. It's just a cubicle.
Q. How long did that conversation last?
A. A minute, if even that.
Q. And you didn't see anybody else in that work area other than Mr. Giddens?
A. There was others upstairs. But I don't know exactly their names. But I'm sure other people were there looking at us speaking as well.
Q. Well, you knew other people on your team; didn't you?
A. They were downstairs, going back and forth moving their belongings.
Q. Was there anybody else on your team

other than Myron Giddens who was in the new work area when you first arrived there?
A. I can't remember.
Q. How long did you spend in the new work area before going downstairs?
A. Approximately time enough to see if my belongings -- everything was there or not. So like five -- maybe three, four, five minutes.
Q. And what did you do in that new work area before going downstairs?
A. Wiped down the cubicle with the Lysol wipes and put stuff in place of how I wanted to set up.
Q. Where did you get the wipes from?
A. There were napkins on my desk.
Q. Pardon?
A. There was napkins on my desk.
Q. Who put the napkins on your desk?
A. They -- I don't know. I don't know. It could have possibly been from my old desk. I don't know.
Q. Did you put the napkins there?
A. I said it could have possibly been from my old desk. I didn't put them in -- I --



I don't know.
Q. And you said that you wiped the area down and then you said you organized some things in your work area before --
A. I -- I shifted some things around, yes.
Q. What did you do?
A. I put pens in place and then I went -- that's when I seen Mr. Giddens.
Q. When you were shifting things around, were you sitting down at your desk --
A. No.
Q. -- or were you standing up?
A. Standing up.
Q. Why did you leave your new work area and then go downstairs?
A. To get the rest of my belongs that I did not see on the desk and help other coworkers.
Q. But there were some things other than your computer that were there when you arrived Friday morning that had not been there when you left Thursday, correct?
A. There was some things -- say that



again? There was some things there?
Q. When -- when you arrived in your new work area on Friday morning, your computer was there, correct?
A. It was unplugged, yes.
Q. And when you left work on Thursday night, your computer was still down in your old cubicle, correct?
A. Correct, correct.
Q. When you arrived at work on Friday morning and went up to your new work area there were also other things in your new cubicle that had been left in your old cubicle when you left work on Thursday night, correct?
MR. POLIQUIN: Objection.
THE WITNESS: I didn't tell you that. What I'm saying to you is that what I took upstairs myself Thursday afternoon is what I took. And you asked me who would have took it, I said I didn't know who took my other belongings upstairs.
BY MR. MCGEE:
Q. Yes. But there were some other things that other people -- somebody else had brought



up to your cubicle so that it was there when you arrived Friday morning?
A. Yes, you said about the napkins, yes, the napkins, I don't know where they came from. So I went back downstairs to get the rest of my belongings.
Q. What other than your computer were in your new cubicle Friday morning that had not been there Thursday night?
A. A bin possibly -- I can't remember -- a bin, a little bin for my pick files possibly. But I can't remember.
Q. How did you then get from your new cubicle downstairs to your old work area? Tell me what route you took?
A. The steps with my jacket on -- I had everything on and went downstairs.
Q. Why did you keep your jacket on?
A. It was raining that day.
Q. Well, you were inside?
A. Okay.
Q. Why -- why hadn't -- why didn't you take your jacket off once you got inside in your new work area?

141

A. I just didn't.
Q. What kind of jacket were you wearing?
A. Black.
Q. What kind of black jacket?
A. A black rain jacket.
Q. Did you see anybody on your way down from your new work area to your old work area? In other words, did you pass anybody on the way?
A. There was people shifting back and forth. I don't know their names, no.
Q. What time was it when you arrived back down to your old work area, your old cubicle?
A. Approximately after 8:30.
Q. What time was it approximately?
A. Maybe 8:33 -- 8:33, 8:34, 8:35.
Q. When you went downstairs, tell me where -- where you went?
A. To my old cubicle.
Q. And what was the status of your old cubicle when you arrived there? Was there anything in there?
A. Someone else's computer.

142

Q. Were any of your belongings still in the cubicle -- in your old cubicle when you arrived there?
A. My hanger, my coat hanger.
Q. Was anything else in your old cubicle when you arrived there?
A. I can't remember.
Q. What did you do when you arrived in your old cubicle -- at your old cubicle?
A. Went in, spoke -- I seen Sherri. She advised me -- Jason, good morning. I said good morning, happy Friday. I spoke to other -- other coworkers. And she said to me, Jason, your belongings are already upstairs. I said I know.
Q. Were you in your old cubicle when you spoke to Sherri O'Connell?
A. I was basically outside of my cubicle, outside the box.
Q. But right next to it?
A. Yes.
Q. So, had everything already been moved up to your new cubicle by the time that you arrived at your new cubicle that morning?

143

A. I just told you earlier, I went back downstairs to make sure everything was in place. I went -- went downstairs.
Q. And had, in fact, everything already been moved upstairs?
A. Except my coat hanger.
Q. Was it your personal coat hanger?
A. It was from my -- from my desk, yes. Not mine but from my desk.
Q. Did you bring that coat hanger from your old cubicle up to your new cubicle?
A. Yes.
Q. How do you know what time it was when you arrived at your old cubicle on that Friday morning?
A. I did have a watch on.
Q. Did you look at your watch?
A. Why wouldn't I. I would have seen what time it was.
Q. I'm not asking you whether -- whether you would have. I'm asking did you?
A. Yes. I -- I knew what time it was.
Q. How did you know what time it was?
A. I had a watch on. And there's also --

144

also a clock in the break room.
Q. And did you look at that clock when you arrived at your old cubicle?
A. Yes.
Q. How much time did you spend at your old cubicle or in the -- in your old work area that morning?
A. Enough time to help everyone else bring their belongings upstairs.
Q. How -- how much time was that?
A. Approximately half an hour.
Q. And you spent a half hour straight down there in that old work area?
A. Back and forth helping others.
Q. Specifically whom did you help move upstairs?
A. Toni Shepperson.
Q. Did you help anyone other than Toni Shepperson move his stuff upstairs?
A. I helped Janet Evangelista, a couple of her things.
Q. How many trips did you make back and forth from your old work area to your new work area that morning?

A. Too many. I can't remember the number.
Q. More than ten?
A. I can't remember.
Q. More than five?
MR. POLIQUIN: Objection.
THE WITNESS: I can't remember.
BY MR. MCGEE:
Q. Did you make more than two trips back and forth?
A. It had to have been, but I can't remember.
Q. Did you help move anything for anybody other than Toni Shepperson and Janet Evangelista that morning?
A. Yes.
Q. Who else did you help?
A. I just took people's belongings. I can't -- the particular people's names wasn't on the boxes or whatever it was. I just took boxes up just to help, just to help out.
Q. Did anybody ask you to do that?
A. No. I knew it was my team, so I helped them out.



Q. And you -- I think you said you spent about a half hour helping others move upstairs?
A. Correct.
Q. And then what did you do next when you were finished helping others move upstairs?
A. Helped them set up their desk, plug in their computers. They had to get their phones registered or re-registered, clocked in.
Q. Who did you help set up their desk in the new work area?
A. Toni, Janet.
Q. Anyone else?
A. Let me think. I can't remember, no. No --
Q. Did you help them set up their desk before you set up your desk in the cubicle?
A. I plugged in my own at that point in time.
Q. Pardon?
A. I plugged in my own as those were loading up as well.
Q. When you say you plugged in your own, you mean your own computer?



A. Uh-huh, yes.
Q. Did you plug in your computer before or after you helped Toni Shepperson and Janet Evangelista set up their computer?
A. If I remember correctly, I set up mine. I plugged in mine and it was loading and I helped them set up theirs and plug it in.
Q. What time did you plug in your computer?
A. I can't remember the exact time.
Q. Approximately what time it was -- was it?
A. 10 o'clock, maybe, 10:00, 10:30.
Q. What time did you actually sit down and start doing your regular work that morning?
A. Between 10:00 and 10:30.
Q. Before actually starting your regular work that morning, did you have any conversations with Sherri O'Connell other than the -- the one that you just mentioned earlier that you claim occurred at your old work station where she told you that your things had been moved upstairs?



A. No. Because she was talking to other coworkers downstairs.
Q. So, the conversation you described was the only conversation you had with Sherri O'Connell before you actually started work in your new -- sitting down at your new work station around 10:00 or 10:30?
A. Yes.
Q. On that Friday morning, September 11, 2009, did you speak with anybody on the phone that morning prior to arriving at the Biddle Street location?
A. I can't remember.
Q. Did you call anybody to let them know that you were going to be late that morning?
A. No, because I wasn't going to be late that morning.
Q. When did you first enter your time on the time records that morning, Friday, September 11, 2009?
A. When the rest of Bronco team did after the phones were set up and we started working, between 10:00 and 10:30.
Q. And -- and did you enter your time in

both the Supply Chain Solutions time system and in the Kelly Services time system?
A. If I remember, yes.
Q. And I may refer you to the documents. It's been marked as Scott Deposition Exhibit 1. Did you enter into the Kelly Services system for September 11 that you started work at 8:30 a.m.?
A. Correct.
Q. And did you also enter an 8:30 start time in the Supply Chain Solutions time system for that day?
A. I believe that I would have, yes, yes.
(Document marked Exhibit Scott 2 for identification.)
BY MR. MCGEE:
Q. Mr. Scott, let me show you what's been marked as Scott Deposition Exhibit 2 and ask you if this is the Supply Chain Solutions time record that you entered for September 11, 2009? Is that your Supply Chain Solutions time record for that day?
A. Yes, it is.
Q. And so -- so you recorded as your



start time for that day 8:30 a.m., correct?
A. Correct.
Q. And -- and there's a record at the bottom, card history, that has the first time recorded as 9:45 a.m. Is -- is that when you first entered your -- your time that morning?
A. That would have been when I went into the system.
Q. And so you went into the system at -- at 9:45 and then sometime after that you entered in your start time as 8:30 a.m. that day?
A. Which is correct, I backdated to 8:30 that day; that's correct.
MR. MCGEE: All right. Do you want to take a break for lunch at this point.
MR. POLIQUIN: Sure.
THE VIDEO TECHNICIAN: We're going off the record at 12:51.
(Whereupon a break was taken.)
THE VIDEO TECHNICIAN: We're back on the record at 1:52. Please continue.
BY MR. MCGEE:
Q. Mr. Scott, let me remind you that



you're still under oath.
A. Yes.
Q. Do you understand that?
A. Yes.
Q. The -- the new work area that you moved to on September 11, 2009, that -- that was a secure work area; wasn't it -- wasn't it?
A. Yes.
Q. And -- and you did not have access to that work area; did you?
A. Access?
Q. There -- there was a door that you -- through which you had to go that was -- was locked and needed a pass to get in, correct?
A. It was propped open that morning, I believe.
Q. Well, that's -- I'm not talking about Friday morning. I'm talking about generally?
A. Generally, yes.
Q. Okay. So you either had to have an access card or you had to ring the bell and let somebody else -- so somebody else could let you in, correct?
A. Correct.



Q. And you did not have an access card because you were not a Supply Chain Solutions employee?
A. Correct.
Q. So normally the door was locked. So you would have to ring the bell and somebody else would have to let you in?
A. Yes.
Q. Okay. Was there somebody, a receptionist or somebody sitting right outside the door that was there to let people in?
A. That morning I can't remember.
Q. But -- but generally --
A. Yes.
Q. Generally -- so, when you came to work after that in -- in the mornings, you would ring the bell and somebody would -- you know, a receptionist or somebody would be right there to let you in?
A. Yes.
Q. That was the norm?
A. Yes.
Q. On Thursday, September 10, 2009, what -- what time was it when you took some of

your things from your old cubicle upstairs to your new cubicle?
A. The end of the workday.
Q. Pardon?
A. The end -- excuse me. The end of the workday.
Q. What -- what time was it?
A. The end of the workday, approximately 5:00 -- 5:00.
Q. 5:00 p.m.?
A. Yes.
Q. How did you get into the work area that evening, Thursday evening?
A. Other coworkers was coming in and out. They were leaving for the day.
Q. Who?
A. I can't remember their names.
Q. So, you're saying while somebody was leaving you just took the opportunity to go in the door while it was open?
MR. POLIQUIN: Objection.
THE WITNESS: That's standard protocol, you can.
BY MR. MCGEE:



Q. Is that -- is that what you did on Thursday evening?
A. Yes.
Q. So, you did not have your own access key to that floor; did you?
A. No.
Q. Okay. And you claim that you did not ring the bell to have somebody else let you in that evening?
A. No.
Q. You just, you know, went through the door when somebody else was leaving?
A. Yes.
Q. And -- and what did you take with you and put in that new cubicle on Thursday evening?
A. I stated --
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: I answered that earlier.
BY MR. MCGEE:
Q. Well, what was it?
A. The pens, my files, paper. I said all



that earlier.
Q. What files did you move on Thursday evening?
A. Just like paper from off the wall that I had.
Q. What kind of papers from off the wall?
A. Numbers of transfer calls to -- just general papers that we would need.
Q. What else did you move up to your new cubicle on that Thursday evening?
A. The same information that I gave you earlier, the pens, the papers.
Q. Anything else?
A. That's it.
Q. Why did you take the pens and papers up there Thursday evening?
A. That was going to be my new desk.
Q. But why did you do it Thursday evening as opposed to waiting Friday -- until Friday morning?
A. That was --
MR. POLIQUIN: Objection. I think this has already been asked and answered.



You can answer the question.
THE WITNESS: It's the same answer as before, because we was moving our desk.
BY MR. MCGEE:
Q. Yes. But why did you do that on Thursday evening as opposed to wait until Friday morning to do that?
A. Because that's what we was advised to do.
Q. Did you leave anything in your cubicle -- in your old cubicle on Thursday night other than your computer?
A. I stated that earlier, too. That's why I went back downstairs that Friday morning.
Q. What else -- what did you leave in your cubicle Thursday night other than your computer?
A. My coat hanger.
Q. Anything else?
A. I went back to double check, yes.
Q. Did you leave anything else in your old cubicle Thursday night other than your computer and your -- and the coat hanger?

157

A. I stated that earlier.
Q. What was -- did -- did you?
A. As I remember, I went back down there to get -- that was basically -- that was it.
Q. So -- so just so I'm clear on this. Did you leave anything in your cubicle -- in your old cubicle Thursday night other than your computer and the coat hanger?
A. As I remember, the coat hanger. That's the main, specific thing. I mean, I can't remember.
Q. How many trips did you make upstairs to the new work location on Thursday evening?
A. I can't remember.
Q. Did you make more than one trip?
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: I answered that I can't remember.
BY MR. MCGEE:
Q. Why didn't you take your computer upstairs with you on Thursday evening?
A. Because the other computer wasn't already brought downstairs where my new

158

location was going to be seated at.
Q. Pardon?
A. Because the other computer where I was going to be seated at wasn't unplugged and ready to be brought downstairs. So I left mine where it was at, as I was directed to.
Q. At what point did you -- at what point on Thursday, September 8, 2009, did you unplug the computer that was in your -- you know, your old cubicle?
A. I wouldn't -- I wouldn't have unplugged my computer on Thursday. I clocked out on Thursday.
Q. So are you saying that when you left the building on Thursday evening your computer in your old cubicle was still plugged in?
A. It was still there and ready --
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. Pardon?
A. It was still there, yes.
Q. I know it was still there. Was it still plugged in?
A. I can't remember.

159

Q. Did you log out on your computer on Thursday before or after you took the papers and pens upstairs to your new cubicle?
A. I can't remember.
Q. Did anyone else on your team move their belongings from their old work station to their new work station on Thursday?
A. Yes.
Q. Who else?
A. The other Bracco team that got off at 5 o'clock, other members on the team.
Q. Who specifically do you claim moved on Thursday?
A. The Bracco team members. I can't remember particularly which one, but I know the other Bracco that got off at 5 o'clock.
Q. Can you identify for me any other employee who moved their belongings from their old work area to their new work area on Thursday as opposed to Friday morning?
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: I can't remember. I can't remember.

160

BY MR. MCGEE:
Q. You can't remember a single person who did what you did?
A. I just know Bracco was advised to do so.
Q. Well, did you see anybody else on your team moving to the new work location upstairs on Thursday?
A. I can't remember.
Q. Did anyone see you move your things upstairs to the new work location on Thursday?
A. They should have. They should have.
Q. Who?
A. Toni, possibly, Shepperson. That's it.
Q. When you moved some of your belongings upstairs to the new cubicle on Thursday, what was the state of that cubicle? What did it look like?
A. It still had a computer, someone else's computer was still there.
Q. Was there anything in the cubicle other than somebody else's computer?

A. Their work belongings.
Q. Specifically what?
A. Everything they would do -- they would need for a daily basis to do their job.
Q. So -- so your -- your predecessor's -- everything of your predecessor was still in that cubicle when you moved your stuff up there Thursday night?
MR. POLIQUIN: Objection.
THE WITNESS: I just stated that, every -- the previous person that sat there, their stuff was still there.
BY MR. MCGEE:
Q. Where did you put your stuff on Thursday night?
A. On the corner.
Q. When you arrived in your new work station, the first thing the following morning, Friday morning, September 11, had the previous occupant of that cubicle, had all of their stuff been moved out by the time you arrived that morning?
A. Yes. And my computer set up.
Q. Your computer was already set up in



the new cubicle?
A. Yes.
Q. Was it plugged in?
A. No.
Q. Was there anything from -- that belonged to the previous occupant of that cubicle that was still there on Friday morning when you arrived?
A. I wasn't worried about theirs. I can't remember.
Q. What was Myron Gidden's job?
A. Collection specialist.
Q. He was not on your team; was he?
A. No.
Q. Sherri O'Connell did not -- kind of did not supervise him; did she?
A. No.
Q. Where was Mr. Myron Giddens' work station?
A. His old work station was upstairs. He was moving downstairs.
Q. On September 11 he was moving from upstairs to downstairs?
A. Yes.



Q. And where was his upstairs, his previous upstairs work location in relation to where your new cubicle was?
A. Where I seen him.
Q. Pardon?
A. Where I seen him.
Q. Where was that?
A. In front of the room.
Q. It was in the same room as -- as your cubicle, your new cubicle?
A. Yes.
Q. How far -- approximately how far away?
A. Maybe 10 feet, 20 feet.
Q. And -- and were there approximately 23 people on the Bracco team that Sherri O'Connell supervised?
A. Were there -- yes -- not 20 -- no, not 23. That's too many.
Q. How many, approximately?
A. Fifteen.
Q. I want you to focus in on Friday, September 11, 2009 again. After you settled down to work in your -- your new cubicle



upstairs, kind of take me through the remainder of that day, please?
A. Placed phone calls to clients, did my daily work. Then I went and spoke to Heidi Maslin about starting the 8:00 to 4:30 shift the following Monday. And she did advise me, Jason, you were a couple times late this week. And I said I understand that. I said I would be better off doing 8:00 to 4:30 on that Monday. She agreed to it.
Q. Did you speak to Sherri O'Connell about that?
A. Yes.
Q. And what did you say to Sherri O'Connell?
A. The same. She agreed to it.
Q. Did you speak with Heidi Maslin and Sherri O'Connell together or separately?
A. Separately.
Q. Who did you speak to first?
A. I can't remember.
Q. Why did you want to switch -- switch your start time from 8:30 to 8:00 a.m.?
A. It was more convenient.

Q. And -- and what about that made it more convenient for you?
A. That I would -- that I worked 8:00 to 4:30 and getting off earlier.
Q. And -- and why did you want to get off earlier?
A. Personal reasons.
Q. And what were the personal reasons?
A. To go to Philadelphia and my appointments as well.
Q. Pardon me?
A. And my appointments as well.
Q. Did you go to Philadelphia several times a week?
A. Numerous occasions.
Q. How -- how frequently?
A. Maybe twice.
Q. Twice a week?
A. Yes.
Q. At what point in the day on September 11, 2009 did you talk to Sherri O'Connell about changing your -- your regular start time?
A. After everything calmed down.
Q. What time was that?



A. Maybe after lunchtime.
Q. How -- so, approximately what time of the day?
A. I can't remember the exact time.
Q. Was it early afternoon or late afternoon?
A. I'm going to say earlier part of the afternoon. I can't remember.
Q. And when you asked Sherri O'Connell if you could change your regular start time, what did she say?
A. She agreed to it, speak to Heidi.
Q. So, take me through the remainder of the day, September 11, 2009?
A. Continue on with my workday, continue to lunch, clocked out, got in the car and left.
Q. On September 11, 2009, was there any breakdown in either the Supply Chain Solutions or the Kelly Services time recording system on that day?
A. I didn't have a problem with it.
Q. So, as far as you know it was -- it was functioning correctly?



A. Yes. But the Supply Chain was -- was not -- the Supply Chain's was not properly.
Q. What was wrong with the Supply Chain --
A. I wasn't able --
Q. -- time recording system?
A. I wasn't able to clock in at 8:30, like no one else on the Bracco team was or any other department that was upstairs from downstairs.
Q. But that was simply because your computer had not yet been plugged in, right?
A. Exactly.
Q. Okay. But that was the only reason you couldn't clock in, right?
A. Yes.
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. I mean, the system wasn't down in any way, you're just -- your -- your computer had not been plugged in?
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. Right?



A. No one could clock in that day, that morning at all until we was advised to do so. And then we back did our time to original start time.
Q. Well, you or anybody else could have clocked in as soon as your computer was plugged in, right?
MR. POLIQUIN: Objection.
THE WITNESS: No. We was advised to do -- do it all at one time, which when the phones were back on and everything, that's when we did -- everyone did it at one time.
BY MR. MCGEE:
Q. Who advised you to do that?
A. The supervisors.
Q. Specifically who?
A. Heidi and Sherri.
Q. Well, which one?
A. Heidi and Sherri.
Q. Together or separately?
A. Separately.
Q. Well, what did Heidi Maslin say about that?

A. Basically go ahead and clock in once you get your computer up and running and the phones are up and running, and we'll take care of the rest as far as the time.
Q. But you -- you entered your actual -- I mean, I think we went over the time record. You -- you think you logged on around 9:45 a.m. that morning and you --
A. That's correct.
Q. -- right -- and you recorded your start time as 8:30 a.m., correct?
A. That is correct. I was advised to.
Q. Well, you were advised to record what time you started that day?
A. Exactly.
Q. When did Sherri O'Connell first review your -- your time record for September 11, 2009?
MR. POLIQUIN: Objection.
THE WITNESS: That I don't know.
BY MR. MCGEE:
Q. When did Sherri O'Connell first realize that you had claimed that you -- based



on your time record that you started at 8:30 a.m. that morning?
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. Do you know when she found that out?
A. That I don't know.
Q. I want to ask you to shift your focus now to Monday, September 14, 2009. Take me through that day, please? Tell me what happened that day?
A. I got to work at approximately 7:52, 7:55 because my start time would have been 8:00 to 4:30. I got to work, went upstairs to my new desk and buzzed the door, went in, clocked in and started my workday, received a phone call from the temp agency, Paola, around approximately 10:00, maybe about 10:26, 10:00 something in the morning, advised me she needed me to clock out. So I questioned her why. She said it was brought to her attention -- no. She first said just go ahead and clock out and call me once you get in the car. I said, why, what is going on. I'm confused. She said, well, it's been -- something came up due -- a



problem from last week's time card. And I said explain it to me. So she went to explain to me that on Friday my time had been falsified. And I explained to her how would it have been falsified if -- what are you talking about. She said, well, they're saying that you clocked in and you put your time as incorrect time. I said no. I was here at 8:30. And then she said, well, she would talk to me in a little bit. So I hung up with her. And I started packing my belongings up. And I called her back, said I was leaving. She said okay. So I got in the car and I left.
Q. Did you talk to anybody at the Biddle Street location between the time that you got that call from Paola at Kelly on September 14th and when you left the building?
A. No. They seen me getting up and leaving. They didn't know what was going on. So no.
Q. So you -- you left the building that day without speaking with anybody else?
A. No. I was advised not to by Paola.
Q. So, you didn't speak with Sherri



O'Connell then, you know, about that?
A. I was advised not to.
Q. So, what did you do when you left the building?
A. I got in the car, called Paola back. And -- and she further explained to me what was going on.
Q. What did she tell you at that point?
A. The same thing she told me when I first called -- when she first called my phone, that they was ending my assignment because of the time card was falsified on the Friday.
Q. What did you say to her?
A. That can't be right because I was there. I didn't falsify my time card Friday. If I falsified my time card Friday, everyone did.
Q. Well, do you know what time the other people entered as their start time that day?
A. It should have been the same time as when I would have entered mine.
Q. Well, you're supposed to enter the time that you actually arrive at work, right?
A. You're supposed to, yes.

Q. Now, not everybody arrives at exactly the same minute --
A. We're on the same shift, 8:30 to 5:00, most of the team.
Q. And some people are late and some people are early on any given day, correct?
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. Isn't that the norm?
A. Yes, it is.
Q. So -- so let me see if I have this right. On -- on Monday morning you got a call from Paola at Kelly Services letting you -- instructing you to clock out and letting you know that your assignment was being ended?
A. Yes.
Q. You packed up and left the building without speaking with anybody at Supply Chain Solutions about that, correct?
A. Yes.
Q. After you left the building and got in your car you called Paola back and she basically repeated what she had told you before that your assignment was being -- being ended



because it was alleged that you had falsified your time card for Friday?
A. Correct.
Q. So what -- what happened next that day? Where did you go?
A. I went home, changed my clothes and went to the unemployment office.
Q. That very same day?
A. Monday, yes, if I remember correctly, yes.
Q. Did you ever talk to anyone at Supply Chain Solutions about why your work assignment had ended?
A. Yes, later in the week.
Q. Who did you speak with?
A. Janet Evangelista.
Q. Who was she?
A. She was a temporary employee through Kelly's.
Q. Did you contact her or did she contact you?
A. She sent me a text message through my cell phone.
Q. What did the text message say?



A. I heard the true reason you were fired -- I heard the true reason you were let go, because you were gay.
Q. And it said all that in the text message?
A. Yes.
Q. Do you have that text message?
A. I don't have it now, no.
Q. Did you actually speak with Janet Evangelista?
A. I spoke with her later in the week as well via telephone.
Q. Did you call her or did she call you?
A. I can't remember.
Q. What did you discuss at that point?
A. The same thing, she sent me a new text message.
Q. What did she say?
A. That she had heard it. That I was fired because I was gay.
Q. Did she say where she heard that?
A. Sherri O'Connell.
Q. What?



A. Sherri O'Connell.
Q. What did Janet Evangelista tell you?
A. Jason, I heard the true reason that your termination was that Sherri didn't hire you because you were -- she was -- no. Her exact words. I heard that you were fired -- I heard that you was terminated because you were gay. And then I received another call from another --
Q. Let's talk about Janet Evangelista first. Did she say anything other than that?
A. No.
Q. Did she say how she knew that that's the reason you were fired?
A. She overheard it.
Q. What did she say about that?
A. She overheard it in Sherri's voice. She overheard it -- the conversation.
Q. Overheard what?
A. Sherri telling another individual that.
Q. What did -- you know, what did Janet Evangelista tell you she heard Sherri say?
A. What I just stated, that she was

177

terminating me because I was gay. I was gay.
The true reason is because I was gay.
Q. Did Janet Evangelista tell you who Sherri O'Connell supposedly was making that statement to?
A. A lady named Terri.
Q. Terri who?
A. I don't know her last name.
Q. Who is Terri?
A. She works there as well.
Q. What is her job?
A. I want to say a team lead.
Q. Did you ever talk to Janet Evangelista about that again?
A. I was just so distraught, I didn't really want to believe that's what the true reason was, so, no.
Q. You had no further conversation with Janet Evangelista about that?
A. At that point in time, no. I knew what I had to do at that point in time. No.
Q. At -- at any point in time have you had any other conversations with Janet Evangelista concerning that or the reason that

178

your assignment ended?
A. I can't remember.
Q. Did you ever have any conversations with any supervisor or manager of Supply Chain Solutions about why your assignment ended?
A. No.
Q. Did you ever speak to Heidi Maslin or Kim Kohler or Sherri O'Connell about why your assignment ended?
A. No.
Q. Did you ever speak with anybody at Kelly Services, other than Paola, about why your assignment at -- at Supply Chain Solutions ended?
A. Only Paola.
Q. And Paola is Paola Caroza, correct?
A. Yes.
Q. Did you have any conversations with Paola Caroza about the ending of your assignment other than what you've just described for us that you claim -- the conversations that you claim occurred on Monday?
A. That was it.

179

Q. Now, you were -- notwithstanding the ending of your work assignment at Supply Chain Solutions, you were -- your -- your employment with Kelly continued and you still remained eligible to be given other work assignments by Kelly; didn't you?
A. Yes.
Q. And did you receive other work assignments from Kelly after your work assignment at Supply Chain Solutions ended?
A. We spoke on several occasions for other opportunities that was available but the pay rate wasn't worth the driving.
Q. So, Kelly offered you other work assignments but you declined those because you thought the pay wasn't high enough?
A. They offered a position and stated that someone else was hired and also the pay rate, yes, that is true.
Q. And -- and what other work assignments were you offered?
A. One of them was at Christiana Care.
Q. And what was that assignment, what -- what work?

180

A. That was something to dealing with -- I can't remember the exact assignment, but I know the work was at Christiana Care. Another one was on 202.
Q. Well, let's -- let's -- okay. Let's talk about the Christiana Care. First one first. That I take it was in Christiana, Delaware?
A. Yes, yes.
Q. And what was the pay offered for that assignment?
A. $10 an hour.
Q. When were you made that offer?
A. Approximately a couple of weeks after this assignment.
Q. Why did you turn that offer down?
A. Someone else was offered the position and also the pay rate.
Q. Well, you turned it down before you found out somebody else had been offered the position, correct?
A. When she called and told me someone was offered the position -- when someone offered the position, I couldn't take it no

way. It was $10 anyway. I mean, I would have took it -- if I needed to take it, I would have took it. That would have been no problem at all.
Q. But when it was first offered to you, you told her you weren't interested?
A. I advised her could she find me something a little bit more, I did say that to her.
Q. And -- and -- and you declined that opportunity because the pay wasn't high enough?
A. And she was looking for other opportunities for me from -- coming from Dover to Christiana.
Q. Okay. And -- and did -- were you offered other opportunities by Kelly?
A. Kelly's had told me to continue to call back on a weekly basis to followup and let them know if I'm still available.
Q. And you -- and did you do that?
A. Yes, I did.
Q. And -- and you were advised of other opportunities through Kelly, correct?



A. Nothing was available. I spoke to Jay several occasions.
Q. And what about the assignment on 202?
A. Oh, 202. That was an assignment -- it was a third shift position that I didn't get full details back on. She would get back to me.
Q. Do you know where -- where -- where it was?
A. They don't tell you the exact location, just 202 -- 202.
Q. And that -- is that Route 202?
A. Yes.
Q. And what town is that?
A. Wilmington, Concord Pike.
Q. Wilmington?
A. Yes.
Q. Did they -- did they tell you what the pay for that position was?
A. No.
Q. Did you tell them that you were not interested because it was -- of the location?
A. No. I worked down here on 202.
Q. Pardon?



A. No. I worked down here on 202.
Q. So did you decline that opportunity?
A. No. They would get back to me with more information. Once they got the information confirmed, it would be an assignment.
Q. Did you have any conversations with Kelly about any other opportunities?
A. Just called to followup on a weekly basis, I was -- I was advised to do, spoke with Jay numerous occasions.
Q. And were you advised of any other -- other opportunities?
A. No. He would keep me on a list that I was available.
Q. Who made the decision to end your assignment at SCS on Biddle Street?
A. I don't know.
Q. You don't know?
A. Sherri.
Q. Do you know who made the decision?
A. Sherri.
Q. How do you know Sherri made the decision?



A. Because from Paola's conversation, Sherri told her that I falsified my time card.
Q. But do you know who made the decision to end your assignment?
A. I don't know.
Q. Who -- who recommended that your assignment at SCS be ended; do you know?
A. More than likely Sherri.
Q. Do you know?
A. I don't know.
Q. Do you know who approved that decision?
A. I don't know.
Q. Do you know who else was involved in that decision?
A. I don't know.
Q. Why was your work assignment at SCS ended?
A. Because I was gay.
Q. Was there any other reason that you believe that assignment was ended?
A. No.
Q. You believe the only reason that your

work assignment at SCS was ended is because you're gay?
A. Yes.
Q. Do you agree -- you deny that you falsified your time record, correct?
A. I didn't falsify my time record.
Q. But you would agree that if you had falsified your time record, then your work assignment should have been ended --
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. -- correct?
MR. POLIQUIN: Objection.
THE WITNESS: Say that again?
BY MR. MCGEE:
Q. Yes. I understand that you deny that you falsified your time record?
A. Right, I did not.
Q. But if you had actually falsified your time record, you believe that that would have been a legitimate reason for ending your assignment; don't you?
A. No. They would have went through a proper protocol, which would have been a verbal



warning or written up or they would have -- they went through -- they would have to do the proper procedures.
Q. Do you mean that you don't think somebody should be fired for falsifying their time record?
MR. POLIQUIN: Objection.
THE WITNESS: I didn't falsify my time record.
BY MR. MCGEE:
Q. I understand that you didn't do that. That's your claim, you didn't do that. But I'm asking as a general matter, don't you think somebody should be fired if they did --
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. -- falsify their time record?
A. I don't know HR policies.
Q. I'm asking you what you believe. Do you believe that somebody should be fired --
MR. POLIQUIN: Asked and answered.
BY MR. MCGEE:
Q. -- for falsifying their time record?



A. No.
MR. POLIQUIN: Asked and answered.
BY MR. MCGEE:
Q. You don't?
A. I don't know HR's policy.
Q. Well, if you were running a business, would you fire somebody who fired -- who falsified their time record?
MR. POLIQUIN: Objection. Asked and answered.
THE WITNESS: If I was running a business, I would speak to that individual.
BY MR. MCGEE:
Q. And you wouldn't fire them?
A. I would go through the proper channels.
Q. What are the proper channels when somebody falsifies their time record?
MR. POLIQUIN: Objection.
THE WITNESS: I don't know what the HR policy is.
BY MR. MCGEE:
Q. Well, what would your policy be if



you --
MR. POLIQUIN: Objection.
BY MR. MCGEE:
A. -- if you ran a business?
MR. POLIQUIN: He's already answered the question several times.
BY MR. MCGEE:
Q. Have you ever worked anywhere where the business said it's okay to falsify your time card?
A. I answered the question.
Q. Have you ever worked anywhere where you were told that it was okay to falsify your time card?
MR. POLIQUIN: Objection.
THE WITNESS: No.
BY MR. MCGEE:
Q. Do you believe somebody should be just fired for dishonesty?
MR. POLIQUIN: Objection.
THE WITNESS: They should go through the proper channels.
BY MR. MCGEE:
Q. What are the proper channels when

somebody is dishonest -- you have an employee who is dishonest?
A. Speak to the individual and get their side of the story.
Q. And -- and if it turns out that the conclusion is the person intentionally falsified their time records, what should happen to that employee?
A. That's when you take that determination and get rid of that person.
Q. If somebody intentionally falsifies their time record, you think that they should be terminated, correct?
MR. POLIQUIN: Objection; asked and answered. We've gone over this a number of times.
BY MR. MCGEE:
Q. Correct?
A. I stated my answer.
Q. But we -- we haven't heard -- so let me ask the question. If an employee intentionally falsifies their time record, should they be fired?
A. I stated that they should have a



meeting and go through the proper channels to get the reasoning or whatever happened, not just automatically assume that that person falsified their time record.
Q. And if you have a conversation and the conclusion is that the -- the worker intentionally falsified their time record should they be fire for that?
A. I would say yes.
MR. MCGEE: We have to take a break because the videographer has to change tapes.
THE VIDEO TECHNICIAN: We're going off the record. We're at the end of disk No. 2. The time is 2:35.
(Whereupon a break was taken.)
THE VIDEO TECHNICIAN: We're back on the record. We're at the beginning of disk No. 3. The time is 2:45. Please continue.
BY MR. MCGEE:
Q. Mr. Scott, when did you first come to believe that your work assignment at SCS was ended because you're gay?



