**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Jason Scott | : | |
| | : | |
| v. | : | Civil Action No. 10-cv-929-RGA |
| | : | |
| UPS Supply Chain Solutions | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Jason Scott, by and through his undersigned counsel, hereby submits this Memorandum of Law in opposition to Defendant's Motion for Summary Judgment.

## I. Introduction

Plaintiff, Jason Scott, was employed by defendant as a Collections/Customer Service Associate assigned to the Bracco team from November 17, 2008 until September 14, 2009, when he was terminated. Mr. Scott alleges in the Complaint that he was terminated because of his sexual orientation and/or for failing to conform to traditional male stereotypes. Defendant argues that Mr. Scott was terminated because he falsified his time record for September 11, 2009. For the reasons set forth below, there remain material facts in dispute concerning whether defendant's stated reason for terminating Mr. Scott was a pretext for discriminating against him because of her sexual orientation and/or gender (i.e., for failing to conform to traditional male stereotypes). Accordingly, the Court should deny Defendant's Motion for Summary Judgment.

## II. Background Facts[1]

### A. SCS Operations in Newark Delaware

Mr. Scott concurs with defendant's statement of SCS operations in Newark Delaware.

### B. Scott's Employment by Kelly Services

[1] For the convenience of the Court, Mr. Scott will adopt the section headings used by Defendant in Part II, Statement of Facts, of the Memorandum in Support of Defendant's Motion for Summary Judgment.

Mr. Scott concurs with defendant's statement of his employment by Kelly Services.

**C. Scott's Temporary Assignment at SCS**

Mr. Scott concurs with defendant's statement of his temporary assignment at defendant, except as noted herein. Specifically, although the employment agreement Mr. Scott signed with Kelly Services stated that he was not an employee of the business to whom he was assigned, the facts indicate that he was an employee-in-fact of defendant. For example, Kelly Services temps at defendant received their daily assignments from defendant's supervisory personnel. Carazo at 6:6-6:10.[2] Carazo contacted defendant's supervisors approximately every two (2) weeks to feedback on the performance of the Kelly Services temps. *Id.* at 7:5-7:24. Moreover, defendant had the unfettered right to terminate a Kelly Services temp's assignment at any time. *Id.* at 9:16-9:22.

Kelly Services temps were also required to follow defendant's policies that related to their job duties. *Id.* at 6:11-6:15. Carazo and defendant's supervisors jointly exercised the right of approval of a temp's absences. *Id.* at 7:15-7:24.[3] And defendant's supervisors had final approval of Kelly Services employees' time cards; Kelly Services approval was not required in order for the temp to be paid. *Id.* at 8:1-8:18.

**D. Scott's Attendance Problems**

Mr. Scott denies that he had any attendance problems while employed by defendant. Although Scott was absent on a number of occasions in 2009, most of those absences were attributable to doctor's appointments or physical therapy appointments related to injuries he

[2] A copy of the deposition transcript of Paola Carazo is attached to the Declaration of Lori A. Brewington as Exhibit 24.

[3] Nikki Pinkett, one of Mr. Scott's former supervisors at defendant, testified that Kelly Services temps and defendant's employees were required to follow the same attendance policy. Pinkett at 10:17-10:21.

suffered in an automobile accident in April 2008. Scott at 36:12-36:15.[4] On each occasion, however, he would inform Paola Carazo at Kelly Services in advance so that his absences would be excused. With respect to absences that were unrelated to prior scheduled doctor's appointments or physical therapy appointments, Mr. Scott would call Ms. Carazo, who would then inform his supervisor at defendant. *Id.* at 112:9-112:12. Nikki Pinkett, Mr. Scott's supervisor at defendant from December 2008 until May 2009, when she went out on maternity leave, and for a few weeks in August 2009 when she returned to defendant from maternity leave, testified that Mr. Scott did not have attendance issues. Pinkett at 18:15-19:24.[5]

Mr. Scott called out sick on August 3 and 4, 2009, he was 30 minutes late on August 26, 2009 and he called out sick on September 4, 2009. Each of these incidents was unrelated to his auto accident. However, on each occasion, he called Ms. Carazo, who in turn informed his supervisor at defendant. Scott at 112:13-113:13.

