IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JASON SCOTT,                 :
      Plaintiff,         :
                    :
    v.                  :     Civil Action No. 10-929-RGA
                    :
UPS SUPPLY CHAIN SOLUTIONS,  :
      Defendant.     :

Andrew Lukashunas, Esq., Wilmington, DE; Robert T. Vance Jr., Esq., Philadelphia, PA, Attorneys for Plaintiff.

Jennifer C. Jauffret, Esq., Lori A. Brewington, Esq., Wilmington, DE; Emmett F. McGee, Jr., Esq., Ariana Wright Arnold, Esq., Baltimore, MD, Attorneys for Defendant.

## **MEMORANDUM OPINION**

June 5, 2012
Wilmington, Delaware

ANDREWS, U.S. DISTRICT JUDGE:

Plaintiff Jason Scott claims his temporary assignment with Defendant UPS Supply Chain Solutions was terminated as a result of discrimination on the basis of his nonconformance with gender stereotypes and his sexual orientation, and that he is entitled to relief under Title VII and the Delaware Discrimination in Employment Act. (D.I. 1). Presently before the Court is UPS' Motion for Summary Judgment and Memorandum in Support (D.I. 59, 60, 61), Scott's Answer and Memorandum in Opposition (D.I. 63, 64, 65), and UPS' Reply (D.I. 66). For the reasons discussed, UPS' Motion is granted.

## BACKGROUND

For several years, Kelly Services employed Scott, placing him in temporary assignments with their clients. (D.I. 61, Ex. 25 at 55-60; Ex. 5). Scott signed several documents regarding his employment by Kelly Services, indicating Scott's understanding that his time must be submitted to Kelly Services to get paid, and that he must promptly contact Kelly Services (not the client business) if he was going to be late or absent. *Id.*, Ex. 5 at 7. Kelly Services explained to Scott that he was not actually employed by the company at which he was placed. *Id.*, Ex. 25 at 66.

In November 2008, Kelly Services placed Scott with UPS in a temporary work assignment in UPS' Newark, Delaware office. *Id.*, Ex. 25 at 66, 70. In connection with that placement, Scott signed an acknowledgment indicating his understanding that he was employed solely by Kelly Services and would remain solely an employee of Kelly Services at all times; that he was not employed by UPS and was not subject to the employment policies or direction of UPS; and that he would not assert any employment-related claims against UPS. *Id.*, Ex. 5 at 11-12. UPS and Kelly Services also agreed that Kelly Services "shall have sole responsibility to counsel,

2

discipline, review, evaluate, set the pay rates of, and terminate its employees assigned to UPS." *Id.*, Ex. 1 at 3.

Scott received a Kelly Services employee handbook, and was paid by Kelly Services during his UPS assignment. *Id.*, Ex. 25 at 65-69; Ex. 5 at 7. Scott reported to a Kelly Services supervisor, Paola Carazo. *Id.*, Ex. 25 at 84; Ex. 24 at 5-6. If Scott wanted to take time off, or if he was going to be absent or late, he was to contact Kelly Services and Kelly Services would approve as appropriate. *Id.*, Ex. 25 at 84-85, 111-12. Scott's only conversations about his work performance and attendance were with his Kelly Services supervisor. *Id.*, Ex. 25 at 85-86. Scott did not have a badge that gave him access to the UPS building; instead, each day when he arrived, Scott had to ring a door bell and wait for the receptionist to unlock the door and let him in to the building. *Id.*, Ex. 25 at 107.

At UPS, Scott performed collections work, contacting UPS customers regarding outstanding balances due. *Id.*, Ex. 25 at 71-73. Several other Kelly Services employees also performed collections work. *Id.* at 73-74. In August 2009, UPS employee Sherri O'Connell became responsible for Scott's group of collection workers. *Id.*, Ex. 25 at 75; Ex. 9, ¶ 3. O'Connell reported to Heidi Maslin, who in turn reported to Kim Kohler. *Id.*, Ex. 4.

Scott was late or absent numerous times in 2009, and Scott's Kelly Services supervisor had warned him that his attendance and punctuality needed to improve. *Id.*, Ex. 25 at 110-14; Ex. 6. Scott would inform Carazo of his absences, who would excuse them and notify UPS as appropriate. *Id.*, Ex. 25 at 84-85, 111-14; Ex. 6. Scott was absent on August 3 and 4, and September 4, 2009. *Id.*, Ex. 25 at 112-13, Ex. 6. He was also late on Tuesday, September 8, and Wednesday, September 9, 2009. *Id.*, Ex. 25 at 114-16; Ex. 6.

3

On Friday, September 11, 2009, Scott's collections group was moving from the first floor to the second floor of its building. *Id.*, Ex. 9, ¶ 5; Ex. 10, ¶ 7. The parties dispute whether Scott arrived late that morning, or whether he arrived on time (by 8:30) but reported to the second floor and did not log in because his computer was not hooked up. It is undisputed that Scott backdated his time card to reflect an 8:30 arrival time. *Id.*, Ex. 25, 149-50, 169.