A. When I received a text message. It just threw me for -- I couldn't believe it.
Q. So, when you got that text message from Ms. Evangelista, that's the first time that you thought that you had been -- your job assignment or work assignment had ended because you're gay?
A. Yes. And then when I was getting other phone calls as well stating the same thing.
Q. What makes you believe that your job assignment or work assignment was ended because you're gay?
A. Because there wasn't no other reason to believe that I would have been terminated because my work performance that I had done at the company.
Q. Is there any other reason that you believe that you were -- your work assignment was ended because you're gay?
A. No. I was -- my work assignment -- my -- my performance was great.
Q. Do you have any facts or any evidence to support the claim that your work assignment



was ended because you're gay?
A. I have witnesses that's called on numerous occasions after the fact telling me the reason why, which I just really still can't believe it to this day.
Q. Other than what those -- what you claim are witnesses told you after the fact, do you have any -- any other -- any facts or evidence that your sexual orientation had anything at all to do with the ending of your work assignment as SCS?
MR. POLIQUIN: Objection.
THE WITNESS: Can you restate it?
BY MR. MCGEE:
Q. Other than what you claim you were told by those witnesses after the fact, do you have anything else, any other facts or evidence to support a claim that your sexual orientation had anything to do with the decision to end your work assignment as SCS?
A. That's it, the witnesses -- the witnesses.
Q. And give me the names of those

witnesses?
A. Toni Shepperson, Myron Giddens, Vonda Bynum and the Janet --
Q. Pardon?
A. The Janet originally -- originally.
Q. Ms. Evangelista?
A. Yes.
Q. And you've already told us everything that she told you, correct?
A. Yes.
Q. Any other witnesses that you rely on to support your claim that you -- your work assignment was ended because you're -- you're gay or because of your sexual orientation?
A. Curt Slaughter had a conversation with Toni Shepperson around the holiday of that year in December at -- at the post office. She seen him. She advised me she seen him. And he stated the same thing. He couldn't believe that I was let go due to my sexual preference.
Q. Who told you that?
A. Toni Shepperson has seen Curt Slaughter.
Q. So Toni Shepperson told you that she



saw Curt Slaughter and Curt Slaughter said something to her?
A. About it, yes.
Q. And -- and what did Toni Shepperson tell you that Curt Slaughter said to her?
A. She couldn't -- that he could not believe the reason for my termination. Yes, it was because of my sexual preference.
Q. Who is Curt Slaughter?
A. He works there as well.
Q. Was he a Kelly Services Temp?
A. No.
Q. Was he a Supply Chain Solutions employee?
A. Yes.
Q. Did you know him?
A. I knew of him. He was on my team, Bracco team.
Q. What was his job?
A. The same, collections -- collections specialist -- collections specialist.
Q. Do you rely on any other witnesses to support your claim that your work assignment was ended because you're gay or because of your



sexual orientation or because of your failure to conform to any type of sexual stereotype about what a man ought to be or act like?
A. Those would be the key ones that I would say. Those would be it.
Q. Are there any others?
A. I can't say, no.
Q. Who was Toni Shepperson?
A. Who is she?
Q. Who is she, yes.
A. She worked with Kelly Services, also, as a temp to perm employee.
Q. She was a Kelly employee who was assigned to work at Supply Chain Solutions?
A. Yes.
Q. Was she on the same team that you were on?
A. Yes.
Q. What did she tell you?
A. She actually told me that she heard Sherri state the comment because she was sitting in her cubicle that day. I guess Sherri didn't know she was sitting there. But when Sherri and Terri were talking amongst



themselves, she actually heard her state that, that Sherri didn't like faggots.
Q. When did Toni Shepperson tell you that?
A. About the same week that Janet told me -- the following week, the week of the 14th, the following week after.
Q. When did -- did Toni Shepperson tell you when she heard Sherri O'Connell make that statement?
A. The same day on that -- that Monday.
Q. September 14, 2009?
A. That Monday, yes.
Q. Did Sherri -- excuse me. Did Toni Shepperson tell you where she was when she supposedly overheard Sherri O'Connell make that statement?
A. Toni was sitting at her cubicle.
Q. And where supposedly was Sherri O'Connell?
A. At Terri's desk.
Q. Where -- do you know where that was in relationship to Toni Shepperson's cubicle?
A. No, I don't.

Q. And -- and who was Terri?
A. Terri is a team lead.
Q. For the Bracco team or some other team?
A. I don't -- I don't know. I'm -- I'm not there any -- I don't know exactly what team she was for after I was terminated. I don't know.
Q. Well, did you know -- did you know Terri when you --
A. At that point in time she was for another team, yes. But now I don't know.
Q. Did Toni Shepperson ever tell you anything else that has any connection or relevance to the ending of your assignment or the reason your assignment was ended?
A. She just couldn't believe and I -- what I told her, I said, I was -- telling me my time was falsified. She said no, she heard it, that statement.
Q. Did Toni Shepperson tell you anything else?
A. No.
Q. Who was -- who was Myron Giddens?



A. He was an employee there for UPS, for the Supply Chain.
Q. But he worked on some other team, correct?
A. Yes.
Q. What did Myron Giddens tell you?
A. The same thing, that he overheard rumors, that was the reasoning about my termination.
Q. When did he tell you that?
A. I seen Myron months after the fact. It was at Del State homecoming weekend. I seen him that -- months after the fact at a -- at a gathering.
Q. Del State, the homecoming --
A. Yes, Delaware State.
Q. Del State meaning Delaware State University --
A. Yes.
Q. What were you doing there?
A. It was homecoming weekend.
Q. You didn't go to Delaware State; did you?
A. No. It was the homecoming weekend, so



everybody was out enjoying their weekend.
Q. So where did you see Mr. Giddens?
A. At Dover Downs, at a club in Dover Downs, yes.
Q. And that was months after your assignment ended?
A. It was one month, like a month or two after the fact, yes.
Q. And what did Mr. Giddens tell you?
A. That he heard the same statement, rumor, that he had heard the same statement, that I was terminated due to my sexuality.
Q. So Mr. Giddens didn't claim that he heard Sherri O'Connell make that statement, he simply told you that he heard rumors that that was the reason that you were -- that your assignment was ended; is that correct?
A. That's what he told me, yes.
Q. What else did Mr. Giddens tell you, if anything?
A. He was just telling me -- wishing me the best in my future because he knew I came there to make a career out of UPS. You were so great. You're so -- you did your job. You



knew your job. Everything is -- he basically applauded me and told me good luck with everything and that was it. Well, and he did confirm that that morning that I was there. He said you wasn't late. You didn't falsify anything. I seen you that morning. I came to -- because he was basically to the point where you got smart with me that morning when I came to your desk. And I did -- he said how do you like your new seating arrangement. I said it's just a desk. And he quoted that to me. And you was all smart with me on Friday, that day it happened. So he specifically quoted that to me.
Q. Who is Vonda Bynum?
A. She was a Kelly Services representative as well that worked for UPS.
Q. Was she on the Bracco team?
A. Yes.
Q. What did she tell you?
A. She heard the same information.
Q. Tell me what she told you?
A. She said that she heard that I was terminated due to my sexuality.

Q. Did she say where she heard that from?
A. She said the same thing that everyone had said, the rumor, yes.
Q. She just heard the rumor?
A. Yes.
Q. When did she tell you that she had heard that rumor?
A. This was -- I can't remember the exact time frame but it was a little -- a little bit after the fact.
Q. Months after the fact or weeks after the fact?
A. I would say a couple of weeks, a couple of weeks to a month after the fact. I can't remember the exact --
Q. And was that a telephone conversation or a face-to-face conversation?
A. She actually e-mailed me.
Q. What did the e-mail say?
A. She was -- just couldn't believe that I was terminated for my sexuality and basically wishing me the best with everything and that's basically it.
Q. Did you ever have a conversation, an



actual conversation with --
A. I spoke to her over the phone.
Q. Excuse me. If you just let me ask the question first.
Did you ever actually have a conversation with Ms. Bynum about that as opposed to an e-mail communication.
A. I spoke to her over the phone.
Q. When did you speak to her over the phone?
A. About -- I can't remember the exact time frame but about a couple of weeks or a month after the fact. And she stated the same thing.
Q. That she had heard a rumor?
A. Yes.
Q. Did she say anything else to you?
A. I knew my job. I knew the job better than some of the permanent employees. We was told when we first started it was temp to perm position. She can't believe I wasn't hired permanent by -- by then after working there almost a year. That was it.
Q. Where is the -- the e-mail that you



received from Vonda Bynum?
A. The labor board has it, EEOC.
Q. Do you -- do you have a copy of it?
MR. POLIQUIN: It's been provided.
BY MR. MCGEE:
Q. Did you respond to her e-mail?
A. Thank you. That was it. I can't -- that was it.
Q. But you did respond to the e-mail?
A. I believe I said thank you.
Q. Where is your response?
A. They have it. It's been provided to them.
MR. MCGEE: Mr. Poliquin, I don't believe you produced Mr. --
MR. POLIQUIN: I don't have a copy of it.
MR. MCGEE: I understand you may not have a copy of it. But I'd ask you to please obtain that from your client and produce it.
BY MR. MCGEE:
Q. Mr. Scott, you've -- have you now told



us everything that Janet Evangelista, Toni Shepperson, Myron Giddens and Vonda -- Vonda Bynum told you?
A. Yes, I have.
Q. And other than what they told you, do you have any facts, evidence or anything else at all to support the claim that your sexual orientation had anything to do with the decision to end your assignment at Supply Chain Solutions?
MR. POLIQUIN: Objection.
THE WITNESS: I just -- no.
BY MR. MCGEE:
Q. Did anybody falsify their time cards or time records on September 11, 2009?
MR. POLIQUIN: Objection.
THE WITNESS: I don't know.
BY MR. MCGEE:
Q. Are you -- as far as you know, did anyone ever falsify their time cards?
A. I don't know.
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. Was anyone late for work on September

11, 2009?

MR. POLIQUIN: Objection.

THE WITNESS: I don't know.

BY MR. MCGEE:

Q. Did Sherri O'Connell accuse anybody else of not coming in on time on September 11, 2009?

A. I don't know that.

Q. Do you know of any other Kelly Services employees whose work assignment at SCS was ended --

A. No. That same day?

Q. No. At any point in time?

A. No.

Q. Now, you -- you know of some SCS employees who were terminated; don't you?

A. By face, yes, I do.

Q. What SCS employees do you know who were terminated?

A. By name I don't know but by face, I would know them by face.

Q. Okay. If you don't know their names, describe for me who they were and when and why they were fired?



A. I know Myron was terminated.

Q. Myron Giddens?

A. Yes, he was term -- terminated. But as far as anyone else, no. He was terminated. That's it.

Q. Why was Myron Giddens terminated?

A. He didn't -- he don't -- he didn't tell me his business. I don't know.

Q. Pardon?

A. He didn't give me his business. I don't know.

Q. Are you telling me and testifying under oath that Myron Giddens has never discussed with you the reason or circumstances for his termination?

A. Myron -- me and Myron -- Myron never gave me a reasoning for his termination.

Q. Well, what did he tell you about his termination?

A. He was fired from UPS.

Q. Did he tell you what the circumstances were?

A. I know he was out on medical leave, I do know that.



Q. How do you know that?

A. He told me that.

Q. What did he -- what did he tell you?

A. He's been out on leave. But I would never -- there would be times where I wouldn't see him at work. But as far as a reasoning why he was terminated, no, he didn't tell me that.

Q. Tell me what Myron Giddens told you about the ending of his employment at Supply Chain Solutions?

MR. POLIQUIN: Objection.

THE WITNESS: That's all it was. That was it. He was out on medical leave.

BY MR. MCGEE:

Q. Did -- did he tell you that he has filed a claim against Supply Chain Solutions for firing him?

A. He advised me that he had been terminated with no reason. He didn't give me the reason, and he was out on leave. And that's all he told me.

Q. Did you -- did he tell you that he's



filed a claim against Supply -- Supply Chain Solutions?

A. No.

Q. Are you -- but you know that he's filed a claim against Supply Chain Solutions --

A. You're telling me.

Q. You didn't know that before?

A. But you're telling me now, though, right?

Q. I'm telling you, yes. But you already knew that; didn't you?

A. You're just saying that to me. Did Myron tell you that, I said no.

Q. No, no. I'm not asking you whether Myron told you that. That's another question you've already answered. You knew before today that Myron Giddens had filed a claim against Supply Chain Solutions in connection with the termination of his employment; didn't you?

A. But you just asked me another question.

Q. Well, I'm asking you that question. You knew that; didn't you?

A. You asked me another question before

that and I told you no.
Q. Now answer the question that I just asked you?
A. And that is again?
Q. You knew that Myron Giddens has filed a claim against Supply Chain Solutions in connection with the termination of his employment?
A. Okay. Yes, I do know.
Q. And he's being represented by Mr. Poliquin, the same person that represents you?
A. Okay.
Q. You knew that; didn't you?
A. Yes.
Q. Did you know that Toni Shepperson has filed claim against Supply Chain Solutions?
A. No.
Q. Does Toni Shepperson still have a work assignment at Supply Chain Solutions?
A. She doesn't. She works somewhere else now.
Q. When did her work assignment at Supply Chain Solutions end?



A. That I don't know.
Q. Did you ever discuss that with her?
A. I don't know.
Q. Have you ever discussed it with her?
A. No.
Q. Did you know that she's filed a claim against Supply Chain Solutions as well?
A. And I said no.
Q. You didn't know that?
A. No.
Q. Did you know that Vonda Bynum has filed a claim against Supply Chain Solutions?
A. No.
Q. Does she still work at Supply Chain Solutions?
A. No, she doesn't.
Q. When did her assignment end?
A. I don't know.
Q. Have you discussed anything -- anything with her about the ending of her assignment?
A. She called my job which is -- for her son. That's it. But we never talked about the -- no.



Q. About your son?
A. No. About her son. Her son went to the hospital where I work at now. But we never talked about anything as far as the Supply Chain Solutions, no, except for -- for what she sent me.
Q. As far as you know, is Myron Giddens gay?
A. No, he's not.
Q. Is Toni Shepperson gay?
A. No.
Q. Is Vonda Bynum gay?
A. No.
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. Do you believe you were discriminated against in any way in connection with your work assignment at Supply Chain Solutions other than the decision to end that assignment?
A. Do I -- do I believe -- say that again?
Q. Were you discriminated -- you're -- you're claiming that your job assignment or work assignment at Supply Chain Solutions was



ended for discriminatory reasons, correct?
A. Yes, that is correct.
Q. Do you believe that you were discriminated against in any other way other than the ending of your assignment?
A. No.
MR. POLIQUIN: Objection.
THE WITNESS: Just for the sexual orientation and -- just for the sexual part -- part of it.
BY MR. MCGEE:
Q. Yes. But -- but -- but only in connection with the ending of your assignment, correct? Are you claiming you were discriminated against in any other way other than when your assignment was ended?
A. No.
Q. Did you ever -- strike that. Before September 11, 2009 did you ever complain to anyone that you were being discriminated against because of your sexual orientation?
A. I didn't have a reason to.
Q. Because at -- at that point you didn't believe you were being discriminated against,

right?
A. Only to the reason I told you earlier this morning that the facial expressions that Sherri would make towards me and speaking and then the talent show, so, yes, that was it.
Q. But you -- you did not complain to anybody about discrimination prior to September 11, 2009; did you?
A. No, I didn't.
Q. At any time after September 11, 2009 did you ever complain to anybody at Kelly Services that you had been discriminated against because of your sexual orientation?
A. Kelly Services is not aware of this.
Q. You -- so, the answer to my question, did you ever complain to anybody at Kelly Services about discrimination before or after September 11, 2009?
A. Kelly Services, no, does not know anything about this, what I'm going through.
Q. So you've never complained to Kelly Services about this; have you?
A. No.
Q. Did you have any problems getting



along with anybody at SCS?
A. I was a people person. No.
Q. Did you -- I think you told us, but correct me if I'm wrong, you did not contact an attorney about this matter until after you went to the EEOC; is that right?
A. I believe my time frame was correct but I can't remember.
Q. Whose idea was it for you to go to the EEOC or the Department of Labor?
A. Mine, my own.
Q. Did you discuss that with anybody before contacting the EEOC or the Department of Labor?
A. No. I knew my rights.
Q. How did you know your rights?
A. The EEOC, I knew my rights as far as an employee, equal opportunity, I knew that.
Q. How did you know about that?
A. Because I went on line and I read it.
Q. Did you talk to anybody about it before you went to the EEOC?
A. Myself.



Q. Did you talk to anybody else?
A. Me, myself and I. I knew my rights.
Q. Did you talk to anybody else?
A. No.
Q. Why did you go to the EEOC?
A. Because I thought that I was discriminated against.
Q. Were you ever subject to any type of harassment at Supply Chain Solutions?
A. No.
Q. What -- what is your -- your current financial condition?
MR. POLIQUIN: Objection.
THE WITNESS: I work at the hospital.
BY MR. MCGEE:
Q. Do you have -- do you have any debt? I mean, do you owe anybody money, any banks or owe people any money? You have a car loan, correct?
A. Yes, I do have a car loan.
Q. And what's the outstanding balance on that?
A. I just purchased it, so I have a loan



with the bank.
Q. And how much is that, do you owe on that?
A. I owe nine -- no. I can't remember the exact amount.
Q. A couple of thousand -- thousand dollars?
A. A couple of thousand, yes, it is.
Q. Do you have any other outstanding loans?
A. Just the car loan is the main thing, just the car loan.
Q. You don't have a mortgage; do you?
A. No, I don't.
Q. Do you have credit cards?
A. No.
Q. Have you ever been in default or behind in any type of loan payments?
A. A credit card.
Q. Was that years ago?
A. Years ago.
Q. But you're -- you're currently up to date on all of your -- your loan payments, correct?

A. The car payment, yes.
Q. And that's the only loan you have?
A. The car payment, yes.
Q. Do you have a bank account?
A. Yes.
Q. How much do you have in your bank account?
A. I don't know.
Q. Where is your bank account?
A. PNC.
Q. What branch of PNC do you bank at?
A. Dover.
Q. Where in Dover?
A. Dover, just that.
Q. There's more than one PNC branch in Dover?
A. I think -- there's one on the highway, Route -- on 13 in Dover, the one.
Q. Other than your employment at Nemours, and what you've received in unemployment, have you had any other income since September 11, 2009?
A. No, just my unemployment.
Q. Have you received any type of



financial assistance?
A. No, I have not.
Q. And how have you been -- how did you pay your bills in the interim, just from your unemployment?
A. Just from unemployment, yes.
Q. Have you filed income tax returns?
A. No.
Q. Why not?
A. I didn't file this year.
Q. Why not?
A. Because I owe from 2000 and -- what year is it -- from this year when all this happened.
Q. Pardon?
A. I said I owe from this year when all this happened. I haven't filed.
Q. What do you mean you owe?
A. I owe a balance.
Q. So you -- you haven't paid all of your taxes?
A. Exactly.
Q. So you have an outstanding tax balance that you haven't paid from what years?



A. '09, '09, '09.
Q. Did you file a tax return for 2009?
A. Yes.
Q. And that tax return indicated that you owe additional taxes?
A. Yes.
Q. But you haven't paid that?
A. I'm on a payment plan.
Q. Do you have a tax lien against you?
A. No.
Q. How much do you owe in taxes from 2009?
A. I make -- I don't know the exact amount.
Q. Did you file a tax return for 2008?
A. Yes, I did.
Q. But you have not filed a return for 2010?
A. No, I have not.
Q. Why not?
A. I just haven't. I don't know. Do I plan to, yes.
Q. Have you filed for an extension?
A. I have filed for -- no, no, no, no,



no, no, I have not filed for an extension. I spoke with the IRS about three weeks ago -- no -- approximately a couple of weeks ago.
Q. When did you start working for Nemours?
A. February.
Q. Of 2011?
A. Yes.
Q. When did you first see a psychiatrist -- have you ever seen a psychiatrist, psychologist or a mental health counselor for anything?
A. Mind -- Mind and Body Consortium.
Q. When did you first see somebody from Mind and Body Consortium?
A. April 19th was my first day.
Q. What year?
A. This year.
Q. Prior to April 19, 2011, did you ever -- had you -- had you ever seen any psychologist, psychiatrist, therapist, social worker or other mental health provider for any reason?
A. One, Chris Hampton back from the car

accident, from the '08 accident.
Q. And who is Chris Hampton?
A. He's a counselor.
Q. And you saw him in connection with the auto accident in 2008?
A. Yes.
Q. Why did you see a counselor for that?
A. Posttraumatic stress.
Q. Were you diagnosed with posttraumatic stress syndrome from that accident?
A. Yes, I was, yes.
Q. And did he diagnose you, Mr. Chris Hampton diagnose you as having posttraumatic stress syndrome?
A. Yes, he did.
Q. Did you see any other health professional in connection with any emotional reaction to that car accident other than Chris Hampton?
A. Yes. My primary care doctor who referred me to him.
Q. Who is that?
A. Dr. Isiocha, I S I C H I O A.
Q. How many times did you see Chris



Hampton?
A. More than ten.
Q. Why did you feel a need to see somebody of Chris Hampton's qualifications?
A. I was depressed. I was having flashbacks. I couldn't sleep.
MR. POLIQUIN: I'm going to need to take a little -- a quick break.
THE VIDEO TECHNICIAN: We're going off the record at 3:27.
(Whereupon a break was taken.)
THE VIDEO TECHNICIAN: We're back on the record at 3:37. Please continue.
BY MR. MCGEE:
Q. Mr. Scott, please describe for me the emotional distress that you claim that you suffered as a result of the 2008 auto accident?
A. Unable to sleep, unable to focus, as I said, flashbacks. My mind -- my mind was racing, flashbacks from the accident. So from -- my primary care, Dr. Isiocha referred me to Dr. Chris Hampton.
Q. Where was Mr. -- Dr. Hampton's office?
A. In Camden, Dover, Delaware.



Q. What is Camden?
A. That's it, Camden, Delaware.
Q. What kind of doctor was Chris Hampton?
A. He was a -- his business card has licensed clinical worker, social -- social psychiatrist worker.
Q. What type -- what type of services did he provide for you?
A. Counseling sessions. Counseling -- counseling sessions, hour long counseling sessions.
Q. Pardon?
A. Hour long counseling sessions when I was still working at UPS.
Q. And what type of counseling?
A. Come in and talk to me, ask what is on my mind, how is everything going, telling me everything is going to be okay. Let me basically speak what was on my mind.
Q. Was this all in connection with some type of legal claim that you were pursuing to collect money from the 2008 auto accident?
A. No. This was in pursuit to getting



back on my right frame of mind.
Q. Did you have any medication prescribed for you?
A. The Ambien and the Wellbutrin.
Q. Did you receive any counseling, treatment or anything, any other kind of care from any other mental health provider in connection with the 2008 auto accident?
A. Counseling, no, just his office and the primary care, Dr. Isiocha.
Q. Other than Chris Hampton and the Mind and Body Consortium, have you ever seen any other psychologist, psychiatrist, counselor or other mental health provider for any reason?
A. No. That's it.
Q. Have you ever received any counseling or treatment in connection with your use of alcohol?
A. No.
Q. Have you at various times in your life had a drinking problem?
A. No.
Q. You had -- had what anybody else told you was a drinking problem?

MR. POLIQUIN: Objection.
THE WITNESS: No.
BY MR. MCGEE:
Q. Has anybody advised you to seek treatment in connection with a drinking problem?
A. No.
Q. How would you describe your use of alcohol?
A. Usually like social, social drinker.
Q. Have there ever been times that things have happened to cause you to drink more than -- than normal?
A. This right here.
Q. What -- what is this right here?
A. The UPS case.
Q. The lawsuit has caused you to drink?
A. Yes.
Q. How has the lawsuit caused you to drink?
A. Stress, depressed, worry, want it to be over with.
Q. Pardon?
A. Stress, depressed, worried, want it to



be over with.
Q. And that has led you to drinking?
A. Yes. And that's why I went to -- that's why he referred me to a psychiatrist, Dr. Isiocha.
Q. Tell me about the drinking?
A. He's advised me that, Jason, that's not good for you. You can't be on the medication that he prescribed for me. So he referred -- referred me to see the Mind and Body Consortium. That's what I've been doing.
Q. Well, describe for me what your drinking was, your pattern of drinking?
A. I would drink maybe more than -- on a daily basis. I wouldn't drink socially. I would drink more than twice a week.
Q. And when you drank, how much did you drink?
A. Maybe three beers.
Q. Did you drink anything other than beers?
A. Maybe a mixed drink, like a vodka and pineapple, vodka and cranberry.
Q. Would you drink to the point of



intoxication?
A. No, never, I wouldn't do that, no.
Q. But the first time that saw any mental health provider in connection with anything doing -- to deal -- dealing with the ending of your assignment at Supply Chain Solutions was in April of 2011?
A. That is correct.
Q. So why -- why did you first see somebody about that a year and one-half after your work assignment at Supply Chain Solutions ended?
A. Because that's when my primary care doctor referred me to Mind and Body Consortium.
Q. Why didn't you see anybody about those issues before then?
A. Because he prescribed Wellbutrin for me himself and Ambien for me himself.
Q. Why didn't you seek out a psychiatrist, psychologist or counselor before April of 2011?
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: My primary care



referred me to him.
BY MR. MCGEE:
Q. Who at Mind and Body Consortium have you consulted with?
A. Elenor.
Q. Pardon?
A. Her name is Elenor.
Q. Moore?
A. Elenor, E L E N O R. And Karen.
Q. What is Elenor's last name?
A. Perk -- Perkins.
Q. What is her position?
A. She's an actual counselor, a psychiatrist, a psychiatrist.
Q. She is a psychiatrist?
A. She is, yes.
Q. Have you seen anybody else at Mind and Body Consortium?
A. Karen McCormick.
Q. What's her position?
A. She's -- I guess she would be the one that prescribes your medications. So she would be that. I seen her.
Q. How many -- and what is -- what has

Elenor Perkins done for you? Why type of services has she provided?
A. She listens to my conversation as far as what I'm going through and then she referred me to Karen.
Q. How many times have you seen Elenor Perkins?
A. Twice.
Q. Were those counseling sessions?
A. Yes, they were.
Q. How many times have you seen Karen McCormick?
A. I seen Karen once.
Q. And that was just for -- to have her prescribe some medication for you?
A. Yes.
Q. What medication did she prescribe?
A. The celexa and ambien.
Q. Have you seen any other psychiatrists, psychologists, counselor, mental health provider in connection with anything having to do with Supply Chain Solutions or the ending of your assignment there or this lawsuit?
A. No. That's it.



Q. Are you continuing to see anybody at Mind and Body Consortium?
A. Yes.
Q. Who?
A. Ellen and Karen -- Elenor and Karen.
Q. When is your next appointment?
A. It was today but I had to come here.
Q. Have you missed some appointments?
A. No, just today's.
Q. Has your partner attended any sessions with you?
A. No.
Q. How about when you've met with Dr. Isiocha; has your partner attended any of those sessions?
A. No.
Q. Have you attended or been seen by Dr. Isiocha with anyone else?
A. Yes.
Q. Who?
A. Denise Wright.
Q. And why did she accompany you?
A. That day I was feeling so down, she drove me to the appointment.



Q. Did you have a car?
A. Yes, I had my car.
Q. When did you -- remind me when you got your car?
A. March, March.
Q. Describe for me what was -- was the emotional impact on you of having your work assignment at Supply Chain Solutions end?
A. I didn't want to do anything. I didn't want to go anywhere. I lost my appetite. I lost interest in doing anything with family, my friends. It's just been -- I want to lock myself in a room and just sleep whenever the rain -- rainy days, just laid in my bed and just wrote in my diary, wrote in my little journal, cried myself to sleep asking myself why am I going through this, why would the ignorance of someone let me get my job terminated, why -- it was just so much on my mind. My mind was just racing.
Q. What -- what's your current weight?
A. I weigh 150.
Q. And what was -- what was your weight on September 11, 2009?



A. I don't know.
Q. Do you have your driver's license with you?
A. Yes.
Q. Pull it out and let me know what the weight is on the driver's license?
A. 161.
Q. What is the date of that?
A. 5-16-2008.
Q. Have you lost any weight since your job assignment at Supply Chain Solutions ended?
A. Yes.
Q. How much?
A. I was down to 142 at -- once.
Q. When was that?
A. I don't remember the exact --
Q. What year?
A. That was 2009, 2010.
Q. What year?
A. 2009 into 2010. It fluctuated. He would tell me every -- every time I would go to the visit.
Q. Did your experience any other symptoms or manifestations of this emotional distress

233

that you claim that you suffered?
A. Loss of appetite.
Q. You told me --
A. Loss of sleep.
Q. Did you -- did anybody prescribe anything for you for sleep?
A. It was the Ambien.
Q. Who prescribed that?
A. Dr. Isiocha --
Q. When?
A. -- and -- and Mind and Body.
Q. But when did Dr. Isiocha first subscribe -- prescribe something for sleep for you?
A. He prescribed that at my second visit after August -- my second or third visit, the first or second or third visit in the beginning.
Q. When was that?
A. That was -- my first visit with him was -- I don't know the exact date.
Q. Had you experienced any other symptoms or manifestations?
A. I cut my hair off. I lost some of my

234

hair, so I cut my hair off.
Q. When was that?
A. I cut my hair February of this year.
Q. What do you mean you cut it off?
A. I had braids that was down here.
Q. Why did you cut your braids?
A. Loss of hair, stress.
Q. Did you ever experience any hallucinations?
A. No, just heard voices.
Q. What voice?
A. Sherri's voice.
Q. When did you start hearing her voice?
A. I heard her voice numerous times.
Q. When did you first start hearing voices?
A. Approximately Christmas time I got very depressed around Christmas time. I wouldn't -- I didn't enjoy my Christmas this year or that year in 2009.
Q. Well, is that when you started hearing voices?
A. Yes, and a couple of weeks after, yes,

235

sir.
Q. And what were the voices?
A. Good morning, Jason. All of your stuff is already upstairs. And I replied to her, I already know.
Q. And that's the voice that you heard?
A. Yes.
Q. Did you hear anything else?
A. Just that morning, that -- that's all I hear. Good morning, Jason. Your stuff is already upstairs. I would -- then I would instantly think back, like, why am I going through this. Are you serious. Like I couldn't really believe that I'm going -- hearing this voice that I don't want to hear.
Q. Did you -- when you heard the voice, did you hear her say anything else?
A. That's the only conversation that we had that morning.
Q. And that's the only voice that you heard?
A. Yes.
Q. How many times did you hear that after -- the first time, Christmas 2009 time

236

period?
A. Whenever it's raining I hear it.
Q. You still hear that voice?
A. Yes. I told them that at the -- my psychiatrist office last week, that I still do. That's why they put me on the Celexa to try to -- they say my mind is racing. But I -- it's -- it's just a lot.
Q. When was the last time you heard that voice?
A. Last week, last week.
Q. Do you hear it when you're asleep or awake or is it part of a dream or tell me about it?
A. It's part of -- I guess I'm -- I don't know. It's -- it's part of -- throughout the day when it's raining throughout the day and I'm at work. I hear it at work now at Nemours Hospital.
Q. Is it only when it's raining that you hear that?
A. Mainly when it's raining, yes.
Q. And -- and you hear it when you're awake?

237

A. When I try to put myself to sleep. If I'm home -- if I'm home relaxing in the rain, yes.
Q. And -- and -- and is it when you're trying to sleep at work that you hear it?
A. I don't sleep at work.
Q. Okay. But you told me you hear it when you're sleeping. You told me you hear it at work --
A. When it's raining is what I said, yes.
Q. When it's raining at work you hear it?
A. Yes.
Q. And is there a particular time of the day that you hear it?
A. Morning time, it could be in -- in the morning time.
Q. Any other times of the day that you hear it at work?
A. No.
Q. When was the last time you heard that at work?
A. When it rained -- what day was it this week -- today is Thursday. No. Last week. It was last week. That's what I told my counselor

238

that, the same day. I told Karen that the same day I heard the voice.
Q. And do you -- when you hear it, do you just hear it once during -- during the day or do you hear it more than once?
A. I want to say maybe once or twice throughout that day.
Q. Separated by how much time?
A. I try not to think about it, but I would say -- I would say probably a couple of hour time frame.
Q. So you'll -- you'll hear it once and a couple of hours later you'll hear the same voice --
A. I'll hear it again.
Q. -- saying the same thing?
A. Yes, sir.
Q. And it's always saying the same thing?
A. (The witness indicates.)
Q. And -- and tell me again what it is you hear?
A. Good morning, Jason. All of your stuff is upstairs already. And I would reply

239

back, I already know, Sherri.
Q. Do you hear any other voices?
A. No.
Q. Do you ever hear a voice saying anything else?
A. Me telling myself it's going to be okay. I'll get through this.
Q. Anything else?
A. That's it.
Q. How has the -- the problems in your -- your personal life -- life, your relationship with your partner affected you?
A. As I said previously, we don't do as much as we used to do, as far as the movies, go out to dinner. We don't do that any more.
Q. Does that make you happy?
A. No. I'm sad.
Q. Why are you sad?
A. Because I miss those things.
Q. How does it make you feel?
A. Like nothing, like why am I here and why am I going through this.
Q. Have you told your partner how you feel about that?

240

A. Yes.
Q. And what has his response been?
A. It's going to be okay. I'm not going nowhere.
Q. Do you still take well -- was it Wellbutrin?
A. Wellbutrin?
Q. Right.
A. No. They took me off the Wellbutrin and gave me the Celexa. They wanted me to get on something stronger.
Q. When was the Celexa -- Celexa first prescribed for you?
A. That was just prescribed last week.
Q. Have you been taking the Wellbutrin up until --
A. Wellbutrin.
Q. -- that point?
A. No. I stopped.
Q. When did you stop that?
A. I stopped that about a couple of months ago.
Q. Why did you stop?
A. I felt as though I was crazy.

241

Q. Pardon?
A. I felt as though I was crazy as far as hearing the voices. That's what I thought.
Q. You thought the medication was causing that?
A. Uh-huh.
Q. You need to give an audible response.
A. Yes.
Q. Have you ever discussed your sexuality with any mental health provider?
A. Yes.
Q. Who -- who have you discussed that with?
A. Mind and Body.
Q. What have you told them about that?
A. How my relationship is on eggshells basically.
Q. How do you feel about your sexuality?
MR. POLIQUIN: Objection.
THE WITNESS: Excuse me?
BY MR. MCGEE:
Q. How do you feel about your sexuality?
A. I accept it.
Q. Are you comfortable with it?

242

A. Yes.
Q. Are you currently using illegal drugs?
A. No.
Q. Have you ever used any illegal drugs?
A. No.
Q. You haven't used illegal drugs with your partner?
A. No, no.
Q. Since September 11, 2009 have you taken any medications other than Wellbutrin, Ambien or Celexa?
A. No, just over-the-counter medications, ibuprofen from the accident.
Q. Did you see Nikki Pinkett on September 11, 2009?
A. Yes.
Q. When?
A. That same morning when I got there.
Q. Where did you see her?
A. She was downstairs.
Q. When did you see her?
A. Approximately around the same time I seen Sherri.
Q. And what time was that?

243

A. Between 8:30 time frame, 8:30, 8:33 time frame when I came downstairs from upstairs.
Q. What time did you come downstairs from upstairs?
A. As I stated earlier, between 8:33, 8:33, 34 after speaking to Myron.
Q. And where did you see Nikki Pinkett?
A. She was downstairs in the -- where my old seating area was.
Q. And specifically where was she?
A. She was at Toni's desk.
Q. Toni who?
A. Shepperson's desk that morning.
Q. Did you speak with Nikki Pinkett?
A. I said good morning to her.
Q. Anything other than that?
A. No, good morning, happy Friday, good morning.
MR. MCGEE: Why don't we take a break, a five-minute break.
THE VIDEO TECHNICIAN: We're going off the record at 4:06.
(Whereupon a break was taken.)

244

THE VIDEO TECHNICIAN: We're back on the record at 4:14. Please continue.
BY MR. MCGEE:
Q. Mr. Scott, have you experienced any emotional distress as a result of the car accident that you were in October of 2010?
MR. POLIQUIN: Objection. I think we -- that was asked and answered previously.
THE WITNESS: I spoke about that, too.
BY MR. MCGEE:
Q. What did you answer?
A. I spoke about that. Yes.
Q. And what emotional distress have you experienced as a result of the October 2010 car accident?
A. The same, the same as far as not able to sleep, thinking about how I was going to get back on my feet, get to interviews, and get to a job once a job became available and worrying about the case and worrying about my relationship, worrying about my family relationship. I didn't want to do anything as

far as with my nephew, with my family. I wanted to just be in the bed all day.
Q. And -- and that's all as a result of the October 2010 car accident?
A. It all trickled -- trickled down to this thing -- situation at -- the UPS situation, too.
Q. But I -- I want to know what, if any, emotional distress you experienced as a result of the October 2010 car accident?
A. I feel as though if I wasn't going to Ron's office on that day, the accident would have never happened.
Q. Have you ever had flashbacks from that car accident?
A. I do. I think about it, yes, I do.
Q. And tell me about the flashbacks?
A. I see myself in the car --
MR. POLIQUIN: I'm going to object but answer the question.
THE WITNESS: I see myself in my car driving down 13 and the sun is beaming in my eyes, and I ran in the back of the -- of the vehicle in front of me.