**E. The Move-September 11, 2009**

Mr. Scott disputes defendant's statement of facts relevant to the move of the Bracco team from the first to second floor within defendant's Biddle Street building. The central disputed fact concerns what time Mr. Scott reported for work on Friday, September 11, 2009. At that time, Mr. Scott's assigned start time was 8:30 a.m. Mr. Scott testified that he arrived at work between 8:20 a.m. and 8:30 a.m. Scott at 121:2-121:13. When he arrived at work, he did not, as was customary, log into his computer and enter his start time because in preparation for the move, his

[4] A copy of the deposition transcript of Jason Scott is attached to the Declaration of Lori A. Brewington as Exhibit 25.

[5] A copy of the deposition transcript of Nikki Pinkett is attached to the Declaration of Lori A. Brewington as Exhibit 21.

computer was not hooked up. *Id.* at 121:14-121:21.[6] On the evening of Thursday, September 10, 2009, he had moved his personal belongings, except for his computer, from his old cubicle on the first floor to his new cubicle on the second floor. *Id.* at 123:7-124:19. Instead, he went to his new cubicle on the second floor. When he arrived he saw Myron Giddens. *Id.* at 129:17-129:20.

Mr. Giddens had reported to work on September 11, 2009 between 8:00 a.m. and 8:15 a.m. Giddens at 30:23-31:1.[7] He testified that he first saw Mr. Scott on September 11 at Mr. Scott's new cubicle on the second floor, and that they talked for about 2-3 minutes. *Id.* at 34:12-36:12. Mr. Giddens recalled that when he first saw Mr. Scott it was sometime between 8:15 a.m. and 8:45 a.m. *Id.* at 36:18-37:14. After conversing with Mr. Giddens, Mr. Scott returned to the first floor to his old cubicle to assist other members of the Bracco team in moving their belongings, arriving there shortly after 8:30 a.m. Scott at 141:13-141:20; 143:13-144:4.

Tasha Horace, an employee of defendant, stated in an Affidavit prepared for her by defendant's attorney, Horace at 14:3-15:13[8], that Mr. Scott was late for work. However, she testified at her deposition with respect to that statement that she had not seen Mr. Scott at his cubicle on the first floor on September 11 by 8:30 a.m., but that she did not know whether he was on the second floor or somewhere else in the building at that time. Horace at 16:16-16:22. Ms. Horace had stated in the same Affidavit that she recalled Ms. O'Connell walking around looking for Mr. Scott at 8:45 a.m. However, she testified in her deposition that the statement

---

[6] Mr. Scott logged onto his computer later that morning, as did other Bracco team members. O'Connell at 43:13-43:18.

[7] A copy of the deposition transcript of Myron Giddens is attached to the Declaration of Lori A. Brewington as Exhibit 28.

[8] A copy of the deposition transcript of Tasha Horace is attached to the Declaration of Lori A. Brewington as Exhibit 20.

was not accurate. Id. at 17:21-18:7. In fact, she testified that she did not know whether Mr. Scott was on time or late on September 11; she simply had not seen him at 8:30 a.m. Id. at 18:19-19:4.

Defendant claims that both Ms. O'Connell and Heidi Maslin looked for, but could not find, Mr. Scott at or around 8:30 a.m. on September 11, and because of those efforts they knew that he had not arrived to work by 8:30 a.m. Ms. Maslin claims that about 8:40 a.m. she began looking for Mr. Scott. She testified that at 8:45 a.m. she checked the parking lot visible from her office window and did not see either of the cars that Mr. Scott would drive to work. Maslin at 13:12-14:11.[9] She claims that she also checked the cubicles on the first floor with Ms. O'Connell and did not find Mr. Scott. Id. at 14:14-15:5.

However, Ms. Maslin did not check the cubicles on the second floor or anywhere else in the building for Mr. Scott and could not think of a reason why she did not do so. Id. at 16:15-16:20; 32:10-32:16. She also admitted that parking is available on all four (4) sides of the building, but that she only had a view of and checked the parking lot on one (1) side of the building. Id. at 53:1-53:15. She finally admitted that she did not know whether Mr. Scott had arrives at work by 8:30 a.m., and therefore that she could not say that Mr. Scott's act or entering 8:30 a.m. as his start time on his time record for September 11 was a falsification. Id. at 22:21-23:5; 27:15-27:24.