It is also undisputed that at around 8:35, the worker who was to move into Scott's first floor space approached O'Connell and asked to move in since Scott was not there. *Id.*, Ex. 9, ¶ 10. O'Connell went to Scott's first floor work station and observed that he was not there, then went to Maslin's office and asked Maslin whether she had notice that Scott was going to be late. *Id.*, Ex. 9, ¶¶ 10-13; Ex. 10, ¶¶ 10-11. Maslin reported she had no notice about Scott and that she did not see his car in the parking lot (although she could only see part of the parking lot out her window). *Id.*, Ex. 10, ¶¶ 10-11. O'Connell returned to Scott's first floor space to monitor the moving of his possessions, but did not see Scott until sometime after 8:45. *Id.* Ex. 9, ¶¶ 14-15. O'Connell told Scott that she had authorized another employee to move some of his belongings since he wasn't there. *Id.*, Ex. 9, ¶ 15; Ex. 16, ¶¶ 4-5. Scott never said to O'Connell or Maslin that he had arrived on time. *Id.*, Ex. 17 at 18, 25; Ex. 9, ¶ 22; Ex. 18 at 22.

As supervisor of Scott's group, O'Connell was responsible for reviewing Kelly Service employees' time entries. *Id.*, Ex. 9, ¶ 20. On Monday, September 14, 2009, O'Connell reviewed Scott's Friday, September 11, 2009, timecard and noticed that he had recorded the start of his workday as 8:30 a.m., when O'Connell thought he had not arrived before 8:45. *Id.* Ex. 9, ¶¶ 21-22; Ex. 17 at 23-24. O'Connell informed her supervisor, Maslin, of Scott's recorded 8:30 start time. *Id.*, Ex. 18, pp. 20-24. Maslin concluded, based on her belief that Scott had arrived after

4

8:45, that Scott had an "integrity issue." *Id.*, Ex. 18, pp. 20-24; Ex. 10, ¶ 15. Maslin and O'Connell thought Scott's assignment should end and brought the matter to the attention of Maslin's supervisor, Kohler. *Id.*, Ex. 10, ¶ 16; Ex. 9, ¶ 24; Ex. 11, ¶ 7; Ex. 17, pp. 28-29. Based on Scott's timecard and Maslin's and O'Connell's beliefs that Scott had arrived after 8:45, Kohler agreed that Scott had falsified his time card and committed an integrity violation, so his UPS assignment should end. *Id.*, Ex. 11, ¶ 7.

That same day, O'Connell notified Scott's supervisor at Kelly Services (Carazo) by phone that Scott had falsified his time entries and faxed copies of the entries to Carazo. *Id.*, Ex. 7; Ex. 9, ¶ 25; Ex. 24 at 10-12. Carazo informed Scott that he should log out and leave the building, and that his assignment was over because of a problem with his time entry. *Id.,* Ex. 25 at 173-74. Scott left UPS without speaking to any UPS employees, and never spoke to any UPS supervisor or manager about why his assignment ended. *Id.*, Ex. 25 at 173-74, 178. Scott remained a Kelly Services employee, eligible to receive other work assignments. *Id.*, Ex. 25 at 179; Ex. 24 at 13-14.

Scott has stated that neither Kohler nor Maslin have ever discriminated against him. *Id.*, Ex. 25, at 89-90, 92-93. His claims are focused on O'Connell. Scott claims he felt O'Connell knew Scott was homosexual based on O'Connell's turning her nose up at his outfit of a pink polo shirt and shorts one day, and O'Connell's change in attitude toward Scott after he questioned her during a company talent show as to why she was not wearing a wig while impersonating one of The Supremes. *Id.* at 94-95, 105. Scott also claims that his mohawk haircut achieved with hair extensions, and his skinny jeans, suggested he was homosexual. *Id.* at 105, 107-09. Scott also

5

points to testimony by his Kelly Services colleague,[1] Toni Shepperson, that she overheard O'Connell discussing Scott's late arrival that morning. Shepperson testified that O'Connell said Scott had come in late, and that's why she didn't like "faggots." *Id.,* Ex. 27, pp. 81-82. Shepperson testified that another colleague came to Shepperson's cubicle after O'Connell's remark to talk to Shepperson about the remark. *Id.,* Ex. 27, p. 83. O'Connell states she did not know Scott was homosexual until he filed his discrimination claim, and denies making the remark Shepperson attributed to her. *Id.,* Ex. 9, ¶¶ 18, 32. The person to whom O'Connell allegedly made the remark also denies that the conversation took place. *Id.,* Ex. 12, ¶¶ 6-8.

## DISCUSSION

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp.,* 477 U.S. at 323.