BY MR. MCGEE:
Q. And -- and what kind of injuries did the person sustain?
A. She said she had back injuries.
Q. And did you suffer any physical injuries as a result of that car accident?
A. I did not, no.
Q. And was there anybody in the car with you?
A. Yes.
Q. Your partner?
A. Yes.
Q. Was he injured?
A. Yes, he was.
Q. And in what way?
A. He had a big cut, a gash in his head. He had back pain. He also had a burn from the air bag.
Q. Did you suffer posttraumatic stress syndrome as a result of that car accident as well?
A. Did I?
Q. Yes.
A. No, I didn't.



Q. Have you seen any type of mental health provider in connection with that accident?
A. No, just gone to Mind and Body for the UPS case, I let -- I let her know about it, the situation. They're well aware of it.
Q. We -- we talked about the work opportunities that you declined through Kelly Services. Have you declined any other work opportunities since September of 2009?
A. It's not that I declined the work opportunities through Kelly Services. I told you when I called them back and they called me back, we both -- they stated to me that someone else had got the position and one of the positions were not going -- they didn't go through with it.
Q. Have you been made any job offers other than the Nemours --
A. No, that's the only offer I received.
Q. Have you received -- did you have any job interviews?
A. Plenty.
Q. With whom?



A. Sally Mae, AAA, who else, Beebe Medical Center.
MR. MCGEE: Mr. Poliquin, I mean, this is something that we asked for in our interrogatories. And rather than taking the time to go through this --
MR. POLIQUIN: I have a -- I have a plethora of forwarded e-mails that we've provided in our documents --
MR. MCGEE: Well, I had an interrogatory on this. So I'd like you to answer the interrogatory rather than having to go through it here in the deposition. Will you do that?
MR. POLIQUIN: As far as interviews he's been on?
MR. MCGEE: It talks about job search including, you know, who he applied with and asks for specific information about that.
MR. POLIQUIN: I think we have provided -- I mean we -- we've provided a plethora of confirmations concerning job interviews and -- and, I mean --
MR. MCGEE: You haven't

answered the question we've asked you to answer. Will -- will you answer the question that we asked you to answer?

MR. POLIQUIN: If -- if that's -- I mean, we haven't -- I don't think that's the request we received, as far as a deficiency in our responses. But to the extent that we can answer it, I -- I think we already have. But I will supplement it.

BY MR. MCGEE:

Q. Have you ever received any job assignments through the recorder -- excuse me -- recruiter Yo?

A. Yo?

Q. Yes.

A. That is one of them.

Q. Have you received job assignments through Yo?

A. Not an assignment, no.

Q. Have --

A. We -- I spoke to them and applied with them, yes.

Q. Who did you receive interviews from?

A. Sally Mae, as I stated and Dupont, the



actual engineering company, Dupont, over-the-phone conversations, interviews with -- who was that -- Bank of America for a loan -- loan negotiator position. Several -- I provided I believe -- I did provide it with my attorney.

Q. What other interviews did you receive?

A. So many I can't even remember in that year and one-half.

Q. What other interviews did you receive?

A. No, honestly, there's so many, I cannot remember.

Q. I'm not asking you to -- you're telling me -- you're telling me you can't remember another one?

A. It's -- Dale One is a financial bank in Dover, Logistic Care. There's so many.

Q. Well, keep naming them because you haven't named them in response to our discovery request.

A. I have not?

Q. No.

MR. POLIQUIN: What discovery



request are you -- are you --

MR. MCGEE: Interrogatories.

MR. POLIQUIN: I'm looking at them. I'm just --

BY MR. MCGEE:

Q. Go ahead, Mr. Scott, who else did you interview with?

A. Nemours, I accepted that one. It's been so many I cannot remember.

Q. Well, go ahead, tell me which other ones?

A. That's all I can remember.

Q. Of all the interviews that's -- that's all you can remember?

A. After a year and one-half interviewing, yes. And I provided, like I said, all the e-mail and correspondence through him, which he should have forwarded to you.

MR. POLIQUIN: I mean, we can give you a complete list.

MR. MCGEE: That's what I would like.

MR. POLIQUIN: I have no problem with that. But we -- I mean, there's



e-mails.

MR. MCGEE: But e-mails don't tell, you know, whether there was an interview, what the offer was, things like that. So if you'd answer the interrogatories, that will -- I'd appreciate it. Thank you.

Mr. Scott has informed us that he kept a diary relating to the events at issue and his claim for damages. That has not been provided to us. So I'm going to suspend the deposition at this point, reserving the right to resume it after that journal has been produced.

MR. POLIQUIN: I think he testified that was -- he was -- that was provided to the -- to the medical doctor.

MR. MCGEE: Well, he testified that he -- he also kept it -- something on his computer in type fashion that he says he did not provide to the medical provider. In any -- in any case whether he provided it to somebody else or not, he's obligated to and you are obligated to provide it to us. Until it's been provided, we can't complete the deposition.

But at this point, I'm going to suspend the deposition reserving the right to resume the deposition once you provide that -- that -- what he's generally referred to as his journal to us.

That's all I have for today.

THE WITNESS: Did you receive --

MR. POLIQUIN: You don't -- you're not here to ask him question.

THE VIDEO TECHNICIAN: We're going off the record at 4:23.

(Witness excused.)

(Deposition concluded at 4:23 p.m.)



C E R T I F I C A T E

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

-------------------------

Dolores M. Horne
Dated: May 18, 2011

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)



------

LAWYER'S NOTES

------

| PAGE | LINE | CHANGE |
| --- | --- | --- |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |



DEPOSITION ERRATA SHEET

NO. 234454
JASON SCOTT
- VS -
UPS SUPPLY CHAIN SOLUTIONS

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _______ day of _______, 20 --.

________________________________________
JASON SCOTT

# Exhibit 26

IN THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

JASON SCOTT ) NO. 10-929-JCJ
)
- vs - )
)
UPS SUPPLY CHAIN )
SOLUTIONS )

Oral Deposition of VONDA BYNUM, held at One Rodney Square, 920 North King Street, Wilmington, Delaware, on Monday, May 9, 2011, at 2:54 p.m., before Dolores M. Horne, Professional Reporter and Notary Public, in and for the Commonwealth of Pennsylvania.

ESQUIRE DEPOSITION SERVICES
1600 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
215-988-9191



APPEARANCES:

THE LAW OFFICES OF RONALD G. POLIQUIN
BY: RONALD G. POLIQUIN, ESQUIRE
48 The Green, Second Floor
Dover, Delaware 19901
(800) 811-5182
ron@ronpoliquin.com
Attorneys for the Plaintiff

JACKSON LEWIS, LLP
BY: EMMETT F. MCGEE, JR., ESQUIRE
2800 Quarry Lake Drive
Suite 200
Baltimore, Maryland 21209
(410) 415-2003
emmett.mcgee@jacksonlewis.com
Attorneys for the Defendant



INDEX

| WITNESS | EXAMINATION | PAGE |
| --- | --- | --- |
| VONDA BYNUM | | |
| | By: Mr. McGee | 5, 55 |
| | By: Mr. Poliquin | 46 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Bynum 1 | E-mail | 52 |
| Bynum 2 | E-mail | 52 |



DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer
Page Line Page Line Page Line

Request for Production of Documents
Page Line Page Line Page Line

Stipulations
Page Line Page Line Page Line

Question Marked
Page Line Page Line Page Line

VONDA BYNUM, after having been first duly sworn, was examined and testified as follows:

* * *

EXAMINATION

* * *

BY MR. MCGEE:
Q. Good afternoon, Ms. Bynum. My name is Emmett McGee. I'm an attorney with the law firm of Jackson Lewis. I represent UPS Supply Chain Solutions in a lawsuit that's been filed against that company by Jason Scott. We're here today for your deposition in the Jason Scott case because he has identified you as a potential witness in this matter.
I'm going to be asking you some questions. You've been sworn in. You're under oath, so your obligation to tell truth is just the same as it would be if you were in open court. Do you understand that?
A. Yes.
Q. And you do need to give an audible, verbal response because the court reporter here will be taking down everything that will be



said, every question that I ask and every answer that you give and she can only take down kind of an uttered, articulated word as opposed to nods of the head or gestures. So occasionally if you lapse into gestures as opposed to words, I'll try to remind you of that just for the court reporter's benefit. Also, for the court reporter's benefit, try to let me finish a question before you answer, and I similarly will try to remember to allow you to finish your answer before I ask the next question.
A. Okay.
Q. If at any point you want to break for any reason, just let me know and I'll try to accommodate you.
A. Okay.
Q. If you don't understand a question or would like me to repeat it, please let me know and I'll try to accommodate you there as well.
A. All right.
Q. Can you please state your full name and your current address for the record?
A. Vonda Renee Bynum, 43 Egret Court,



Newark, Delaware 19702.
Q. How long have you lived at that address?
A. A couple of months.
Q. Where did you live immediately prior to that?
A. 1407 Flanders Way, Newark, Delaware 19702.
Q. Do you live with anyone else at the Egret Court address?
A. My son.
Q. Anyone else?
A. No.
Q. How old is your son?
A. Fifteen.
Q. What is your home telephone number?
A. 302-420-0636.
Q. And how about your cell phone number?
A. That is my cell phone.
Q. Do you have any other phone numbers?
A. No.
Q. Are you currently employed?
A. Yes.
Q. Where do you work?



A. State of Delaware.
Q. Where?
A. DMV.
Q. What location?
A. New Castle.
Q. What is your job?
A. I work in vehicle services.
Q. How long have you had that job?
A. A year.
Q. When did you start?
A. July last year.
Q. Who do you report to?
A. Stacy Dickson.
Q. What is your work e-mail address?
A. What do you need my work e-mail address for?
Q. Just in case we need to get a hold of you --
A. I will give you my personal e-mail address.
Q. Okay.
A. VR Bynum at Yahoo dot com.
Q. What is your work telephone number?
A. We don't have a particular telephone

number. When you call the State of Delaware you might get anywhere.
Q. Do you know Jason Scott?
A. Yes.
Q. How do you know Jason Scott?
A. We worked together.
Q. Where?
A. UPS.
Q. At the Supply Chain Solutions location?
A. Uh-huh.
Q. On Biddle Street?
A. Yes.
Q. Were you employed by Kelly services like he was?
A. Yes.
Q. And Kelly assigned you to work at the Supply Chain Solutions location?
A. Yes.
Q. Were you ever a Supply Chain Solutions employee?
A. No.
Q. Always were a Kelly Services employee while you were working there?



A. Yes.
Q. When did you start working at the Supply Chain Solutions, Biddle Street location?
A. I don't have an exact date.
Q. How long did you work there?
A. It hadn't been a very long time, so I'm not sure.
Q. When did you stop working there?
A. I don't remember that, either.
Q. What year?
A. I guess it was 2009. I'm not sure.
Q. What was your work assignment at the Biddle Street location?
A. We worked in a department under Bracco doing hospital billing.
Q. Is that the same team that Mr. Scott was on?
A. Yes.
Q. Who was your supervisor who supervised the work on that team?
A. In the end it was Heidi.
Q. Heidi Maslin?
A. I think that's what her last name was.



Q. Did you ever work with Sherri O'Connell?
A. Before I left, yes.
Q. When did you work with her?
A. Maybe a week or two.
Q. Did you leave that assignment before or after Jason Scott left?
A. Before.
Q. Why did you leave that assignment?
A. I got a call on my lunch and said the assignment was over.
Q. Who informed you, somebody from Kelly?
A. From Kelly.
Q. Who was it? Was it Paola Caroza?
A. Yes, Paola.
Q. Did she tell you why your assignment was over?
A. No.
Q. Did you ever ask?
A. Yes. She said the only reason they gave them was that assignment was over. And it was supposed to be a temp to hire assignment. That's why we took the job.



Q. Did you ever ask anyone else why your assignment at Supply Chain Solutions ended?
A. I couldn't ask anyone else. They wouldn't allow me back in the building.
Q. Who was the supervisor of the team that you worked on at the time your assignment there ended?
A. Heidi.
Q. Do you know who made the decision to end your assignment?
A. I know nothing.
Q. Why do you believe your assignment at Supply Chain Solutions ended?
A. I don't know. All I was told was your assignment ended. And I said can I go back in the building and get my things after I asked why. And Paola said they wouldn't give her a reason, just said the assignment ended and that's all I got because that's all Paola knew.
Q. Did you subsequently learn that Jason Scott's assignment later ended?
A. Uh-huh.
Q. Yes?
A. Yes.

Q. How did you learn that?
A. Another coworker.
Q. Who is that?
A. Several coworkers.
Q. Who?
A. I don't remember exactly who. That's been a while ago.
Q. What were you told?
A. That Jason didn't work there any more.
Q. Did anybody tell you why he didn't work there any more?
A. No. I didn't ask.
Q. Did anybody tell you the circumstances of his departure?
A. No.
Q. Pardon?
A. No.
Q. Do you have any idea why his assignment ended?
A. No. He was an excellent worker. He was one of the top workers, so I have no idea.
Q. Have you had any discussion with anybody about why his assignment ended?



A. Discussions why his assignment ended, no.
Q. Have you had any communication with Jason Scott since his assignment ended?
A. After his assignment ended, yes.
Q. What was that?
A. We were all trying to figure out why we didn't have a job any more.
Q. So what happened?
A. What do you mean what happened?
Q. About the communication with Mr. Scott, how did that come about?
A. I don't know when we talked or what day or anything we talked. But we all found out that none of us had jobs any more and nobody was actually given a reason.
Q. Who else no longer had an assignment at Supply Chain Solutions?
A. A lady named Toni. Another --
Q. Toni Shepperson?
A. Uh-huh.
Q. Is that yes?
A. Yes. Another lady -- I forget her name. It was quite a few people.



Q. Were they all Kelly Services people?
A. Yes.
Q. Were they all Kelly Services employees whose assignment at Supply Chain Solutions ended?
A. Yes.
Q. And did you all get together on a conference call or something?
A. No.
Q. Did you ever get together as a group face-to-face?
A. No.
Q. You just started calling around to each other?
A. Me and Toni are friends. We were friends previously before the job and Jason became associated when we started working together.
Q. Well, did you call Jason Scott or did he call you?
A. I don't remember.
Q. And how long after Jason Scott's assignment ended was it that you spoke with him?



A. I don't remember.
Q. What did you discuss with him?
A. I don't remember.
Q. Did Mr. Scott tell you why his assignment ended?
A. I can't recall.
Q. Had you heard any rumors about why Mr. Scott's assignment ended?
A. Rumors, no.
Q. Where does Toni Shepperson live?
A. I don't know her exact address.
Q. What area?
A. I think she still lives in Newark.
Q. What's her phone number?
A. I don't have it with me.
Q. Do you have your phone with you?
A. No.
Q. You don't?
A. No.
Q. Where does Ms. Shepperson work?
A. That I don't know. I don't know if she still works through Kelly or not.
Q. When was the last time you spoke with Ms. Shepperson?

A. It's been a while.
Q. How long?
A. Maybe six months.
Q. Did you speak with anybody about the fact that you were going to have a deposition today?
A. No, because I just got this paper Friday after some gentleman was walking around my job with it.
Q. As far as you know did Mr. Scott, Jason Scott have any conflicts or problems with any coworkers or supervisors at Supply Chain Solutions?
A. Not coworkers so much. His work performance was well. They kind of treated him a little different because of the presumption of what his sexual orientation was.
Q. Who is they?
A. Management, like heidi.
Q. Anyone else?
A. No. I can't even hardly remember who worked there.
Q. What was Mr. Scott's sexual orientation?



A. I have no idea. I never asked him.
Q. Did he ever tell you?
A. No.
Q. Then why or how is it that Heidi treated him differently?
A. It was very obvious how you brush people off or, you know, act like a person that's less than what they are.
Q. Well, tell me what you observed?
A. You can tell when people are, say, prejudice or -- against certain things that they may perceive of a person.
Q. Well, tell me what you observed?
A. Just a little snickering, just the brushing him off. Certain people assumed that he was homosexual.
Q. Who assumed that he was homosexual?
A. Heidi, different people on the team.
Q. Who other than Heidi?
A. Different people on the team.
Q. What makes you say that Heidi assumed he was homosexual?
A. When you work in a cubicle, you can hear little things going on.



Q. What caused you to assume that Heidi assumed that he was homosexual?
A. Just little comments that they made or saying things like, you know, stop being a girl and different little inappropriate things that people say to other people at work.
Q. Did Heidi Maslin ever say anything inappropriate to Jason Scott?
A. Yes, little things like that. Some people try to say it as a joking manner and it offends the person.
Q. Did Heidi Maslin ever say anything to Jason Scott that you believed was inappropriate?
A. It was more or less -- when I would witness anything it was like behind his back type thing.
Q. What did you witness?
A. Like different mannerisms of, you know, he would come in the office and say something and make fun of him after he left.
Q. Heidi Maslin --
A. Different people. Because you're at work, people are in different groups.



Q. I just want to talk about Heidi Maslin first. Did she ever do or say anything to indicate to you that she knew that Jason Scott was gay?
A. Heidi didn't talk directly to me. But as I said previously, you can hear little comments.
Q. I'm not asking whether she said something to you. I'm asking you if she ever said or did anything to indicate to you that she knew Jason Scott was homosexual?
A. You just asked me if Heidi said anything to me. I said she didn't say anything directly to me. And my statement was you hear things in groups when you're working because we work so close together.
Q. Just note -- listen carefully because I didn't say anything about whether anybody said anything to you. So please listen carefully. Did Heidi Maslin ever say or do anything to indicate that she knew that Jason Scott was gay?
A. Not that she knew, that she assumed.
Q. What, if anything, did she say or do

that led you --
A. I can't give you exact words.
Q. Can you tell me anything?
A. No.
Q. Did anybody else ever make any reference to Jason Scott's sexual orientation?
A. No.
Q. Did you get along with Heidi Maslin?
A. Yes.
Q. Did you have any conflicts or disagreements with her while you were working there?
A. No.
Q. Did Jason Scott ever tell you why he believed it was that his assignment at Supply Chain Solutions ended?
A. He thought it was because he was gay or is gay or they thought he was gay.
Q. He told you that?
A. Uh-huh.
Q. Pardon?
A. Yes.
Q. When did he tell you that?



A. I don't have a date or time.
Q. Well, what year was it?
A. I don't know.
Q. Was it 2009?
A. I have no idea. It was after he was released from UPS.
Q. Was it 2010?
A. I don't know.
Q. Was it this year, 2011?
A. I haven't talked to Jason this year.
Q. Did he indicate to you -- strike that. Have you seen Jason Scott face-to-face since his assignment at Supply Chain Solutions ended?
A. No.
Q. How many times have you spoken to Jason Scott since his assignment at Supply Chain Solutions ended?
A. Maybe two or three times.
Q. Have you had any e-mail communications with Jason Scott?
A. No.
Q. Have you had any e-mail communications with anybody about Jason Scott since his assignment ended?



A. No.
Q. Did Jason indicate to you who he believed made the decision to end his assignment at Supply Chain Solutions?
A. No.
Q. At the time that your job assignment at Supply Chain Solutions ended, where was your cubicle?
A. What do you mean where was it?
Q. What floor was it on?
A. The first floor.
Q. Had you always worked on the first floor?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Have you ever spoken to Toni Shepperson about the ending of Jason Scott's job assignment?
A. Yes.
Q. What did you discuss with Toni Shepperson?
A. That he had gotten fired and really didn't know why. We were surprised he had



gotten fired because he had good work performance.
Q. Was Toni Shepperson still working there when Jason Scott's assignment ended?
A. I'm not sure if she was. I think she was.
Q. Did Toni Shepperson ever discuss with you anything about what she believed was the reason Jason Scott's job assignment ended?
A. I don't think so.
Q. Did Toni Shepperson ever tell you that she had heard anyone at Supply Chain Solutions make any comment about Jason Scott's sexual orientation?
A. I don't know.
Q. Did she tell you anything about that?
A. I said I don't know.
Q. You don't know or you don't recall?
A. I don't recall.
Q. After your job assignment at Supply Chain Solutions ended, did Kelly Services assign you to work at some other location?
A. Uh-huh, yes.
Q. Where was your next job assignment?

A. It was in Newark somewhere -- no -- Elkton.
Q. How long after your job assignment at Supply Chain Solutions ended was that?
A. I don't remember.
Q. A week later?
A. I don't remember.
Q. Where in Elkton were you assigned to work?
A. It was an office. It's been a while. I don't remember what the name of the office was.
Q. What kind of work was it?
A. Office work.
Q. What kind of business?
A. They had several things going on at that office.
Q. What things?
A. What I did was administrative work.
Q. What type of administrative work?
A. What do you mean?
Q. Can you tell me what kind of work you did?
A. I worked on the computer. I answered



the phone, scanning.
Q. Where in Elkton was the business located?
A. Right on the Elkton, Delaware line. And I also worked for the State.
Q. Was that through Kelly as well?
A. Uh-huh.
Q. You need to give an audible response.
A. Yes.
Q. How long did you work at the business in Elkton?
A. About three months.
Q. Why did that assignment end?
A. Because I got a full-time job with the State.
Q. Is that when you started at DMV or a different job?
A. Different.
Q. When did you start the full-time job with the State?
A. I just said July last year.
Q. That's when you started at DMV, right?
A. That's the State.
Q. You mentioned that you had another job



with the State prior to DMV?
A. You said full-time.
Q. You told me you left the Elkton job and then you got a full-time job --
A. Kelly is considered a temporary service. You asked me to answer the question. That's what I'm doing.
Q. That's fine. Let's just take it back and take it a little slower --
A. I'm not taking it any slower.
Q. Not for you, it's for my benefit. Where was the first place that you went to after your job assignment at Supply Chain Solutions ended?
A. I worked in an office for Kelly Services.
Q. Where?
A. In Elkton.
Q. How long did you work there?
A. A couple of months possibly.
Q. Where was the next place that you worked?
A. I worked simultaneously in Elkton and for the State for Kelly's.



Q. When you were working for the State through Kelly, where were you working?
A. In new castle.
Q. Doing what?
A. I was a greeter.
Q. Where.
A. In the inspection lane.
Q. Pardon me?
A. At the inspection lane.
Q. How long did you do that?
A. Six months.
Q. Is exhaust emissions inspection lane?
A. No. I said I was a greeter.
Q. Where?
A. At the inspection lane in New Castle.
Q. What is the inspection lane?
A. It's the State of Delaware job through Kelly Services.
Q. What kind of inspections do they do?
A. They do vehicle inspections.
Q. Why did that assignment end?
A. Because I got a full-time job with the State.

Q. What was that full-time job with the State?
A. Vehicle services.
Q. Where?
A. New Castle.
Q. Where in New Castle?
A. Airport Road where the guy was sent to bring me the papers.
Q. When did you get a full-time job with the State in new castle?
A. I said previously July last year.
Q. Have you held that job since July?
A. I still work there.
Q. What is your pay?
A. I will not tell you my pay.
Q. How much do you earn there?
A. I don't think I'm obligated to tell you how much I get paid.
Q. You are under subpoena, Ms. Bynum.
A. Why do I need to tell you how much I get paid if we're here talking about Jason Scott?
Q. Because it's relevant because Jason Scott has identified you as witness.



A. So what does that have to do with my pay grade?
Q. I need to know about your background, your situation --
A. If I work for the State of Delaware, obviously they've done a background check on me. If you would like a background check, say that's what you want, a background check.
Q. I'm just asking the question, Ms. Bynum.
A. Because I don't find the relevance of what I get paid if we're here discussing something previous.
Q. If you're refusing to answer the questions, I'm not going to belabor the point now.
A. I said that in the beginning. I said I don't feel like I need to tell you how much I get paid.
Q. That's fine. I'm not to going argue with you about it. If we have an issue we'll take it up with the judge.
A. Okay, no problem.
Q. When was the last time that you spoke



with Jason Scott?
A. I don't know.
Q. What year was it?
A. I don't know.
Q. When was the last time you spoke Toni Shepperson?
A. I don't know. It's been a while.
Q. Have you ever spoken to Ron Poliquin before?
A. I'm not sure. I heard his name.
Q. How did you hear his name?
A. From either Toni or Jason. I'm not sure which one.
Q. Have you ever spoken to Mr. Poliquin before today?
A. I don't believe I have. I'm not sure.
Q. Have you ever filed a lawsuit against anyone?
A. A lawsuit, no. We sent -- and I'm not even sure if it was him or not -- some type -- a complaint on UPS when we were let go of a job that we were told was -- during training that was temp to permanent.
Q. Who is we?



A. Me, Toni, Jason and I think it was a few other people. I'm not sure.
Q. Did you all decide to do that together?
A. Not at first, no.
Q. How did that come about?
A. I believe Jason looked into it.
Q. Did he tell you about that?
A. I don't remember.
Q. Did you end up filing some type of claim against Supply Chain Solutions?
A. I didn't file a claim. I -- Jason asked me to witness that he felt as though he was unjustly fired and I felt as though he was a good employee. So I put it in a letter for him.
Q. With whom?
A. I don't know. I think I sent it to him, gave it to him.
Q. Was it an e-mail that you sent to him?
A. I can't remember if it was an e-mail or if it was given to him.
Q. But it's something that he asked you

to do?
A. Yes.
Q. What did you say in that e-mail?
A. I don't remember.
Q. Did you also file some type of claim in connection with the ending of your assignment at Supply Chain Solutions?
A. I think I sent in a letter that I also worked for them and felt I was unjustly let go, also.
Q. Why did you think you were unjustly let go?
A. Because I did what I was supposed to do while I was there. And I was told upon taking the position that it was a permanent position and that's what the company was telling us while they were training us.
Q. What did you claim was the reason that your assignment ended?
A. I don't remember. I don't have that paper work.
Q. Do you believe your assignment ended because of your race?
A. Do I believe it ended -- I don't know



why it ended. I never got any answers.
Q. Did you ever ask anybody why it ended?
A. As I stated previously, there was no one to ask because I wasn't allowed back in the building.
Q. So when you say you never got any answers, answers to what?
A. Why -- like, if you would sit down with the HR person or the person that is managing you and they would sit down and explain to you why you were being let go. They couldn't even tell Paola why I was being let go from work.
Q. What is your race?
A. I'm African American.
Q. Do you believe that your assignment ended because you're African American?
A. With UPS I don't know what to believe.
Q. Do you have any evidence that your assignment ended because you're African American?
A. Like I said, I don't know what to



believe with UPS.
Q. Did anybody ever do or say anything to suggest that they were inclined to end your assignment because of your race?
A. Nobody gave me forewarning that my assignment was going to be ended in the first place. It was just like a lot of the petty little sneaky little underhanded things being done, people just being very rude and nasty to you, so.
Q. Did anyone ever do or say anything to suggest that they were racially bias?
A. Most people that are racist are not going to get up and announce it.
Q. I'm not asking you that. My question is did anybody do or say anything to indicate --
A. My answer is -- you asked me a question. I'm giving you my answer. I'm not going to answer it the way you answered it. My answer is nobody is going to announce that, oh, by the way, I don't like whatever race it is. You watch people by the way they treat you.
Q. Did anybody treat you in any way



that --
A. You get --
Q. If you let me finish the question.
A. I'm sorry.
Q. Did anybody treat you in such a way that caused you to believe that they were doing that because you're African American?
A. You don't know what people's reasons are why they do things.
Q. Did anybody ever do or say anything to suggest that they were racially bias?
A. Of course not. They're not going to say it.
Q. Did you have any other supervisors at Supply Chain Solutions other than Heidi Maslin?
A. We had another lady. I can't remember her name, a black lady. I can't remember her name.
Q. Was she your supervisor at some point?
A. Uh-huh, when we first started working there.
Q. Did you have any issues or problems with her?
A. No. I didn't have any issues or

problems with Heidi.
Q. Was Sherri O'Connell ever your supervisor?
A. She came in, I believe, like a week or two when -- before I left. I don't know specifically what her title was when she came.
Q. Did you ever have any issues or problems with her?
A. No. She was just -- she was kind of a nasty person, so I just stayed away from her.
Q. Did Sherri O'Connell ever do or say anything to suggest that she was racially biased in any way?
A. She was just kind of rude.
Q. Pardon?
A. She was just kind of rude. She was just --
Q. Was she rude to everyone?
A. I don't know what everyone else was doing. I was in my cubicle.
Q. While you were working at the Biddle Street location, did anyone indicate to you any dissatisfaction with your job performance?



A. No. Every time I asked Heidi, she said everything was going fine.
Q. Did you have any production targets that you were supposed to meet or expected to meet?
A. Uh-huh.
Q. You did?
A. Yes.
Q. And did you meet those production targets?
A. As far as I'm aware, any time I asked Heidi, she said everything was fine.
Q. What were the production targets?
A. I don't remember.
Q. Did anyone ever tell you that any of the Supply Chain Solution customers complained about you?
A. No.
Q. Who is Larry Hopkins?
A. He worked on the team.
Q. Did you have any conflict with him?
A. No, I didn't.
Q. As far as you know, did he make any complaints about you?



A. Yes. I got a letter in the mail saying he said I didn't like him because his wife was white. And how would I know his wife is white. He doesn't even have a picture of his wife up. He only had his children on the wall.
Q. Where did you get such a letter?
A. It supposedly came from UPS.
Q. Did you ever make any comments about Larry Hopkins' wife?
A. Absolutely not. Larry trained me when I first got there. How can I make a comment about somebody I have never seen before.
Q. Did you know he was married to a white woman?
A. No. And why would that matter.
Q. Did it matter to you?
A. Absolutely not.
Q. Who is Glenda Bailey?
A. She was one of the trouble makers on the team.
Q. Why do you call her a trouble maker?
A. She was always one of the ones that was gossiping and getting things started about



stuff. I don't know. She was just that type of person. She was one of those, somebody always did something to me, I'm the victim and sit there and cry at work. That's the type of person she was.
Q. Did you have any conflict or issues with her?
A. Yes.
Q. What was the nature of those conflicts --
A. She said I said something to her when I didn't.
Q. What did she accuse you of saying to her?
A. Supposedly I threatened her.
Q. How did you know that --
A. It was in that same letter that came from UPS. That's the first time I heard of it.
Q. Did you know that people at Bracco Diagnostics had complained about you?
A. No. Because I was at my cubicle during my work time. And for lunch I always went out for lunch.
Q. What does that have to do with

anything?
A. Because I didn't sit in the building. I'm a grown woman. I know how to conduct myself at work. I don't go to work to make trouble. I go to work and I did my work and I left.
So what could they complain about.
Q. Do you know Myron Giddens?
A. I don't think so. Myron, he was one of the guys that worked -- he worked on a different team.
Q. Do you know if he's still at Supply Chain Solutions?
A. I have no idea. I didn't work directly with him.
Q. Did you work on the Bracco Team the entire time you were there?
A. Yes.
Q. Were you aware of the fact that Jason Scott had an attendance problem while he was working at Supply Chain Solutions?
A. No.
Q. How did you get into the work area where your cubicle was at Supply Chain Solutions?



A. Through the front door.
Q. Did you have to ring a doorbell to have somebody let you in?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. You just need to say yes instead of uh-huh so the court reporter can take that down. Did you not have any type of pass card that you swiped to get you in?
A. Not that I remember. I think we had to get buzzed in.
Q. Do you know who Nikki Pinkett is?
A. I don't think so.
Q. Was she ever your supervisor at Supply Chain Solutions?
A. Oh, yes. That was our first supervisor.
Q. Was that the African American woman that you were referring to?
A. Yes.
Q. Did you have any issues or conflicts with her?



A. Not at all.
Q. Did you ever hear Heidi Maslin make any comment about anybody's sexual orientation?
A. Any comment about anybody's sexual orientation?
Q. Yes.
MR. POLIQUIN: Objection. She's answered that.
THE WITNESS: Why do you keep asking me the same questions over and over?
BY MR. MCGEE:
Q. I don't think you've answered that question.
A. Yes, I have. I've answered that. If you look back in your notes --
Q. What is the answer?
A. I did answer that.
Q. What is the answer?
A. I'm not going to keep repeating myself. I mean, if you don't have any more questions to ask me, I wish you would please let me go. I have a child to take care of and I have to pick my child up from school.



Q. Did Heidi Maslin ever make any comments about anybody's sexual orientation?
A. I'm not going to answer that again.
Q. Did Nikki Pinkett ever make any comments about anybody's sexual orientation?
A. Did Nikki Pinkett -- I never said she did. She was there for a little while and then she went out on maternity leave.
Q. Did Nikki Pinkett ever make any comments --
A. I never heard her make -- she was nice to everybody at work.
Q. Did Sherri O'Connell ever make any comments about anybody's sexual orientation?
A. I didn't talk to Sherri.
Q. Pardon me?
A. I didn't talk to Sherri.
Q. So is that, no, she did not?
A. You can't answer the question for me. You asked me a question --
Q. I'm sorry --
A. You asked a question and you told me when I first came here you're going to ask me a question and I was going to answer --

Q. I'll wait for your answer.
A. -- and then when I answer you want me to give you a specific answer.
Q. No. I do want you to give me a specific answer --
A. You want me to answer it the way you want me to answer it.
Q. I want you to answer the question. Did Sherri O'Connell ever make --
A. I didn't talk to Sherri. So I don't know what she did.
Q. Ms. Bynum, would you let me ask the question before you interrupt, please?
A. Sure.
Q. Did Sherri O'Connell ever make any comments about anybody's sexual orientation?
A. I don't know.
Q. Did Myron Giddens ever make any comment --
A. I don't know.
Q. Ms. Bynum, can you let me ask the question, please. Did Myron Giddens ever make any comments about anybody's sexual orientation?



A. I didn't work with Myron, so I don't know.
Q. Has Jason Scott worked anywhere since this assignment at Supply Chain Solutions ended?
A. I don't know.
Q. Is Toni Shepperson still working at Supply Chain Solutions?
A. I don't think so. I don't know.
Q. Where is she currently working?
A. You asked me that earlier, too, and I told you I don't know.
Q. Was she still working at Supply Chain Solutions when you left?
A. Yes.
Q. Do you know anything about why her assignment at supply Chain Solutions ended?
A. I don't know.
MR. MCGEE: Ms. Bynum, I don't have any other questions. Thank you.
BY MR. POLIQUIN:
Q. I have a few questions for you. And I'm sorry for your inconvenience of being here and I know that it's a pain to rearrange your



schedule and come here. I'm going to try to get you out of here as soon as possible. You talked about when Jason Scott was employed or working at Supply Chain Solutions and he was -- his position, like yours, was supposed to be a temp to hire assignment?
A. Yes.
MR. MCGEE: Objection to the form of the question.
BY MR. POLIQUIN:
Q. And you also stated that he was treated differently because of his sexual orientation?
A. Yes.
Q. And you talked about that you would overhear people, individuals making comments outside the presence of Mr. Scott about his sexual orientation?
A. Right.
MR. MCGEE: Objection to the form of the question.
BY MR. POLIQUIN:
Q. Was one of those people Heidi?
A. Heidi, yes, the supervisor, manager,



whatever.
Q. So she was part of those conversations?
A. Yes.
Q. And you also talked about -- how did she treat Mr. Scott differently than other employees?
A. I thought where, you know, certain employees were top employees, I think she kind of gave more recognition to others than she did him. When, you know -- and me and him weren't even acquainted at that time, like conversation or whatever. But he knew the job. He knew it well.
Q. And it was your impression that Mr. Scott was a top employee?
A. Yes.
MR. MCGEE: Objection to the form of the question.
BY MR. POLIQUIN:
Q. And she did not treat him like similar other top employees?
A. Correct.
Q. And your basis that there would be

prejudice against Mr. Scott was that there was snickering and that she would brush him off?
MR. MCGEE: Objection to the form of the question.
THE WITNESS: If he was asking her something, it would be something like he must be out with his boyfriend, just inappropriate things for work.
BY MR. POLIQUIN:
Q. You also made a statement that there was comments like stop acting like a girl or stop being like a girl?
A. Right.
MR. MCGEE: Objection to the form of the question.
BY MR. POLIQUIN:
Q. These comments about his sexual orientation would be in that -- is it the Bracco section?
A. Correct.
MR. MCGEE: Objection to the form of the question.
BY MR. POLIQUIN:
Q. Do you remember having conversations



with a Curt Slaughter after the end of your employment?
A. Yes.
Q. And when did that conversation take place?
A. I saw him in the mall. And he asked me what happened. And I just told him, I said, I didn't know. I was coming -- sitting in my car for lunch, coming back from lunch and I was told that I couldn't go back.
Q. And was this right around the time that you were -- after you were let go or terminated?
A. Yes.
Q. And was there any conversation -- that conversation, did he say anything about Jason Scott or did you say anything about Jason to him during that conversation?
A. He was just basically talking about, you know, how they're letting people, you know, unfairly leave and letting -- people's jobs are discontinued and their being good employees.
Q. And was there any conversation with Curt Slaughter about Jason Scott being let go



because of his sexual orientation?
A. He believed, also, that's what it was.
Q. He said that to you?
A. He said he believed, also, that's what it was because he was doing his job and he was top, he was better than most of the people on the team even, you know, better than some of the people that were permanent employees. So what else -- you know.
Q. What mall did this take place at?
A. Christiana.
Q. And do you know where you were when you had this conversations?
A. No, I don't remember exactly where we were.
Q. Who is Curt Slaughter?
A. He's an employee at UPS.
Q. Do you know what his position at UPS was?
A. He worked on the same team. We were all just in the same area on the same team.
Q. During the time you were -- you worked with Jason Scott at Supply Chain, did you ever



observe Jason Scott having any kind of attendance issues?
A. No. He worked on one end, and I worked on the other, how we were set up. He was down one side. I mean, he's been absent before. But he was down one side and I was down the other.
Q. But you never heard about him having any attendance issues?
A. No.
Q. Now, I have -- if we could take a quick break. I have one document to show you. I'd like to go make copy of it and I think we'll be done after that.
(Whereupon a break was taken.)
(Documents marked Exhibits Bynum 1 and Bynum 2 for identification.)
BY MR. POLIQUIN:
Q. I'm showing you two e-mails, one, the first document is marked Bynum 1. The second one is Bynum 2. I believe the first e-mail is an e-mail from you to Jason Scott?
A. Uh-huh.
Q. Can you read the date of that

e-mail?
A. December 6, 2009.
Q. So, that obviously was some time ago that you wrote that e-mail?
A. Correct.
Q. Why did you write that e-mail?
A. When I heard that he was let go of the job.
Q. And did Mr. Scott request that you put down some kind of statement about his -- about the --
A. When I sent this -- I'm sorry to cut you off.
Q. That's all right.
A. When I sent this -- this is just a communication, just being shocked that he was not employed there any more.
Q. And I believe in that e-mail you make comments about him being -- his sexual orientation --
A. Uh-huh.
Q. -- and --
MR. MCGEE: Objection to the form of the question.