Ms. O'Connell claims that she began looking for Mr. Scott at 8:35 a.m. on September 11. O'Connell at 12:13-12:21.[10] She testified that she saw Mr. Scott for the first time when she and Shirley Pettit, a former employee, were at Mr. Scott's cubicle on the first floor packing his

---

[9] A copy of the deposition transcript of Heidi Maslin is attached to the Declaration of Lori A. Brewington as Exhibit 18.

[10] A copy of the deposition transcript of Sherri O'Connell is attached to the Declaration of Lori A. Brewington as Exhibit 17.

belongings to move them to the second floor. Id. at 17:9-18:6; 18:15-18:19. Using the timeline that Ms. O'Connell testified to, Mr. Scott would have arrived between 8:49 a.m. and 9:00 a.m. See id. at 12:13-12:21; 15:10-15:12, 15:13-15:18; 15:22-16:8; 17:9-18:6; 18:15-18:19.

Ms. O'Connell admitted, however, that she did not know whether Mr. Scott was somewhere in the building other than at his cubicle at 8:30 a.m. on September 11. Id. at 23:22-24:18. Moreover, she admitted that although Ms. Maslin had told her that she did not see Mr. Scott's car in the parking lot visible from her office window, there were other lots suroounding the building where Mr. Scott could have parked. Id. at 25:14-26:1. Despite the fact that she only believed that Mr. Scott was not at work in September 11 at 8:30 a.m., she was comfortable firing him for recording on his time record that he was at work at 8:30 a.m. Id. at 28:17-29:2.

### F. SCS Discovers the Inconsistency Between Scott's Arrival Time and Time Entry

The facts set forth in Part II, Section E, above, indicate that there was no inconsistency between Mr. Scott's actual arrival time and the arrival time that he entered on his time record for September 11, 2009. Moreover, at the time that the alleged inconsistence between Mr. Scott's arrival time and time entry was discovered, both Ms. O'Connell and Ms. Maslin knew that Mr. Scott was homosexual.

According to Vonda Bynum, a former employee and member of the Bracco team, Bynum at 41:16-41:18[11], Ms. Maslin treated Mr. Scott differently than other employees because of her presumption about his sexual orientation. Id. at 17:10-17:17. In fact, Ms. Maslin made statements that indicated that she assumed that Mr. Scott was homosexual, such as "stop being a girl." Id. at 18:17-19:11. Mr. Scott believed that Ms. Maslin knew that he was homosexual

[11] A copy of the deposition transcript of Vonda Bynum is attached to the Declaration of Lori A. Brewington as Exhibit 26.

because of his actions, his dress and his hairstyles. Scott at 90:19-90:24; Exhibit F to Declaration of Andrew Lukashunas ("Lukashunas Dec.").

Ms. O'Connell's actions and statements indicated that she knew Mr. Scott was homosexual on September 11. Mr. Scott had criticized Ms. O'Connell for not wearing a wig at a work talent show in the summer of 2009 in which she was portraying a member of the Supremes. After that criticism, Mr. Scott notice a change in her attitude towards him. Scott at 94:15-95:17. Ms. O'Connell gave Mr. Scott the impression that she did not want to be bothered with him, and she did not interact with him in the same manner that she interacted with other members of the Bracco team. *Id.* at 96:2-96:17.

On one occasion, Ms. O'Connell expressed visual disapproval about an outfit that Mr. Scott wore to work. The outfit consisted of shorts and a pink polo shirt. *Id.* at 105:1-105:23. Mr. Scott also wore his hair in a Mohawk style that suggested that he was homosexual. It was a weave that contained extensions, such as what women wear in their hair. *Id.* at 107:21-109:9. Mr. Scott also wore skinny jeans to work, which suggested that he was homosexual. *Id.* at 109:21-109:24. In any event, any doubt concerning whether Ms. O'Connell believed that Mr. Scott was homosexual was dispelled on September 11.