---

[1] (D.I. 61, Exh. 27, pp. 28-29).

6

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute ...." FED.R.CIV.P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49; *see Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

UPS moves for summary judgment on the grounds that Scott cannot establish that he was UPS' employee, cannot establish a prima facie case of discrimination, and cannot proffer any evidence of pretext.

**B. Decision**

7

UPS first argues that UPS was not Scott's employer for purposes of his Title VII and DDEA claims, under *Shah v. Bank of America*. *See* 598 F.Supp.2d 596 (D. Del.), *aff'd*, 346 F. App'x 831 (3d Cir. 2009). The parties agree that to establish a claim under Title VII of the Civil Rights Act and the DDEA, Scott must first establish that he in fact was an employee of UPS, and not of Kelly Services, his temporary staffing agency. *See Shah*, 346 F. App'x at 833. (D.I. 60 at 11, D.I. 64 at 11). The common law of agency and the common elements of a master-servant relationship govern whether a plaintiff is an employee of the defendant for purposes of Title VII and DDEA claims. *Shah*, 346 F. App'x at 834, 834 n.2.

The Court may consider the hiring party's right to control the manner and means by which the work is accomplished; the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. *Id.* at 834 (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992)).

There are no disputed facts in relation to Scott's employment. The only disagreement between the parties is whether the facts establish that he was, or was not, an employee of UPS. While Scott worked for UPS for longer than Shah worked for Bank of America (ten months versus four hours), and while the record does not decisively indicate that Scott received unemployment benefits from Kelly Services like Shah did from Adecco, the cases are still much

8

more alike than they are different. *See, e.g.*, *Fields v. Colgate Palmolive Co.*, 2010 WL 5252537, *1, *4 (D.N.J. Dec. 15, 2010) (finding a temporary worker was employed by the temporary agency, and not by the defendant, where the worker had been at that assignment nearly a year). Like Shah, Scott remained employed by Kelly Services after his UPS assignment ended, and Kelly Services offered him other assignments; Kelly Services assigned Scott's rate of pay (and actually paid him); and Kelly Services terminated the UPS assignment.

Additional factors make this case even more clear than *Shah*. Scott applied for work with Kelly Services, filling out its job application. Ex. 5. Scott signed numerous written acknowledgments that he was Kelly Services' employee, not UPS's. Kelly Services, not UPS, was responsible for handling Scott's time off and attendance. Scott discussed his performance at UPS only with his Kelly Services supervisor. Scott did not have employee access to the UPS facility, but instead had to be buzzed in like a guest. In light of these many factors, Scott's arguments (*see* D.I. 64 at 11-12) that UPS controlled Scott's daily work activities and that Scott was required to follow UPS's policies do not distinguish this case from *Shah*. Because UPS was not Scott's employer, he cannot maintain an employment discrimination claim against UPS under either Title VII or the DDEA.

The Court need not reach UPS' other arguments in favor of summary judgment (that Scott cannot establish a *prima facie* case of discrimination because UPS was not aware of Scott's sexual orientation and he was terminated for legitimate non-discriminatory reasons; and that Scott cannot show that the proffered nondiscriminatory reasons were pretextual). There appears to be a dispute of material fact as to whether or not O'Connell referred to Scott as a "faggot," which in turn would generate a dispute as to whether O'Connell, and therefore UPS, was aware

of Scott's sexual orientation and whether that was the true motivation behind his termination. Since Scott was not a UPS employee, the Court need not reach that issue. The Defendant notes that Shepperson's UPS assignment was also terminated for document falsification; that Shepperson filed her own, ultimately unsuccessful, discrimination claim against UPS; that Shepperson testified she was unable to hear the rest of the conversation in which O'Connell made the remark, and her cubicle was a few cubicles away from the conversation; that Shepperson's testimony that O'Connell said Scott had lied about his arrival time on Friday, September 11, is inconsistent with the record showing O'Connell did not review Scott's timecard until the following Monday; and that Shepperson's testimony that she spoke with Scott between 7:15 and 7:30 am on Friday, September 11, is inconsistent with Scott's testimony that he arrived at work between 8:20 and 8:30. (D.I. 61, Ex. 27 at 35, 40-41, 70, 74, 79-80; 120-22; Ex. 7; Ex. 9, ¶ 21; Ex. 25 at 121). O'Connell denies making the remark Shepperson attributed to her, and the person to whom O'Connell allegedly made the remark also denies that the conversation took place. *Id.*, Ex. 9, ¶¶ 18, 32; Ex. 12, ¶¶ 6-8. The Defendant argues that, based on the foregoing evidence, Shepperson has zero credibility. Her credibility, however, is not for the Court to determine at this stage. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). It may be very unlikely, but a jury could ultimately believe Shepperson, so Scott's arguments that rely on her testimony would survive summary judgment if he were a UPS employee.

An appropriate order will be entered.

10