MR. POLIQUIN: Let me finish the question before you object. If I could finish the question and then you can object.
MR. MCGEE: Go ahead:
BY MR. POLIQUIN:
Q. In that e-mail do you talk about Mr. Scott's sexual orientation and its connection with how he was treated at work?
A. Yes, I did.
Q. And what do you say in that?
A. I'm just saying how -- with the new lady, her name was Sherri, that came in like a week or two before I did, she was very -- what's the word -- abrupt.
Q. So, in the second paragraph it says you could tell she really had a problem with homosexuality. And in reference to she, you're referring to Sherri O'Connell?
A. Sherri. He would speak to her, good morning. She would bypass him like he wasn't there. She'd be just -- I mean, that's just how she would do him.
Q. And there's another e-mail there from Toni Shepperson. I don't know if you have ever



seen that e-mail before. Do you want to take a minute to read it over? It was sent five days prior to your e-mail. Does that perhaps refresh your recollection as to any conversations you had with Ms. Shepperson concerning Mr. Scott's termination?
A. Yes, just that stating that he was terminated. She was still there when I was gone. And that it was saying because he was gay. Like I said, when I saw Curt, and a lot people there -- permanent employees were scared to say anything because, you know, they didn't know if they would lose their jobs, too, because people were just losing their jobs so quickly, back to back. And it was like I want to say something but I can't because they were scared of being -- you know, having to lose their job. But a lot of people didn't think it was right.
MR. POLIQUIN: I have no further questions at this point.
BY MR. MCGEE:
Q. Ms. Bynum, was Sherri O'Connell abrupt with you?



A. Yes.
Q. In what way?
A. Just if you asked her a question, she was just an abrupt person.
Q. Did you find her to be dismissive of you?
A. No, because I had -- very rarely. She was my last resort. I really didn't talk to her much, and I wasn't there that long when she was there.
Q. Did you know Sherri O'Connell before she became your supervisor?
A. No.
Q. Did Sherri O'Connell ever do or say anything to suggest that she had an issue or problem with homosexuality?
A. I didn't talk to her.
Q. Did Sherri O'Connell ever do or say anything to suggest that she had a problem with homosexuality?
A. I just answered that question.
Q. No, you didn't answer the question.
A. Yes, I did.
Q. I didn't ask you whether you spoke

with her.
A. But I answered the question.
Q. My question is, did Sherri O'Connell ever do or say anything to indicate that she had a problem --
A. I don't know.
Q. -- with homosexuality?
A. I don't know.
Q. Who else's assignment at Supply Chain Solutions was ended?
A. I don't know.
Q. Your assignment was ended, correct?
A. Yes.
Q. You mentioned that a bunch of you got together about the fact that all of your assignments were being ended --
A. I never said that. I never said a bunch of us got together. That's not what I said.
Q. Who got together to discuss that?
A. Nobody got together. Toni and I are friends, and so we had a conversation.
Q. Toni who?
A. Shepperson.



Q. Did her assignment end as well?
A. I guess. I don't know.
Q. What were you talking about?
A. Jason.
Q. You didn't talk about her situation?
A. You asked me a question, I answered you. A group of us didn't get together.
Q. I have a different question now, Ms. Bynum --
A. Because previously you said you were done asking me questions. You jump right back in so --
Q. You can take as long as you want. Let's take a break --
A. No, we're not taking a break.
Q. I'm happy to take a break --
A. No, no, no because I have things to do besides this.
Q. We have a while to go so you might want to take a break.
A. No, we don't have a while to go because I have a child to pick up from school. I know it don't matter to you, but I have a child to pick up from school.



Q. Go ahead.
A. I have absolutely nothing else to say because you're not going to badger me and harass me. You can ask me questions and I'll give you an answer and that's it.
Q. Did you talk to Ms. Shepperson about the ending of your assignment?
A. Yes.
Q. What did you discuss with her?
A. I just got let go and with no reason.
Q. How do you know what Jason Scott was told about the nature of his work assignment at Supply Chain Solutions?
A. How do I know what he was told about his work assignment?
Q. Yes.
A. What do you mean about his work assignment?
Q. I think you said that you believe that he was told that his was going to be a temp to hire position?
A. Because that's what all the positions were supposed to be.



Q. How do you know that?
A. Because we've said it to each other.
Q. Who told you anything about Mr. Scott's assignment?
A. Who told -- him. I just said we talked about it.
Q. What did he tell you about that?
A. That our assignments were -- the assignments there were temp to hire, just like me and another lady when we first started was temp to hire.
Q. Did you discuss anything about the nature of Mr. Scott's assignment with anybody other than him?
A. No. For what?
Q. Did you discuss it with anybody at Kelly Services?
A. No.
Q. So you don't know anything other than what Mr. Scott told you about that?
A. Why would I go to Kelly Services and ask them about his job assignment.
Q. I didn't ask you that question, Ms. Bynum. Do you need more time to answer the

question?
A. I don't have an answer.
MR. MCGEE: Please read back the last question to Ms. Bynum. I think she's forgotten it.
(The court reporter read back the record as requested.)
THE WITNESS: I already answered that question. I'm not going to repeat myself.
BY MR. MCGEE:
Q. Can you please answer the question, Ms. Bynum?
A. I did.
Q. What is the answer?
A. The same one I stated previously.
Q. I missed that answer. Can you state it --
A. I'm sorry. I would think you would be listening to me. You're asking me the question.
Q. You're not answering the question I'm asking, Ms. Bynum.
A. You asked me did I discuss it with anybody at Kelly Services, and I told you no.



Q. My question is did you discuss it with anybody other than Jason Scott?
A. And I told you no to that, also.
Q. Did Heidi Maslin ever make any comments about Jason Scott's sexual orientation.
A. You had already asked me that question.
MR. POLIQUIN: Objection; asked and answered.
BY MR. MCGEE:
Q. What's the answer?
A. The same one that it was previously.
Q. What's the answer?
A. I'm not giving you another answer to that. I already answered that question.
Q. You've given a couple of different answers.
A. Well, pick one.
Q. That's why I'm asking the question. Did Heidi Maslin ever make any comments about Jason Scott's sexual orientation?
A. I refuse to answer that question again.



Q. It's really not in your interest to do that because we'll just have to bring you back and I don't think you want to come back, Ms. Bynum.
MR. POLIQUIN: I'm going to object. I think she's answered the question several times.
BY MR. MCGEE:
Q. Can you identify for me any statement that Heidi Maslin made, that you claim Heidi Maslin made about Jason Scott's sexual orientation?
A. I answered that, also. I'm not going to answer that again.
Q. Do you have an answer to the question?
A. Yes, I do.
Q. What did she say? What did she say?
A. The same thing I said earlier.
Q. I'm just going to wait for the answer, Ms. Bynum.
A. We'll wait because I don't have an answer for you.
MR. POLIQUIN: Are we doing something here?



MR. MCGEE: I'm waiting for the witness to answer the question.
MR. POLIQUIN: I think she's made it clear what her position is. I don't think it does anybody any good to --
MR. MCGEE: Listen, it's a very relevant question. I'm just waiting for the answer.
THE WITNESS: Let me be clear, since obviously I haven't been. I'm not going to keep repeating myself answering the same questions over and over. I've answered them once. This is not about me. This is about Jason. And we're not going to keep going over this. I'm not going to let you sit here trying to intimidate me into answering questions. I won't have it. I've answered them once.
BY MR. MCGEE:
Q. Ms. Bynum, I don't believe you've answered the questions --
A. That's what you don't believe. And I believe I did.
MR. POLIQUIN: I mean, I'm not going -- we're not going to sit here in

silence. If you want to ask another question or if you want --

MR. MCGEE: I have other questions but I don't want to ask them until I get the answer to the first question, Mr. Poliquin.

MR. POLIQUIN: I think she's already made it clear what her position is. What you want to do with that, I don't know.

MR. MCGEE: I'm going to wait for the answer.

MR. POLIQUIN: We're not sitting here and waiting --

MR. MCGEE: I'm going to wait here as long as it takes for her to answer the question. I'm not going to badger her. I asked a question. It's a simple question. I'm just waiting for the answer.

MR. POLIQUIN: You've already --

MR. MCGEE: I'm not going to argue.

MR. POLIQUIN: I'm just stating that you've asked the question previously. She



had given you an answer.

MR. MCGEE: She's given different answers.

THE WITNESS: I've given you an answer. Whether it's the answer that you want or not is irrelevant.

MR. MCGEE: All I want is the truth --

THE WITNESS: Understand this, at a certain time I'm walking out that door because I have things to do.

BY MR. MCGEE:

Q. Ms, Bynum, all I want is the truth --

MR. POLIQUIN: If we're going to sit here and just wait forever, we just need to call the judge and get his position on it.

MR. MCGEE: That's fine. If you want to call --

MR. POLIQUIN: I'm not going to sit here in silence.

MR. MCGEE: If you want to call the judge, that's fine.

MR. POLIQUIN: If you want to move on with the record that we have or we're



going to end this deposition.

BY MR. MCGEE:

Q. I have a question. And the question is, can you identify for me, Ms. Bynum, any statement that you ever heard Heidi Maslin make about Jason Scott's sexual orientation?

A. I said previously, I gave you an answer to that. That's all I'm saying.

Q. What's the answer?

A. The same one you wrote down the first time.

Q. What's that?

A. I'm not going to play this game with you.

MR. POLIQUIN: I mean, if it's your position that we're going to sit here and wait, then I think we should call the judge.

MR. MCGEE: Mr. Poliquin, you can do whatever you want in that regard. I have a question. It's a legitimate question the witness hasn't answered. I'm not going to argue with her because that doesn't do any good. I'm simply going to wait for the answer.

MR. POLIQUIN: She's made her



position clear. Whether you take -- do what you want with it. But we're not going to sit here in silence. I doesn't make sense. I mean, whether you agree with her position or not -- I don't think it's fair to anybody in this room -- whether if you like her position or not, that's what she stated.

MR. MCGEE: I'm just waiting for the answer. It's a very simple question.

BY MR. MCGEE:

Q. Did you hear anybody other than Heidi Maslin make comments about Jason Scott's sexual orientation?

A. I don't know.

Q. Pardon?

A. I don't know.

Q. You don't know why?

A. You just asked me a question. I said I don't know.

Q. What comments did Heidi Maslin make that you interpreted as a comment about Jason Scott's sexual orientation?

A. I answered that earlier, too.

Q. In reference to Jason Scott, did

69

anybody make a comment to the effect of stop acting like a girl?
A. I answered that, also.
Q. Who made what comment to that affect?
A. I answered that, also.
Q. When was that comment made?
A. When I was working at Bracco.
Q. When?
A. I told you earlier, I didn't have a time and day.
Q. How about a year?
A. I don't have a year, either.
Q. Was anybody else around when you heard that comment?
A. People are always around.
Q. Who was around?
A. I don't know.
Q. Who was the comment made to?
A. It was made in a group.
Q. Who was in the group?
A. People.
Q. Were you in the group?
A. No. I was walking by.

70

Q. Where were you walking by?
A. At work.
Q. Where at work?
A. Stop.
Q. Where were you?
A. I'm not going to play this game with you.
Q. Where were you --
A. In the building.
Q. Where in the building?
A. Where my team is.
Q. Where were you standing?
A. I worked there in what year and you expect me to tell you where I was standing, are you serious?
Q. I'm asking you where you were standing when you supposedly heard someone make a comment?
A. I don't know.
Q. How far away --
A. I don't know.
Q. How far away from them were you when --
A. I don't know.

71

Q. Who else -- can you identify anybody who was in the group?
A. I don't know.
Q. Who made the statement?
A. I don't know.
MR. MCGEE: No further questions.
THE WITNESS: Thank you.
MR. POLIQUIN: No further questions at this time.
(Witness excused.)
(Deposition concluded at 4:20 p.m.)

72

CERTIFICATE

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

-------------------------
Dolores M. Horne
Dated: May 20, 2011

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

# Exhibit 27

IN THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

JASON SCOTT ) NO. 1:10-CV-00929RGA
)
- vs - )
)
UPS SUPPLY CHAIN )
SOLUTIONS )

Oral Deposition of TONI SHEPPERSON, held at One Rodney Square, 920 North King Street, Wilmington, Delaware, on Thursday, January 5, 2012, at 4:08 p.m., before Dolores M. Horne, Professional Reporter and Notary Public, in and for the Commonwealth of Pennsylvania.

ESQUIRE DEPOSITION SERVICES
1600 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
215-988-9191



APPEARANCES:

LAW OFFICES OF ROBERT T. VANCE, JR.
BY: ROBERT T. VANCE, JR., ESQUIRE
100 South Broad Street
Suite 1530
Philadelphia, Pennsylvania 19110
(215) 557-9550
rvance@vancelf.com
Attorneys for the Plaintiff

JACKSON LEWIS, LLP
BY: EMMETT F. MCGEE, JR., ESQUIRE
2800 Quarry Lake Drive
Suite 200
Baltimore, Maryland 21209
(410) 415-2003
emmett.mcgee@jacksonlewis.com
Attorneys for the Defendant

ALSO PRESENT:
JASON SCOTT



I N D E X


| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| TONI SHEPPERSON | | |
| | By: Mr. McGee | 5, 124 |
| | By: Mr. Vance | 118 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Shepperson 1 | Document Dated 7-26-11 | 108 |
| Shepperson 2 | Document | 110 |
| Shepperson 3 | Document Dated 1-6-10 | 116 |




DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer
Page Line Page Line Page Line

Request for Production of Documents
Page Line Page Line Page Line

Stipulations
Page Line Page Line Page Line

Question Marked
Page Line Page Line Page Line

TONI SHEPPERSON, after having been first duly sworn, was examined and testified as follows:

BY MR. MCGEE:

Q. Good afternoon, Ms. Shepperson. I'll introduce myself again. My name is Emmett McGee. I'm a lawyer with the law firm of Jackson Lewis and I represent UPS Supply Chain Solutions in a lawsuit that's been filed against that company by Jason Scott. We're here today for your deposition. I'm going to be asking you some questions. You've been sworn in, which means you're under oath and obligated to tell the truth. Do you understand that?
A. Yes.
Q. If you want a break at any time, let me know and I'll try to accommodate you. If I ask any questions that you need to have repeated or if you don't understand the question, will you speak up and let me know?
A. Sure.
Q. And you do need to give audible, verbal responses because the court reporter is



here taking down everything and she can only take down actual words that are uttered as opposed to nods of the head and things like that. So I'll try to remind you, and she'll probably try to remind both of us if we have lapses in that regard. By way of introduction, I'll just remind you that we do need to have verbal responses. Okay?
A. Okay.
Q. I will try to let you finish your answer to a question before I ask the next question, and I ask that you let me complete my question before you start to answer. And, again, that's basically for the benefit of the court reporter so it makes it easier for her to take down what is being said.
A. Okay.
Q. Have you ever had your deposition taken before?
A. No.
Q. Where do you currently live?
A. In Maryland.
Q. Where?
A. Elkton.



Q. What is your address?
A. 106 Winfield Drive, Elkton, Maryland.
Q. How long have you lived there?
A. A year.
Q. Do you live with anyone?
A. Me and my daughter.
Q. How old is she?
A. Twenty-three.
Q. What is her name?
A. Porsche.
Q. Where does she work?
A. Olive Garden.
Q. Where did you live immediately before that address in Elkton?
A. Newark.
Q. What was your address there?
A. 3637 Branchwood Drive.
Q. How long did you live there?
A. About two years.
Q. Did you live with anybody at that address?
A. Yes.
Q. Who was that?



A. My husband and I.
Q. Are you currently married?
A. No.
Q. When were you divorced?
A. This year.
Q. What was your ex-husband's name or what is your ex-husband's name?
A. Rodney Shepperson.
Q. Where does he currently live?
A. I'm not sure.
Q. What was his last known address?
A. At Branchwood Drive with me.
Q. And what was -- who filed for divorce?
A. I did.
Q. On what basis?
A. Adultery.
Q. Is he the father of your daughter?
A. Yes. But what do this have to do with --
Q. Just getting background, Ms. Shepperson.
A. No, he's not.
Q. Who is the father of your daughter, Porsche?

A. Purcell Matsonberg (ph).
Q. Do you have any other children?
A. I have another daughter.
Q. What is her name?
A. Sierra Matsonberg.
Q. How old is she?
A. Twenty-five.
Q. Where did you live prior to the Newark address that you just gave us?
A. Richmond, Virginia.
Q. During what period of time did you live in Richmond, Virginia?
A. My whole life.
Q. Until when?
A. About five years ago.
Q. Are you currently taking any medication?
A. No.
Q. Do you use drugs?
A. No.
Q. Are you currently impaired in any way? And by that I mean is there anything that would affect your ability to recall things accurately or completely?



A. No.
Q. Did you graduate from high school?
A. Yes.
Q. What high school?
A. Powhatan, Virginia.
Q. What year?
A. '85.
Q. Do you have any education after high school?
A. Two years of college.
Q. Where was that?
A. Richmond, Virginia.
Q. What's the name of the school?
A. J. Sargeant Reynolds.
Q. What kind of school is that?
A. Community college.
Q. Pardon?
A. Community college.
Q. Did you get a degree?
A. A certificate, certification.
Q. In what?
A. Computer.
Q. But you didn't get an AA degree?
A. No.



Q. How many credits did you take?
A. I can't recall.
Q. How many classes did you take over the two-year period?
A. It was just that one class, Computer I and II.
Q. Have you ever been a witness in any case before?
A. No.
Q. Have you ever filed a lawsuit against anybody other than the divorce proceeding?
A. No.
Q. Have you ever been sued by anybody?
A. No.
Q. Have you ever filed for bankruptcy?
A. Yes.
Q. When was that?
A. Sometime in '90, I believe in the nineties.
Q. Have you ever filed a Workers' Compensation claim?
A. No.
Q. Other than the charge of discrimination that you filed in connection



with your work assignment at UPS Supply Chain Solutions, have you ever made any other types of discrimination claims?
A. No.
Q. Have you ever consulted with an attorney about any matter other than your divorce?
A. Any other matter?
Q. Yes, other than your divorce.
A. Meaning anything else -- car accident.
Q. When was that?
A. That was back in the eighties.
Q. Have you consulted with an attorney other than that car accident --
A. No.
Q. -- with regard to that car accident in the eighties?
A. No.
Q. Do you have an e-mail address?
A. Yes.
Q. What is that?
A. Beauty to style, Yahoo dot com.
Q. How long have you had that e-mail

address?
A. I've had it for a while.
Q. How long?
A. I would say probably late nineties, I guess.
Q. Have you ever been -- have you ever had any other e-mail address since then, since the late nineties?
A. That's the only one that I really recall me ever having.
Q. What is your cell phone number?
A. 804-986-5568.
Q. 55 --
A. 68.
Q. How long have you had that number?
A. Forever.
Q. Have you had any other cell phone numbers --
A. No.
Q. -- since 2008?
A. No.
Q. Who is your cell phone provider?
A. Verizon.
Q. Do you have a Face Book page?



A. No.
Q. Twitter?
A. No.
Q. Do you use any kind of social media in any way?
A. Tag.
Q. Have you ever communicated with Mr. Scott via tag?
A. No.
Q. What have you done to prepare for the deposition?
A. Nothing really because I got this Saturday. It came Saturday.
Q. This being the subpoena to appear here today?
A. Yes.
Q. That subpoena required you to produce certain documents. Have you brought any documents with you today?
A. No. I didn't know that I had to bring any documents.
Q. Did you read the subpoena?
A. No. Actually, I just opened it to see what it was. I really didn't read to see where



I had to bring anything in.
Q. Have you ever had any type of e-mail communications with Mr. Scott?
A. Yes.
Q. Did you produce those documents today?
A. Did I --
Q. Did you bring those with you today?
A. No.
Q. How many e-mail communications have you had with Mr. Scott?
A. I would say maybe two.
Q. When was the most recent e-mail?
A. I would say last year.
Q. When last year?
A. I can't recall exactly.
Q. Last year meaning 2011?
A. Yes.
Q. When in 2011?
A. I can't recall exactly what day.
Q. What was the e-mail communication about?
A. Job opportunity.
Q. Did he e-mail -- did he initiate the



communication or did you?
A. He did.
Q. What was the job opportunity?
A. It was a position that was opened in Nemours, the hospital.
Q. Nemours?
A. Yes.
Q. Where Mr. Scott works?
A. I don't know if he's still working there or not.
Q. Was he working there at the time that he sent you the e-mail?
A. Yes.
Q. Did you pursue that job opportunity?
A. Yes, I filled out an application, yes.
Q. Did you get the job?
A. No.
Q. What other e-mail communication have you had with Mr. Scott?
A. When the last lawyer that he had requested that I send in a letter, that was the last time I communicated with him. I think that was about maybe about two years ago.

Q. The last lawyer, you're referring to Mr. Poliquin?
A. Yes.
Q. Mr. Poliquin asked you to provide something?
A. Uh-huh.
Q. You need to give a verbal response. Yes?
A. Yes.
Q. What did Mr. Poliquin ask you for?
A. I think a statement. I think it was dealing with a statement of actually what happened.
Q. Did Mr. Poliquin prepare a statement for you to sign?
A. No.
Q. Did he give you a draft of one?
A. No.
Q. How did Mr. Poliquin communicate with you?
A. He called -- he contacted me a couple of times on my phone, but I didn't respond to him. A couple of times I didn't respond to him because I didn't recognize the number. And



then that's when Jason had reached out to me, and that's when I did a letter for Mr. Poliquin.
Q. When you say Jason reached out to you, he sent you an e-mail?
A. Yes.
Q. In the e-mail what did he say?
A. Just asked me if I could do a letter for Poliquin, just write a statement.
Q. Have you had other e-mail communications with Mr. Scott?
A. No.
Q. Have you ever had any e-mail communications with any of his lawyers?
A. No.
Q. Have you ever spoken to Mr. Vance before?
A. I just seen him today.
Q. Have you ever spoken to him before?
A. No.
Q. Have you ever spoken to any attorney about Mr. Scott other than Ron Poliquin?
A. No.
Q. Did you ever keep any type of diary or



journal?
A. No.
Q. Did you ever make any notes of anything that happened at Supply Chain Solutions?
A. No.
Q. How did you first meet Mr. Scott?
A. At UPS.
Q. Supply Chain Solutions?
A. Yes.
Q. What was your relationship with Mr. Scott?
A. We really didn't have a relationship. We were -- just a co-worker.
Q. Did you see each other outside of work at all?
A. No.
Q. Did you socialize outside of work?
A. No.
Q. Did you work in the same area of the office?
A. Yes.
Q. On a daily basis what type of interaction did you have with Mr. Scott?



A. No more than speaking, good morning.
Q. When was the last time that you had any communication with Mr. Scott either by e-mail or telephone or face-to-face conversation?
A. The last conversation I had with him was when I received this subpoena because I was kind of actually, you know, upset about it.
Q. So, when was that, this weekend?
A. Saturday.
Q. Did you telephone him?
A. Yes.
Q. Why did you telephone him?
A. To ask him why was they sending me a subpoena because I had already gave them my statement.
Q. What did he say to you?
A. He said he didn't know.
Q. What else did you discuss?
A. That was it.
Q. When was the last time that you had any communication with Mr. Scott before that?
A. Today.
Q. So, today is the most recent

communication?
A. Is the most recent, yes, than Saturday.
Q. What happened today?
A. Just tell me about -- reminding me about coming in here today.
Q. What did he say to you?
A. Just asked me was I still coming.
Q. Did you talk about the case at all?
A. No.
Q. You didn't know anything about this case?
A. No more than what I can tell you about the case.
Q. Do you know what Mr. Scott is alleging in this case or claiming in this case?
A. Discrimination.
Q. What type of discrimination?
A. Being that he's gay.
Q. How do you know that's what he's claiming in this case?
A. Because I'm pretty sure that's what he's claiming in this case because that's what I heard in the office.



Q. Have you ever talked to Mr. Scott about what he's claiming in this case?
A. No, not really.
Q. Now, you told me you spoke with Mr. Scott this weekend. When was the next most recent occasion on which you spoke with him?
A. Today.
Q. So, going back the other way in time, when had you previously spoken to him before --
A. Saturday.
Q. -- before Saturday?
A. I would say the e-mail about the job.
Q. How about before then?
A. I would say the last time I actually spoke to Jason was probably about two years ago, I'm thinking.
Q. Have you -- prior to today had you seen Mr. Scott since he stopped working at Supply Chain Solutions?
A. Have I seen him?
Q. Yes.
A. No, I can't -- no, no more than when we met in Mr. Poliquin's office.



Q. You met with Mr. Scott in Mr. Poliquin's office?
A. Yes.
Q. When was that?
A. I would say maybe two years ago or a year ago -- a year ago I'm figuring.
Q. What were you meeting about?
A. His lawsuit.
Q. Who asked for the meeting?
A. Mr. Poliquin.
Q. What happened in that meeting?
A. He -- I really don't know, to be honest with you. He was just discussing, you know, the case. I don't really know word for word what was said.
Q. What do you recall? What were you doing there?
A. Because Mr. Poliquin asked me to come there.
Q. And why did he ask you to come there?
A. Because I was a witness.
Q. So what happened once you got to Mr. Poliquin's office?



A. He just asked me what happened and I told him.
Q. At that point --
A. He asked me what happened. He asked me who else was involved, and I gave him the information that he wanted.
Q. At that point had you prepared any type of written statement?
A. No, not at that point, no.
Q. So, you met with Mr. Poliquin before you gave him a written statement?
A. Right.
Q. Was that the first time that you had seen --
A. Yes.
Q. -- Mr. Scott since he stopped working at Supply Chain Solutions?
A. Yes.
Q. And was that the only time that you had seen Mr. Scott since he stopped working at Supply Chain Solutions?
A. That was the only time, yes.
Q. Are you currently employed?
A. Yes.

Q. Where?
A. Dow Chemical.
Q. Where?
A. In Newark.
Q. How long have you been working there?
A. Two years.
Q. What is your job?
A. SAP customer service.
Q. Who is your supervisor?
A. Josh Hollaway.
Q. Have you had any other employment since your temp assignment at Supply Chain Solutions ended?
A. Yes.
Q. Where else?
A. Easy Money Group.
Q. Where was that?
A. In Newark.
Q. Pardon?
A. Newark.
Q. What did you do there?
A. Loans.
Q. Made loans?
A. Gave loans.



Q. You gave loans?
A. Yes.
Q. What kind of loans?
A. Money lending.
Q. Was there a limit in terms of how much money you could lend?
A. It depends on their paycheck.
Q. Are these payday loans?
A. Payday loans, uh-huh.
Q. During what period of time did you work there?
A. I'd say about a year before I started working at Dow Chemical because I worked there for about a year.
Q. Did you work anyplace else after leaving the work assignment at -- the temp assignment at Supply Chain Solutions?
A. That's when I went to Easy Money Group. And then I also did -- because I'm a stylist, I did hair.
Q. Where did you do that?
A. At Smart Style in Elkton.
Q. Have you had any other work since your temp assignment at Supply Chain Solutions



ended?
A. No, just the jobs that I just stated.
Q. Have you ever been fired from a job?
A. No -- well, yes, UPS.
Q. The temp assignment at Supply Chain Solutions?
A. It ended -- well, yes.
Q. Have you ever had any problems getting along with anybody at any job?
A. No.
Q. Have you ever had any conflict with any co-workers or supervisors?
A. No.
Q. When were you employed by Kelly Services?
A. I started working for Kelly Services when I was in Richmond, Virginia.
Q. So what year was that?
A. Back in the nineties. I'm sorry. I'll probably say late nineties, the year 2000.
Q. Then did you continue your relationship with Kelly Services --
A. Moved here.



Q. -- when you moved to Delaware?
A. Yes.
Q. When was that again?
A. When I moved here?
Q. Yes.
A. About five years ago, four or five years ago.
Q. What year?
A. 2007.
Q. How long did you continue to be employed by Kelly Services?
A. I didn't start back with Kelly's until after I stopped working at Smart Styles in Elkton.
Q. You started with Kelly Services in Delaware in 2007 when you moved to Delaware, correct?
A. I started working with Kelly Services when I was in Richmond, Virginia. When I moved to Delaware, I was working at Smart Styles. That was a job that I found on my own. After Smart Styles, that's when I went through Kelly Services. Through Kelly Services, that's when they found me a job at UPS.

Q. Was the first assignment that you got from Kelly Services in Delaware the temp assignment at Supply Chain Solutions?
A. Yes.
Q. And after your temp assignment at Supply Chain Solutions ended, did you get another temp assignment from Kelly Services?
A. No. I went to Easy Money.
Q. And that was employment with Easy Money and not through Kelly Services?
A. Yes.
Q. You were never an employee of Supply Chain Solutions; were you?
A. No.
Q. When you came on your work assignments did you have access to the building?
A. In other words, did I have a badge?
Q. A badge that got you in?
A. Yes, a badge.
Q. Could you swipe it to get in?
A. Just at the door, just hold it.
Q. What was your work assignment at -- your temp assignment at Supply Chain Solutions, what did you do?



A. Customer service, processed -- we used to the sell product to the hospitals and put the data in the computer, call the customers. If they owe, we would collect on that.
Q. Were you assigned to a particular team?
A. Yes, the Bracco Team.
Q. And Bracco was one of Supply Chain Solutions' customers and you did collections work on behalf of Bracco?
A. Yes.
Q. Was your work assignment the same as Mr. Scott's work assignment?
A. Yes.
Q. Who at Kelly Services did you report to?
A. At that time I think it was Paola.
Q. Who at Supply Chain Solutions was in charge of the Bracco Team?
A. In charge?
Q. Yes.
A. Heidi Maslin.
Q. Were there any other supervisors of the Bracco Team?



A. We had a couple of supervisors that came in, and then they put them in other positions.
Q. Who were they?
A. One was Nikki Pinkett and Sherri O'Connell.
Q. Did you have any day-to-day interaction with Heidi Maslin?
A. Yes.
Q. What was that?
A. Basically every day.
Q. What kind of contact did you have with her?
A. Just if it wasn't talking about the work that our team had to do or just general conversations I would have with her.
Q. Did she work in the same area where you worked?
A. She had her own little office, but it was generally in the same area, yes.
Q. Did you work in an office or a cubicle?
A. Cubicle.
Q. Did you have your own cubicle?



A. Yes.
Q. What kind of relationship did you have with Nikki Pinkett?
A. No more than her being the supervisor.
Q. Did you get along with her?
A. Yes.
Q. Have any problems with her?
A. No.
Q. How about Sherri O'Connell; what kind of relationship did you have with her?
A. Just supervisor.
Q. Did you get along with her?
A. Not really.
Q. What was the problem?
A. Sherri was the type of supervisor that you really couldn't talk to or go to talk to.
Q. Why not?
A. Because of her response to stuff, the way she used to look.
Q. What was that?
A. What was what?
Q. What was the way she used to look?
A. Like she didn't care about whatever we had to say.

Q. Is that the way she treated you?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Did she treat others the same way?
A. I would say, yes, the African Americans she did, yes.
Q. Well, what did she say or do to indicate to you that she didn't care what you had to say?
A. It was just her response, her body movement. Because I really -- I tried to stay out of her way because I knew how she was.
Q. What body movement did she give that gave you the impression --
A. I mean, when somebody --
Q. If I may. What body movement did she give that gave you the impression that she didn't care what you had to say?
A. Well, when somebody looks at you and rolled their eyes like they really don't care what you have to say, then that's an issue.
Q. Did she do that to you?
A. Yes.



Q. Did she say or do anything else to indicate to you that she didn't care what you had to say?
A. No.
Q. Did you like Sherri O'Connell?
A. I didn't have anything against her.
Q. Did you ever have any disagreement with her?
A. No.
Q. Did you find her rude?
A. Yes.
Q. Dismissive?
A. Yes.
Q. Did you have any problems with anybody else there?
A. No.
Q. When did your temp assignment at Supply Chain Solutions start, July of 2008?
A. I believe so.
Q. When did it end?
A. 2010.
Q. You're sure about that?
A. I know it was around a couple of weeks before the Thanksgiving holiday, I think. I'm



not sure.
Q. Was it 2009 that it ended?
A. Yes. I'm sorry. Yes.
Q. So, November of 2009?
A. Uh-huh, yes.
Q. And why did it end?
A. It was told to me that I had falsified a document.
Q. Who told you that?
A. At the time it wasn't Kelly's any more. It was Manpower.
Q. But the temp agency that you worked for?
A. Yes.
Q. Was it Shamira Henderson?
A. Yes, Shamira.
Q. She was your supervisor at Manpower?
A. Yes.
Q. What did she tell you about your assignment ending?
A. She just called me and told me that my assignment had ended. And I asked her why. And she said because they said something about me falsifying a document.



Q. Did she tell you what documents you were accused of falsifying?
A. No, she didn't really tell -- no.
Q. Did you know what documents you were accused of falsifying?
A. Let me see. I think I did talk to her. And she was telling me that -- she was giving me information on the document, and I knew exactly which one she was talking about. And I remember having a problem with that particular customer.
Q. What document -- was this something that you had entered into the system?
A. Entered data into the system yes.
Q. And you were supposed to enter into the system what action you had taken to collect money and who you had spoken with?
A. I think it was -- during that time it was a document that a customer said that I didn't call but the notes had in it that I did call because I did call.
Q. Who was the customer?
A. I don't remember.
Q. Who had entered into the system that

37

you had, in fact, called the customer? Was that something you entered into the system?
A. Yes.
Q. But the customer told Supply Chain Solutions that you had not called?
A. From my understanding it was something that Sherri had went back and looked up that happened like a year prior to that happening.
Q. You said you remembered this particular customer and occasion. How did you remember it?
A. I remember because the customer was asking me questions about the account, and I remember putting that data into -- into the computer at that time.
Q. Who was the customer?
A. I don't remember who the customer was. We dealt with so many clients. I don't remember.
Q. Did it have something to do with you preventing the customer prepaying for a purchase?
A. Not that I -- no.
Q. What did it deal with?

38

A. I don't -- I mean, they really didn't tell me exactly what it dealt with. But I only could remember that the customer that they were saying that I said that I called and didn't call and I was saying that that couldn't be true because if I called a customer how can I have all the details in there about the account.
Q. When your supervisor at Manpower talked to you about this, what did you say to her?
A. I told her that couldn't be true and why did they wait a whole year to come and say something to me about it now.
Q. Well, what made you think that it related to a transaction that occurred a year earlier?
A. Because if I'm not mistaken, I think that's what my supervisor told me.
Q. Your Manpower supervisor?
A. Uh-huh.
Q. Pardon?
A. Yes.
Q. Did you ever talk to anybody at Supply

39

Chain Solutions about the ending of your work assignment there?
A. No more than when I called Kelly's to see if they could find me another position.
Q. You spoke with Kelly Services or Manpower, correct?
A. Kelly Services.
Q. Did you speak with anybody at Supply Chain Solutions about the ending of your work assignment there?
A. No. But I was called. A couple of people called me and asked me what happened.
Q. Who called you?
A. Linda Belly (ph) was one, Tasha -- I don't know her last -- I don't remember her last name, Mr. Kirk.
Q. Kirk who?
A. Slaughter.
Q. Anybody else?
A. No.
Q. When these people called you and asked you what happened what did you tell them?
A. I told them that they had let me go because they said I had falsified a document.