On September 11, sometime around lunch, Toni Shepperson, a former employee and a member of the Bracco team, was sitting in her cubicle on the second floor after the move, when she overheard Ms. O'Connell speaking with Terri Hinderer, at the time a Kelly Services temp. Apparently, Ms. O'Connell did not know that any other employees were present; Bracco team members frequently ate their lunch outside the building or in the breakroom. Ms. O'Connell told Ms. Hinderer that she knew that Mr. Scott had come in late that day and was lying about already being in the building. Ms. O'Connell then said to Ms. Hinderer, "that's why I hate faggots."

Shepperson at 79:22-81:20; 121:16-123:7[12]; Lukashunas Dec., Exhibits A and C. After Ms. O'Connell walked away, Kirk Slaughter, a employee of defendant and a member of the Bracco team, came to Ms. Shepperson's cubicle and asked, "did you hear that?" Ms. Shepperson replied that she had and that she couldn's believe that Ms. O'Connell had said something like that. Shepperson at 82:22-83:8. After Jason was terminated, Ms. Shepperson ran into Mr. Slaughter and they discussed what Ms. O'Connell had said. *Id.* at 87:17-89:5. Ms. Bynum testified that she had a conversation with Mr. Slaughter at the Christiana Mall after she and Mr. Scott had been terminated during which Mr. Slaughter said that he believed that Mr. Scott had been terminated because of his sexual orientation. Bynum at 49:24-51:22.

**G. Scott's Temporary Assignment at SCS Ends**

Mr. Scott concurs with defendant's statement of the end of his temporary assignment. In addition, it was Ms. O'Connell who made the initial recommendation that Mr. Scott be terminated; Kim Kohler merely approved Ms. O'Connell's recommendation and relied on the facts told to her by Ms. O'Connell. O'Connell at 29:4-29:9. Moreover, neither Ms. O'Connell nor Ms. Maslin asked anyone at Kelly Services to ask Mr. Scott why he had recorded his arrival time on September 11 as 8:30 a.m. *Id.* at 27:13-27:16; Maslin at 28:4-28:8.

## III. Argument

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see*

[12] A copy of the deposition transcript of Toni Shepperson is attached to the Declaration of Lori A. Brewington as Exhibit 27.

also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, supra, 477 U.S. at 323. When the moving party does not bear the burden of persuasion at trial, as is the case here, its burden "may be discharged by 'showing' – that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Once the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*.

To defeat a motion for summary judgment, the non-movant need only produce evidence sufficient to establish the existence of a genuine issue of material fact regarding the essential elements of her case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party need not match, item for item, each piece of evidence proffered by the movant, but simply must exceed the "mere scintilla" standard to raise a genuine issue of material fact. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993).

The substantive law governing the dispute determines which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Facts that could alter the outcome of a case are "material." See *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995).

A summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Peters v. Delaware River Port Authority of Pa. and N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994); *Petruzzi's IGA Supermarkets, Inc.*, *supra*, 998 F.2d at 1330 (3d Cir. 1993); *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied*, 480 U.S. 947 (1987). Credibility determinations and the weighing of evidence must be left to the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Simply stated, "if reasonable minds can differ as to the import of the proffered evidence that speaks to an issue of material fact, summary judgment should not be granted. *Morrison v. Coatesville Area School District*, 2000 WL 1185375 *4 (E.D.Pa. Aug. 21, 2000).

In reviewing the evidence submitted by the parties, a court must grant all reasonable inferences arising therefrom in favor of the non-movant, *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), and "the evidence of the nonmovant is to be believed," *Anderson*, *supra*, 477 U.S. at 255. Inferences should be drawn in the light most favorable to the nonmoving party, and where the nonmoving party's evidence contradicts the movant's, the nonmoving party's evidence must be taken as true. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 113 S. Ct. 1262 (1993). "If there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment…." *Celotex Corp.*, *supra*, 477 U.S. at 330 n.2. In fact, a court cannot make an inference detrimental to the nonmoving party's case when a favorable inference is also possible. *Weinstein v. Bullick*, 827 F. Supp. 1193, 1201 (E.D. Pa. 1993).