40

Q. Did you ever talk to Jason Scott about the ending of your temp assignment at Supply Chain Solutions?
A. I hadn't even seen Jason. I talked to him about it after the fact when the situation went down with the paper work that he was filing for what happened at UPS.
Q. How did that come about?
A. How did what come about?
Q. How did it come about that you spoke to him at that point in time?
A. That's when he had contacted me for the lawyer. That's when I told him that I wasn't working there any more either.
Q. You've also filed a charge of discrimination with the Delaware Department of Labor regarding the termination of your temp assignment at Supply Chain Solutions; didn't you?
A. That's correct.
Q. Whose idea was it to do that?
A. Mine.
Q. Did you do that before or after you spoke with Mr. Scott?

A. I guess before because I didn't know Jason had filed until after, you know, all that was going on. So I don't know if I filed before him or what.
Q. Did you ever talk to any attorney about --
A. No.
Q. -- about your claim against -- your claim of discrimination?
A. No -- yes, I did. That's when I had talked to Mr. Poliquin.
Q. Did you talk to Mr. Poliquin about representing you?
A. Not about representing me but I talked to him about it.
Q. About your particular situation?
A. Right. Well, I was just telling him that I had filed. I had went to, I guess, the labor board or whatever.
Q. But you had already filed your charge of discrimination at the time you spoke to Mr. Poliquin?
A. Yes.
Q. Did you ever talk to Mr. Poliquin



about him representing you?
A. No.
Q. What type of discrimination were you claiming?
A. Discrimination that I felt that she had an issue with African Americans.
Q. Who is she?
A. Sherri O'Connell.
Q. Weren't most of the workers there African American?
A. Yes, most of them were. And a lot of them were let go when she became the supervisor.
Q. Who else was let go?
A. Oh, my goodness. I don't even remember half of them, to be honest with you.
Q. Well, what makes you say that you felt that Sherri O'Connell had an issue with blacks or African Americans?
A. I just told you.
Q. Rolling her eyes?
A. With other African Americans?
Q. No. You just said that you felt that Sherri O'Connell had an issue with African



Americans. My question is --
A. Just the way she responded to us or the way she looked at us or treated us.
Q. What was that?
A. Like I said, there was a lot of African Americans that was let go once Sherri got there.
Q. Do you know whether she had anything to do with it?
A. I'm pretty sure she did.
Q. Do you know or are you guessing?
A. I can't really say.
Q. You don't know; do you?
A. I really don't.
Q. So, how did Sherri O'Connell treat you?
A. I told you, I stayed out of her way. I stayed out of her way because I could see how she -- the type of person she was.
Q. What type of person was she?
A. Didn't want to be bothered. I mean, her response to Caucasians was totally different to her response to African Americans.
Q. How did she respond to you?



A. I really didn't go to her to ask her anything. But if she had called me in her office just to -- you know, the way she looked at me or --
Q. Did she ever call you in her office?
MR. VANCE: Wait. Let her finish her answer.
BY MR. MCGEE:
Q. Go ahead.
A. The way she looked at me or the way she responded to me.
Q. Did she ever call you into her office?
A. Once. And that was when we had to -- I guess it was when they gave us our evaluation.
Q. What did she say to you?
A. She just went over the evaluation.
Q. What did she say about it?
A. She gave me a good evaluation. She gave me a good one, I would say. I can't tell you word for word.
Q. Did she treat you disrespectfully in that meeting?

A. I would say that Sherri wasn't as nice as she could have been being that she was the supervisor.
Q. What do you mean by that?
A. Like I said, her body language, the way she spoke.
Q. Anything else?
A. No.
Q. Did she ever roll eyes at anything that you said?
A. It was like she was always rolling her eyes whenever I was in her presence.
Q. Did she ever roll her eyes at anything you said?
A. I can't recall. I don't really know.
Q. Was there anything about her body language that you did not like or you thought was an indication of discrimination other than her rolling her eyes?
A. Yes. Her body language always played a part in it.
Q. What other body language other than rolling the eyes?



A. Just like, you know, mostly a shove off, like she didn't really want to be bothered.
Q. Well, tell me what she did that gave you that impression?
A. I just told you.
Q. What?
A. I mean, it just could have been the way she turned away or, you know.
Q. Did she ever turn away from you when you were speaking with her?
A. Even if she's sitting at a desk with the eval it's like, you know, she wanted to hurry up and get over with it because she -- she didn't want to be near me or something.
Q. Did she ever turn away from you when you were speaking with her?
A. No.
Q. How did she speak with you?
A. Like I said, when she gave me my eval, that was the only time that I really conversated with Sherri because I tried to stay out of her way.
Q. You said you had some issue with the



way she spoke. What was it about the way she spoke --
A. If it was in a meeting, even if it was in a meeting with people with us in a group, you know.
Q. What was it about the way that she spoke that caused you some concern?
A. I felt that she didn't want to be bothered.
Q. What did she say or how did she speak that gave you that impression?
A. I don't know.
Q. Do you know if Sherri O'Connell had anything to do with the ending of your temp assignment at Supply Chain Solutions?
A. Excuse me?
Q. Do you know if Sherri O'Connell had anything to do with your temp assignment at Supply Chain Solutions?
A. I would believe so. She was the supervisor. She was the one that found the record.
Q. What record?
A. The record that they said I



falsified.
Q. How do you know she found the record?
A. Because she was the IT person that could go in there and pull up the information.
Q. How do you know she is the one that found the record at issue?
A. Because I'm thinking -- because she was the IT person.
Q. Did anybody tell you she was the person?
A. No, nobody told me anything. I'm just assuming.
Q. Did the Delaware Department of Labor inform you that after investigating your allegation of discrimination they concluded you had not been discriminated against?
A. Yes.
Q. When you had your temp assignment at Supply Chain Solutions, what was your regular starting time?
A. 7:00.
Q. 7:00 a.m.?

A. (The witness indicates.)
Q. Did everybody have the same starting time?
A. No. Everybody had different times they came in.
Q. Did your starting time ever change?
A. I think at one point it did. I think at one point it did. I was coming in at 7:30, I believe.
Q. At the time that your temp assignment ended, were you coming in at 7:00 a.m. or 7:30 a.m.?
A. I want to say 7:30, I believe.
Q. When you came to work there, how did you enter the building?
A. What do you mean?
Q. What entrance did you come in?
A. The front.
Q. Was that door locked?
A. The first door, no. The door to enter into where I had to go was, yes.
Q. Where did you have to go?
A. It was a door on the side, on the right -- on the left side.



Q. Inside the building?
A. Inside the building.
Q. That led to what area?
A. That was the area that everybody worked.
Q. Where the Bracco collection team worked?
A. Yes.
Q. Was that on the first floor of the building?
A. Yes.
Q. And how did you get in that locked door?
A. It was a receptionist sitting at the front desk that let me in.
Q. You didn't have access to that area?
A. No.
Q. You had to have somebody let you in, correct?
A. Yes.
Q. What was your kind of regular procedure when you arrived at work?
A. That day, my first day or --
Q. No. Your normal, regular procedure?



A. I would go in in the morning and sign in on the computer.
Q. How do you sign in?
A. Put my pass code in.
Q. You log onto the computer?
A. Yes.
Q. Is that typically the first thing that you did?
A. Well, I mean -- yes.
Q. Go ahead. You tell me what your regular, normal schedule was?
A. I would hang my jacket up or whatever and then sign in.
Q. So, you usually go immediately to your cubicle?
A. Yes.
Q. Typically the first thing you would do is log on to your computer?
A. Yes.
Q. Did you kind of enter -- typically enter your start time, also, and insert some type of record?
A. Through Kelly's web, yes.
Q. Did you also have to enter a start



time for Supply Chain Solutions?
A. No.
Q. When your work area was on the first floor of the building or your cubicle was on the first floor of the building, where was your cubicle in relationship to Mr. Scott's cubicle?
A. When we first started -- I think Mr. Scott was on the other side when I -- when he first started working there.
Q. On the other side of what?
A. It was like a divider. But all of the cubicles was -- but they had different sections.
Q. And at some point did you or he move?
A. Yes, they moved all of us.
Q. Is that when they moved you upstairs?
A. No. That's when we were still downstairs when they moved -- they moved everybody. They had seating arrangements.
Q. And when they moved you around on the first floor, at that point where was your cubicle located in relationship to Mr. Scott's

cubicle?
A. Two cubicles down.
Q. What was your regular quitting time?
A. 4:00.
Q. 4:00 p.m.?
A. 4:00 p.m., I believe.
Q. And what was your regular procedure at the end of the day?
A. No more than just sign out, sign out and leave.
Q. Sign out meaning log off the computer?
A. Log off, yes.
Q. Now, at some point the Bracco Team relocated from the first floor to the second floor of the building?
A. Yes.
Q. And did that move occur on September 11, 2009?
A. I don't recall exactly what day, but I do know that we moved. I'm not good with dates.
Q. What was going on with that move?
A. Everything was chaotic that day.
Q. Was it a Friday, the actual move



day?
A. I couldn't tell you what day it was.
Q. Did everybody move on the same day?
A. Our team?
Q. Yes.
A. Yes.
Q. Were you given instructions how the move was going to take place?
A. Pretty much. You know, everybody was to unplug their own computer and, you know, pack everything up.
Q. First thing in the morning?
A. Yes.
Q. But did you know in advance that that was going to be moving day?
A. Yes.
Q. And how did you know that?
A. They told us in a meeting.
Q. How far in advance of the actual move date did you know about it?
A. I couldn't tell you. I don't remember.
Q. And at this meeting where this move was announced, what were you told?



A. They told us that when we come in that morning we were going to unplug our computers and move all of our stuff upstairs.
MR. VANCE: Is it possible to take a break?
MR. MCGEE: Yes, when I get to a convenient stopping point.
BY MR. MCGEE:
Q. So, tell me what you did on the day of the move?
A. My normal routine going in the morning.
Q. What time did you arrive?
A. I'd say between 7:00, 7:30 because I don't remember exactly the time. But I knew I was way there before 8 o'clock. So it had to be between 7:00, 7:30.
Q. And when you entered the building that morning, where did you go first?
A. To my cubicle.
Q. On the first floor?
A. Yes.
Q. Is that what you had been instructed to do?



A. Yes.
Q. Everybody had been told when you come in that morning, go to your old cubicle?
A. Uh-huh.
Q. Yes?
A. And pack, yes.
Q. You were told to go to your old cubicle and pack things up?
A. Yes.
Q. Is that what you did?
A. Yes.
Q. Had you done any packing or moving --
A. Prior to?
Q. -- prior to that?
A. I think I probably put a couple of things in boxes.
Q. Had you taken anything upstairs --
A. No.
Q. -- prior to --
A. We couldn't because people were still upstairs.
Q. So, please continue. Tell me what you did on the actual day of the move. You arrived between 7:00 and 7:30. You went directly to

your old cubicle on the first floor as you and the others had been instructed to do, correct?
A. Right.
Q. And then you started packing your stuff?
A. Unplugging the computer.
Q. You unplugged your computer?
A. Yes, we had to unplug the computer.
Q. Did you put your belongings in a box or how did you pack --
A. Some of the stuff I did. They had chairs. A lot of stuff they just put in chairs to push because it was too heavy for us to take. So they had chairs coming back and forth.
Q. Was everybody supposed to arrive at the same time that morning?
A. We all had different clock in times.
Q. So, how long did it take you to get your belongings together in your old cubicle?
A. Not long, maybe 20, 25 minutes. I'm not sure.
Q. What did you do next?
A. Wait until they were saying that we



could take -- because people upstairs, they were bringing stuff downstairs, too. So we couldn't go up there until after they had cleaned up from upstairs.
Q. So at the same time you were packing up your stuff downstairs, the people upstairs were packing up their stuff to prepare to move downstairs?
A. Yes.
Q. So, you had to wait for them basically to vacate --
A. Right.
Q. -- the cubicle that you were moving into?
A. That's correct.
Q. Did somebody tell you when it was okay for you to take your things upstairs?
A. As far as the supervisors, no. But the co-workers, they would say, okay, you know, we can start taking some of our stuff upstairs.
Q. Who told you that?
A. I don't remember who it was.
Q. So --



A. So when we started seeing them taking stuff up, that's when we started -- everybody else started taking stuff upstairs.
Q. So, what time did you start taking things upstairs?
A. It was late, later on in the morning. I would say probably around 9:00 I'm thinking. I'm not sure.
Q. Did you know in advance what specific cubicle you were going to have upstairs?
A. Yes, because they gave us -- I think they gave us seating arrangements. I think there were seating arrangements upstairs as well. When we got upstairs, that's when they told us who was going to be sitting where.
Q. So you didn't know where you were moving before the actual day of the move; did you?
A. No. They had a chart, but we still didn't know until actually we got upstairs to actually see where the seats were.
Q. So, when you got upstairs, who did you see to find out exactly where your cubicle was going to be?



A. I think at that time it was Sherri and Heidi standing in the middle of the floor, each one on each side of the corner, and they were telling us.
Q. And when you first walked in to your new cubicle upstairs, was it completely cleaned out at that point in time?
A. Yes.
Q. Was there any computer there?
A. No.
MR. SCOTT: I need to put money in the meter before I get a ticket. Can we take a break?
MR. MCGEE: Yes, we can.
(Whereupon a break was taken.)
BY MR. MCGEE:
Q. Ms. Shepperson, we were talking about the day that your group, the Bracco Team moved from cubicles on the first floor to cubicles on the second floor of the building of Supply Chain Solutions. Okay?
A. Yes.
Q. I want to continue with that. I think we were up to the point where you finally went

upstairs that morning to where your new cubicle was going to be?
A. Correct.
Q. And you found out at the time you got upstairs which specific cubicle you were being assigned to, correct?
A. Correct.
Q. And you walked in to that new cubicle, correct?
A. Correct.
Q. And when you walked in it had been completely cleaned out at that point, correct?
A. Correct.
Q. And when you made the first trip upstairs, did you bring anything with you to your new cubicle?
A. I think at that point we were basically -- I think the computer, I think.
Q. You brought the computer up yourself?
A. Yes. Well, we was pushing them in chairs.
Q. But you pushed your computer upstairs and in the chair --
A. We were helping each other.



Q. Pardon me?
A. We were helping each other to push the chair to take the computer upstairs.
Q. Is your computer the first thing that you brought upstairs?
A. I believe so.
Q. And how did you get your particular computer upstairs?
A. Pushed it in a chair.
Q. Who pushed the chair?
A. It was me and Tasha, I believe.
Q. Was that just bringing your computer upstairs?
A. No. We were doing each others, bringing each others upstairs.
Q. Did you bring both your computer and Tasha's computer upstairs at the same time?
A. Not at the same time, no.
Q. Tell me the sequence of events?
A. We brought mine up and then we went back down and got hers. And like I said, it was just chaos because everybody was -- it was so many of us getting on the elevator at one time to go upstairs.



Q. That's how you got upstairs, through the elevator?
A. Yes.
Q. How did you get in to the work area where your new cubicle was going to be located?
A. At that time I believe the receptionist had to buzz us in.
Q. Because you didn't have access to that work area, either; did you?
A. No.
Q. So each time you went upstairs you had to be buzzed in by the receptionist?
A. Right, until they activated our badges.
Q. What was Tasha's last name?
A. I don't remember.
Q. So, on your first trip upstairs you and Tasha pushed your computer on the chair --
A. Uh-huh.
Q. -- correct?
A. Correct.
Q. And then you went back downstairs to get her computer, the two of you together



pushed the chair with her computer on it, got back on the elevator and took that upstairs to her new cubicle?
A. Right.
Q. What did you do next?
A. Just back and forth taking stuff, helping everybody else take stuff upstairs.
Q. Just tell me the sequence of events? After your computer and Tasha's computer were put in your new cubicles, what did you do next, you?
A. Went back downstairs and get -- just helping everybody else. We were just helping each other bring stuff upstairs. It wasn't just me alone. It was all of us going back and forth.
Q. Well, was there anything else from your old cubicle that was brought upstairs to your new cubicle other than your computer?
A. Folders, files, yes.
Q. And who brought the folders and files from your old -- from your old cubicle up to your new cubicle?
A. I did.

Q. Did anybody carry any of your folders or files --
A. No.
Q. -- other than you?
A. No.
Q. Was there anything else from your old cubicle that needed to be moved upstairs other than the folders and files and your computer?
A. Just my flowers and, you know, pictures.
Q. And who carried those things upstairs?
A. I did.
Q. Did you do that all yourself?
A. Yes.
Q. How many trips did you have to make back and forth before everybody was moved out of your old cubicle into your new cubicle?
A. I don't recall. It was way -- like I said, we were helping each other take stuff. So it was right many. I don't know how many.
Q. But nobody helped you take any of your stuff?
A. Yes, we were helping each other.



Q. But I asked you if anybody brought anything from your cubicle upstairs other than yourself?
A. No, no.
Q. But did you help bring some other people's stuff up to their cubicle?
A. Not their personal stuff, no.
Q. Did you carry anything upstairs other than your stuff and Tasha's computer?
A. Yes, we were helping each other. Everybody else was helping each other to take their keyboards, their mouse, you know, everything dealing with the computer.
Q. But your keyboard and your mouse --
A. We put that on the chair.
Q. With your computer?
A. Yes.
Q. Did you carry anybody else's computer upstairs other than Tasha's?
A. No.
Q. Did you carry anybody else's keyboard upstairs other than Tasha's?
A. Yes.
Q. Who else?



A. I don't recall who else. I mean, like I said, it was just everybody helping everybody else just take stuff.
Q. What time was it when all of your stuff was finally upstairs in the new cubicle?
A. I couldn't tell you.
Q. How long did it take you to move your stuff upstairs into the new cubicle?
A. Everything or just the computer?
Q. Everything.
A. I don't -- I really don't know, to be honest with you.
Q. At what point did you plug your computer in in the new cubicle?
A. I don't think that -- well, probably after everybody else was upstairs, once we all got upstairs.
Q. Did you plug your computer in on your own --
A. Yes.
Q. -- or did you need help to do that?
A. No.
Q. You did it on your own?



A. Yes.
Q. Once you plugged in your computer were you able to log on to the system on your own or did you need help doing that?
A. No.
Q. You did it all on your own?
A. Yes.
Q. What time was it when you logged on to your computer that morning?
A. I can't recall. I really don't know. But I know it wasn't the time that we actually -- because everything was unplugged. That morning nobody logged on that morning because we were going upstairs. So nobody logged on early that morning. I don't think it was until later on like -- I don't know. It was later on when we actually got to log on.
Q. Well, you logged on before noon; didn't you?
A. I believe, yes, I believe so, yes.
Q. What was the first thing that you did after you logged on to the computer?
A. You said the first thing that I did --
Q. After you logged on to the computer?

A. I just started working.
Q. Did you, for example, as soon as you logged on to your computer, did you then go into the Kelly Services time keeping system and enter your time?
A. Yes, yes.
Q. Did you help Mr. Scott move anything from his old cubicle upstairs to his new cubicle?
A. No.
Q. And he didn't help you move anything; did he?
A. No.
Q. Did you see Mr. Scott at work on the date of the move?
A. Yes.
Q. Where were you when you first saw Mr. Scott?
A. In my cubicle.
Q. Your new cubicle?
A. No. The one downstairs.
Q. Were you sitting or standing when you first saw him?
A. Sitting.



Q. Where was Mr. Scott?
A. He came back there to my cubicle.
Q. Pardon me?
A. He came back there to my cubicle.
Q. For what purpose?
A. Just to say good morning like he always do.
Q. Do you know what time it was when you first saw mr. Scott?
A. It had to be between I'd say the time that -- between 7:00 -- probably about 7:15 to 7:30, the time that I got there. I hadn't been back there too long before he had came back there.
Q. So you think you saw Mr. Scott maybe 15 minutes after you arrived that morning?
A. Yes.
Q. Maybe 7:15 or 7:30?
A. Yes.
Q. When did you next see Mr. Scott that day?
A. Just in passing in taking our stuff back and forth upstairs.
Q. Did you see Mr. Scott moving things



upstairs that morning?
A. Yes.
Q. What was he moving upstairs?
A. His computer.
Q. Did you see him carrying his computer?
A. If I'm not mistaken, I think all of us was pushing our computers in the chair. I think he had a chair, too.
Q. Do you recall seeing Mr. Scott pushing his computer in a chair that morning?
A. Yes.
Q. Did you see Mr. Scott carrying anything else upstairs that morning?
A. Maybe a box or two, I guess.
Q. I don't want you to guess.
A. Maybe a box or two, yes.
Q. Do you recall seeing him --
A. Yes.
Q. -- carry a box upstairs?
A. Uh-huh.
Q. You do?
A. Yes.
Q. Was he carrying it in his arm?
A. Yes.



Q. Do you know what was in the box?
A. No. I don't even know if it was his box. Like I said, we were helping each other.
Q. Did you speak with Mr. Scott that day other than when he came -- first came to your cubicle -- to your old cubicle to say good morning?
A. No. Because we were busy that day, that morning.
Q. So the only time that you spoke with him that day was when he came to your old cubicle to say good morning?
A. Yes.
Q. Did you see Nikki Pinkett the morning of the move?
A. I don't recall seeing Nikki that morning.
Q. And was the first time that you saw Sherri O'Connell that morning upstairs when you made your first trip upstairs?
A. No.
Q. When did you first see Sherri O'Connell?

A. She was standing in the aisle of our -- where our cubicles were.
Q. Downstairs where your old cubicles were?
A. Yes.
Q. What time was it when you first saw Sherri O'Connell that morning?
A. I don't recall because I'm not good with times. I really didn't pay attention to the clock.
Q. Was it before you took your computer upstairs?
A. I believe so.
Q. Did you speak with Sherri O'Connell that morning?
A. No.
Q. What was Sherri O'Connell doing when you first saw her downstairs that morning?
A. She was talking to one of the other temps.
Q. Who was she speaking with?
A. Terri.
Q. Terri Hinderer (ph)?
A. I don't remember her last name.



Q. What did Terri look like?
A. She was a small framed woman, short hair. I think her hair was salt and pepper.
Q. What race?
A. Caucasian.
Q. Was she on the Bracco Team?
A. Yes.
Q. Was there only one Terri on the Bracco Team?
A. Yes.
Q. When you saw Sherri O'Connell speaking with Terri that morning downstairs, that was before you took your computer upstairs; is that right?
A. Correct.
Q. You're certain of that?
A. Uh-huh.
Q. Pardon?
A. Yes.
Q. When you saw Sherri O'Connell speaking with Terri, did Sherri O'Connell say something about Mr. Scott?
A. Yes.
Q. Pardon?



A. Yes.
Q. Did you -- when was the next time that you saw Sherri O'Connell that morning?
A. Upstairs.
Q. When you took your computer upstairs?
A. Yes.
Q. That's when she kind of directed you to where your new cubicle was going to be?
A. Yes.
Q. How did the rest of the day go after you logged on to your computer in your new cubicle on the date of the move?
A. Just a normal day. We worked and we just started doing our assignment for that day.
Q. In the upstairs area, the new area for your team upstairs, where was your new cubicle in relationship to where Mr. Scott's new cubicle was?
A. Catty corner, he was like catty corner from -- it was a temp sitting beside me and then he was next to her. So it was basically catty corner the way the cubicles were set up.



Q. But everybody had their own cubicle?
A. Yes.
Q. How did you learn that Jason Scott was no longer working at Supply Chain Solutions?
A. They announced it the next morning.
Q. What next morning?
A. When we came back to work.
Q. When was that?
A. That was -- I think it was -- I don't remember the day, the exact day that we worked. I don't know if it was a Friday or a Thursday but the following next day, whatever the next workday was, that's when they announced that Jason Scott was no longer with the company.
Q. Who announced that?
A. I think Sherri did, I believe.
Q. Was it announced in any --
A. No, no, that's not what happened. I saw Mr. Scott get up that day from his cubicle.
Q. This is not the day of the move; is it?
A. No. He got up from his cubicle and took some of his belongings with him. And

myself and a couple of other temps were wondering what was going on. And I think the next day, that's when they announced that he no longer worked there.
Q. Who announced that?
A. I think Sherri did.
Q. Was it in a group setting?
A. Uh-huh.
Q. Pardon?
A. Yes.
Q. And what was said?
A. That Jason was no longer with company any more.
Q. Did anybody say why?
A. No.
Q. Did you ever ask anybody why?
A. No.
Q. Did anybody ever tell you why?
A. I mean, people was talking. But, you know, they were talking, of course people was talking but, you know.
Q. Did anybody say why?
A. I think they were saying because -- the same thing, falsifying a record, I



believe.
Q. Who said that?
A. Just talking to -- within the -- our area, the Bracco area.
Q. I want to go back to the day of the move and on the morning of the move. The first time that you saw Sherri O'Connell was when you were downstairs and you saw her speaking with Terri; is that correct?
A. That is correct.
Q. And that was before you had taken your computer upstairs; is that correct?
A. Correct.
Q. And where were you?
A. In my cubicle.
Q. Sitting or standing?
A. Sitting.
Q. And where was Sherri?
A. She was standing at the second -- I think she was standing at Terri's cubicle in the aisle.
Q. Outside Terri's cubicle?
A. Uh-huh.
Q. Yes?



A. Yes.
Q. And you do need to give an audible response. Okay?
A. Okay, yes.
Q. Was Terri inside her cubicle?
A. Yes.
Q. Was Terri sitting or standing?
A. I'm not sure.
Q. Could you see --
A. I couldn't see Terri.
Q. How high were the partitions on the cubicle?
A. Being if I was standing up you could see. But if they're sitting down, no, you can't see them.
Q. So, if you were standing up in your cubicle, could you see over the top of your cubicle?
A. Yes. I got a little height on that that you could see, you know.
Q. Could you hear Terri?
A. I could hear Sherri talking to Terri.
Q. Could you hear Terri?
A. No. Because --



Q. Where was your cubicle in relationship to Terri's cubicle?
A. Mine was like two, three cubicles down, I believe.
Q. Could you see Sherri O'Connell as she was speaking?
A. Yes. I rolled out. I rolled my chair out in the aisleway and I saw her.
Q. Literally you rolled your chair into the aisleway?
A. Yes.
Q. So out --
A. I mean, the space between the cubicles wasn't that far.
Q. But did you roll your chair completely out of your cubicle?
A. Not completely. Just enough to where I could see who was standing.
Q. And why did you roll your chair out?
A. Because I heard somebody talking. I heard them talking.
Q. Well, what was it that caused you to move your chair out into the aisle?
A. Because of what was said.

Q. And what did you hear?
A. I heard her talking about Jason.
Q. Did anybody mention Jason Scott's name by name?
A. Yes.
Q. Who was that?
A. Sherri.
Q. What did she say?
A. She was talking to Terri about the incident that had happened that morning and --
Q. What incident?
A. About -- she was saying that Jason had came in late. And that's what made me roll my chair out a little bit.
Q. What specifically did she say? What words did you hear?
A. I heard -- actually, I heard her say that, you know, he was late coming in and that's why she didn't like faggots. So that's when --
Q. Just repeat for me exactly what you heard?
A. She said that Jason Scott -- she was telling Terri that Jason had came in late.



Q. So what did she say about that?
A. She was just saying that, you know, she knows he came in late.
Q. Did she say Jason or did she say Jason Scott?
A. She said Jason. And then after that, I don't know what Terri said because she was inside her cubicle. But then I heard --
Q. Did Sherri O'Connell also say anything about Jason lying about what time he came in?
A. No, I don't recall.
Q. Did she -- did Sherri O'Connell say what time Jason came in that morning?
A. No. If she did I didn't hear her.
Q. Did she say how late Jason came in?
A. I didn't hear her say if he came in -- I didn't hear her say that.
Q. Did she say how she knew Jason came in late?
A. Yes, she -- no, she didn't. Because all I heard was what I heard.
Q. What did you hear?
A. I heard when she told Terri that -- that Jason had came -- that he came in late and



that -- I didn't heard her say what time or anything like that. And then all of a sudden I just heard her say that's why I didn't like faggots. And that's when a few minutes later, Mr. Kirk came over to my cubicle and he said did you hear that. And I was like, yes, wow.
Q. Kirk Slaughter?
A. Yes.
Q. Did you hear Sherri O'Connell say anything else?
A. No, not after that I didn't.
Q. How long was Sherri O'Connell standing outside Terri's cubicle and speaking with her?
A. I can't say exactly how long. Like I said, I'm not really good at keeping time or clocking time on it. I don't know.
Q. Was it five seconds? Was it five minutes? Was it an hour?
A. She wasn't there that long.
Q. How long was she there?
A. I really don't know. She was having a conversation with Terri. And when I heard that, that's what really caught my attention to



when she was talking to her about him coming in.
Q. How long was she there?
A. I really don't know. I can't tell you what time. I don't know.
Q. What did you do next after hearing Sherri O'Connell make that statement to Terri?
A. I didn't do anything. That's when Mr. Kirk came back there to my cubicle.
Q. So tell me the next -- you did something?
A. I was just sitting there, and I couldn't believe that she had said that.
Q. What were you doing in your cubicle at the time?
A. I was just sitting there. I wasn't doing nothing because there wasn't anything for me to do at that time.
Q. Weren't you supposed to be packing up and moving?
A. The majority of my stuff was packed. It was already -- it was packed. I was just sitting there waiting for --

Q. Some instruction to take your stuff upstairs?
A. Correct.
Q. So how long after hearing Sherri O'Connell make that statement was it that you made your first trip upstairs?
A. I don't know. I really don't know --
Q. Well --
A. -- how long it was between the time that I heard her say that to go and take my stuff upstairs.
Q. What did you do in between the time that you heard that statement and when you made your first trip upstairs?
A. What do you mean what did I do?
Q. What were you doing? Did you stay in your cubicle?
A. Yes, I stayed in my cubicle --
Q. For how long?
A. -- I told you that. I can't really give you a time because I don't know. I'm not just going to give you a time when I really don't know what time or how long it was.
Q. But you remained in your cubicle until



you made your first trip upstairs?
A. Correct.
Q. Approximately how old is Terri, the other temp.
A. I don't know.
Q. Is she in her twenties or thirties or forties, fifties?
A. I would probably say her late thirties, I guess. I'm not sure.
Q. Was she already working there when you first arrived?
A. No -- what, that morning?
Q. No. At --
A. No.
Q. -- Supply Chain Solutions?
A. No.
Q. She came there after you were already there?
A. Yes.
Q. Did you hear Sherri O'Connell say anything else?
A. No.
Q. Are you sure?
A. That was -- that's what I heard.



That's what stunned me when she said that.
Q. Did you hear Terri say anything?
A. I didn't hear Terri because, like I said, she was standing inside the cubicle -- I mean sitting inside the cubicle.
Q. Was anybody else in the area when you heard this?
A. At that time it was -- I didn't know that Mr. Kirk was there in his cubicle until he came around the corner. Because at first I just thought it was me over there.
Q. Was anybody else in their cubicles?
A. Not that I know of, no.
Q. Where was everybody else?
A. Either in the break room or just waiting until, you know --
Q. Did you ever tell anybody what you had heard Sherri O'Connell say?
A. Me and Mr. Kirk -- I had seen him again out.
Q. Who?
A. Kirk Slaughter. I had seen him again and we had talked about it.
Q. Where did you see him?



A. At the post office.
Q. When was that?
A. Not too long after Jason was let go, I believe.
Q. What post office?
A. The one in Newark.
Q. Was this before or after your assignment at Supply Chain Solutions ended?
A. I think it was before. I think it was before.
Q. Was Mr. Slaughter still working at Supply Chain Solutions at the time?
A. Yes.
Q. Was he also on the Bracco Team?
A. Yes.
Q. So, did you see him there at Supply Chain Solutions every day?
A. Yes.
Q. So what happened when you later saw him at the post office?
A. He was telling me that it was a shame what happened, that they let Jason go and it was a shame about what Sherri said.
Q. What did he say about that?

A. He was just saying it was a shame and that there should be something done about it.
Q. Was that the last time that you ever spoke to Kirk Slaughter about that?
A. Yes.
Q. Did you ever tell anybody else what you heard Sherri O'Connell say?
A. No.
Q. At some point you told Mr. Scott what you heard; didn't you?
A. I think I did tell Jason, I think, yes.
Q. Did you ever tell Janet Evangelista what you heard?
A. No.
Q. When was the first time that you had any communication with Jason Scott after his work assignment at Supply Chain Solutions ended?
A. I think the first time that I had any communication with Jason was when this -- all of this came about, when he had contacted me for -- to meet with Mr. Poliquin.
Q. How did he contact you?



A. He called me.
Q. How long after his temp assignment ended was that?
A. It had been a while. I'm not sure. I'm not really sure.
Q. When Mr. Scott had called you, had your temp assignment at Supply Chain Solutions ended or were you still working there?
A. It had ended.
Q. When Mr. Scott called you and told you he wanted you to meet with his attorney, did he tell you why he wanted you to meet with his attorney?
A. Yes, he did.
Q. What did he say?
A. Because of the discrimination, he said that he was filing for discrimination.
Q. Well, why did he want you as opposed to someone else to talk to his attorney?
A. Because I had heard it.
Q. You had heard what?
A. What was said.
Q. How did he know that you had heard that?



A. I don't know how he heard it because I hadn't talked to him. He had called me.
Q. Did he tell you that he had heard that you overheard Sherri O'Connell say something?
A. Yes, he did.
Q. What did he say to you about that?
A. He told me that he had heard that -- about the -- that Sherri had called him out of his name.
Q. Pardon?
A. Had called him out of his name.
Q. Called him out of his name?
A. Yes. I don't like using that word, faggot.
Q. Did he tell you how he had heard about that?
A. Janet.
Q. Janet who?
A. I don't know her last name. Estavas (ph) or whatever her last name is.
Q. Well, you had never told Janet that you had heard that; had you?
A. Un-nh.
Q. Pardon?



A. No.
Q. When Jason Scott first called you, did you tell him what you heard Sherri O'Connell say?
A. Jason, when he first called me, he had told me. And I told him, yes, I had heard it and how did he know. And he said that Janet had said something to him. How did she know, Mr. Kirk had told her.
Q. How do you know that Kirk had told her, told Janet; is that what Mr. Scott told you?
A. Yes.
Q. How did Jason Scott have your telephone number?
A. We all had each others telephone numbers at work.
Q. You --
A. We all had each others telephone numbers at work.
Q. Your personal numbers?
A. Yes.
Q. Did you have Mr. Scott's personal number?

A. Uh-huh.
Q. Yes?
A. Basically the whole Bracco Team had each others numbers.
Q. How did you get Mr. Scott's number?
A. We exchanged them. I had Heidi's and everybody else's on the Bracco Team's numbers.
Q. When was the next time that you had -- strike that. When Mr. Scott called, first contacted you and asked you to meet with his attorney, what did you say?
A. At that point I asked him why, for what. And that's when he went in to tell me you didn't hear. And I said heard what. And that's when he started telling me. I was like, yes, I did. And that's when I asked him how did he know. And that's when he went on to tell me that he had heard from Janet.
Q. And did you agree to meet with his attorney?
A. I told him yes.
Q. And how was the appointment with his attorney arranged?



A. I guess he just -- the attorney just contacted him. Because like I told you earlier, the attorney had asked him -- he had called me a couple of times but I didn't answer the phone because I didn't know the number. So I guess that's when he asked Jason to contact me, for me to come to the office.
Q. When did you meet with Ron Poliquin, Mr. Scott's previous attorney?
A. A couple of years ago.
Q. How long was it after Mr. Scott first called you and asked you to meet with his attorney?
A. That was months, months. I mean, it had to have been almost close to a year, I guess, I'm thinking.
Q. To this day have you told anybody other than Kirk Slaughter, Jason Scott and Ron Poliquin that you heard Sherri O'Connell make a statement about Mr. Scott?
A. No.
Q. Those are the only people that you have ever discussed this with?
A. Yes.



Q. Did you ever talk to Mr. Scott about the ending of your temp assignment at Supply Chain Solutions?
A. The day when he called me on the phone. And that's when I told him, I said, they let me go, too.
Q. What did you tell him about the ending of your temp assignment there?
A. Just telling him why they let me -- the reason why they said they let me go.
Q. And did you tell him that you thought Sherri O'Connell was behind letting you go?
A. No, we didn't talk about it. I don't think we talked about that.
Q. But you do believe she's the one behind it --
A. Yes, I do believe that.
Q. Did Mr. Scott give you a statement in support of your claim of discrimination?
A. I don't know -- no.
Q. Did anybody give you a statement in support of your claim of discrimination?
A. No, I don't think, no.
Q. Did you ask anybody to?