Court's typically consider summary judgment an inappropriate occasion to resolve an issue like intent. *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994). In employment discrimination cases particularly, where intent and credibility are critical, a court must apply the summary judgment evidentiary standards with particular care. *Senner v. Northcentral Technical College*, 113 F.3d 750, 757 (7th Cir. 1997). Moreover, motions for summary judgment are subject to additional safeguards in employment discrimination actions. *Aman v. Cort Furniture Rental Co.*, 85 F.3d 1074, 1082 (3d Cir. 1996)(cautioning courts to look especially carefully in modern-day Title VII cases to make sure discrimination had not been "coat[ed]" with the "appearance of propriety"); <u>see</u> <u>also</u> *Williams v. URS Corp.*, No. 04-1055, 2005 WL 361573 (3d Cir. Feb. 16, 2005) at *4 ("summary judgment must not become a procedural expedient for resolving claims that raise a genuine issue of fact even though courts may be skeptical of the merits of plaintiff's underlying claim"). In fact, at least one court has noted that the ascertainment of intent may defeat summary judgment. "[I]n a Title VII action, where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) (citations omitted). By pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment. *U. S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716-17 (1983).

**B. Scott Was An Employee of UPS**

For purposes of this Memorandum, Mr. Scott agrees with defendant's statement of the law relevant to determining whether a person is an employee for purposes of anti-discrimination laws. Applying those legal principles to the facts of this case indicates that there remains a disputed issue of material fact concerning whether Mr. Scott was an employee of defendant for

purposes of Title VII and the Delaware Discrimination in Employment Act. Specifically, the facts set forth in Part II, Section C, above indicate that defendant controlled Mr. Scott's daily work activities and that Mr. Scott was required to follow defendant's policies that related to his job duites. Most significantly, although Mr. Scott's paycheck was issued by Kelly Services, he could not be paid unless defendant's supervisors approved his time card. In fact, Kelly Services' approval of his time card was not required.

Accordingly, at the very least the facts are in dispute concerning whether Mr. Scott was an employee of defendant for purposes of Title VII and the Delaware Discrimination in Employment Act. Thus, summary judgment cannot be granted on this basis.

**C. Scott's Discrimination Claim Cannot be Dismissed Because There Remains a Dispute of Material Fact Concerning Whether Scott Was Terminated Because of His Sexual Orientation of His Failure to Conform to Traditional Male Stereotypes**

Mr. Scott's claims are asserted under Title VII of the Civil Rights Act of 1964, as amended, and the Delaware Discrimination in Employment Act, 19 Del. Code §710(c)(3)(d). Title VII and the Delaware Discrimination in Employment Act are interpreted using the same legal principles. Title VII prohibits discrimination based on an alleged failure to conform to traditional gender stereotypes. *See Bibby v. Phila. Coca-Cola Bottling Co.*, 260 F.3d 257 (3d Cir. 2001).

In cases such as this, the burden of proof is governed by the framework announced in *McDonnell Douglas Corp. v. Ford*, 411 U.S. 792 (1973). The plaintiff first must establish all of the elements of a *prima facie* case of discrimination. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged action. To prevail, the plaintiff must then prove that the employer's articulated reasons for the challenged action were a pretext for discrimination.

Where a plaintiff alleges that he was the victim of disparate treatment, to establish a *prima facie* case he must show 1) that he is a member of a protected class; 2) that he satisfactorily performed the duties required by his position; 3) that he was subjected to an adverse employment action; and 4) that either similarly situated non-members of the protected class were treated more favorably or that the adverse job action occurred under circumstances that give rise to an inference of discrimination. *See*, *e.g.*, *Jones v. School Dist. of Phila*., 198 F.3d 403, 410 (3d Cir. 1999); *Viola v. Philips Medical Systems of North America*, 42 F.3d 712, 716 (2d Cir. 1994). Adverse employment actions include discharges, demotions, refusals to hire, refusals to promote, and reprimands. *See DuPont-Lauren v. Schneider (USA), Inc.*, 994 F. Supp. 802, 819 (S.D. Tex. 1998).

Once the defendant articulates a legitimate, non-discriminatory reason for the challenged action, the plaintiff can defeat summary judgment by pointing "to some evidence, direct or circumstantial, from which a reasonable finder of fact could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Brewer v. Quaker State Oil Refining Corp*., 72 F.3d 326, 331 (3d Cir. 1995) (*citing Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994). The plaintiff can satisfy the first prong of this burden by "demonstrate[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its actions that a reasonable fact finder could rationally find them 'unworthy of credence.'" *Fuentes*, *supra*, 32 F.3d at 765; *Sheridan v. E.I. DuPont de Nemours & Co*., 100 F.3d 1061 (3d Cir. 1996) (en banc). The plaintiff can satisfy the second prong by showing " 'that the employer has previously discriminated against the plaintiff, that the employer had previously discriminated against other persons within the

plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class.'" *Jones*, supra, 198 F.3d at 413 (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998). In meeting this burden, a plaintiff may rely on the same evidence that she used to establish a *prima facie* case of discrimination.