A. No, I don't believe I did. That was so long -- I don't remember. Yes, I did, yes, I did.
Q. You did what?
A. I did ask -- I can't remember if I asked anybody.
Q. Who did you think you might have asked?
A. Jason.
Q. Jason Scott?
A. Uh-huh.
Q. Yes?
A. Yes. I don't know whether I asked him or not.
Q. Did you prepare his statement or did he prepare it?
A. Excuse me?
MR. VANCE: Objection. She said she's not sure if she asked him. She didn't say she asked him and got one from him.
BY MR. MCGEE:
Q. Mr. Scott did give you a statement; didn't he?
A. I don't remember. I don't think so.

I don't think he did. I'm trying to remember the paper work that I filed with the labor board.
Q. You identified Mr. Scott as a witness; didn't you?
A. But Jason wasn't there at the time when the situation -- when I got --
Q. In connection with your -- with the discrimination claim that you filed with Delaware Department of Labor, you identified Mr. Scott as a witness; didn't you?
A. Yes.
Q. You asked him to talk to the investigator; didn't you?
A. No, I don't remember asking him to talk to the investigator.
Q. Why did you identify Mr. Scott as a witness for your --
A. You said why?
Q. Yes.
A. Because Mr. Scott knew that -- the environment that was in the office, the environment that we worked in. I mean, everybody talked about the environment there.



And that was after Sherri came aboard, how things was different when she came aboard.
Q. How were things different after Sherri O'Connell --
A. Like I stated earlier, it was just the way that she treated African Americans. I mean nobody else in there had no issues. But when she came along it was -- like everything was different, the way she would, you know, act with us.
Q. The statement that you prepared for Mr. Scott about what you claim you heard Sherri O'Connell say --
A. Right.
Q. -- when did you prepare that statement?
A. I couldn't tell you exactly what date, sir, because like I stated, I don't remember dates.
Q. Did you prepare it on a computer?
A. Yes, I did.
Q. Whose computer?
A. My work computer.
Q. Where were you working at the time?



A. Easy Money Group, I believe.
Q. Who did you give the statement to?
A. I mailed it -- I think I mailed it to Jason.
Q. Did you keep a copy?
A. I probably have a copy on my hard drive, I believe.
Q. What hard drive?
A. If I sent the e-mail, it should be still in my e-mail.
Q. Did you send it by e-mail?
A. Yes, I did, I sent it by e-mail.
Q. Who did you send it to by e-mail?
A. Jason.
Q. Where is that e-mail?
A. You're asking me where is it now?
Q. Yes.
A. Probably still in my account.
Q. The subpoena required you to produce that document.
A. I didn't know. I mean, because like I said, I got that Saturday. I opened it and I said I was -- you know, I wasn't thinking because I had the death of my grandmom just



passed. I wasn't even thinking about that.
Q. I'm going to ask you then when you go home tonight to gather the e-mails and other documents related to Mr. Scott including the e-mail communications that you've had with him and then produce copies of those to me in compliance with the subpoena. Okay?
A. Sure.
Q. Did you have that statement notarized, a notary signed the statement?
A. I believe I did.
Q. Who was the notary?
A. Paula Hutchinson.
Q. Who is that?
A. You said who is she?
Q. Yes.
A. A lady that works with me.
Q. Where?
A. Did I have it notarized? I don't know if I got it notarized or not.
Q. Where does Paula Hutchinson work?
A. She works at my company now.
Q. What company is that?
A. Dow.

Q. What is -- where? I'm sorry.
A. The company I work at now.
Q. What is it called?
A. Dow.
Q. Dow Chemical?
A. Yes. I don't remember if I did the letter -- I'll have to check my e-mail address and I'll be able to tell you.
Q. What is Paula Hutchinson's phone number?
A. I don't know.
Q. Can you check your phone?
A. Can I check my phone?
Q. Yes, and give me Paula Hutchinson's number?
A. 287-8338.
Q. What is the area code?
A. 302.
Q. What is the address of your office at Dow Chemical?
A. 300 D and S Lane, Baer.
Q. Newark, Delaware?
A. Yes.
Q. When did you start your job at Dow



Chemical?
A. Two -- I've been there almost two years, I think back in September of last year.
Q. Did you ever give a copy of your statement to anybody other than Jason Scott?
A. No.
Q. Did Jason Scott ever tell you he was homosexual?
A. No. He didn't have to.
Q. Did he ever discuss with you his sexual orientation?
A. No.
Q. Did Mr. Scott ever discuss with you any psychological, mental or emotional problems that he had?
A. No.
Q. Are you aware of any such problems?
A. No.
Q. Have you ever seen a psychiatrist?
A. Yes.
Q. When?
A. When I had surgery.
Q. Pardon?



A. When I had surgery.
Q. For what?
A. Lap band.
Q. When was that?
A. About three years ago.
Q. Was it before or after your temp assignment at Supply Chain Solutions ended?
A. I'm sorry?
Q. Was it before or after your temp assignment --
A. Before.
Q. -- at Supply Chain Solutions ended?
A. Before.
Q. Was it while you were on a temp assignment there?
A. Yes.
Q. Why did you see a psychiatrist at that point?
A. Because that is what is required.
Q. Have you ever seen or consulted a psychiatrist on any other occasion?
A. No.
Q. Any other type of mental health provider?



A. No.
Q. Where did you work prior to getting a temp assignment at Supply Chain Solutions?
A. Before I started working there?
Q. Yes.
A. At Walmart at Smart Styles.
Q. Where?
A. Smart Styles.
Q. Where, what Walmart?
A. Elkton.
Q. Just kind of run through for me, if you will, starting when you got out of high school and take me chronologically all the different jobs that you've had up until today?
A. After high school I was in nursing. I did nursing for so many years.
Q. What did --
A. Nursing assistant, I was a nursing assistant.
Q. Where?
A. A place called Guinea Hall South.
Q. Where was that?
A. In Richmond, Virginia.

Q. How long did you work there?
A. I would say maybe three years.
Q. Why did that end?
A. Better opportunity somewhere else.
Q. Where was that?
A. I worked at Metropolitan Hospital, I worked there. Transportation department --
Q. Just tell me when and where?
A. What year?
Q. When you say transportation department, what transportation department, where and when?
A. The transportation department in Richmond, Virginia. All of this is in Richmond. You said to start from when I got out of school.
Q. That's fine. I want you to do that. Tell me what the name of the employer was, where it was located and during what dates you worked there.
A. Then I worked there. I don't know how long I worked there. From there I opened my own business, and I worked doing hair for over 20 some years.



Q. Have you ever been arrested?
A. Yes.
Q. When?
A. Here in Delaware.
Q. Where?
A. In Newark.
Q. When?
A. Maybe three years ago, two, three years ago.
Q. What were you arrested for?
A. Domestic.
Q. Domestic what?
A. Offensive touching.
Q. Of who?
A. Husband.
Q. What did you do?
A. I pushed him off of me.
Q. Did you injure him?
A. I was the one that was injured.
Q. Was he injured?
A. No.
Q. Were charges pressed?
A. No.
Q. Were you convicted?



A. No.
Q. What was the result of the case?
A. They dropped the case.
Q. Have you been arrested on any other occasion?
A. No.
Q. Have you ever had any other criminal charges filed against you?
A. No.
Q. I'm sorry for the interruption, but can you continue with the chronology of your prior employment?
A. I finished it. I told you I did hair for some 20 some years in Richmond, Virginia until I moved here to Delaware.
Q. Where?
A. Where what?
Q. Where did you do hair?
A. I said Richmond, Virginia.
Q. Where in Richmond, Virginia?
A. What do you mean where in Richmond, Virginia?
Q. Did you do it out of your house?
A. I had my own beauty salon.



Q. Where was that located?
A. In Richmond.
Q. Where in Richmond?
A. On Hall Street.
Q. What was the name of it?
A. Visions of Essence.
Q. And when you moved up to Newark did you do hair somewhere?
A. In Elkton, Maryland.
Q. Where?
A. In Walmart at Smart Styles.
(Document marked Exhibit Shepperson 1 for identification.)
BY MR. MCGEE:
Q. Ms. Shepperson, let me show you what's been marked as Shepperson Deposition Exhibit 1. Is that your signature --
A. Yes.
Q. -- on the document?
A. Uh-huh.
Q. When did you sign that document?
A. On the date.
Q. What date?
A. The date that I wrote it.

109

Q. What date was that?
A. When I put date on here, July 26th.
Q. Is July 26, 2011 the day that you first typed this statement?
A. No, I don't believe so. It's in my e-mail. I don't think that that was the day.
Q. When did you prepare this statement?
A. I would have to check my e-mail.
Q. Did you type this statement?
A. Yes, I did, I did type it.
Q. Who put the date July 26, 2011 on this statement?
A. I did if I typed it.
Q. Why did you put that date on the statement?
A. That's the date I typed it -- I mean, that's the day I printed it out that I typed it.
Q. Why did you sign this statement on July 26, 2011?
A. Because Jason had told me that he needed a statement, that Mr. Poliquin was asking me for a statement. And the thing about it, I don't know if because it was asked to do

110

a statement a while back, and I didn't and I guess it was time for -- getting closer to whatever Mr. Poliquin was doing, needing me to give a statement. Because I had asked him -- you know, I had talked to Mr. Poliquin before and he just said that he needed a statement, that I wouldn't have to -- with Mr. Poliquin I wouldn't have to go to a deposition. That's why I wrote the statement.
Q. And the date that you claim that you heard Sherri O'Connell make that statement was September 11, 2009?
A. Uh-huh.
Q. Pardon?
A. Yes.
(Document marked Exhibit Shepperson 2 for identification.)
BY MR. MCGEE:
Q. Ms. Shepperson, let me show you what's been marked as Shepperson Exhibit 2 and ask you -- this is a series of five pages and ask you to identify those documents for me, please? What are these documents?
A. These are text that we put in the work

111

document -- I mean in the database.
Q. So the first page, is that text that you entered into the Supply Chain Solutions' system?
A. It has my initials there.
Q. Where are your initials?
A. TXS.
Q. And what is the number preceding your initials?
A. I don't remember the number.
Q. Is that the date that you entered the text?
A. Yes.
Q. November 11, 2009?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Did you speak with Barbara in purchasing on November 11, 2009?
A. If I wrote it in the text, I'm pretty sure I did.
Q. Did you leave a message for Chris, the owner of the business on November 11, 2009?
A. I'm pretty sure I did. I wouldn't

112

have no reason to put a text in the note if it's not true.
Q. Did you leave a message for Lynn Keefe on November 11, 2009?
A. Well, the thing about this record is, I don't -- if I left a voice message for Chris, the owner -- I want to say that the system was duplicating stuff at one time because from my knowledge, when we did -- when we put data into it, you couldn't call the customer no more than once. You couldn't keep repeatedly calling the customers. So I don't -- you know, I don't know.
Q. You don't know what?
A. I don't know if -- I mean, my initials is there, so, I mean evidently I had to -- I can't say nobody else did it because my initials is there. But I can't see me calling and -- if I spoke to Barbara, why would I call and leave a message for Chris or a message for Lynn. I mean, that wouldn't make sense if I spoke to Barbara.
Q. Who is Barbara?
A. I guess it's the customer. I'm not

sure. I mean, I guess it's the customer that I was calling.
Q. You didn't speak with Barbara; did you?
A. I had to have spoke to her if I put the text in there. That's what I'm saying, I had to have spoken to her if I put the text in there.
Q. By putting this text in there you were representing that you spoke to Barbara on that day, correct?
A. Correct, correct.
Q. But Barbara denies that you spoke to her?
A. She denied that I spoke to her?
Q. Correct.
A. Yes, evidently she did. I got let go for falsifying a document. But, you know, I remember the conversation. I thought it was -- I don't know.
Q. You do remember the conversation?
A. I don't know if it was that particular person that I spoke to about this particular account. It might have been another account



that I was thinking about. I don't know, I mean, like I said, we dealt with different accounts all day long.
Q. This has a particular order number on it; doesn't it?
A. That doesn't mean nothing to me, the order number. I still don't know who the customer is. I still don't know who the customer is.
Q. When you put --
A. At that point --
Q. -- things into the system, you don't put it in by a particular customer?
A. The text that we have here, if there's an order number, we pull that order number up and we look at if we should call that person or whatever. If we call, if they're there, if they're not, we'll put in a text, leave a message. And if we spoke to them, we'll say we spoke to them. They they will let us know whether they want to pay the bill or whatever.
Q. But it relates to a specific order, right?
A. Right. But what I'm saying is I don't



know what customer that I particularly spoke to about this account.
Q. Well, you must have known at the time, right, because you know what the order related to, you just don't remember now, is that what you're saying?
A. Right. I mean, I spoke to a whole lot of people dealing with different people on different accounts. I can't say exactly what account or specifically who I -- who I actually spoke to now during that time because I don't remember.
Q. Well, if you made a call --
A. Do you understand what I'm saying?
Q. If you actually made a call, that would be reflected in the phone records, correct?
A. Correct.
Q. And that's all tracked by the company, correct?
A. It's tracked, whatever -- whatever we put in the system, yes, it's in the system.
Q. And telephone calls are automatically tracked and there's a log of telephone calls



that you make, correct?
A. Correct. I guess that's how they do it. I'm not --
Q. And the pages that follow are a list of telephone calls that were made by you on November 11, 2009, correct?
A. I guess.
MR. VANCE: Don't guess. If you don't know, you don't know.
THE WITNESS: I mean, I can't really say. Because, like I said, the system, you know, sometimes the system has glitches in it, too. I don't know. I can't really tell you.
(Document marked Exhibit Shepperson 3 for identification.)
BY MR. MCGEE:
Q. Let me show you what's been marked as Shepperson Deposition Exhibit 3. That's the charge of discrimination that you filed with the Delaware Department of Labor?
A. Uh-huh.
Q. You need to give an audible response.
A. Yes.

Q. The Delaware Department of Labor informed you that they investigated it and did not believe that there's any merit to your claim of discrimination, correct?
A. Correct.
Q. Do you know of any African American, black employee that Sherri O'Connell discharged?
A. That she let go?
Q. Yes.
A. Yes, it was me, Jason, it was another employee but I don't remember her name.
Q. Well --
A. It was --
Q. You don't know what, if any, role Sherri O'Connell had in the decision to end your temp assignment; do you?
A. I'm just going by if she was the one -- she's the supervisor and she was the one that, you know -- I mean, it could have been responded from manager to her to let us go.
Q. But you don't know; do you?
A. No, I don't.
Q. You don't know who made the decision



to end Jason Scott's work assignment; do you?
A. No, I don't.
MR. MCGEE: I don't have any other questions at this time. But I do want to at least leave this open subject to you producing the documents that are required by the subpoena.
THE WITNESS: Okay.
MR. MCGEE: And you'll go home tonight and look for those and then send those to me?
THE WITNESS: Yes.
BY MR. VANCE:
Q. Ms. Shepperson, I'm Robert Vance. I represent Jason Scott in this lawsuit. I just have a couple of questions to clarify a few things in your testimony. On September 9 -- I'm sorry -- September 11, 2009 when you heard Sherri O'Connell make the derogatory statement about Mr. --
MR. MCGEE: Excuse me. What date did you say?
MR. VANCE: September 11, 2009.
BY MR. VANCE:



Q. When you heard Sherri O'Connell make the derogatory statement about Mr. Scott, did you know what time Mr. Scott was scheduled to start work that day?
A. I think it was between 7:00 and 7:30, I believe, the same time.
Q. And you testified that if your -- on that particular day in question when you heard Ms. O'Connell make that statement that you were sitting in your cubicle but if you were standing in your cubicle you would have been able to see over the wall. Do you recall saying that?
A. Yes.
Q. How tall are you?
A. Five, six. I mean, if I stand in the cubicle, I can see over -- see somebody standing.
Q. And do you have the statement in front of you, which is Shepperson 1, the July 26, 2011 statement; do you have that?
A. Uh-huh.
Q. In the third sentence you say, all of my other co-workers had left to go to lunch.



Do you see that?
A. Uh-huh.
Q. That's yes, right?
A. Yes.
Q. I believe you had testified you weren't sure -- you thought they were either in the break room or somewhere else, correct?
A. Right.
Q. Why did you say in the statement that they had gone to lunch?
A. Like I told him, they were probably in the break room at the time. They probably was in the break room eating.
Q. Is that where you all typically ate your lunch?
A. Yes, either there or go out. But that's where we ate our lunch.
Q. And if you also look at your statement, further down you say -- the sentence reads, well, Mrs. O'Connell was telling Terri that she knew that Jason was late coming in and that he was lying about already being in the building that morning?
A. Correct.

Q. Did I read that correctly?
A. Yes.
Q. And then when Mr. McGee examined you, you said that you did not recall Ms. O'Connell saying that Mr. Scott had been lying about being in the building that morning. Do you recall testifying --
A. Yes.
MR. MCGEE: Objection. Objection to the form of the question. Objections to the mischaracterization of the prior testimony.
BY MR. VANCE:
Q. You can answer the question.
A. Yes. That's --
Q. Let me ask the question. Why did you write in the statement that Mrs. O'Connell was telling Terri that she knew that Jason was late coming in and that he was lying about already being in the building that morning?
A. Because that's what I heard. That's what I did heard. I mean when --
Q. Mr. McGee?
A. When Mr. McGee was asking me, you



know, I was really thinking, trying to think about what else I heard her say. And that's what she did say. She did say that, that he was lying about coming in, being late, and not being late.
Q. This sentence is accurate?
A. This is accurate, yes. I'm sorry. I apologize for that.
Q. That's perfectly okay. Now, you also wrote in the next sentence, then this is when Mrs. Sherri O'Connell said that's why I hate faggots. Did I read that correctly?
A. Correct, yes.
Q. And is that accurate?
A. Yes.
Q. Is that what you recall her saying?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. Do you recall her saying anything after that?
A. No, I don't recall her saying anything after that. Like I said, that's when Mr. Kirk came to my cubicle and that's when he was like



did you hear that. That's all I heard her say.
Q. And you testified that Kirk Slaughter came to your cubicle and said did you hear that?
A. Uh-huh.
Q. Yes, correct?
A. Correct.
Q. Then you testified that you saw him sometime after that at a post office in Newark, Delaware, correct?
A. Uh-huh.
MR. MCGEE: Objection to the form of the question.
BY MR. VANCE:
Q. Is that correct?
A. That's correct.
Q. And that on that occasion at the post office in Newark, Delaware he referred back to what he had discussed with you that you had written in your statement here, correct?
A. Correct.
MR. MCGEE: Object to the form of the question.
BY MR. VANCE:



Q. Did you have any conversation with Mr. Slaughter about what he told you he had heard Ms. O'Connell say after you saw him at the post office in Newark, Delaware?
A. Did we discuss that?
Q. Yes, after, at any day after, at any point after?
A. Oh, no.
Q. So it was just on the day that it happened and then at the post office?
A. Right.
MR. VANCE: I don't have any other questions for you. Thank you very much.
BY MR. MCGEE:
Q. Ms. Shepperson, how long after Sherri O'Connell made that alleged statement was it that Kirk Slaughter came to your cubicle?
MR. VANCE: Objection; asked and answered. You can answer the question.
THE WITNESS: Not too long after. I think at that point Sherri had left and that's when he came around to my cubicle.
BY MR. MCGEE:
Q. How long after you heard that

statement --
A. I would say --
Q. -- was it that Mr. Slaughter came to your cubicle?
MR. VANCE: Objection; asked and answered.
THE WITNESS: A couple of minutes after that.
BY MR. MCGEE:
Q. By that time Sherri O'Connell was gone?
A. Right, correct.
Q. Was Terri still in her cubicle?
A. I believe so. Like I said, I didn't see Terri because she was sitting down.
MR. MCGEE: I just ask that you produce those documents for me. I'll give you a card and you can scan them and e-mail them to me.
THE WITNESS: Okay.
(Witness excused.)
(Deposition concluded at 7:07 p.m.)



CERTIFICATE

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

------------------------
Dolores M. Horne
Dated: January 10, 2012

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)



------
LAWYER'S NOTES
------

| PAGE | LINE | CHANGE |
| --- | --- | --- |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |

# Exhibit 28

1

IN THE UNITED STATES
DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

JASON SCOTT ) NO. 10-929-JCJ
)
- vs - )
)
UPS SUPPLY CHAIN )
SOLUTIONS )

Oral Deposition of MYRON GIDDENS, held at One Rodney Square, 920 North King Street, Wilmington, Delaware, on Monday, May 9, 2011, at 9:39 a.m., before Dolores M. Horne, Professional Reporter and Notary Public, in and for the Commonwealth of Pennsylvania.

ESQUIRE DEPOSITION SERVICES
1600 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
215-988-9191

2

APPEARANCES:

THE LAW OFFICES OF RONALD G. POLIQUIN
BY: RONALD G. POLIQUIN, ESQUIRE
48 The Green, Second Floor
Dover, Delaware 19901
(800) 811-5182
ron@ronpoliquin.com
Attorneys for the Plaintiff

JACKSON LEWIS, LLP
BY: EMMETT F. MCGEE, JR., ESQUIRE
2800 Quarry Lake Drive
Suite 200
Baltimore, Maryland 21209
(410) 415-2003
emmett.mcgee@jacksonlewis.com
Attorneys for the Defendant

3

INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| MYRON GIDDENS | | |
| | By: Mr. McGee | 5 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| | (NONE) | |

4

DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|

Request for Production of Documents

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|

Stipulations

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|

Question Marked

| Page | Line | Page | Line | Page | Line |
|---|---|---|---|---|---|

MYRON GIDDENS, after having been first duly sworn, was examined and testified as follows:

* * *

EXAMINATION

* * *

BY MR. MCGEE:

Q. Good morning, Mr. Giddens. My name is Emmett McGee and I'm an attorney with the firm of Jackson Lewis. I represent UPS Supply Chain Solutions in connection with a lawsuit that's been brought against that company by an individual named Jason Scott.

We are here today for your deposition in the Jason Scott case. You've been sworn in. You're sworn to tell the truth. Although the setting may appear to be a bit more informal than a courtroom setting, your obligation to tell the truth is just the same since you've been sworn in by the court reporter.

I'm going ask you a series of questions. You're going to need to give an audible, verbal response as opposed to the



shake of the head or a nod or something like that because the court reporter will take down everything that is said and can only take down words that are spoken as opposed to gestures.

If at any point do you not understand a question or would like me to repeat it, please speak up, and I'll try to accommodate you. Okay?

A. Yes.

Q. And if you don't tell me that you don't understand a question, can I safely assume that you do understand the question and are answering truthfully and completely?

A. I'll let you know if I don't understand something.

Q. And you will testify truthfully and completely?

A. Yes.

Q. If you want to break at any time, let me know and I'll try to accommodate you there as well.

A. All right.

Q. Have you ever had your deposition taken before?



A. No.

Q. Have you ever been involved in any lawsuits before?

A. No.

Q. Have you ever sued anybody?

A. No.

Q. Have you ever been sued?

A. No.

Q. Have you ever been a witness in any case?

A. No.

Q. Are you currently under the influence of any medication or drugs?

A. No.

Q. Do you currently have prescribed for you any medication or drugs?

A. No.

Q. Have you had occasion to see a doctor within the last year?

A. Have I seen a doctor within the last year?

Q. Yes.

A. Yes.

Q. For what?



A. I don't chose to go into details of why I went to a doctor. I visited a doctor. I have a primary care physician. I've seen him this year and that's it.

Q. Who is your primary care physician?

A. Dr. Bonner.

Q. Pardon?

A. Dr. Bonner.

Q. Where is he located?

A. He's located on Kirkwood Highway in Wilmington, Delaware -- no. Dr. Harrison, I'm sorry, Dr. Harrison is my doctor.

Q. Who is Dr. Bonner?

A. Dr. Bonner was another doctor I had years ago. I don't know why his name popped up in my head like that.

Q. Have you ever been -- have you ever consulted a psychiatrist or psychologist, a counselor or other mental health provider?

MR. POLIQUIN: I'm going to object. You can answer the question.

THE WITNESS: I don't choose to answer that one. I'm not going to answer that.

BY MR. MCGEE:

Q. You're under an obligation to answer the question, Mr. Giddens.
A. Can you ask the question again?
MR. MCGEE: I'll have the court reporter read it back.
(Whereupon the court reporter read back the record as requested.)
THE WITNESS: It has been recommended.
BY MR. MCGEE:
Q. Who recommended it?
A. My doctor.
Q. Who?
A. Harrison.
Q. What is Dr. Harrison's first name?
A. Scott Harrison.
Q. What kind of doctor is Scott Harrison?
A. My primary care physician, sir.
Q. When did he recommend that you see some type of mental health provider?
A. Within maybe about four visits ago he recommended that. I'd have to look at my paper work.
Q. What year?



A. I would say it was in 2009 -- 2010.
Q. And why did Dr. Harrison recommend that you see some type of mental health provider?
A. Because I was having panic attacks and anxiety issues.
Q. What was the cause of those panic attacks and anxiety issues?
MR. POLIQUIN: I'm going to object to this line of questioning but you can still answer it.
THE WITNESS: I felt it was from my job.
BY MR. MCGEE:
Q. What job?
A. The job where I worked for UPS, sir, at UPS Supply Chain Solutions at 200 Biddle Avenue in Baer, Delaware -- Newark, Delaware.
Q. What about your job do you believe caused you to suffer panic attacks or anxiety issues?
A. I believe it was pressure from my supervisor and upper management.
Q. What kind of pressure?



A. Unjust pressures.
Q. Who was your supervisor?
A. Nadine Ruling was my supervisor.
Q. Who in upper management do you believe caused you to suffer panic attacks or anxiety issues?
A. Nadine Ruling.
Q. Anyone else?
A. She was my immediate supervisor. She was the one that dealt with me on a one-on-one basis.
Q. Did anyone else do anything to cause you to suffer panic attacks or anxiety issues?
A. Throughout the time, yes, I could say yes. The HR supervisor, Reba Alexander.
Q. What did Nadine Ruling do to cause you to suffer panic attacks or anxiety issues?
A. She called me a liar on several different occasions when I would bring in documentation stating facts, things of that nature.
Q. What else?
A. I had an emergency situation at one



point where my father was hospitalized, and I called her and stated that I would not be able to come in to work due to the emergency. She stated to me, well, it's not an emergency and that I would be penalized for any time that I was out, things of that nature where you're bringing in you're -- you're trying to communicate effectively to prevent chaos and it doesn't do anything but cause chaos.
Q. When did you have an emergency situation involving your father?
A. Sir, right offhand I can't recollect the actual date, sometime in 2009.
Q. What was the emergency?
A. He was hospitalized.
Q. For what?
A. I don't choose to give his medical condition out. I mean, that's his personal business.
Q. Where was he hospitalized?
A. He was hospitalized in Virginia.
Q. Where in Virginia?
A. Chester, Virginia.
Q. And why did you inform your supervisor

of that?
A. I informed her because I knew and I saw ahead of time that I was going to be -- going to need to be out of work, which is my first priority, and I didn't want to cause any confusion, and I wanted to make sure that she understood clearly what was going on and that this was an emergency situation to me.
Q. And why did you need to be out of work?
A. I just told you. My father had an emergency situation where he was hospitalized. That's the reason.
Q. And why -- how did that affect you and your attendance at work?
A. I only have one father. And when things like that happen with me and my father, son relationship, we're there for one another, whether it's financially as a support system, someone to talk to or lean on or just be there to help him with any ailment or anything he needed help with.
Q. Did you go to the hospital?
A. Yes.



Q. And how much time did you spend at the hospital?
A. I don't recall exactly how long I was there. It was an emergency procedure in the beginning, which later on as they diagnosed what it was, it was not as -- I mean, they found a remedy for it. So it wasn't as extreme as initially not knowing what the cause or what's going on with someone.
Q. How much time did your father spend in the hospital?
A. I think it was a day in the hospital.
Q. Did he spend the night in the hospital?
A. He spent a day, a full day in there.
Q. Did he spend the night in the hospital?
A. I went there the one time. I don't know -- I don't believe he spent the night in there, no, sir.
Q. Now, you also mentioned that Nadine Ruling called you a liar when you brought some documents in?



A. Yes. One time I recall bringing in a doctor's note for being out of work by request of my doctor. And she advised me I was playing a deadly game, and that she didn't like it and that I knew what I was doing and she didn't believe that this was true, whatever the situation was at that time, as far as the doctor's note. She said she didn't believe it and that I was a liar and I was playing a deadly game.
Q. When did that occur?
A. Sir, it's kind of hard for me to remember the exact dates when so many different situations arose with her micro managing my life, as far as an employee there. So I can't recall the dates.
Q. Who was the doctor that provided you with --
A. Same doctor, Dr. Harrison is my primary care physician.
Q. Did you have to miss work at that point in time?
A. Yes, it was recommended by him that I be out of work.



Q. What was the issue or medical problem at that time?
MR. POLIQUIN: Objection.
THE WITNESS: I have a condition, a medical condition.
BY MR. MCGEE:
Q. What is that?
A. It deals with like allergies and sinuses. It's called sinusitis. It flares up. Certain times of the year it's more extreme than others.
Q. When it flares up, what happens?
A. Just a very uncomfortable situation.
Q. What happens?
A. I mean, there's continuous sneezing, there's red eyes, itchy throat, just something that's not really comfortable at all.
Q. What causes it to flare up?
A. Allergies.
Q. What are you allergic to?
A. Different pollens in the air, depending on the season. It could be dust mites. I don't know. Whatever it was, it was acting up at that time.

Q. Has it never been determined or analyzed what you're allergic to?
A. No, it has not, not as of yet, no.
Q. So you and your doctors don't know what you're allergic to?
A. Something outside or something with the air at certain times a year, sir. I don't know.
Q. Have you ever been prescribed any medications to deal with that?
A. Yes, he prescribed medication for it on a number of occasions.
Q. Do you currently have any --
A. No.
Q. -- medication?
A. No.
Q. If you will just let me finish asking the question so the court reporter can take down and everything is clear and I'll in turn try to allow you to answer before I ask the next question.
Are you currently prescribed any medication?
A. I've answered that question once



before. Refer back to that answer.
Q. What is the answer?
A. Didn't you ask me in the beginning of this conversation was I on any medication at the time of this interview? And I answered no. It's the same answer, sir.
Q. Do you currently have prescribed for you any medications?
A. I've answered -- I've already answered that question.
Q. When was the last time that you had any medication prescribed for you?
A. It's been -- I can't recall. It was within 2010, 2009 I had been prescribed at some point.
Q. What was that --
A. Not -- yes, it was anxiety medication that was prescribed at one point and antibiotics that was prescribed at some point.
Q. Who prescribed the anxiety medication for you?
A. My doctor gave me a dosage until I went to the counselor that he had referred me



to.
Q. What doctor prescribed the medication for you?
A. Dr. Harrison.
Q. And what counselor did you see?
A. I never said I saw a counselor.
Q. Have you ever seen a counselor?
A. No, I have not.
Q. Have you ever consulted a counselor?
A. I've got the information he gave me. He read up -- I read up on it. I didn't go forward because I didn't really have insurance to pay for it at that time. So I -- the financial burden was a little bit too much for me.
Q. Have you ever spoken to or consulted any psychiatrist, psychologist, counselor or other mental health provider?
A. As of now, no.
Q. What is your current address?
A. 1501 Linden Street, Wilmington, Delaware.
Q. How long have you lived there?
A. Three years.



Q. Who do you live with?
A. I live with myself right now.
Q. Have you ever lived with anybody at that residence?
A. Yes.
Q. Who?
A. My -- it was my fiancee. Her name was Sabrina.
Q. What's her last name?
A. Meauhead, M E A U H E A D.
Q. Are you still engaged to be married to her?
A. Yes, we're working on some things.
Q. Where does she currently live?
A. She lives in Newark, Delaware now.
Q. Where in Newark?
A. Off of Route 273.
Q. Where does she work?
A. Barkley's Bank.
Q. Where?
A. In Newark.
Q. Where in Newark?
A. Off of 273.
Q. During what period of time were you

living with her?
A. Up until I lost my job in January of 2000 -- January 15, 2010.
Q. How long have you been living with her?
A. Before that we were living together for approximately 15 years.
Q. Why did you stop living together?
A. From what I understand of it, it was because of the amount of stress that I was under from my job and actually losing a job. It all went down in a spiral. First it was the job, then it was my relationship.
Q. Have you ever dated anybody else since January 15, 2010?
A. No. Can I ask a question?
MR. POLIQUIN: You're here to answer questions, not ask questions.
BY MR. MCGEE:
Q. Are you currently employed?
A. No.
Q. Have you worked anywhere since January 15, 2010?
A. No.



Q. Why not?
A. I haven't been able to find gainful means of employment.
Q. What efforts have you made to find a job?
MR. POLIQUIN: Objection to the question.
THE WITNESS: What efforts have I made? I signed up on Career Builders, Monster dot com. My resume is out there. I've applied for countless numbers of jobs. There just hasn't been anything that has come to -- anything that has come to surface as far as employment as of now.
BY MR. MCGEE:
Q. Have you ever been treated for alcohol or drug addiction?
MR. POLIQUIN: Objection. You can answer the question.
THE WITNESS: Yes.
BY MR. MCGEE:
Q. When?
A. It was in the past. It was sometime when I was younger. It wasn't within the last



seven years.
Q. What type of treatment did you receive?
A. Alcohol, AA meetings.
Q. Do you still go to those meetings?
A. No, sir. I said this wasn't within the last seven years.
Q. Are you currently abusing alcohol?
A. No.
Q. Are you currently using any illegal drugs?
A. No.
Q. When was the last time that you used illegal drugs?
A. I have no recollection of that, sir. I don't know when the last time was. It was -- it wasn't within the last five years.
Q. Have you ever been married?
A. No.
Q. Have you ever been engaged to anyone other than --
A. No.
Q. -- Ms. Meauhead?
A. No. Meauhead.



Q. Meauhead, excuse me. Do you know Jason Scott?
A. Yes.
Q. How do you know him?
A. I've worked with him at a number of jobs in the past.
Q. What jobs have you worked with him at?
A. I worked with him at JP Morgan Chase Bank and UPS.
Q. When you say UPS, are you referring to UPS Supply Chain Solutions?
A. Yes.
Q. Now, I'll refer to that business as either Supply Chain Solutions or SCS.
A. Okay.
Q. For how long had you and Mr. Scott worked together at JP Morgan Chase?
A. I was there for a term of five years. I think I recall working with him at least two years of the time.
Q. What was his job?
A. He was a collections representative.
Q. What was -- strike that. During what

period of time were you employed by Supply Chain Solutions?
A. From 2008 until 2010.
Q. During the period that you were employed by Supply Chain Solutions, did you have any daily contact with Mr. Scott?
A. I wouldn't say daily. I mean, we worked in the same building. I seen him probably two, three times a week. I mean, I can't say that I saw him every day. He was in a different department.
Q. What department was he in?
A. I believe he was in Bracco. I was in Convatec and he was in Bronco or Genzime.
Q. Where in the building was your work area during the time that Mr. Scott worked there?
A. It's two different places because they switched floors. So one time it was upstairs and one time it was downstairs. My office was upstairs and then one time it was downstairs.
Q. At the time that your office was upstairs in the building, where did Jason Scott work?



A. Downstairs.
Q. When -- and at some point did your -- you work in a cubicle?
A. Yes.
Q. At some point did your cubicle change, the location of your cubicle change from upstairs to downstairs?
A. Yes, sir.
Q. When did that occur?
A. I don't recall the actual date that it occurred. But when the change took effect, it was -- I recall it was a Friday where everyone had to switch, move their -- change their desk from upstairs to downstairs. And the ones downstairs had to change their desk to upstairs.
Q. And did Mr. Scott change his location on that same day?
A. Yes.
Q. You moved from downstairs --
A. No.
Q. You moved from upstairs to downstairs, he moved from downstairs to upstairs?
A. Yes, sir.



Q. What was your regular -- and I want to focus in on the time of this office change or the office location change. What were your regular work hours at that time?
A. It was either from 8 o'clock to 4:30 or it was 8:15 to 4:45. They're the only two shifts I ever worked when I was there.
Q. Do you recall what your shift was at the time that you moved your cubicle from upstairs to downstairs?
A. It may have been from -- I think it was 8 o'clock -- 8:15 to 8:45. I believe that was my time.
Q. How did that move take place?
A. How did --
Q. Did you physically move things?
A. Uh-huh.
Q. You did?
A. Yes.
Q. And when did you start moving things?
A. That day that we reported to work on -- it was a Friday. Everybody was -- when they came in -- you know, it had been posted



all week through memos and things, office memos that there was going to be a move on Friday. When the move came on Friday, we was instructed when we came in to just go to our assigned, you know, desk, get with your supervisor to find out where your new desk is going to be. From that point on, clear your computer on your desk -- not the monitor but the CPU and all of your personal belongings and whatever and take it with your chair and move it downstairs.
Q. Did you know where you were going be moving before that Friday morning?
A. I recall, yes, I did.
Q. How did you know where you were going to be moving?
A. Like I said earlier, we were given instructions on the move on that Friday. They gave memos and things of that nature. And my supervisor had communicated to each one on our team what area we was going to be sitting in downstairs and what seats that she wanted us to go to. So I had a pretty good idea of where I was going to be at and where I was going to be seated.