Defendant argues first that Mr. Scott has failed to make out a *prima facie* case because the relevant decision-makers with respect to his termination – Ms. O'Connell and Ms. Maslin[13] – did not know that he was homosexual at the time he was terminated. That argument must be rejected because the facts set forth in Part II, Section F, above, indicate that at the very least the facts are disputed concerning whether Ms. O'Connell and/or Ms. Maslin knew that Mr. Scott was homosexual on September 14, 2009 when he was terminated.

Defendant next argues that Mr. Scott has failed to make out a prima facie case because he has not shown that his termination occurred under circumstances that give rise to an inference of discrimination. To the contrary, there is sufficient disputed evidence to suggest that illegal discrimination was a motivating factor in Mr. Scott's termination. There are three principal reasons why the circumstances of Mr. Scott's termination raise an inference of discrimination.

First, the statement made by Ms. O'Connell, overheard by Ms. Shepperson and Mr. Slaughter[14], clearly provides a basis for the jury to conclude that Ms. O'Connell was motivated by animus against homosexuals when she made the decision to terminate Mr. Scott for allegedly

---

[13] Ms. Kohler was not a decision-maker with respect to Mr. Scott's termination because she relied on the facts as reported to her by Ms. O'Connell and Ms. Maslin and merely accepted their recommendation that Mr. Scott be terminated.

[14] Although Mr. Slaughter denied in his deposition and in an Affidavit that he heard the derogatory statement that Ms. Shepperson testified Ms. O'Connell made about Mr. Scott, Mr. Scott submits that the fact finder must be allowed to determine whether Mr. Slaughter's testimony in this regard is truthful. In this regard, and supporting Mr. Scott's position that Mr. Slaughter was not truthful, Ms. Bynum testified about a conversation she had with Mr. Slaughter in which he stated that he believed that Mr. Scott was terminated because of his sexual orientation.

falsifying his time record. Second, that both Ms. O'Connell and Ms. Maslin made little effort to determine whether Mr. Scott actually was in the building by 8:30 a.m. on September 11 casts doubt on alleged falsification as the reason for his termination. Third, the fact that by all accounts Mr. Scott was a top performer at defendant, and that that fact was not considered in determining whether to terminate him also raises questions about the true motivation of Ms. O'Connell and Ms. Maslin.

Accordingly, the Court should find that Mr. Scott has made out a *prima facie* case of discrimination , and further that the evidence is in dispute concerning whether defendant's stated reason for terminating Mr. Scott was pretextual.[15]

[15] Mr. Scott relies on the same evidence to prove pretext that he relies on to establish the fourth prong of a *prima facie* case.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff, Jason Scott, respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

___*s/Andrew Lukashunas*____________________
Andrew Lukashunas
The Lyons Law Firm
1526 Gilpin Avenue
Wilmington DE 19899
302.777.5698 tel
302.777.5051 fax
alukashunas@lyonslaw.com

Robert T Vance Jr (pro hac vice)
Law Offices of Robert T Vance Jr
Suite 1530 Land Title Building
100 South Broad Street
Philadelphia, PA 19110
215 557 9550 tel
215 557 9552 fax
rvance@vancelf.com

*Attorneys for Jason Scott*

Certificate of Service

I hereby certify that the foregoing Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and supporting documents were filed on the Court's CM/ECF system on March 21, 2012, and are available for viewing and downloading thereon by the following counsel of record:

Jennifer C. Jauffret
Lori A. Brewington
Richards, Layton & Finger
One Rodney Square
920 N. King Street
Wilmington DE 19899

Emmett F. McGee, Jr.
Ariana Wright Arnold
Jackson Lewis LLP
2800 Quarry Lake Drive, Suite 200
Baltimore MD 21209

____*s/Andrew Lukashunas*____________________
Andrew Lukashunas