Q. Did you know specifically where your cubicle was going to be at any point prior to coming to work that Friday morning?
A. I can't recall. I can't recall if I knew exactly where I was going to sit or if she told me that day.
Q. Did you move anything to your new cubicle prior to that Friday morning?
A. No. But I had things packed up at my desk and ready to go.
Q. When did you pack up things?
A. Throughout the workweek.
Q. Did any of your team members do any moving on Thursday?
A. Not that I was aware of.
Q. And did anybody from downstairs move upstairs on Thursday?
A. No. They had already communicated that we couldn't do that until Friday.
Q. Take me through, if you will, that Friday from the time that you came to work? Where did you go when you came to work that Friday morning?
A. I located my supervisor.



Q. Who was that?
A. Nadine Ruling. And I asked her questions on, you know, how -- what she needed me to do and what was the procedure going to be and she's like, you know, just get your stuff and gave me where to go. And that's what I did.
Q. Where did you -- what location in the building did you first report to that morning?
A. Upstairs because that's where I was at.
Q. Your old cubicle?
A. Right.
Q. Is that where you saw your supervisor?
A. I either saw her there or at the new -- downstairs at the new -- she might not have been at her desk when I went up there, when I reported to work that day. She might have already been down in the new area where we was moving at, one or the two.
Q. What time did you report to work that day?



A. It was between 8:00 and 8:15.
Q. When did you first see Nadine ruling that day?
A. Between 8:00 and 8:15.
Q. How many trips did you have to make to move your belongings from upstairs to downstairs?
A. There was a lot of commotion. I probably went three or four times with my stuff. But there was elderly women and things like that that were within the upstairs. Some of them may have asked me, Myron could you move this for me and things like that. So it's a lot of movement that day.
Q. Were you the only one in the upstairs work area when you were moving or were there other people there, also?
A. There was other people there.
Q. How many other people were in the area?
A. A whole department fill of people, sir.
Q. Approximately how many people?
A. Upstairs maybe 30 to 40 people.



Q. What time did you get settled in your new work location or new cubicle downstairs?
A. I couldn't say that I got settled before 12 o'clock. It was a lot of helping other people and getting my stuff down. It could have maybe took me ten or 15 minutes to do my stuff but just helping others and getting settled in. It was --
Q. Did you actually move your own computer from upstairs to downstairs?
A. Yes, sir, and a chair.
Q. And how did you move those things?
A. Just put it in the chair. They had rolling chairs. I put all my stuff in boxes, maybe three or four boxes and a CPU, rolled your chair to the elevator and go down the elevator and roll it to your new spot where you're going to.
Q. Did you move your computer monitor as well?
A. No, sir.
Q. Did anyone move your computer monitor or was that left in your old cubicle?
A. That was left in my old cubicle.

Q. And did you then just use the computer monitor that was already in your new cubicle?
A. Yes, sir.
Q. What time did you log on to your computer that day?
A. I don't know. I have no idea when I logged on.
Q. Did you have to record your work hours in any way?
A. My supervisor pretty much took care of that for the day for everybody, you know, as far as when they got there and things of that nature. We couldn't really do anything because everything was pretty much --
Q. What was the normal procedure for recording your work time?
A. You would go to your desk and clock in when you get there.
Q. How do you do that?
A. Through the system.
Q. The computer system?
A. Through the computer system, yes, sir.
Q. Did you do that on that Friday



morning?
A. I can't recall that day if I actually entered my time in or was I advised to -- by my supervisor that she knew the time that everyone was in and she would just put it in there. I can't recall that.
Q. Did you see Jason Scott that Friday morning when you were moving from upstairs to downstairs?
A. I did. I saw him throughout the move. I did see him.
Q. Where you did you first see him, if you recall?
A. Yes, I recall seeing him that day. And I first saw him upstairs when he was to his new desk.
Q. Where specifically was he when you saw him?
A. At his new -- in the area of his new desk.
Q. Was he inside the cubicle or outside the cubicle?
A. From what I recall, he was outside of the cubicle.



Q. Was he wearing a rain jacket or any kind of jacket at all when you saw him?
A. I do remember it raining that day. Yes, I think he did have one on.
Q. Was he still wearing the jacket when you saw him?
A. I don't know. I don't know if he had it on or what. I just asked him how did he like his new spot, and he gave me some answer that I didn't agree with, and I kept it moving.
Q. What answer did he give you?
A. I think he stated like what's the big deal, it's just a desk, something of that nature.
Q. How much time did you spend speaking with Mr. Scott?
A. Probably two, three minutes.
Q. What else did you discuss that morning?
A. Nothing because, you know, with the answer that I got, he gave me the impression that he didn't feel like -- he didn't really want to be bothered. So I didn't --



Q. What did you discuss for two or three minutes?
A. Hey, how do you like your new desk, you know, good morning or what's up, Jason, how do you like your new desk. This is with me going one way and stopping there for a brief minute. And he said what's so good -- what's the big deal about it. It's just a new -- it's just a new -- it's just a desk or something like that. And, I mean, maybe it was a minute or two. Maybe it wasn't two or three minutes. Maybe it was just a minute or two.
Q. Did you see Mr. Scott any more that day?
A. I can't say that I -- maybe going out of the building at lunch time or something like that.
Q. Do you know what time it was when you first saw Mr. Scott that day?
A. Yes. It was fairly early. It was -- from what I can recall it was 8:00 -- between the time that I was there, which was between -- I would say between 8:15 and 8:45 I saw him.
Q. How do you know that it was in that

range?
A. Because I got to work between 8:00 and 8:15. I saw my supervisor. She advised me what to do as far as getting the change and that's when I saw him.
Q. Did you see Mr. Scott before or after you first spoke with your supervisor that morning?
A. It was after.
Q. Did you see Mr. Scott before or after you made your first trip downstairs that morning?
A. I took one trip downstairs, came back up. That's when I saw him.
Q. When was the last time that you spoke with Jason Scott?
A. Maybe a week or two ago.
Q. Was it a telephone conversation at that point?
A. Yes.
Q. Who initiated that?
A. I believe he called me.
Q. Did he say why he was calling you?
A. Yes, to see what I was doing that



weekend.
Q. Do you typically socialize with Mr. Scott?
A. No. I mean, he's a friend. I have his number. He has my number. I mean, every once in a while I'll give him a call and see how he's doing. That's basically it.
Q. Have you ever dated Mr. Scott?
A. No, sir.
Q. Have you ever been together with him outside of work?
A. Yes.
Q. What occasions?
A. I don't know about occasions. I think I seen -- I know I saw him one time in a Del State homecoming, the homecoming and I seen him at a club.
Q. What club?
A. I think it was called Fire and Ice or something like that.
Q. Where is that located?
A. In Dover, Delaware.
Q. On this last occasion when you spoke with Mr. Scott after he called you, what did



you talk about?
A. Basically asked me how was my job search going. I advised him on, you know, what I'm looking for and how I'm still diligently searching, seeking work. He asked me what I was doing for that weekend. I advised him what I was doing and -- I advised him what I was doing. That was pretty much it, pretty much it.
Q. Did you talk about the fact that you're going have to your deposition taken in this case?
A. No.
Q. Have you ever spoken to Mr. Scott about the fact that you were going to have your deposition taken in this case?
A. I haven't spoken to him about this deposition, no.
Q. Have you ever -- have you spoken to Mr. Scott at all about his lawsuit against Supply Chain Solutions?
A. No.
Q. When was the most recent time that you've had any communication with Mr. Scott



prior to that last telephone conversation that you just told me about?
A. I don't know, sir. He's a friend of mine that occasionally calls, checks up on me, sees how I'm doing. If he has any helpful information, as far as finding employment, he gives it to me, small talk, nice day outside, blase, blase, this -- that's pretty much it. As far as an actual last time -- I said I communicate with Jason -- maybe sometimes I'll speak to him within a 30-day period, sometimes I will not.
Q. What is your cell phone number?
A. 302-607-5574.
Q. Who is your service provider?
A. Actually, technically, I don't have a cell phone. I don't own a cell phone. That's the number for me, but I don't own it.
Q. Who owns it?
A. My sister.
Q. What's her name?
A. Her name is Tynisha, T Y N I S H A.
Q. What is her last name?
A. Widgeon.

41

Q. Where does she live?
A. She stays in Newark.
Q. Where in Newark?
A. Fairway Road.
Q. Does she work?
A. Right now she goes to school.
Q. Where does she go to school?
A. Goldey Beacom.
Q. What kind of school is that?
A. It's a college for kids to go to for -- I don't know. I don't know what their curriculum is there. I don't know.
Q. It's a college?
A. It is a college.
Q. Where is that located?
A. In Pike Creek, Delaware.
Q. What is your e-mail address?
A. What is my e-mail address?
Q. Yes.
A. MG dot Giddens at Yahoo dot com.
Q. Have you ever had any e-mail communication with Mr. Scott?
A. Not that I recall, can recall.
Q. You mentioned that you had seen Mr.

42

Scott at a Del State homecoming?
A. Yes.
Q. Where was that?
A. At the Del State homecoming.
Q. Was that --
A. It wasn't at -- it was at the casino. That's where the club was at.
Q. Dover Downs?
A. Dover Downs casino.
Q. Are you a Del State grad?
A. No, sir.
Q. Were you at the homecoming event?
A. I was in that vicinity for the festivities, yes.
Q. Why were you there?
A. Hanging out, man, just hanging out.
Q. Are you a college grad?
A. No, sir.
Q. Have you attended any college?
A. No.
Q. Did you graduate from high school?
A. Yes, sir.
Q. What year?
A. 1992.

43

Q. From what high school?
A. Nandua High School.
Q. Where is that located?
A. Onley, Virginia.
Q. When was the Del State homecoming event where you saw Mr. Scott?
A. It was during the summer -- no, it wasn't. When the normal homecoming is. I don't know what the actual dates are.
Q. What year?
A. It was in '09 when I saw him.
Q. Was Mr. Scott still working at Supply Chain Solutions at that time?
A. I do not believe he was.
Q. Were you still working there at that time?
A. I was, yes.
Q. Did you have any discussion with Mr. Scott about his employment or his situation at Supply Chain Solutions?
A. Briefly that night I think I did. It was basically, you know, what happened because I hadn't seen him. And it was -- he said he got fired.

44

Q. What did he tell you about that?
A. He didn't want to get into it.
Q. What did you say to him?
A. I said, oh, you did. And that was it. He wanted to talk about something else, so I didn't push the issue. I figured that he didn't want me to really know.
Q. Did he say anything to you about the circumstances of his departure?
A. No, sir.
Q. Did you ask him any questions about that?
A. No, sir, I did not probe. It was something that he -- it was something that he -- I asked him a question about it. I said -- I heard -- he told me he got fired. At that point he didn't choose to go into any more discussion or conversations about it, so I left it at that.
Q. Was that the first time that you had spoken to him since he left work?
A. Yes, that was.
Q. Have you at any time spoken to --
A. Excuse me. Can I take a break for a

minute?
Q. Absolutely.
(Whereupon a break was taken.)
BY MR. MCGEE:
Q. Mr. Giddens, when did you first find out that Mr. Scott was no longer working at Supply Chain Solutions?
A. Probably the week, you know, when he got fired. They probably made an announcement. They usually announce when someone is not going to be with SCS no longer so that way if we see them lurking around on the premises, you know, we don't open the door for them or anything.
Q. Do you know who made the decision to end Mr. Scott's assignment at Supply Chain Solutions?
A. I have no idea about that type of stuff, sir. I wasn't in management.
Q. Do you know why his assignment was ended?
A. I don't know.
Q. Have you ever discussed with Mr. Scott why his assignment was ended?
A. Sir, his termination wasn't something



he wanted to discuss. And, again, I never pushed the issue. You know, he never really told me anything about it.
Q. Have you ever discussed with anybody else anything about the ending of Mr. Scott's work assignment at Supply Chain Solutions?
A. Sir, there's cooler talk and break room talk when it first happened of course within the break room and at the water cooler. I can't recall actual persons that I may have spoken to in regards to it. But did you hear about Jason and why he got fired. I mean, nothing concrete, just words amongst people in the office.
Q. What was the water cooler talk that you heard?
A. That he was fired due to the fact that his supervisor didn't like him because he was gay.
Q. Where did you hear that?
A. Within the break room or within the -- by the water cooler, you know, within the office talk.
Q. Who said that?



A. Like I said, I can't recall. It was groups of people talking at one time on smoke break. You know, I can't pinpoint any one person that I actually spoke to about it. I don't recall the name of them or anything like that.
Q. Did you ever say anything to anybody about the reason or circumstances of Mr. Scott's departure?
A. No.
Q. Did you ever discuss this water cooler talk with Mr. Scott?
A. I think at the time when I actually saw him in Del State I may have said I heard that you, you know, that you was fired and that was it. But he didn't push the issue and didn't want to talk about it, so I left it at that.
Q. Did you say to Mr. Scott that you heard that he was terminated because he's gay?
A. Yes.
Q. And you think --
A. I said that -- I may have said that



and something to the effect of that your supervisor was out to get you because you were gay.
Q. And you think you might have said that to him when you saw him at the Del State reunion?
A. Yes, homecoming.
Q. Homecoming, excuse me. What did Mr. Scott say about that?
A. He said he had heard that, too. But he didn't push it. He didn't push it. So I didn't, you know -- there's invisible boundaries that I just won't cross with just people in general. I mean, if -- I feel like if it's something that they want me to know, they'll tell me. I don't probe and pick to get -- I mean, it's not like he was my girlfriend or any -- or my family or anything really to do with me. So I didn't probe.
Q. Who was Mr. Scott's supervisor?
A. I think her name was Sherri.
Q. Did you know her?
A. I worked with her, yes. I knew her.
Q. What was her last name?

A. I can't remember her last name. Is it McDonald? I don't know.
Q. Was she ever your supervisor?
A. No -- maybe when my supervisor wasn't there or something of that nature but, no, I never worked for her.
Q. When you said that you worked with her, what did you mean by that?
A. Meaning that if there was a situation where my supervisor wasn't there and she covered for my supervisor and, you know, was watching over our team or something like that. That's what I meant.
Q. Did that ever happen?
A. Yes.
Q. How often did that happen?
A. Only once or twice that I can recall the supervisor wasn't there.
Q. Did you ever speak with Sherri, whatever her name was?
A. Yes.
Q. And what was the nature of your discussion with her?
A. I mean, work related, something



involving work or what we were supposed to do or a question or something that may have needed answered in regards to my work. I believe once or twice I may have went to her.
Q. Did you ever have any conflict with her?
A. No.
Q. Do you know anything about her relationship with Jason Scott?
A. No.
Q. Did you ever talk with Mr. Scott about his relationship with her?
A. Never really -- I mean, he never said anything to me about her. I mean, even when he was there working, so, no, no.
Q. Did Sherri ever do or say anything to you to suggest that she was out to get Mr. Scott in some way?
A. Not to me, sir.
Q. Did anyone tell you other than this -- what you call this water cooler talk, did anyone else ever tell you that Sherri was out to get Jason Scott in any way for any reason?
A. No.



Q. What are you looking at, Mr. Giddens?
A. I was just looking over here.
Q. You're looking at Mr. Poliquin's computer screen?
A. Yes. I looked over there.
Q. Why are you looking at Mr. Poliquin's computer screen?
A. Because these are my eyes and I can look anywhere I want to look at with these eyes.
Q. And what were you seeing as you looked at Mr. Poliquin's computer screen?
A. I just saw something that said Yahoo mail. That was it.
Q. Do you know what Sherri's sexual orientation is?
A. No, sir.
Q. Do you know what Jason Scott's sexual orientation is?
A. From his mannerisms and things of that nature, I thought the dude -- I thought he was gay.
Q. Did he ever tell you that he was



gay?
A. I think he was -- I think it was -- yes, I think he may have, yes.
Q. When did he tell you that?
A. I mean, at some point while we was working, working together, I mean, he may have mentioned he was gay.
Q. Do you recall him doing that?
A. I can't say that I recall.
Q. Did Sherri --
A. I was just basically going by the man's mannerisms and things of that nature. I can't recall if that guy ever told me he was gay, no. But to me it doesn't matter. Human beings are human beings. But sometimes you can see with the way that people -- you know, you can read between the lines. I looked at his eyebrows one time, and I think he had his eyebrows done or something. I mean most -- I mean, metro sexuals get their eyebrows and things like that done. But, I mean, it seems like from what I could -- I could have interpreted it just from his mannerisms and seeing, you know, details if I observed his

facial -- his hair and stuff, you know, I think it was more of a flamboyant or -- I guess you can say more it's more relevant in the gay community.

Q. What about his hair?

A. He always got it done differently.

Q. Describe for me the different hairstyles?

A. Just braids one day and one day he would have it free flowing, you know. Sometimes he had it in a big bun with the rubber band in it. That's pretty much -- I mean, from what I gathered and what I observed -- I respect the man, as I would respect any other man.

Q. Did you ever hear anyone comment or make any comment about Jason Scott's sexual orientation?

A. Other than the water cooler talk, no.

Q. What water cooler talk did you hear?

A. That his supervisor was out to get him because he was gay.

Q. And did you ever hear any talk like



that while Mr. Scott was still working at Supply Chain Solutions?

A. I didn't hear it while he was there.

Q. Did Sherri, his supervisor, ever make any comment about his sexual orientation?

A. Not to me, sir, no, sir.

Q. Did Sherri ever make any comment about the fact Mr. Scott was gay?

A. The supervisor in question, Ms. Sherri, never spoke to me about anything about Jason's sexuality.

Q. Did anyone ever tell you that Sherri had made any comment about the fact that Mr. Scott was gay or his sexual orientation?

A. Yes, it was in the water cooler talk and in the break room. It was rumored throughout the building that he was fired because he was gay, because the woman didn't like him and she didn't like gay people. That was just basic -- I don't know if you are familiar or if you have ever had a job in a corporate world -- well, I don't know if you have or hadn't. But when things happen in there from the top levels of management, it



trickles down. When people get fired or whatever, you hear little rumors from the managers just leaking information that have relationships with their employees where they feel comfortable that they can discuss, then they tell one person and they tell another and they tell another and then before you know it, everybody is -- that's the talk for that week, whatever happens.

Q. But you can't identify anybody by name who was engaged in this water cooler conversation?

A. No, sir.

Q. Did Sherri ever do or say anything to indicate to you that she knew or believed that Mr. Scott was gay?

A. No.

Q. Did Sherri ever do or say anything to suggest that she would discriminate against anybody who was gay?

A. Just from my observations, sir, and working -- working in that environment, it's easily -- easy to -- for me from just observation to identify who deals with people



on certain levels. And the impression that I got was that she could have been -- to me I -- that sounded believable to me that she doesn't like gays because just by -- from her actions and from what I observed, it was -- that's what I observed. Whether I -- from my observation and what I observed, what I thought, that she was racist. That's what I thought. I didn't deal with her like that too much. I just wanted to stand clear of her and stay out of her way.

Q. Did Sherri ever do or say anything to suggest that she did not like gays or would discriminate against gays?

A. From the actions that I observed, yes.

Q. What did she do or say to indicate to you that she didn't like gays or would discriminate against gays?

A. You know, it's just basically -- it's just -- I guess you can say 90 percent of our language, the English language is not spoken. It is with gestures, body motions and things of that nature. From what I observed with this

woman is that she had ulterior motives and that she didn't deal with -- seems like to me the only time I seen her dealing with someone black was in her office when it looked like it was something as far as being reprimanded for something.
Q. I'm not talking about somebody's race right now. I'm talking about sexual orientation. My question is did Sherri ever do or say anything to suggest that she didn't like gays or that she would discriminate against somebody because they were gay?
A. From what I observed, yes.
Q. And what did you observe?
A. Just her body language and her body gestures and things of that nature with all of the employees.
Q. What did you observe?
A. I observed facial expressions. I observed hand gestures, body gestures. And from what I was reading from that is that she didn't really -- she wasn't a diverse thinker or diversity wouldn't be something that was -- set good with her.



Q. What specific facial expressions and under what circumstances did you observe those facial expressions that it would suggest that to you?
A. Daily circumstances from working with -- being in an office and seeing these people interact with other employees throughout the day.
Q. Did you ever see Sherri interact with anybody who was gay or homosexual?
A. No.
Q. So what specifically did you observe that would suggest to you that she didn't like gays?
A. For the simple fact that I never seen her really deal with them.
Q. Anything else?
A. Body gestures and facial expressions.
Q. What facial expressions?
A. You know, like distaste or distasteful facial expressions or things of that nature, no one incident. This is just something that is over a period of time I observed.



Q. And what was the circumstances where you observed such a facial expression?
A. Circumstances was just everyday work circumstances, I mean, from passing out papers to anything.
Q. So, you think you can detect when somebody doesn't like gays just by looking at that person?
MR. POLIQUIN: Objection.
THE WITNESS: No. I never said that.
BY MR. MCGEE:
Q. So, describe for me the facial expression that you observed from Sherri that suggested to you that she did not like or might not like gays?
A. To me every time she was talking to him, she had an unpleasant look on her face.
Q. Talking to who?
A. Mr. Scott when he worked there.
Q. Did you ever see her talking to him?
A. Yes, sometimes I would see them talking.
Q. When was the last time that you saw



her speak with Mr. Scott?
A. I can't recall the last time I actually did.
Q. But you also saw her with the same type of facial expression when she was speaking with other employees; didn't you?
A. Yes, yes, yes.
Q. Did she ever make any hand gestures that suggested to you that she might not like gays?
A. No.
Q. Did she ever make any body gestures or body motions that suggested to you that she might not like gays?
A. Yes.
Q. What was the body movement or body gestures --
A. You know, from the times that I saw her conversing with him -- because it just seemed to me that she -- that it was -- she would only speak to that guy on -- from what I observed, only from what I observed, it seemed like she would only deal with him on a need to basis.

Q. What did you observe that suggested that to you?
A. Because she never really talked to the guy. It didn't seem like she talked to him outside of anything that was -- this is just my observation from the few times that I did see her interact with him.
Q. How many times did you see her interact with him?
A. Maybe two or three.
Q. Where did that occur?
A. You know, within their team and downstairs when he was in his old seat.
Q. Your work station was upstairs, right?
A. Yes.
Q. So what were you doing downstairs?
A. There could have a number of reasons why I was downstairs.
Q. I want to know what it was?
A. Faxing something --
MR. POLIQUIN: Objection.
THE WITNESS: I could have been faxing, checking interoffice mail. It could have been a number of things.



BY MR. MCGEE:
Q. Do you have a specific recollection of any particular occasion where you saw Sherri speaking with Mr. Scott?
A. No, I don't. You know, throughout work when you work in an office, you see a lot of different things. You see people interacting with one another. You see people talking with one another. Team members that are on a certain team, you see them talking to their supervisor at times.
Q. But you can't remember any occasions where you saw Mr. Scott speaking with Sherri; can you?
A. Not exactly the date. But, I mean, I can recall seeing them talk maybe once or twice. That's it.
Q. And could you hear what they were talking about?
A. No, sir, just in passing.
Q. How far away were you when you observed this?
A. Just in passing, sir. They could have been over there. I could have been walking



this way doing something else.
Q. What did you see?
A. Maybe her explaining something to him or maybe him asking her a question.
Q. I'm not asking maybe. If you don't recall what you saw, just say you don't recall. I'm not asking you to guess.
A. I don't know.
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. What did you see?
A. I seen them talking, interacting as coworkers interact.
Q. Where were they when you saw this?
A. In their team area.
Q. Where in the team area?
A. Where in the their team area? Where their team usually meets up. They used to have an ECM meeting every morning. Every team within that building --
Q. Do you have any specific recollection --
MR. POLIQUIN: Objection. Let him answer.



BY MR. MCGEE:
Q. -- of any particular occasion where you saw Mr. Scott and Sherri speak with each other?
MR. POLIQUIN: Objection. He's answered that question.
THE WITNESS: Sir, when you work in an office setting, it's common for you to see a supervisor meeting with her team and talking to individual members on her team. Everyone had an ECM meeting every morning to be briefed with anything that was going on within the company. I have seen on a number of occasions when she was meeting with her team. I seen on a couple of occasions where she maybe was talking to him one-on-one. As far as what they said, I don't know that.
BY MR. MCGEE:
Q. Tell me what you saw?
A. I saw them talking one-on-one.
Q. Is that all you saw?
A. Yes. And the other team members -- people -- first of all, the ECM meeting is in the morning time. They allot a certain amount

of time. The head of it, which is your supervisor, tells you what is going on with your team. They have a certain amount of time for it. Then after there's questions that are asked by the employees to their supervisor. So it could have been something in regards to the ECM meeting that he had just met with her about. Who knows. I don't know.
Q. Did Sherri ever do or say anything to suggest to you that she was racist?
A. To me, I can, you know -- I observe a lot. So in my observations, yes. That's from what I observed with her.
Q. Did --
A. There was a distinct click inside that place of employment that you was either a part of or you was not a part of. This click was involved with all the undermining schemes of what's going on behind the scenes, not of actually what you see and just -- from what I observed, she was a part of that click.
Q. Did Sherri ever say anything that suggested to you that she was racist?
A. She's never said nothing personally to



me, no.
Q. Are you aware of firsthand or otherwise of anything that Sherri said that indicated to you that she was racist?
A. Sir, from what I observed with the woman, my impression of her was that she was not a diverse player. She was not an out of the box thinker.
Q. I'm going to ask you later about what you observed. But right now I'm asking you about what she said. My question to you is, do you know, either from firsthand knowledge or secondhand knowledge or rumor or hearsay that Sherri ever said anything to suggest that she was racist?
A. No, I don't know, no.
Q. Did Sherri ever do anything to suggest that she was racist?
A. Not that I can recall.
Q. Who was a member of this click that you referred to?
A. Who were the members of it? Is that the question you're asking me?
Q. Yes. You referred to a click.



A. Well, it's called skirting in professional terms.
Q. Called what?
A. Skirting.
Q. What is skirting?
A. Where you have your buddy in one position, which is HR position, you have another buddy over here within the company that has direct communication outside of work and within work. They have built a friendship or whatever it may be, relationship, friendship, whatever. And what happens is this person that is in HR puts all her people or her friends into the positions that are available for, you know, lateral moves and things of that nature. And what happens is they put these people into these positions without the proper qualifications or training. Then what you have is you see all the friends have all the good positions in the company and then you have a lot of lawsuits because these friends are not qualified for the positions and haven't been trained in the positions to handle the tasks at hand. And as far as that click, I believe it



was Reba Alexander. I believe it was Nadine Ruling. I believe it was Kim Kohler, along with Brian Katz. I believe that Sherri could have been a part of that as well.
Q. What suggests to you that Sherri may have been part of that click?
A. Well, office talk was that she didn't -- she didn't like the boy because he was gay and she got rid of him.
Q. What makes -- what makes you think that Sherri may have been part of the click that you just referred to?
A. Because that click is not a diverse thinking or out of the box thinking group of people. And I believe that that is what she was a part of.
Q. What makes you believe she was a part of that?
A. Because it's obvious. If you see how she interacts with people who are gay or people of different religions or different background, different ethnicity, ethnics, they -- hey, she falls under that category from what I observed and that's what I believe.

Q. Did you ever see Sherri interact with somebody of a different race that suggested to you that she was racist?
A. Not too often.
Q. Ever?
A. Not too often, other than her team. I mean, I seen her interact with her team but outside of that I can't say I seen her interact too much with anyone outside of her color.
Q. Are you still employed by Supply Chain Solutions?
A. I don't think so.
Q. When did you -- did your employment end?
A. My employment ended, like I said, again, January 15 of 2010 I received a termination letter through the mail.
Q. Why did your employment end?
A. They stated inaccuracies, and inconsistencies in attendance. That was the reason.
Q. What would that refer to, what inaccuracies?
A. I don't know what inaccuracies because



it wasn't any inaccuracies. The time that I was out of work, each time it was documentation provided to support the reason that I was out.
Q. Were you out of work when you received this letter about your termination?
A. I was on approved short-term disability, leave of absence, sir.
Q. When did that short-term leave of absence begin?
A. In December of '09.
Q. When in December?
A. I don't remember. I don't recall the exact date, sir.
Q. Why were you absent?
A. I was out of work because I was ill.
Q. What was your illness?
A. At that time I had a relapse of the flu, sir.
Q. When did you first start to experience symptoms of the flu?
A. I don't recall the actual date, sir.
Q. How long were you absent because of the flu or relapse of the flu?
A. I don't recall actually how long I was



out, but I do know and recall that short-term disability, I believe it starts at six weeks or the max that you can be out on short-term disability is six weeks.
Q. Well, I'm asking you when did you first experience the flu or the symptoms of the flu?
A. I don't recall exactly the date, sir.
Q. And you referred to a relapse --
A. No. I had the flu. I tried to come back to work to get my strength back to come to work and I had a relapse and it just got worse.
Q. Well, explain to me what you experienced?
A. What, as far as the symptoms?
Q. Yes.
A. Just extreme body aches, hot and cold flashes, just a number of symptoms that are normally associated with the common flu.
Q. What other symptoms did you experience?
A. None other than the extreme body aches



and just fatigue, congestion, all of those type of things, sir.
Q. What else did you experience other than extreme body aches, fatigue and congestion?
A. Coughing, runny nose, stuffy head.
Q. Anything else?
A. That's it, sir, that I can recall.
Q. How did you know you had the flu?
A. I went on line and searched for the symptoms that I had and --
Q. How did you do that?
A. -- came to the conclusion that it was the flu.
Q. How did you do that?
A. Through the internet, sir.
Q. Tell me what kind of search did you do?
A. Flu symptoms, Googled it.
Q. You Googled flu symptoms?
A. Uh-huh.
Q. Pardon?
A. Yes, sir.
Q. What caused you to --

A. Just the way that I was feeling.
Q. What caused you to suspect that you might have the flu as opposed to some other condition?
A. Because I had it before.
Q. When did you have it before?
A. The flu?
Q. Yes.
A. Probably the year before.
Q. The year before -- how did you know that you had the flu the year before?
A. I went to the doctor and was diagnosed.
Q. What doctor did you go to the year before?
A. Dr. Harrison is my doctor.
Q. Are you saying that --
A. Scott Harrison.
Q. Sometime in 2008 Scott Harrison diagnosed you as having the flu?
A. From what I could recall, yes.
Q. Was your condition ever diagnosed by anybody in either December of 2009 or January of 2010?



A. Yes. I had went to the doctor.
Q. When --
A. I went to the doctor.
Q. When did you go to the doctor?
A. I don't recall the actual day when he could see me. I called him and let him know my symptoms. The nurse may have told me on the phone we won't be able to see you until this day. I went in the room. He saw me. He diagnosed me with the flu.
Q. You actually saw him, Dr. Harrison?
A. Yes.
Q. How long did you spend with him?
A. Enough time for him to do the routine check. I don't recall, maybe 30 minutes. I don't know.
Q. Was that in December of 2009 --
A. Yes.
Q. -- or January of 2010?
A. I saw him in December of 2009, and I saw him in January of 2010.
Q. When in December of 2009 did you see Dr. Harrison?
A. I don't recall, sir, the exact date.



Q. Did you make an appointment to see him in December of 2009?
A. Yes, sir.
Q. And when did you first try to schedule an appointment with Dr. Harrison?
A. I don't recall the actual date, sir.
Q. And who did you speak with to schedule an appointment for December of 2009?
A. One of the nurses that was within his office, sir.
Q. Did you know any of the nurses in his office?
A. No -- yes, I knew them when I came in to see the doctor.
Q. Did you have any friends who worked in that office?
A. No, sir.
Q. And when you came in to see Dr. Harrison in December of 2009, tell me what happened?
A. He diagnosed me with the flu.
Q. Tell me what happened?
A. He --
Q. Did he ask you questions? Did you



tell him things? How he was he able to diagnose you?
A. Sir, I -- I don't know if you -- let me explain to you about the doctor's visit.
Q. I don't want to know about doctor visits generally. I want to know about a very specific doctor's visit. That's when you saw Dr. Harrison in December of 2009. I want you to tell me what happened on that occasion?
A. I went to see my doctor, which is Scott Harrison. He performed a number of different procedures. I guess they're called procedures.
Q. Tell me what he did?
A. He checked my heart rate. He looked into my ears. He made me stick my tongue out and he stuck -- looked at the back of my throat. He put his stethoscope on and told me to breathe in and breathe out for wheezing and things of that nature. This is just from what I can recall.
Q. I'm asking you to tell me what happened when you saw him?
MR. POLIQUIN: Objection.

THE WITNESS: That's just what happened, sir.
BY MR. MCGEE:
Q. What else happened?
A. That's -- then he diagnosed me with the flu. He said you're going to need some time off, gave me my prescription and sent me on my way.
Q. What prescription did he give you?
A. Some type of antibiotic. I don't recall the actual medicine that he prescribed.
Q. But it was an antibiotic?
A. Yes, sir.
Q. Did you fill the prescription?
A. Yes, sir.
Q. Where did you fill the prescription?
A. I believe it was at Walmart.
Q. Where?
A. In Wilmington.
Q. Where in Wilmington?
A. The Walmart in Price's Corner, you can say.
Q. Did Dr. Harrison ask you any questions



when you saw him in December of 2009?
A. Yes, he asked me questions as far as how I was feeling, you know, things that would help him determine what was actually wrong with me at that time.
Q. What questions did he ask you?
A. I can't recall, sir.
Q. What did you tell him?
A. I told him how I was feeling.
Q. What did you tell him?
A. What I was experiencing.
Q. Tell me what you told him?
MR. POLIQUIN: Objection. You can answer the question.
THE WITNESS: Anything that is associated with how I was feeling at the time, sir.
BY MR. MCGEE:
Q. Had you already done the research on the internet at the time you saw Dr. Harrison in December of 2009?
A. I had Googled to find out what I was experiencing, was it similar to what the flu was.



Q. When in December 2009 did you first miss work?
A. I can't recall, sir.
MR. POLIQUIN: Objection. Does that have anything to do with Mr. Scott's case?
MR. MCGEE: Yes.
BY MR. MCGEE:
Q. Where did you spend Christmas 2009?
A. Where did I spend it, at my house.
Q. Did you spend it with your father?
A. I said at my house. My father doesn't live with me, sir.
Q. I thought you might have visited your father. You didn't visit him for Christmas?
A. No.
Q. Did you visit anybody for Christmas?
A. No, I did not, no.
Q. Was anybody else at your house for Christmas 2009?
A. My dog.
Q. Anyone else?
A. No.
Q. Did you have a Christmas dinner or Christmas Eve dinner with anyone?



A. No, sir.
Q. Did you open presents with anyone?
A. No, sir.
Q. Did you go out of your house on either Christmas eve or Christmas day?
A. I was sick, sir. I wasn't feeling good.
Q. Did you go out of your house --
A. Not that I can recall.
Q. -- on Christmas eve or Christmas day 2009?
A. Not that I can recall.
Q. Was your girlfriend or fiancee living with you at that time?
A. Yes, she was.
Q. She didn't spend Christmas Eve or Christmas day with you?
A. I can't recall, sir, if she was there or if she was not, if she wasn't there.
Q. Did you call anybody or notify anybody at Supply Chain Solutions that would you not be coming in to work?
A. Yes. I called the 800 number.
Q. When did you call the 800 number?

A. I don't recall the actual date, sir.
Q. Why did you call the 800 number?
A. To let them know that I was going to be out.
Q. Did you speak with anybody?
A. I can't recall if I spoke to someone or not. I think I just spoke to a normal number that you call.
Q. Was there a live person on the other end or was it a recording?
A. No, sir. It was a recording.
Q. Did you leave a message?
A. I just let them know that I wasn't going to be coming in.
Q. Did you leave a message?
A. Yes.
Q. What was the message?
A. I don't recall what the actual message was.
MR. POLIQUIN: Objection. I'm going to ask if you can give an offer of proof as to what this has to do with Mr. Scott's case.
MR. MCGEE: Mr. Scott has



identified Mr. Giddens as a witness and given that he's a witness, I'm exploring bias.
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. Did you ever talk to your supervisor about whether you were coming to work?
A. I believe I spoke to her one time to pretty much give her -- from what I could recall, I spoke to her one time to give her a scenario of what was going on, give her an idea of when I was trying to come back to work and that was it.
Q. And who was that that you spoke with?
A. Nadine Ruling.
Q. When did you first talk to her about --
A. I don't recall the actual date, sir.
Q. What did you tell her?
A. I told her what was going on, that I was under my doctor's care and that when I return to work I will bring in proper documentation to support my absence. I believe she in turn then gave me the information for short-term disability, to file a claim. That's



exactly what I did, what I was instructed and that was it.
Q. How did you typically get to work?
A. Drove.
Q. You drove yourself?
A. Yes, sir.
Q. Did you have a car?
A. Yes.
Q. What car, what kind of car?
A. I had a 1999 Geo Prism.
Q. Do you still have that car?
A. No.
Q. When did you get rid of that car?
A. Last year.
Q. Did you have any car trouble in December 2009?
A. No.
Q. Did you ever tell anybody at work that you were going to be late or absent from work because you had car trouble?
A. Not that I can recall, sir.
Q. In December of 2009 were you ever absent or late for work because of weather conditions?



A. Yes, I believe I was. I believe it was a winter weather advisory or state of emergency because of extreme snow.
Q. Did that prevent you from getting into work on a day, any day in December of 2009?
A. It was a state of emergency that was advised not -- for anyone not to be on the roads. To answer your question, when that state of emergency came, I did what the state of the emergency advised me to do, which was not drive.
Q. Did you call in to let anybody know that you were not going to be coming in to work that day, December of 2009?
A. I don't recall, sir. I don't recall. I may have. But if it was a state of emergency, I don't know the procedures with that or what corporate does when there is a state of emergency. I don't know. I think the whole area, everyone was advised, not just me.
Q. Well, I'm asking you if you called in to let anybody at Supply Chain Solutions know that you weren't coming in to work?

A. I don't recall.
Q. In December of 2009 did you call in to let anybody know that you would not be coming in to work because you were sick?
A. Yes. I called in the job number. Remember you asked me that a couple of questions ago?
Q. What did you say about the reason you weren't coming in to work?
A. I just left a message that I wouldn't be in there that day, from what I can recall.
Q. Did you indicate why you weren't coming in that day?
A. I don't recall, sir.
Q. Did you ever speak to your supervisor -- strike that. Did you ever tell your supervisor that you were sick?
A. Yes, sir. I'm being a little repetitive here but, yes, I called. I advised her of what was going on with me.
Q. Well, tell me what you told her?
A. I told her that I was sick, that I'm under my doctor's care and that I do not know at this time when I will be returning to work.



I advised her of when I will be seeing my doctor and told her of that information. She then advised me to go ahead and start the process for short-term disability so that way I could get paid for the time that I was out. I started the process for that. I got approved for short-term disability and was paid for the time that I was off. Then, boom, I received a letter saying I was terminated.
Q. At the time that you told your supervisor that you were under doctor's care and would not be coming in to work, had you seen the doctor at that time?
A. I had not, sir.
Q. Why did you tell her you were under your doctor's care?
A. Because he advised me not to go to work until he saw me.
Q. And did you actually speak with your doctor and --
A. No. The nurse advised me of that.
Q. What did the nurse say to you?
A. Don't go to work until you see the doctor and he's scheduled to see you on this



day.
Q. What nurse was it that you told?
A. Sir --
MR. POLIQUIN: Objection.
THE WITNESS: I don't recall the name of the nurse.
BY MR. MCGEE:
Q. But you're sure that a nurse in Dr. Harrison's office told you that?
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: Sir, they advised me -- just like I just told you, yes.
BY MR. MCGEE:
Q. What did she tell you specifically?
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: She told me don't go to work until you see the doctor.
BY MR. MCGEE:
Q. Pardon?
A. Said don't go to work until you see the doctor.
Q. What did you tell the nurse before she



said that?
A. I told her I needed to see him as soon as possible.
Q. Did you tell her why you needed to see him?
A. I told her what I was feeling, how I was feeling, what was going on with me at the time and that I just needed something to relieve my pain, sir.
Q. What pain?
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: The pain I was experiencing from the flu.
BY MR. MCGEE:
Q. What pain was that?
MR. POLIQUIN: Objection.
THE WITNESS: Body aches, pains, congestion.
BY MR. MCGEE:
Q. What kind of pain?
A. Sir, body aches, that's the pain.
Q. Anything else, any other kind of pain?
MR. POLIQUIN: Objection; asked

89

and answered.
BY MR. MCGEE:
Q. Any other pain?
A. Sir, I answered your question.
Q. Was there any other pain?
A. Sir, I've answered that question.
Q. Any other pain other than body aches?
MR. POLIQUIN: Objection.
THE WITNESS: I've answered the question, sir.
BY MR. MCGEE:
Q. What's the answer?
A. Body aches, congestion, runny nose.
Q. My question was about pain. Did you experience any pain other than body aches?
MR. POLIQUIN: Objection. It's been asked --
THE WITNESS: Maybe I used the word pain out of context. Uncomfortable, very uncomfortable feelings when you're sick, fatigue and those types of things. I'm not going to ask the questions. Just the urge to get better, sir. However I was feeling at the

90

time, I know it was uncomfortable and that I didn't want to feel that way. So I explained to her the severity of what I was feeling so that way I could get some type of medicine to get regrouped and recuperate from whatever.
BY MR. MCGEE:
Q. Did you return to work at some point in December of 2009?
A. No, I did not, sir.
Q. You never came back to work at all --
A. No.
Q. -- in December of 2009?
A. No, sir.
Q. Not even for a day?
A. I don't think I did. I don't recall.
Q. From the time you first experienced these flu symptoms until the end of your employment --
A. No, I did not.
Q. -- did you ever come back to work?
A. No, sir.
Q. You're sure of that?
A. From what I can recall, no.

91

Maybe I did come back one day. I came back and then -- I can't recall, sir. There's a number of things that have happened since that time. I don't recall that. I can't -- I don't recall that. Before I say anything untrue -- I can't answer that question. I don't know.
Q. Why do you believe that your employment was terminated?
MR. POLIQUIN: Objection.
THE WITNESS: I believe that I was terminated because of a conspiracy between the managers and HR.
BY MR. MCGEE:
Q. Who was involved in that conspiracy?
A. Kim Kohler, Brian Katz, Reba Alexander, Nadine Ruling.
Q. What makes you believe they were involved in a conspiracy?
A. Because earlier that year, in 2009 I was out of work for a condition, and my doctor advised me that the HR regional director was asking him about the documentation that I was providing to HR, asking him was it valid or has anything been changed on the notes and things

92

of that nature.
Q. What doctor was that?
A. Dr. Scott Harrison.
Q. What was the condition that you were out for earlier in 2009?
A. Well, one, I had surgery, one was because of anxiety.
Q. What did you have surgery for?
A. I had my wisdom teeth removed.
Q. Who did that?
A. My dentist.
Q. What was his name?
A. Dr. Funjay -- I forget his name.
Q. How do you spell that?
A. F U N J A Y. I don't recall his name.
Q. When did you have your wisdom teeth removed?
A. It was in the month of June of '09.
Q. How long were you out for that?
A. I was out for a short period of time and I recall catching something called dry socket, which is very painful. And I had to go and -- I had to go again and get a spur or

something cut out of my mouth which required me to be out of work even longer. I think I was out for a period of two weeks.
Q. You mentioned you also were out because of anxiety?
A. Uh-huh.
Q. Is that what you said?
A. Yes.
Q. When did you first start experiencing anxiety?
A. When I came back from -- came back to work, gave my dentist note, my doctor's note for the surgery and just -- my supervisor talking to the dentist, questioning him about my condition and things of that nature, it just sent my stress level to level red, where it just -- it just seemed like I couldn't understand the reasoning behind it. I knew that it wasn't done to every employee that is out on some type of leave and I just could not understand why it was done or being done to me.
Q. What caused your anxiety?
A. My supervisor talking to my doctor and



calling and inquiring and talking to him about when am I going to come back to work, what is he prescribing me and things of that nature. It was just overwhelming to me and these are things I felt was out of normality. That's not normal procedures. You see people within the office going through whatever and I never saw -- I even asked a couple of guys that went out for a sprained ankle or something if they had problems with -- when they came back and was their supervisors asking them things. It was something that was not normal procedure. I felt targeted and that they wanted me out of there.
Q. Why do you believe they wanted you out of there?
A. Because I didn't give them a reason to get me out of there.
Q. What was it about you that caused them to want to get you out of there?
A. Because I was having health issues and it was requiring me to be out of work.
Q. What health issues?
MR. POLIQUIN: Objection.



THE WITNESS: Sir, I told you I had a condition earlier in the conversation. I had a medical condition.
BY MR. MCGEE:
Q. What medical condition?
A. I advised you, sir, in your earlier notes. If you -- I don't know. I don't feel like -- you want to refer back to your notes?
Q. No. I don't know what medical condition you're talking about.
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: Sinusitis, sir.
BY MR. MCGEE:
Q. When did you have that condition?
A. I had that condition a while. I had the condition, I believe -- when was I first -- in 2008, that's when the doctor advised me of this condition that I had.
Q. Have you ever been treated by anybody other than Dr. Harrison for your sinusitis?
A. No.
Q. Do you have any medication prescribed for that?



A. Not right now, sir.
Q. Have you ever?
A. Yes.
Q. What kind of medication?
A. I don't recall what the name was. It was an antibiotic.
Q. When was the last time you took medication for sinusitis?
A. I don't recall.
Q. Have you taken any medication within the last year for sinusitis?
A. No, I have not because I -- I don't have insurance right now. I'm unemployed. I don't have the money to go. I'm not saying I don't need to go. I don't have the money to go.
Q. When was the last time that you experienced any symptoms from sinusitis?
A. Maybe last year, the change of the seasons.
Q. What time last year?
A. Spring.
Q. Spring of 2010?
A. Uh-huh.

Q. Pardon?
A. Yes, sir.
Q. Getting back to this anxiety that you claim you experienced in 2009. Describe for me what you experienced that you believe was anxiety?
MR. POLIQUIN: Objection. He's already answered the question.
BY MR MCGEE:
Q. Not what caused it. Tell me what you were feeling that you believed was anxiety?
A. Just an uneasy feeling in that office and nervousness and just always someone just micro managing me. You know, certain things just trigger certain behaviors or certain elements that made me feel uncomfortable and very nervous. And at times I would just need to go and get -- go outside and just take a deep breath and get some fresh air and just try to gather all my thoughts, you know, in regards to it. It was just an unpleasant feeling. It also made my blood pressure go up.
Q. Were you ever diagnosed by anybody as suffering from anxiety?



A. I was prescribed medication by my doctor for anxiety, Scott Harrison.
Q. What medication were you prescribed for anxiety?
A. I don't recall the actual medication. But I was monitoring it -- my blood pressure was going up. I had to monitor my blood pressure for a period of a month where I would go in and he would check my blood pressure. And we were trying to get my blood pressure from just being high from this anxiety to where it was normal.
Q. Did you ever speak to Dr. Harrison about this anxiety that you're claiming --
A. Yes, yes.
Q. Let me finish the question. About this anxiety that you claim you were experiencing?
A. Yes, sir.
Q. Is that on the telephone or face-to-face?
A. Face-to-face in the office.
Q. What did you tell him?
A. I told him the root cause of what was



making me feel this way. And the root cause being my supervisor and the abnormal pressures and questions and questions that was not being delivered to everyone that had a situation similar to mine. That's what I advised him was the reason that I felt that my -- I was getting these nervous and panic attacks and things of that nature.
Q. Why do you believe that these individuals were engaged in a conspiracy to terminate your employment?
A. Sir, because --
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: I was terminated one time before from the job. I disputed it. They found just cause to bring me back into that job. And that's the only time within that office that anyone has been fired and then brought back in to work. And I feel that this was a motive to get me out of there because I disputed it and fought and provided documentation that justified for any times that I was out, and they brought me back to work.



And I believe from me being brought back -- my supervisor made the decision to fire me. And the fact that the management went back against her decision to fire me and brought me back, created a lot of the issues with me because she -- to me it seemed as if she personally targeted me because she already had fired me once and she didn't want me there. That was very obvious. And she made my employment there extremely, extremely unpleasant. And I say that lightly.
BY MR. MCGEE:
Q. Well, is the supervisor you're referring to Nadine Ruling?
A. Yes, sir.
Q. What did she do to make your employment difficult?
A. Sir, in -- with being called a liars -- being -- always have to double check any documentation that I brought in there two and three times, questioning my doctors and stuff like that. I feel that it could be procedure for them to do that. But, I mean, if I'm bringing you in documentation with the

facts on it, I would just prefer that you just read it and go on with it. I don't have any reason to tell anyone anything untrue.
Q. What documentation are you referring to?
A. My doctor's notes and my excuses and things of that nature for each and every time I was out of work.
Q. How many times were you out of work?
A. Sir, I explained to you I had a medical condition and a lot of times -- sometimes I was out. I was out of work with my medical condition. And the things that was going on. She applied a lot of pressure to me because it wasn't nothing physical, physical ailment that she could see with me.
Q. Prior to December of 2009 did you miss work for any reason other than your sinusitis?
A. High blood pressure and anxiety, yes, sir, and plus my wisdom teeth, yes, sir.
Q. Who called you a liar?
A. Nadine Ruling has called me a liar on more than one occasion.



Q. How many times did she do that?
A. I could say probably about two to three times.
Q. When was the first time she called you a liar?
A. The second day that I worked there. My second day of employment I was pulled in the office and she told me that I left on my lunch break -- I left the premises on my ten-minute break. That was not true. I left on my lunch break. And she advised me at that time that we cannot leave the premises -- this is my second day on the job. And she said you can't leave the premises on your break. I was like, I didn't leave on my break. I was on my lunch. And she's like, no, you're lying. You was on your break. That was one occasion where she told me I was a liar. Another occasion when I brought in documentation and she said I was playing some deadly game.
Q. Did she call you a liar?
A. She just said you know what you're doing and you're playing a deadly game. And I was like, what are you talking about. I'm



providing you documentation for the reason that I'm out, what you asked me for and now you're saying I'm playing a deadly game. I couldn't understand -- she wasn't believing what I was saying. And I had facts and documents to bring in there to her.
Q. What did the document say?
A. It was a doctor's note from my doctor each and every time I was out.
Q. I'm talking about this one occasion where she said you were playing a deadly game, when did that occur?
A. I can't recall the actual date that it happened.
Q. What were you out for at that point in time?
A. Some type of ailment. I don't recall what the ailment was. I had a lot of medical conditions in my life. I'm 37. When I first started that job, I had gotten my insurance and stuff and went to the doctor. At that point, that's when I was being revealed that I had these medical conditions. There is a number of different things that was going on as far as



me. As far as disclosing it to my employer, that's my -- that's my legal right as a citizen of the United States. I don't have to give them that information if I don't want to, and I didn't because I felt that it was going to open doors for some other form of discriminatory form of behavior towards me. So I did not -- she couldn't see anything physically wrong with me. So anything that I brought in there was a lie to you. Mind you already -- she had already fired me before.
Q. At that point in time what medical condition did you have other than sinusitis?
A. Remember I told you my blood pressure, I was having blood pressure issues, anxiety issues just from all the things that I see that was abnormal procedures in what was -- she was trying to find any kind of excuse to get me out of there.
Q. Have you ever received any treatment or medications for high blood pressure?
A. Yes, I have.
Q. What was that?
A. I don't recall the medication. But he

105

did prescribe something to help lower my anxiety and put me on some form of blood pressure pill to bring my level of blood pressure down.
Q. Do you believe that your race had anything to do with the decision to end your employment at Supply Chain Solutions?
A. Honestly, sir, I believe it was for the fact that I was a stand up type of guy. I observed a lot, which I have mentioned to you before in our conversation. I observed a lot, and I didn't say much. So I really feel that the fact that I didn't say much -- because you got to remember I'm coming back to a job that I've been fired from. So I wanted to make sure I monitor everything that I'm supposed to be doing so that way we don't have to revisit being fired and the embarrassment of being escorted out of a building ever again. So I monitored what I was supposed to be doing. I did everything by the proper chain of command and by the documentation from my doctors any time that I was out. This woman made my life a literal -- traumatic, it's the only way I could

106

describe it, as a traumatic experience due to the fact that she had a personal vendetta to get me out of there. I never gave them a reason to get me out of there, so they had no other way to get me out of there than to do it wrongfully. That's exactly what they did, so.
Q. Do you believe that your race had anything to do with the decision to end your employment at Supply Solutions --
A. I believe it was a part of it, yes, sir. There's a number of different things.
Q. What other things?
A. I believe it was because of my race, my actual ailment that I had and being that I never did provide them with anything stating what was wrong with me, that they assumed that I was selling something untrue. By the actions and questions and things that I had to go through gave me that impression.
Q. Do you believe there was any other reason why --
A. Yes.
Q. -- your employment ended? What other

107

reasons?
A. I believe it was because she wanted me out of there, and she was going to do it by any kind of means that she could try to do it.
Q. Why do you believe she wanted you out of there?
A. She already fired me one time before, sir. That gave me perfect reason to think that she wanted me out of there. And plus the way she was treating me when I returned to work.
Q. What was her motivation for wanting you out of there?
MR. POLIQUIN: Objection; asked and answered.
THE WITNESS: I answered the question. What I feel her motivation was -- is to -- she just could not get over the fact that this young, black male who has a medical condition but still looks healthy -- whether I'm healthy or not, they don't know. But she could not see anything that was ailing me, so, therefore, I was a liar. She tried to fire me one time before. And how dare them go against her decision of firing me and bringing me back.

108

I'm going to get him out of here the first opportunity that she felt and thinks that she can get me out of there and she did.
BY MR. MCGEE:
Q. What makes you think your race had anything to do with it?
A. Just because of her behavior towards me as a black man and -- I don't know if it was my race. Maybe she just didn't like me personally. It could have been just personally me.
Q. Did Nadine ever do or say anything to suggest to you that she was racially bias?
A. Countless numbers of times.
Q. What did she do or say to indicate she was racially biased?
A. Perfect example. She reprimanded me one day for wearing shoes that was literally shoes. She said their policy says no boots. I'm looking right at another guy with the same type of shoes on but not even a shoe but in a boot form. I was in a shoe form. She didn't say anything to him. But it's not my job to tell on someone if they don't get noticed or

noticed for doing something wrong. So I wouldn't bring it up to anyone's attention. But I'm pretty sure, just as she saw the shoes that was on my feet, she could look at other men and see the type of shoes they had. She made me go home.

Q. Who else was wearing shoes that you thought violated policy?

A. It was a number of times. This guy on my team named Carl, he wore -- he basically wore what he wanted and did what he wanted. He had been working with them for -- ever since they was there. I was the newest member of the team. I don't know if it was my initiation or what. But she -- it was very obvious that she treated me a lot differently than anyone else on her team and in that office.

Q. Well, how else did she treat you differently other than this one occasion --

A. I was --

Q. Excuse me. Other than this one occasion about the boots?

A. I was always in the office about little simple stuff that just would cause an



interruption in me actually doing the job at hand. As far as me going out to a ten-minute break that I'm entitled or a 15-minute break that I'm entitled to, one time I came back and she was like, where have you been. I've been looking all over for you. I was like, I went to the bathroom. You're lying. Don't lie to me. And I'm like, wait a minute. I did go to the bathroom. I just didn't tell you the rest of the story yet. Can you let me finish it first before you call me a liar. I went to the bathroom, and then I went outside and smoked a cigarette and then I returned to my desk. It was those kinds of things. She was so quick to jump at me and try to say something outside of my character.

Q. Do you think that had anything to do with the fact that you're African American?

A. I honestly really think so.

Q. What makes you think it had anything to do with the fact you were African American?

A. The white guys -- or it ain't -- white guys that I saw that had an issue where they



was out of work -- but they wasn't on her team so she wouldn't really have no need to question them. But from what I observed with the way other supervisors treated their employees and things of that nature, it was totally unlawful what she did and unjust.

Q. I'm asking what makes you think it had anything to do with race?

A. The white guys didn't have to deal with it, sir.

Q. What white guys?

A. The white guys that was in my office and any time that they was out of work for -- whether they was on a crutch or they had a sprained ankle or even if their dog died.

Q. Did Nadine supervise any white males?

A. No, she didn't. So I guess -- yes.

Q. Is there anything else that makes you think that the decision to terminate your employment had anything to do with race?

A. Well, sir, I'm going to say it just like this. There was a number of factors that led me to say the word race. And I'm not quick to pull no race card with anyone. I'm a man,



and that's just what I am. I have to go out here every day and put my best foot forward. I'm not saying, oh, she didn't like black people or whatever. I felt that the way that she was treating me was very indifferent from the way that she treated anyone else. I don't know if she -- I don't know what it was. I couldn't determine why she was doing the things. So I said race, medical, I named a number of discriminating factors because I couldn't determine what -- why she was treating me this way or for what reason. I don't know.

Q. Let me ask you this. Do you think the decision to terminate your employment had anything to do with the fact that you're a male yourself?

A. It may, yes, my gender, it could have been. Because I'm going to be honest with you, sir, there's a lot of -- when I was working there, I observed a lot of women empowerment movements that these women -- it was only one male supervisor there. Outside of the ratio of just being one male person in management there, outside of that, it was just all women and it

was ran by women. Now, I didn't want to -- I don't have a problem with working with anyone, I don't. I didn't want to come and say that just because she's a woman and that she doesn't like -- I walked in on a number of male bashing sessions amongst the women, including my supervisor in there. It could have been because of my gender and the fact that I didn't act like the rest of the guys that worked there. If I was wrong for something, I wouldn't say anything because I didn't have a leg to stand on. But if I was right about something, I would fight with you all the way until the end.

Q. Well, what makes you think that the decision to terminate your employment had anything to do with your gender?

MR. POLIQUIN: Objection; asked and answered.

THE WITNESS: It was the fact that -- maybe it was just -- I can't answer that question. I don't know. I could just tell by the way she ran her ship that she wanted total respect to be given to her at all



times, which I gave her. But my mom and my dad, I've been living for 37 years and they've never called me a liar. Do you think I'm going to stand for it from someone who doesn't even really know me that well. That was just out of -- I don't know. In a professional environment I feel that your character is who you are. And if I don't give you a reason to call me a liar, don't call me a liar. I asked several times to be moved from the lady's team. It never happened.

BY MR. MCGEE:

Q. Whose team did you want to be moved to?

A. It didn't matter as long as I could get away from the personality clash that we had or whatever it was. I just wanted to stand clear of her. I'm going to be straight up with you. The job -- that job -- when I got that job I was so happy. I was emotionally just like, okay, great. I've landed a great job with a great company. I looked at it as a career move. I wasn't anticipating health conditions or medical conditions. But I loved



that job. And why should I let someone take something that I'm -- rightfully mine, that I worked hard for and qualified for and placed for. Why should I have to suffer for this person's prejudices or things of that nature and that was really -- I didn't like it.

Q. When did you first contact an attorney about any issues that you had with Supply Chain Solutions?

MR. POLIQUIN: Objection.

THE WITNESS: I can't recall. I inquired a lot about it. But I don't know when I actually made the decision to go with the attorney I got.

BY MR. MCGEE:

Q. Let me ask you this. Did you contact any attorney while you were still employed by Supply Chain Solutions?

A. Oh, yes. This is something that was observation to me for a long time before I made any moves on the actions that I took for myself, as far as maybe filing a discriminatory case against them or whatever. I took a lot, took a lot. This woman just was not going to



let off me by no way. And I felt that I followed the proper chain of command. I tried to let someone know internally what was going on. After I did not get a resolution internally within the company, then I sought out other options that were available to me.

Q. How were you referred to Mr. Poliquin?

A. How was I -- basically just read up on him on line. I read what he stood for and I felt that he had the credentials to be my attorney.

Q. Did you speak to Mr. Poliquin or anybody from his office while you were still employed by Supply Chain Solutions?

A. I can't recall if I did.

Q. Who is Terri Wilson?

A. Terri Wilson was an assistant supervisor or team lead for my team when I was working there.

Q. Did you ever have any conflict with her?

A. Sir, I didn't have any conflict with her. She had an issue with me, I believe.

Q. What was her issue with you?
A. From what I could recall, her asking my mental capacity and things of that nature. That goes along the lines of not being something that is professional to me, especially if you're the person that is designated for me to ask work-related questions to. Whether you feel I should know the answer to the question or not, I don't think -- if you have a Ph.D. you have no right to ask me -- I mean, in this situation you asked me my mental capacity. But you're an attorney and this is for a deposition and things of that nature that you need. But I felt that she didn't have the right to inquire or ask me whether I'm bipolar or something of that nature because she felt I should have known an answer to a work-related question that I asked her that morning or something of that nature.
Q. What are you referring to? What happened? Tell me what happened?
A. She asked my mental state, was I bipolar, have I ever experienced a nervous breakdown. She also let me know her personal



opinion of me, that she felt I was a trouble maker and that I was starting trouble because she felt that I should have known the answer that I went to her to ask her.
Q. What question did you want to ask her --
A. I don't recall. It was work-related. It was something in the standard operating procedures that I asked her, and she felt I should have known the answer to. And I didn't know. That's why I went to her to ask.
Q. Did you get angry at Terri Wilson?
A. Yes, I was very, very -- I was at the point to where it came into me -- to where enough was just enough. I wasn't going to take no more of these -- being ridiculed by this management team and being suggested as someone of bad character versus the person that I am. I was very angry at the time because who is she to ask me about have I had a nervous breakdown or if I have a mental issue or am I bipolar. I really -- I think that's a form of disrespect.
Q. Did you tell your supervisor that you



wanted to leave because you felt that you were so angry with Terri Wilson that if you didn't leave there could be a situation there that day?
A. I told her I wanted to get out of there because I was angry and just the way that she handled the situation was just totally unprofessional. And I wasn't in the mood for that that day. That was at the point where I had enough of all of it with that, with the whole management, my supervisor. It was to the point where everybody knew that Nadine wanted me out of there. They was going to do anything that they could to help her -- help aid her or at least they thought they was helping to aid her in the removal of me.
Q. Well, and you told her that if you didn't leave that day or weren't allowed to go home there could be a situation?
A. There could be a number of situations.
Q. That's what you told Nadine; isn't it?
A. I believe I told her I just didn't -- I wasn't -- I didn't feel comfortable in that situation and I did want to be removed from



it.
Q. You also said that you were going to make Terri Wilson's life miserable; didn't you?
MR. POLIQUIN: Objection.
THE WITNESS: No.
BY MR. MCGEE:
Q. You didn't say that?
A. I don't know if I'm going to make her life miserable. But I would not ask her -- I would not discuss anything with that lady that was not work-related. I do recall saying that.
Q. You said that you were going to make her life miserable; didn't you?
MR. POLIQUIN: Objection.
THE WITNESS: No, I did not, sir.
BY MR. MCGEE:
Q. What was it that Terri Wilson did that made you so angry?
A. Sir, she asked me an unprofessional question.
Q. What did she ask you?
A. Was I bipolar, had I ever had a

nervous breakdown. She told me that she thought I was a trouble maker. These things angered me.
Q. Have you ever kept a journal or made any notes of things that happened to you while you were working at Supply Chain Solutions?
A. Yes.
Q. What kind of notes or journals did you keep?
A. I just have a number of things, sir. I have a number of things pertaining to how I was treated there. I have them.
Q. Pardon?
A. I have -- I do.
Q. Tell me what kind of notes you made?
A. Just I documented each and every situation that I was going through with them each time. I documented everything.
Q. How did you document it?
A. However I could, whatever means I could at the time, if it could be -- e-mails, recordings, anything I could do to do this.
Q. What kind of recordings did you make?
A. I didn't make any recording. When I



say recordings, anything that could be proven and documented.
Q. Did you make any tape recordings?
A. No, I don't, no.
Q. No, you didn't?
A. No.
Q. What kind of e-mails?
A. E-mails that show her writing me up for interoffice communication or using it for personal use, when she did the same type of things to me, any type of question that I asked her I would form it in e-mail form and ask her so that what when -- it came down to the bottom line, I had my documents.
Q. Where are your documents?
A. They're in my filing cabinet.
Q. Did you ever keep a journal?
A. A journal, that's my way of journal. There was so many different situations that I didn't have to write it down. I was doing it through the e-mail form and copying the e-mail.
Q. Did you also make handwritten notes?
A. On the calendar that I had at my desk, yes.



Q. Do you have that calendar?
A. I do not.
Q. Who else did you have conflicts or disagreements with at work?
A. Sir, I had no conflicts or disagreements with anyone other than the two parties that you've stated.
Q. Nadine Ruling and Terri Wilson?
A. They're the only ones throughout my employment history that I had any type of conflict with. I'm not -- that's not something that is my normal behavior or my normal character.
Q. Have you ever been fired from any other jobs?
A. No, laid off and took a service package, yes. But actually fired, none, no.
Q. Where were you laid off from?
A. JP Morgan, I was laid off from there.
MR. POLIQUIN: I'm going to object to this line of questioning.
THE WITNESS: That was it. I got a severance package from there.



BY MR. MCGEE:
Q. Did you make any claim of discrimination there?
A. No, sir.
Q. Have you ever claimed discrimination in connection with any job other than Supply Chain Solutions?
A. No, sir. I've never experienced a traumatic experience like that as far as corporate American in my life.
Q. When you were at Supply Chain Solutions, were you given warnings about your attendance?
A. Yes, I had warnings, yes, sir.
Q. What were the warnings that you were given about your attendance?
A. Just the regular warnings that were given to any other employee.
Q. That you were missing too much time from work?
A. Yes, I believe.
Q. Who made --
A. Anything that was not excused -- that's the thing, anytime that I brought --

anytime I was out of work, being that I had already been fired once, I made sure I brought documentation for each and every time that I was out of work.
Q. In December of 2009 when you missed work because you claim you were sick, when did you first contact your doctor's office?
A. I don't recall the actual date when I was feeling -- when I was feeling to the point that I couldn't go to work, I called my doctor and asked him to see me.
Q. Was that before or after you spoke with somebody at Supply Chain Solutions about your absence?
A. That was before.
Q. Before?
A. Before I spoke to anyone at UPS, anyone personally on the phone.
Q. As opposed to leaving a message?
A. As opposed to leaving a message, yes, sir.
Q. And what caused you to contact your doctor's office at that particular time that you ultimately did?



A. The feeling, the symptoms and the way that I was feeling, sir.
Q. Have you ever had a nervous breakdown?
A. No.
Q. Have you ever been diagnosed as suffering from bipolar disorder?
A. No.
Q. Have you ever been diagnosed as suffering from anxiety other than in connection with the employment at Supply Chain Solutions?
MR. POLIQUIN: Objection.
THE WITNESS: Not that I can recall, sir, no.
BY MR. MCGEE:
Q. How about depression?
A. Depression?
Q. Yes.
A. No.
Q. Have you ever taken any medication for any psychological or emotional condition?
MR. POLIQUIN: Objection.
THE WITNESS: See, there's a child -- when you're a child -- not any time that I was not on my own. When I was a kid



it's something different. What are you asking me? Are you asking me ever in my life?
BY MR. MCGEE:
Q. Yes, that's what I'm asking you.
MR. POLIQUIN: Objection.
THE WITNESS: In my adult life, no.
BY MR. MCGEE:
Q. What about in your childhood?
A. Yes, I may have experienced a depression in my childhood, yes.
Q. Caused by what?
A. I think I had a car accident or something.
Q. When was that?
A. I don't recall, sir. I was 17, 18 years old.
Q. Were you driving?
A. Yes.
Q. Was there anybody injured?
A. No.
Q. You're saying that car accident caused you depression?
A. Yes. The loss of my car at that time,



that was a big thing to me. I was only 17 years old. With the car came friends. When the car wasn't there, there was no friends or nothing. Yes, I went into a little depression when I lost my car from a car accident.
Q. Did you receive any treatment for that depression?
A. Yes, I did.
Q. What treatment?
A. I had a talk therapist and I may have -- was prescribed some medication at that time.
Q. Who was the therapist?
A. I don't recall all that, sir.
Q. What kind of medication?
A. Antidepressant medication.
Q. What specific medication?
A. I think it was mellaril.
Q. How long did you take that?
A. Maybe a year.
Q. Have you received any treatment, medication or counseling for any other type of emotional or mental condition --
A. No, sir.

Q. -- at any point?
A. No. Other than the AA, you know, which I explained to you.
Q. How long were you in AA?
A. I went there for about a year.
Q. What caused you to abuse alcohol?
MR. POLIQUIN: Objection.
THE WITNESS: I don't know. I liked the taste.
BY MR. MCGEE:
Q. Is part of Alcoholics Anonymous having you explore what caused you to have that problem?
A. I think it was the things that I may have been going through at the time or relationship issues. I can't recall, sir.
Q. Who referred you to AA?
A. I referred myself to it.
Q. Why?
A. I identified a problem.
Q. What year was that?
A. I don't recall.
Q. What is your sexual -- sexual orientation?



A. What's --
MR. POLIQUIN: Objection.
THE WITNESS: I like women.
BY MR. MCGEE:
Q. You're a heterosexual?
A. I'm a heterosexual.
Q. Have you ever had any homosexual relationships?
A. No, sir.
MR. POLIQUIN: Objection.
BY MR. MCGEE:
Q. Have you filed any lawsuits against Supply Chain Solutions?
A. Have I what?
Q. Have you filed any lawsuits against Supply Chain Solutions?
A. Have I?
Q. Yes.
A. I have, yes. Not before this but --
Q. You have a pending lawsuit?
A. Yes, from what I understand -- no, I don't have a pending lawsuit, no.
Q. But it's your plan to file a lawsuit?



A. Sir, I --
MR. POLIQUIN: Objection.
THE WITNESS: Right now my plan --
MR. POLIQUIN: You don't have to answer that question. There's ongoing talks between, as you should be aware of, between the parties. And that's not an appropriate question to ask during this deposition. And I think we've gone well beyond the scope of his testimony for Jason Scott's case. And I think we've given you plenty of leeway.
BY MR. MCGEE:
Q. Have you had any income from any source since you stopped working at Supply Chain Solutions other than unemployment?
MR. POLIQUIN: Objection. What's the relevance of these questions?
MR. MCGEE: It goes to bias.
MR. POLIQUIN: They don't establish bias. You have already gone through everything --
MR. MCGEE: I think it relates to bias.



BY MR. MCGEE:
Q. Have you had any income from any sources since you stopped working at Supply Chain Solutions?
A. I'm going to go in detail with this question. I had to fight for my unemployment benefits for approximately nine months. So that was a period where I had absolutely no income, no. And outside of what I have fought and won for unemployment, there's no income other than that.
Q. The location where you currently live, are you renting or do you own?
A. I'm renting right now.
Q. What is your rent?
A. $1000 a month.
Q. How have you paid your rent?
A. How have I paid my rent, by communication effectively with what is going on with my personal life, what is causing me to be behind on everything. And not even that, the first time I got fired from UPS, I got evicted from the place. I lost a car that I bought because of these injustices that this woman has

inflicted on my life. And it's not a game. But to answer your question, how have I been maintaining it, by effective communication, being straight up and honest with my debtor, my creditors and the people that I owe. Thank God for the mercy of them that they believe halfway what I'm saying and gave me room to work with me.

MR. MCGEE: Mr. Giddens, I don't have any further questions at this time.

(Witness excused.)

(Deposition concluded at 12:22 p.m.)



CERTIFICATE

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

------------------------

Dolores M. Horne

Dated: May 20, 2011

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)



------

LAWYER'S NOTES

------

| PAGE | LINE | CHANGE |
|---|---|---|
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |
| --- | --- | ------------ |



DEPOSITION ERRATA SHEET

NO. 234665

JASON SCOTT

- vs -

UPS SUPPLY CHAIN SOLUTIONS

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _______ day of _______, 20 --.

________________________________________

MYRON GIDDENS

# Exhibit 29

## *Corrective Action Record*

Supply Chain Solutions

Employee: D B

Reg./Dist.: 23/26

Employee ID#: 3390565

Facility/Operation: Newark DE Biddle Building

Job Title: Sr. Collections Associate Associate

***Type of Action:*** ☐ Verbal ☐ Written ☒ Discharge

***Nature of Infraction:***

☐ Conduct/Behavior ☐ Attendance/Tardiness

☐ Performance ☒ Violation of Work Rule ☐ Insubordination

☒ Safety/Security Violation ☐ Other

### *Summary of Problem or Reason for Discipline or Counseling*

Please include time and date of infraction or performance issue, a description of the incidents or problem, and specific policy or work rule in violation. Attach supporting documentation as necessary.

On Monday June 30, 2008 you called another employee and asked them to clock you in at an arrival time of 8:55. You were seen by the Manager arriving in the parking lot at 9:03. During the conversation & written statement with the Manager and HR Supervisor you indicated you had clocked your own time. Upon review of the AS System, it was discovered that on several occasions you had changed your start time without prior approval.

### *Action steps for Improvement*

Describe remedy for improving the problem, behavior or performance issue. Identify follow-up dates.

Falsifying time or having another employee enter your time is completely against UPS policy and procedures. It is UPS ' desire to correct inappropriate conduct or behavior before it has an adverse impact on the employee and general work environment. Disciplinary action, up to and including termination, may be taken for conduct deemed inappropriate.

### *Past Relevant Documentation*

Provide the following information for any past violation(s) relevant to current infraction or performance issue.

| | | |
|---|---|---|
| Date: | Date: | Date: |
| Warning Type: | Warning Type: | Warning Type: |
| Nature: | Nature: | Nature: |

***Employee Comments*** (Please use back of form if additional space is needed.)